**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **EARATON ADAMS, *et al.*,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **CIVIL ACTION 08-00155-KD-N** |
| | ) | |
| **AUSTAL, U.S.A., L.L.C.,** | ) | |
| **Defendant.** | ) | |

**ORDER**

This matter is before the Court on Defendant's motion for summary judgment (Docs. 162, 163), Plaintiff's Opposition (Doc. 298), and Defendants' Reply (Doc. 326).

**I.    Factual Background**

On March 20, 2008, multiple Plaintiffs initiated this action against Austal for legal and equitable relief to redress unlawful discrimination and harassment on the basis of race.[1]  (Doc. 1).   Plaintiff Earaton Adams ("Adams") asserts claims for hostile work environment and discrimination (pay and promotion) based on race, in violation of 42 U.S.C. § 1981.  (Doc. 37 at 38-43; Doc. 298).[2]

**A.    Austal**

Defendant Austal USA ("Austal") is an Australian shipbuilding company dedicated to the

---

[1]    While initiated as a purported class action, this is no longer a class action case.  (Doc. 293). Additionally, some of the Plaintiffs allege gender and disability discrimination in addition to asserting Title VII claims.

[2]    Originally, Adams alleged a separate claim for retaliation, (Doc. 37 at 40 at ¶¶171, 176-177). Adams now represents that he "is *pursuing* claims against Austal for *only* hostile work environment and discrimination on the basis of race in regards to pay and promotion" under Section 1981.  (Doc. 298 at 2 (emphasis added)).   Accordingly, the Court construes Adams' intentional exclusion of his retaliation claim as a concession of that claim.  Thus, it is **ORDERED** that Austal's motion for summary judgment as to Adams' retaliation claim is **GRANTED.**

design and construction of customized aluminum commercial and military vessels, located in

Mobile, Alabama.  (Doc. 163 at 2; Doc. 283-48 at 2-3 (Austal's 3/7/07 EEOC Position

Statement)).  The Operations Division has four (4) major Departments (Aluminum (divided into

Fabrication and Components), Electrical, Engineering, and Fit Out).  (Doc. 283-48 at 3).  Job

classifications within the Fabrication Departments include Trade Assistant (trainee position),

Apprentice, Welders, Fitters and Fabricators.  (Id. at 4).

### B.    Adams' Employment

Earaton Adams applied to work for Austal on June 2, 2006 and began working for Austal

as a Trades Assistant ("TA") in Fabrication in the Aluminum Fabrication Department on July 10,

2006 at the rate of $12/hour.  (Doc. 163-1 (Dep. E.Adams at 37); (Doc. 286-38)).  A TA is an

employee who assists the Fitter or Welder in their job duties and is a stepping stone to the Fitter or

Welder position.  (Doc. 326-3 at 2 (Decltn. Combs at ¶4)).  While employed at Austal, Adams

received pay raises dated October 12, 2006 (from $13/hour to $14.50/hour, as a TA); December

20, 2006 (from $14.50/hour to $15.50/hour, as a TA); April 12, 2007 (from $15.50/hour to

$17.50/hour, noting "has recently passed 'A' class and picked up quality of work and

production," as a "W/F");[3] and October 1, 2007 (from $17.50/hour to $18.50/hour).  (Doc. 163-1

at 32-36).

On May 27, 2008, Adams submitted a Notice of Resignation with his last date of

employment as June 10, 2008.  (Doc. 163-1 (Dep. E.Adams at 38-39); Doc. 163-2 at 5 (Decltn.

Lindley)).  Adams was terminated effective May 29, 2008, because he did not report to work on

---

[3]  This appears to be an abbreviation for Welder/Fitter (*i.e*., he was no longer a Trades Assistant).

June 2, 2008 and was a "no call/no show" for three (3) consecutive days without a doctor's excuse in violation of the attendance policy. (Doc. 163-1 (Dep. E.Adams at 39, 46); Doc. 285-4 (Dep. E.Adams at 39-40); Doc. 163-2 at 5 (Decltn. Lindley)). On August 16, 2010, he reapplied and was rehired as a Welder, earning $19.10/hour. (Doc. 163-2 at 5 (Decltn. Lindley)).

## II.  Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (Dec. 2010). The recently amended Rule 56(c) provides as follows:

> *(1) Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> *(2) Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
>
> *(3) Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record.
>
> *(4) Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

FED.R.CIV.P. Rule 56(c) (Dec. 2010). Defendant, as the party seeking summary judgment, bears the "initial responsibility of informing the district court of the basis for its motion, and

identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). If the nonmoving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment. Celotex, 477 U.S. at 323. "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992), cert. den., 507 U.S. 911 (1993) (internal citations and quotations omitted).

## III.  Section 1981 -- Hostile Work Environment (Race)

Racial harassment is actionable under Section 1981 where the conduct is sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment. See, e.g., Freeman v. City of Riverdale, 330 Fed. Appx. 863, 865 (11th Cir. 2009).[4] To establish a prima facie case of hostile work environment and/or racial harassment under Section 1981, the plaintiff must prove that: 1) he belongs to a protected group; 2) he has been subject to unwelcome harassment; 3) the harassment was based on a protected characteristic of the employee (such as race); 4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment;

---

[4]  This is an unpublished decision and is persuasive, but not binding, authority pursuant to Eleventh Circuit Rule 36-2. The Court notes this same rule applies to other Fed. Appx. cases cited herein.

and 5) the employer is responsible for such environment under a theory of vicarious or direct liability.  See, e.g., Reeves v. DSI Sec. Servs., Inc., 395 Fed. Appx. 544, 545-546 (11th Cir. 2010); McCann v. Tillman, 526 F.3d 1370, 1378 (11th Cir. 2008); Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002).  See also e.g., Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999).

Austal contends that: 1) Adams' evidence of sporadic and isolated incidents of racially hostile comments, conduct and graffiti during the time he was employed do not meet the severe or pervasive threshold; 2) Adams makes no allegations and presents no evidence that the allegedly hostile environment unreasonably interfered with his ability to work on a day-to-day basis; 3) Austal maintained a policy establishing how an employee should report discriminatory conduct, but Adams failed to report certain conduct; and 4) Austal took reasonable preventative and corrective/remedial measures to prevent a hostile work environment.

A.    Severe or Pervasive

As to whether the conduct was severe and pervasive, Adams points to the following evidence.[5]  Adams testified that he was repeatedly subjected to racially offensive comments of co-employees and at least once from his supervisor Tim Clements, all which referred to the

_____

[5] Adams also relies on the allegations of the other 22 plaintiffs (Doc. 298 at 21-22) to support that an overall racially charged work atmosphere exists at Austal (i.e., viewed through the lens of the plaintiffs' collective allegations versus each plaintiff's specific allegations).  "To rely on the evidence, each [plaintiff] must show that he was aware of those incidents at the relevant time he alleges the hostile work environment."  See, e.g., Melton v. National Dairy, LLC, 705 F. Supp. 2d 1303, 1342 (M.D. Ala. 2010) (citing Edwards Wallace Comm. College, 49 F.3d 1517, 1522 (11th Cir. 1995)) (emphasis in original). See also e.g., Head v. Pitts Enterprises, Inc., Slip Copy, 2010 WL 2773376, *8 (M.D. Ala. Jul. 14, 2010); McKenzie v. Citation Corp., LLC, 2007 WL 1424555, *13 (S.D. Ala. May 11, 2007).  Courts in the Eleventh Circuit may consider statements not directed at a plaintiff and even hearsay statements, so long as the plaintiff was aware of the statements at the time he was employed.  See, e.g., Yeomans v. Forster and Howell, Inc., Slip Copy, 2010 WL 3716394, *5-6 (M.D. Ala. Sept. 10, 2010).  The Court has only considered the evidence of which Adams testified that he was aware.

African-American employees as "monkeys" and "niggers."  (Doc. 163-1 (Dep. E.Adams at 102-103); Doc. 285-4 (Dep. E.Adams at 79-82, 85-87, 101-107)).  Adams reported this conduct to Coordinator Scott Pearson who responded "don't worry mate, I'll handle it."  (Doc. 163-1 (Dep. E.Adams at 103-104); Doc. 285-4 (Dep. E.Adams at 80-81, 83)).  Thereafter, he never heard Clements make any racially offensive comments, although he did hear co-workers make the same racially offensive comments almost on a daily basis and often in the presence of supervisors.  (Doc. 163-1 (Dep. E.Adams at 104); Doc. 285-4 (Dep. E.Adams at 81, 105-107)).  Again he reported the incidents to his supervisor Clements who responded "don't worry mate" and then laughed and also to Coordinator Pearson, who responded "don't worry mate" and said he would take care of it.  (Doc. 163-1 (Dep. E.Adams at 102-104; Doc. 285-4 (Dep. E.Adams at 80-83, 104-106)).  According to Adams the racially offensive language from his co-workers did not cease.  (Doc. 285-4 (Dep. E.Adams at 81-82, 105-106)).

Adams also was subjected to displays of the Confederate flag, which he finds offensive.  (Doc. 285-4 (Dep. E.Adams at 107-111, 114)).  Specifically, the flag was displayed on co-workers' shirts, toolboxes, tattoos, hardhats and the bathroom walls.  (Id. (Dep. E.Adams at 107-108, 110-111, 114)).  Adams reported the displays to his supervisor Clements and Coordinator Pearson, and expressed his offense of the displays.  (Id. (Dep. E.Adams at 108-109, 111)).  The supervisor and Coordinator agreed to take care of it.  (Id.)  However, the displays of the Confederate flag were not addressed.

Also, racially offensive language and displays of the Confederate flag were found daily in the form of graffiti on the bathroom walls.  (Doc. 285-4 (Dep. E.Adams at 111, 114, 143-144, 146, 148, 150-153).  On occasion, Adams complained of the graffiti and reported it to his

supervisor Akridge. (Doc. 163-1 (Dep. E.Adams at 114); Doc. 285-4 (Dep. E.Adams at 65-66, 148, 150-153)). Starting in August 2007, Austal responded to complaints about the graffiti by painting black over the graffiti on a regular basis. (Doc. 285-2 (Dep. Browning at 16, 110); Doc. 163-1 (Dep. E.Adams at 112, 114); Doc. 285-4 (Dep. E.Adams at 143-144). However, this did not deter the offending scribblers, as the walls would soon be filled again with racially offensive graffiti. (Doc. 163-1 (Dep. E.Adams at 114); Doc. 285-4 (Dep. E.Adams at 143-144, 153); Doc. 284-4 (Dep. Lindley II at 95-96, 166-168, 188-190, 195-196, 202-203); Doc. 284-5 (Dep. Lindley III at 254); Doc. 284-11 (Dep. O'Dell at 74-75); Doc. 284-7 (Dep. Friedlieb I at 84).

Adams also testified that he found a noose in his workspace. (Doc. 285-4 (Dep. E.Adams at 71-73, 76-78)). He reported this to his supervisor David Abear and to Coordinator Pearson. Pearson responded, "don't worry, mate, they were just using it to pull something." (Id. (Dep. E.Adams at 73, 76-77)). Later, Adams was told (and shown photographs) that a second noose had been found by co-employees. (Id. (Dep. E.Adams at 78-79)).

To be actionable as severe or pervasive, the harassment "must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceive[s]…to be abusive." Miller, 277 F.3d at 1276 (internal citation and quotation marks omitted). In other words, the severe or pervasive element has an objective and subjective component. McCann, 526 F.3d at 1378. To determine the objective severity of the harassment, courts look at the totality of the circumstances and consider: 1) the frequency of the discriminatory conduct; 2) the severity of the conduct; 3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and 4) whether the conduct unreasonably interferes with an employee's job performance. Reeves, 395 Fed. Appx. at 546.

See also Faragher v. City of Boca Raton, 524 U.S. 775, 787-788 (1998); Allen v. Tyson Foods, 121 F.3d 642, 647 (11th Cir. 1997) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)). "The conduct is considered cumulatively instead of in isolation." Reeves, 395 Fed. Appx. at 546.

There is sufficient evidence, if believed by a jury, that Adams subjectively perceived his work environment to be racially hostile. Thus, the Court need only determine whether Adams' perception was objectively reasonable.

When viewing the facts in the light most favorable to Adams, a reasonable jury could find that the harassing conduct alleged was frequent and severe. According to Adams, on an almost daily basis during his two (2) years of employment between 2006-2008, he heard Caucasian co-workers, including his supervisor on one occasion, refer to African Americans as "monkeys;" he heard Caucasian co-workers almost daily, and his supervisor on one occasion, use the word "nigger;" he often encountered racial graffiti in the workplace bathrooms; and images of the Confederate flag permeated the workplace as displayed and/or worn on co-workers' toolboxes, shirts, tattoos and hardhat stickers as well as on the bathroom walls and stalls. See, e.g., Webb v. Worldwide Flight Serv., Inc., 407 F.3d 1192, 1193 and 1194 note 3 (11th Cir. 2005) (finding without merit defendant's argument that the evidence was insufficient for jury to find hostile work environment where supervisor referred to plaintiff on a daily basis for two years as a "nigger" and a "monkey," and described him as being "from the tribe[]"); Mack v. ST Mobile Aerospace Engineering, Inc., 195 Fed. Appx. 829, 837-838 (11th Cir. 2006).

While much of the repeated conduct may not have been physically threatening, it is not unreasonable to infer from Adams' allegations that the conduct was racially demeaning,

humiliating and degrading.  McKenzie v. Citation Corp., LLC, 2007 WL 1424555, *13 (S.D. Ala. May 11, 2007).  The nature of the comments, Confederate imagery and graffiti that Adams dealt with regularly, in conjunction with the discovery of a noose in his personal workspace, supports this finding.[6]  Thus, a jury could reasonably find that the incidents alleged were severe and pervasive.

The evidence upon which Adams relies to demonstrate that the conduct unreasonably interfered with his job performance is not as persuasive.  In contrast to interfering with his job performance, Adams received four (4) raises from 2006-2008, one of which noted that he had "picked up quality of work and production."  Moreover, in August 2010, Adams re-applied for employment at Austal and was rehired.  However, Adams has stated that he "was very upset emotionally and mentally" when he found the noose and "so angry all the time…I did not act like the same person. I did not want to be there anymore."  (Doc. 286-37 at 8).  Further, the noose could reasonably be deemed threatening to Adams: "[c]learly, the display of nooses in the workplace should not be cast aside as a light joke or teasing. A noose is a historical symbol of racial hatred for African-Americans and can represent a severe physical threat."  McKenzie, 2007 WL 142555, *13.

Eleventh Circuit precedent mandates that courts consider "the totality of the circumstances" such that the absence of one factor (i.e., unreasonable interference) is not

---

[6]  "The prima facie showing in a hostile work environment case is likely to consist of evidence of many or very few acts or statements ... which, taken together, constitute harassment.... the jury does not necessarily examine each alleged incident of harassment in a vacuum." Vance v. Southern Bell Tel. & Tel. Co., 863 F.2d 1503, 1510 (11th Cir. 1989), overruled on other grounds, Harris, 510 U.S. at 22 (ruling that the evidence, viewed as a whole, established racial harassment, when a noose was twice hung at the plaintiff's work station).

dispositive.  See, e.g., Miller, 277 F.3d at 1277 (finding that a failure by an employee to show how harassing conduct unreasonably interfered with the employee's work performance did not necessarily constitute a failure to satisfy the objectiveness prong).  The U.S. Supreme Court has cautioned further, that harassment need not be shown to be so extreme that it produces tangible effects on job performance to be actionable.  Harris, 510 U.S. at 22.  See also e.g., Miller, 277 F.3d at 1277.  Having established the frequency, severity and the humiliating and demeaning nature of the conduct, Adams' weak demonstration of how the conduct interfered with his job is not fatal to his claim.  Miller, 277 F.3d at 1277; Head v. Pitts Enterprises, Inc., Slip Copy, 2010 WL 2773376, *12 (M.D. Ala. Jul. 14, 2010).

In sum, under the totality of the circumstances and considering the allegations in the light most favorable to Adams, he has produced sufficient evidence – if believed by a jury -- to create an issue of fact as to whether he was subjected to racial harassment that was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment.  Thus, the Court turns to element five: employer liability.

**B.      Element Five: Employer Liability**

This last element of Adams' proof requires a basis for employer liability.  In Faragher v. City of Boca Raton, 524 U.S. 775 (1998) and Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998), the U.S. Supreme Court held that employer liability is automatic when the supervisor's harassment culminates in a "tangible employment action, such as discharge, demotion, or undesirable reassignment."   Faragher, 524 U.S. at 807, 808; Ellerth, 524 U.S. at 762, 763. Where no such action has occurred, "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with

immediate (or successively higher) authority over the employee." <u>Faragher</u>, 524 U.S. at 807; <u>Ellerth</u>, 524 U.S. at 745.  An employer may avoid vicarious liability by raising as an affirmative defense that it: 1) exercised reasonable care to prevent and correct promptly any harassing behavior, and 2) the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.  <u>Faragher</u>, 524 U.S. at 807, 809; <u>Miller</u>, 277 F.3d at 1278.  This is known as the <u>Faragher</u> defense.  "Both elements must be satisfied…and the defendant bears the burden of proof on both elements." <u>Frederick v. Sprint/United Mgmt. Co.</u>, 246 F.3d 1305, 1313 (11th Cir. 2001) (citations omitted).

Moreover, Austal is directly liable for co-worker harassment if Austal knew (actual notice) or should have known (constructive notice) of the harassing conduct but failed to take prompt remedial action.  <u>See</u>, <u>e.g.</u>, <u>Miller</u>, 277 F.3d at 1278; <u>Breda v. Wolf Camera & Video</u>, 222 F.3d 886, 889 (11th Cir. 2000).  Once notice is established, a plaintiff must show that the employer "failed to take immediate and appropriate corrective action."  <u>Watson v. Blue Circle, Inc.</u>, 324 F.3d 1252, 1261 (11th Cir. 2003).  <u>See also</u> <u>Frederick</u>, 246 F.3d at 1314; <u>Minix v. Jeld-Wen, Inc.</u>, 237 Fed. Appx. 578 (11th Cir. 2007).  The prompt remedial action must be "reasonably likely to prevent the misconduct from recurring."  <u>See</u>, <u>e.g.</u>, <u>Baldwin v. Blue Cross/Blue Shield of Ala.</u>, 480 F.3d 1287, 1305 (11th Cir. 2007); <u>Kilgore v. Thompson & Brock Mgt., Inc.</u>, 93 F.3d 752, 754 (11th Cir. 1996); <u>Tipp v. AmSouth Bank</u>, 76 F. Supp. 2d 1315, 1333 (S.D. Ala. 1998).  Specifically, the employer's action must be "effective action" and "must be 'reasonably calculated to end the harassment,' and the promptness and adequacy of the employer's response must be evaluated on a case-by-case basis.  Of special importance is whether the…harassment ended after the remedial action was taken."  <u>Munn v. Mayor and</u>

11

Aldermen of City of Savannah, Ga., 906 F. Supp. 1577, 1583 (S.D. Ga. 1995). See also Saville v. Houston Cty. Healthcare Auth., 852 F. Supp. 1512, 1528 (M.D. Ala. 1994).

Throughout Adams' employment Austal maintained in its Employee Handbook a Non-Discrimination and Anti-Harassment policy which all employees are required to read and sign. (Doc. 163-2 at 3 (Decltn. Lindley); Doc. 285-2 (Dep. Browning at 56-57); Doc. 163-2 at 15-66 (Austal's April 2006-Issue F Hourly Employee Orientation Booklet and Austal's November 2007-Issue A Employee Handbook)). On July 10, 2006, Adams received a copy of Austal's employee policy and signed an acknowledgement concerning same, and Austal reviewed that policy with him during his orientation session. (Doc. 163-1 (Dep. E.Adams at 55, 60); Doc. 163-2 at 3 (Decltn. Lindley)). The policy informed him of the procedures to report a violation. (Doc. 163-1 (Dep. E.Adams at 60-61)). Adams received and reviewed a revised copy of the handbook in November 2007. (Doc. 285-4 (Dep. E.Adams at 65-66)).

Austal's April 2006 and November 2007 anti-harassment policies inform employees about the grievance procedure for reporting incidents of discrimination and harassment. (Doc. 163-2 at 36-37, 50-51). The April 2006 policy provides, in relevant part: 1) that employees are "urged to inform" their Supervisor of suspected violations of the policy, and that the Supervisors are then required to report same to the Department Manager and 2) if for any reason the employee does not feel comfortable discussing the situation with his or her immediate Supervisor, he or she should report the matter to the Departmental Manager. (Doc. 163-2 at 37). The Revised Handbook issued in November 2007, further provides that an employee should report incidents of harassment to his Supervisor, but if not comfortable doing so, may talk to the Department Coordinator or Manager and then if still needing to talk with someone after

completing both of those steps, may contact HR. (Doc. 163-2 at 50).

Taking the facts in the light most favorable to Adams, it is clear that Adams complied with Austal's reporting policy[7] and that that Austal had notice of the harassing behavior. However, there remains a genuine issue of material fact as to whether Austal exercised reasonable care to correct promptly the harassing behavior; an element of the defense to liability for both supervisory and co-employee harassment. Specifically, Adams has presented evidence that even after he reported the racially offensive language, graffiti, and Confederate flags, the work environment remained unchanged with the exception that his supervisor no longer used offensive language and the bathroom walls were periodically painted. These facts, combined with Austal's admissions regarding failure to train[8] its supervisors on Austal's harassment policy prior to the Summer of 2008,[9] create an issue of fact for the jury as to whether Austal should be held liable for the actions of its employees. As such, Austal's motion for summary judgment on this claim is **DENIED.**

IV.    **Section 1981 -- Disparate Treatment (Race)**

Adams contends that he was intentionally discriminated against in the "terms and conditions of his employment" because of his race in violation of Section 1981. Specifically,

---

[7]    Austal's contention that Adams "waived his right" to include certain "misconduct" as a basis for his claims because he "elected not to report" same "in accordance with Austal's policy" as "he failed to report any of the alleged incidents to Human Resources" (Doc. 163 at 13-14), lacks any merit as he clearly was not required to report the incident to HR. This finding applies also to Adams' complaints about his supervisor's and co-workers' conduct.

[8]    Doc. 284-3 (Dep. Lindley I at 174); Doc. 284-9 (Dep. Carver I at 60); Doc. 284-11 (Dep. O'Dell at 210); Doc. 285-1 (Dep. Keeler at 47, 65, 97); Doc. 285-2 (Dep. Browning at 56-57)).

[9]    (Doc. 284-3 (Dep. Lindley I at 174); Doc. 284-4 (Dep. Lindley II at 74-75).

Adams alleges that: 1) he was hired at a lower pay rate than similarly situated Caucasian employees who also received pay raises sooner (disparate pay); and 2) he was denied a promotion (and coinciding pay raise) to a Supervisor position while a Caucasian employee that he trained was promoted to that position (disparate treatment in promotion).

In individual disparate treatment claims, "the plaintiff bears the burden of proving that the employer discriminated against him because of his race." Cooper v. Southern Co., 390 F.3d 695, 723 (11th Cir. 2004), *overruled on other grounds,* Ash v. Tyson Foods, Inc., 546 U.S. 454, 456-457 (2006). See also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000); Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981). Where there is no direct evidence of discrimination or a statistical pattern of discrimination, the burden shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) applies. Under this framework, the plaintiff must establish a prima facie case of intentional race discrimination.[10] Id. at 802. See also e.g., E.E.O.C. v. Joe's Stone Crabs, Inc., 296 F.3d 1265, 1272 (11th Cir. 2002). If a prima facie case is established, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. Id. Once the employer satisfies its burden, the burden shifts back to the plaintiff to offer evidence that the alleged reason of the employer is a pretext for unlawful discrimination. Id. at 1272-1273.

A.    **Statistics**

While Adams does not rely on direct evidence to support his disparate pay claims, he does reference statistical evidence. Specifically, Adams references Exhibits 103 and 104 (Doc.

---

[10] "Claims of race discrimination under § 1981 are analyzed in the same manner as claims brought under Title VII." DeLeon v. ST Mobile Aerospace Eng'g, Inc., 2010 WL 500446, *15 (S.D. Ala. Feb. 9, 2010).

286-1 (Dr. Edwin L. Bradley's Expert Report); Doc. 286-2 (Dr. Bradley's Rebuttal Expert Report)). While referenced by Adams, Adams does not discuss the statistical reports.

After reviewing the reports, the Court finds Dr. Bradley's opinions irrelevant to Adams' disparate treatment claims. Specifically, Dr. Bradley pools employees with different job titles (with likely different experience, skills, education, training and the like) working in different departments and performing different job duties into one collective group: "Craft" employees (*e.g.*, labeling as the same "for purposes of… analysis[,]" for example, a senior pipe welder, a crane operator and an electrician).[11] From this premise, Dr. Bradley bases all of his opinions and findings concerning "the differences in all Supervisory selection rates and pay rates of Craft [] employees between African-American and non-African-American employees at Austal[.]" (Doc. 286-1 at 3). At the very least, this improper aggregation of data ignores the most basic criteria of job similarity, as well as the specific differences in the jobs themselves, the requirements for employees to obtain such jobs, the differences in pay rates associated with each of the different jobs, etc. This same premise is in Dr. Bradley's rebuttal report, even if the Court were to overlook its untimely nature. Further, Dr. Bradley's reports analyze differences in salaries after 2008 and through March 2010, including a time when Adams was not employed at Austal. (Doc. 286-1 at 3 at note 2).

**B.    Disparate Pay**

Adams was hired in June 2006 as a Trades Assistant in the Aluminum Fabrication Department at the rate of $12/hour and earned $18.50/hour by his departure in May 2008. (Doc.

---

[11] While Austal referenced a category of highly paid "Craft Workers" in its EEOC Position Statement, that category simply meant skilled. (Doc. 283-48 (3/7/07 EEOC Position Statement)).

163-1 (Dep. E.Adams at 37); (Doc. 286-38); (Doc. 163-1 at 32-36). Adams contends that he was discriminated against in terms of pay because of his race, African American.

In order to establish a prima facie case of disparate pay, Adams must establish that he held a position "similar to that of a higher paid employee who is not a member of [his] protected class." Crawford v. Carroll, 529 F.3d 961, 974-975 (11th Cir. 2008) (citing Meeks v. Computer Assocs. Int'l, 15 F.3d 1013, 1019 (11th Cir. 1994)). The employee whom the plaintiff identifies as a comparator "must be similarly situated in all relevant respects." Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1091 (11th Cir. 2004). See also e.g., Drake-Sims v. Burlington Coat Factory Warehouse of Ala., Inc., 330 Fed. Appx. 795, 803 (11th Cir. 2009). It is necessary that a comparator must be "nearly identical" to the plaintiff "to prevent courts from second-guessing a reasonable decision by the employer." Wilson, 376 F.3d at 1091. See also e.g., Head v. Pitts Enterp., Inc., Slip Copy, 2010 WL 2773376, *13 (M.D. Ala. Jul. 14, 2010); Drake-Sims, 380 Fed. Appx. at 803; Sylva-Kalonji v. Board of School Comm'rs of Mobile Cty., 2009 WL 1418808, *5-6 (S.D. Ala. May 20, 2009); Hill v. Emory Univ., 346 Fed. Appx. 390, 395 (11th Cir. 2009); Beard v. 84 Lumber Co., 206 Fed. Appx. 852, 857 (11th Cir. 2006) (finding the plaintiff and a proposed comparator had different numbers of years of experiences such that they were not similarly situated in all relevant respects).

Austal contends that Adams cannot establish a prima facie case of race discrimination because Adams cannot demonstrate that any similarly situated non-African American employee was paid more than Adams. Adams responds by identifying the following Caucasian employees who allegedly held the same initial job, Trades Assistant, but were allegedly hired at a higher starting hourly rate than Adams:

16

1)  Robert D. Akridge -- hired 10/30/06 at the rate of $16.50 hour, four (4) months after Adams was hired;

2)  Jeffrey M. Cellon -- hired 12/3/07 at the rate of $16/hour, within one (1) year received three (3) raises such that he earned $18.55/hour by September 9, 2008;

3)  Kenneth Allison -- hired on 7/31/06 at the rate of $12.50/hour, within one (1) year earned $19/hour, two (2) months thereafter received a raise to earn $20/hour and by 6/30/08 earned $20.60/hour;

4)  Walker Franklin -- hired on 7/17/06 at the rate of $13.50/hour, within four (4) months earned $16/hour, one (1) month later given another raise to $17/hour, four (4) months thereafter received another raise to $18/hour and by his termination on 12/11/2008 earned $19.06/hour;  and

5)  Christopher Mordecai – hired on 7/10/06 at the rate of $14/hour, within five (5) months received a raise to $16.50/hour, one (1) month later earned $17/hour, five (5) months thereafter received another raise to $18/hour, six (6) months after that earned $19/hour and within six (6) months of that raise, received another raise to $19.57/hour.

(Doc. 298 at 7-8); Doc. 286-3 (Ex. 105-Sealed)).[12]

Adams does not submit any evidence or argument regarding subjective similarity of the comparators, such as experience, education, previous salary, or salary demand.  Rather, Adams relies on Miranda v. B&B Cash Grocery Store, Inc., 975 F.2d 1518, 1529 (11th Cir. 1992) (finding that the plaintiff established a prima facie case of sex discrimination under Title VII by demonstrating that she is female and that the job she occupied was similar to higher paying jobs occupied by males) and Mulhall v. Advance Sec., Inc., 19 F.3d 586 (11th Cir. 1994), and argues that he meets his burden of producing evidence of a similarly situated comparator by pointing to

---

[12] Adams alleges that a Caucasian employee "Michael" received "top pay" as a lead man, while he did not when he served a lead man on Supervisor Abear's crew.  (Doc. 298 at 7).  Apart from this allegation, Adams presents no further evidence or argument in support of this "top pay" claim, or any information about "Michael" or the type of job he held.  Thus, Adams has failed to show that "Michael" is an appropriate comparator.

Caucasian employees who held jobs with identical titles.

However, as the Eleventh Circuit has counseled "[t]he methods of presenting a prima facie case are not fixed; they are flexible and depend to a large degree upon the employment situation." Wilson, 376 F.3d at 1087. In more recent Eleventh Circuit precedent, we have seen the application of this flexibility. Specifically, the Court has pointed to the absence of relevant similarities amongst comparators, outside of job similarity, and held that plaintiff failed to meet his/her prima facie case. For example, in Cooper, 390 F.3d 695,[13] the Court determined that the comparators for purpose of a disparate pay claim were not appropriate, *i.e.* similarly situated, when the plaintiff did not establish: 1) "that the proposed comparators had similar levels of experience or education" id. at 745; 2) "similar levels of seniority" id. at 743; and 3) similar disciplinary records, id. at 741.

When the Eleventh Circuit has reached beyond job similarities in its similarly situated analyses, unrebutted evidence was in the record to show that there existed a relevant factor (e.g., experience, education, starting pay demand) which rendered the comparators dissimilar. For example, in Mack, 195 Fed. Appx. 829, the court stated "[w]e affirm the court's entry of summary judgment as to this claim because MAE produced uncontroverted evidence that Frye and Wicks were paid more than Mack because each had specialized experience and training in aeronautics and avionics, while Mack had only general electronic training. Consequently, Mack failed to show that they were 'similarly situated in all relevant respects.'" Id. at 843. Thus, although the burden of production at the prima facie stage does not shift to the defendant to

---

[13] The Court in Cooper cited both Miranda and Mulhall in reaching its conclusions.

produce any evidence, the failure of the defendant to point to other traits that are "relevant" to the particular employment situation dictates that the Court should look strictly to job similarities. Therefore, the Court will first examine the record to determine if Adams has submitted evidence of basic job similarities, and if so, whether there is evidence that the comparators are dissimilar in other relevant respects.

At the outset, Adams' claim regarding Allison, Franklin, Mordecai as comparators is not supported by the evidence. Adams cites Exhibit 106 as evidence of starting pay for Allison, Franklin and Mordecai. Adams explains that Exhibit 106 is a summary of pay data contained in Exhibit 105. [14] (Doc. 353 at 17). However, a review of Exhibit 105 shows no support for Adams assertion of starting pay or starting job title for Allison, Franklin or Mordecai. Specifically, Adams has submitted no evidence establishing that Kenneth Allison was hired as a Trades Assistant at the rate of $12.50/hour in 2006; that Walker Franklin was hired as a Trades Assistant at the rate of $13.50/hour in 2006; or that Christopher Mordecai was hired as a Trades Assistant at the rate of $14/hour in 2006. Exhibit 105 does not indicate the title of these employees' starting position. Thus, these employees are not comparators for purposes of Adams claim of discriminatory starting pay.

Moreover, Allison, Franklin and Mordecai are not appropriate comparators for purposes of Adams' claim that his hourly wage of $18.50 was discriminatory. Adams' evidence shows that

---

[14] The Court finds that Doc. 286-3 (Exhibit 105 (Sealed)) can be reduced to a form admissible at trial and thus Austal's objection to Exhibit 105 is **OVERRULED**. However, to the extent Exhibit 106 has no foundation in Exhibit 105, Austal's objection is **SUSTAINED.**

although Allison was paid $20/hour at the relevant time,[15] the only position noted in connection with Allison is the job title of Fitter A- Class/Fabrication.[16]  No evidence has been presented that Adams' position as a Trade Assistant,[17] and a Fitter A-Class are substantially similar jobs.  The same applies to the alleged comparator Franklin, who held the job title of Pipe Welder and Mordecai who held the job title Welder A-Class.  It should also be noted that at the relevant time, Franklin's wage was $18.50/hour, the same as Adams.

Concerning proposed comparators Akridge and Cellon, the evidence submitted by Adams indicates that Caucasian employee Robert Akridge was hired about four (4) months after Adams as a Trades Assistant at the rate of $16.50/hour. (Doc. 286-3 (Ex. 105 (Sealed)).  There is no evidence that Akridge received a pay raise after being hired.  Adams' evidence also reveals that Caucasian employee Jeffrey Cellon was hired over sixteen (16) months after Adams as a Trades Assistant at the rate of $16/hour.  (Id.)  Cellon's rate of pay, at the relevant time, *i.e.* when Adams left on May 29, 2008, was $17/hr compared to Adams' pay of $18.50/hr.

Austal has submitted the Declaration of Harley Combs (Fabrication Department Manager) and the employment applications of Adams, Akridge and Cellon.  Austal then summarily contends: "the named comparators are not similarly situated to Plaintiff based on their relative experience, education, and job skills…The others had prior welding and other relevant training and experience as well."  (Doc. 326 at 11-12).  Combs states in his Declaration that

---

[15] The relevant time period would be before Adams was terminated on May 29, 2008.

[16]  Exhibit 105 only delineates the last position held by the employee.

[17]  A Trades Assistant is an employee who assists the Fitter or Welder in his job duties and is a stepping stone to the Fitter or Welder position.  (Doc. 326-3 at 2 (Decltn. Combs at ¶4)).

Austal takes into consideration skills, education, experience and other qualifications of each applicant when determining starting pay (and subsequent pay rates) and that Austal established different titles for its positions (such as Trades Assistant, Fitter, Welder) due to the different skill sets, training, experience and qualifications needed to perform the job duties unique to each job title. (Doc. 326-3 at 2 (Decltn. Combs at ¶4)).

Concerning Akridge, Combs states that when Akridge applied for a Trades Assistant/Shipfitter position and was hired, he requested an hourly wage of $17/hour and had eight (8) years of prior experience as an HVAC installer (earning $16/hour) and performing foundry work, as well as experience with construction and operating power tools. (Id. at 2-3 (Decltn. Combs at ¶6)). Combs states in comparison, Adams earned $12/hour at his last job before being hired by Austal. (Id.) Regarding Cellon, Combs states that Cellon had prior fabrication experience as an iron worker, fabricator, welder, longshoreman, field technician and quality control inspector. (Id. at 3 (Decltn. Combs at ¶7)). Adams has not rebutted this evidence.

The employment applications reveal that at the time Adams applied, he did not set forth a desired salary; he had two (2) years of electronics (technical) education; and he had been employed by Vulcan Aluminum since January 2005 as a $12/hour Production Worker. (Doc. 326-3 at 5-6). Akridge's employment application reveals that at the time he applied, he listed his desired salary as $17/hour; he had been employed as a $16/hour HVAC Installer since May of 1998; he had previously worked for Mobile Pulley in the "Foundry." (Id. at 8-10). Cellon's employment application does not clearly set forth any desired salary (although a hand-written note on the last page of his application states "$16.00 perhaps"); indicates that he was applying

to be a Welder; he was currently attending welding school through Austal's Training for Welding; and he had worked as a quality control inspector and installer for broadband products (since February 2005) and previously worked as a contractor (about 2 years), longshoreman (1 year), iron worker ("fabrication and welding") (about 2½ years).  (Id. at 12-15).

Adams must submit evidence establishing that the proposed comparators, Akridge and Cellon are "nearly identical" in "all relevant respects" to him, yet received higher pay -- *i.e.*, nearly identical skills, training, experience, education, etc.  Akridge's past work experience and pay demand clearly make him an inappropriate comparator.  Cellon's past work experience is also distinguishable from Adams, but more importantly, the 16 month differential in start dates makes Cellon an inappropriate comparator.  Cellon was hired 16 months later (December 3, 2007) as a Trade Assistant at a rate of $16.00/hour.  At that time Adams was a Trade Assistant being paid $18.50/hour. Accordingly, because Adams has failed to submit sufficient evidence that the comparators are similar in all relevant respects but yet were treated more favorably, he has failed to establish a prima facie case of discriminatory pay.  Austal's motion on this claim is **GRANTED.**[18]

## C.   <u>Failure to Promote</u>

To establish a prima facie case of failure to promote, a plaintiff must show that: 1) he is a member of a protected class; 2) who sought and was qualified for positions that the employer

---

[18] The only other relevant evidence submitted by Adams in opposition to summary judgment on the disparate pay issue, consists of the depositions of Austal's HR employees and CEO Browning, as well as Austal's Rule 30(b)(6) representative Lindley.  These depositions address the overall lack of a written pay structure at the company and the fact that the HR Director was prompted to conduct a study and establish a pay structure to ensure fair pay among employees.  This evidence is not sufficient to support an inference of race discrimination as to the pay issue.

was attempting to fill; 3) despite his qualifications he was rejected; and 4) the employer either continued to attempt to fill the positions or in fact filled the positions with persons outside the plaintiff's protected class. See, e.g., Harrington v. Disney Regional Ent., Inc., 276 Fed. Appx. 863, 872 (11th Cir. 2007) (citing Crawford v. Western Electric Co., Inc., 614 F.2d 1300, 1315 (5th Cir. 1980)). A plaintiff claiming that he was discriminatorily denied a promotion usually must show that he actually applied for the position as part of his prima facie case. Taylor v. Runyon, 175 F.3d 861, 866 (11th Cir. 1999); Combs v. Plantation Patterns, 106 F.3d 1519, 1539 at n. 11 (11th Cir. 1997). Where an employer has an informal promotion procedure (i.e., job openings are not posted or applications are not required), however, an employee may establish this element by showing that the position was available and that the employer had some reason or duty to consider him for same. Jones v. Firestone Tire and Rubber Co., Inc., 977 F.2d 527, 533 (11th Cir. 1992); Carmichael v. Birmingham Saw Works, 738 F.2d 1126, 1133-1134 (11th Cir. 1984).

### 1. Adams' Allegations

Adams contends that Caucasian employee "Preston," a Caucasian male, was unfairly promoted over him to the position of Supervisor. Adams further contends that when he was acting as the lead man[19] on the day shift for Supervisor Abear's crew, he trained "Preston" and instructed him on fitting/welding. (Doc. 163-1 (Dep. E.Adams at 89-90, 94); Doc. 285-4 (Dep. E.Adams at 90-92, 97, 100)). Adams was subsequently moved to the night shift "for a little while" and when he returned to the day shift, "Preston" had been promoted to Supervisor. (Doc. 285-4 (Dep. E.Adams at 89-90, 97). Adams was never made aware of the job opening. (Id.

---

[19] Adams was made the lead man for a short time by Abear; the lead man was the person in charge when the Supervisor was not present. (Doc. 285-4 (Dep. E.Adams at 91-92)).

(Dep. E.Adams at 97)).  From this, Adams contends that he was denied this promotion to Supervisor based on his race.  (Doc. 163-1 (Dep. E.Adams at 121)).

Second, Adams contends that two (2) Caucasian employees, Trades Assistants in the Fabrication Department, were promoted within that Department instead of him: 1) Walter Franklin promoted to Supervisor; and 2) Christopher Mordecai promoted to Welder.

      **2.**        **Austal's Contentions**

As to "Preston," Austal does not address this employee apart from claiming he is not similarly situated and that Adams failed to submit sufficient evidence as to "Preston" being a valid comparator.  (Doc. 163 at 17-18; Doc. 326 at 11 at n. 12).  Next, Austal contends that Adams cannot establish a prima facie case because the exhibits relied upon to support his claim that Franklin and Mordecai received promotions, are inadmissible, and moreover, Franklin was not promoted to Supervisor as Adams alleges.  (Doc. 326 at 13).

      **3.**        **Discussion**

As noted *supra*, to establish a prima facie case of disparate promotion, a plaintiff must show that: 1) he is a member of a protected class; 2) who sought (or should have been informed of the position) and was qualified for positions that the employer was attempting to fill; 3) despite his qualifications he was rejected; and 4) the employer either continued to attempt to fill the positions or in fact filled the positions with persons outside the plaintiff's protected class.

Austal does not dispute any of the elements for a prima facie case of disparate promotion. Instead they simply assert that Adams' proposed comparators are not supported by admissible evidence.  (Doc. 326 at 13).  Austal conflates the prima facie requirements of a discriminatory pay claim with the prima facie requirements to establish a failure to promote claim.  Similarly

situated comparators are not necessary to establish a prima facie claim of failure to promote, rather plaintiff must only show that the position was filled with a person outside his protected class. See <u>Harrington v. Disney Regional Ent., Inc</u>., 276 Fed. Appx. 863, 872-873 (11th Cir. 2007)("The elements are different for disparate pay and promotion claims…").

Adams is a member of a protected class. There is no evidence that he applied for the promotions at issue, however, that deficiency is overcome by the unrebutted evidence, cited by Adams, of the informality of the promotion process and the fact that he was qualified for the promotions. Thus, the Court finds that Austal had reason to consider Adams for the promotions he was denied, specifically the supervisory position held by "Preston," that Adams was qualified for the position and the position was filled with someone outside of Adams protected class. Thus, Adams has made his prima facie case. Because Austal has failed to present any legitimate non-discriminatory reason for its decision, the motion for summary judgment on the claim of disparate treatment in promotion is **DENIED.**

## V.    <u>Punitive Damages</u>

Adams seeks an award of punitive damages against Austal. Upon consideration, the Court finds that resolution of the punitive damages issue is a matter better suited for trial. Thus, it is **ORDERED** that Austal's motion for summary judgment regarding Adams' punitive damages claim is **DENIED** as Adams' request for punitive damages is **CARRIED TO TRIAL.**

## VI.   <u>Conclusion</u>

Accordingly, it is **ORDERED** that Austal's motion for summary judgment is hereby **DENIED** as to Adams' hostile work environment claim; **GRANTED** as to Adam's disparate pay claim; **DENIED** as to Adams' disparate promotion claim; **GRANTED** as to Adams'

retaliation claim; and **DENIED** as to Adams' punitive damages request as that issue will be **CARRIED TO TRIAL.**

**DONE** and **ORDERED** this the **25**[th] day of **April 2011.**

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**