**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **SIDNEY HEDGEMAN,** *et al.*, | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **CIVIL ACTION 08-00155-KD-N** |
| | ) | |
| **AUSTAL, U.S.A., L.L.C.,** | ) | |
| **Defendant.** | ) | |

**ORDER**

This matter is before the Court on Defendant's motion for summary judgment (Docs. 277, 279), Plaintiff's Opposition (Doc. 321, 322), and Defendants' Reply (Doc. 352).

**I.    Factual Background**

On March 20, 2008, multiple Plaintiffs initiated this action against Austal for legal and equitable relief to redress unlawful discrimination and harassment on the basis of race.[1]  (Doc. 1).  Plaintiff Sidney Hedgeman ("Hedgeman") asserts claims for hostile work environment and discrimination (promotion) based on race, in violation of Title VII and 42 U.S.C. § 1981.  (Doc. 37 at 64-69).[2]

---

[1]    While initiated as a purported class action, this is no longer a class action case.  (Doc. 293).  Additionally, some of the Plaintiffs allege gender and disability discrimination in addition to asserting Title VII claims.

[2]    Originally, Hedgeman alleged a separate claim for retaliation (Doc. 37 at 66, 68 at ¶¶ 313, 323-324, 326-328).  Additionally, Hedgeman also alleged claims for denial of training.  (Id. at 66-67 at ¶314-319, 331).  Hedgeman did not address this claim in response to Austal's motion and moreover, in his opposition brief Hedgeman now specifically represents that he "is *pursuing* claims against Austal for *only* hostile work environment and discrimination on the basis of race in regards to pay and promotion" under Title VII and Section 1981. (Doc. 321 at 2 (emphasis added)).   Accordingly, the Court construes Hedgeman's intentional exclusion of his retaliation and denial of training claims as concessions of these claims.  Thus, it is **ORDERED** that Austal's motion for summary judgment as to Hedgeman's retaliation and denial of training claims is **GRANTED.**   Additionally, while Hedgeman initially alleged disparate impact claims against Austal, said claims have been dismissed from this litigation.  (Doc. 366).

(Continued)

1

A. **Austal**

Defendant Austal USA ("Austal") is an Australian shipbuilding company dedicated to the design and construction of customized aluminum commercial and military vessels, located in Mobile, Alabama. (Doc. 279 at 2; Doc. 283-48 at 2-3 (Austal's 3/7/07 EEOC Position Statement)). The Operations Division has four (4) major Departments (Aluminum (divided into Fabrication and Components), Electrical, Engineering, and Fit Out (divided into HVAC, Insulation and Fit Out)). (Doc. 283-48 at 3-4).

B. **Hedgeman's Employment**

Sidney Hedgeman applied on December 12, 2005 and began working for Austal on January 3, 2006, as a HVAC helper in the HVAC Department, at the rate of $11/hour. (Doc. 279-2 (Dep. Hedgeman II at 72, 110); Doc. 279-3; Doc. 295 at 16 (Exhibit 105-Sealed); Doc. 279-1 at 2; Doc. 322-1 at 68-72). Handwritten notes on his employment application include "Roland said get him in," "Lance Leincool," and "GC said that he a good man I work with him." (Doc. 322-1 at 68). At that time, Hedgeman had worked in sheet metal for 13 years and in welding; attended a State business/technical school for welding; was employed as a machine operator ($8/hour); and had prior experience with welding and sheet metal since 1997. (Id. at

---

Austal has moved for summary judgment on claims not included in the Third Amended Complaint. Plaintiff also addresses a pay discrimination claim that was not included in the complaint. In Pleming v. Universal-Rundle Corp., 142 F.3d 1354, 1357 (11th Cir. 1998), the Court held that the "parties frame the scope of the litigation at the time the complaint is filed." Moreover, in Davis v. Coca-Cola Bottling Co., Consol., 516 F.3d 955 (11th Cir. 2008), the court highlighted the difficulty in appellate review of voluminous pleadings involving multiple defendants. In so doing it is clear that the 11th Circuit expects the District Court to "strip the case down and identify each claim and defense." Id. at 982. In an effort to do so the court must rely on the claims asserted in the Third Amended Complaint. Thus, claims asserted in depositions and not included in the complaint have not been considered and will not be addressed. See Smith v. Books-A-Million, 398 Fed. Appx. 437 (11th Cir. 2010) (Claims not included in the complaint were not required to be considered by the District Court).

69). During his first term of employment (approximately 20 months), Hedgeman does not recall whether he received an hourly employee orientation booklet, but believes he probably received "[s]ome of it." (Doc. 279-2 (Dep. Hedgeman II at 51-53)). Hedgeman did review and sign an orientation checklist – after completing orientation. (Doc. 322-1 (Dep. Hedgeman I at 48)). Hedgeman learned about how to report discrimination or harassment violations at Austal, based on his prior work experience. (Id. (Dep. Hedgeman I at 58)). Hedgeman received four (4) pay raises dated February 3, 2006 (from $11/hour to $13/hour); May 22, 2006 (from $13/hour to $14.50/hour); July 18, 2006 (from $14.50/hour to $15.50/hour); and April 24, 2007 (from $15.50/hour to $16/hour). (Doc. 295 at 16 (Exhibit 105-Sealed); Doc. 279-2 (Dep. Hedgeman II at 74); Doc. 279-4). On August 17, 2007, Hedgeman took a leave of absence due to a medical illness. (Doc. 279-2 (Dep. Hedgeman II at 59-60)).

On December 28, 2007, Hedgeman reapplied[3] for employment with Austal and began working on January 21, 2008 at the rate of $16/hour as a HVAC Helper and was upgraded to sheet metal mechanic in the HVAC Department. (Doc. 279-1 at 3; Doc. 279-2 (Dep. Hedgeman II at 72, 74, 76-77); Doc. 279-3; Doc. 322-1 (Dep. Hedgeman I at 71-73); Doc. 295 at 16 (Exhibit 105-Sealed); Doc. 279-4 at 6-7). Hedgeman received pay raises dated April 21, 2008 (from $16/hour to $17/hour, "90 day-good, motivated employee, will do anything asked of him. Deserves a raise[]"); and on June 30, 2008 (from $17/hour to $17.51/hour, "cost of living adjustment…for fiscal year 2009[]"). (Doc. 279-4 at 6-7). On May 8, 2009, Hedgeman was laid

---

[3] Hedgeman disputes that he was "rehired." (Doc. 279-2 (Dep. Hedgeman II at 74)). According to Hedgeman, he took a leave of absence due to his cancer diagnosis to undergo chemotherapy, and then returned to Austal. (Id. at 74, 76). However, the record, which has not been disputed, indicates that on December 28, 2007, Hedgeman submitted a new application for employment (Doc. 279-3) and on January 9, 2008, was offered by letter employment (Doc. 279-1 at 3).

off.  (Doc. 279-2 (Dep. Hedgeman II at 90, 94)).[4] During his second term of employment, Hedgeman received the hourly employee orientation booklet as indicated on the checklist he signed on January 21, 2008.  (Doc. 279-2 (Dep. Hedgeman II at 77)).

## II.    <u>Standard of Review</u>

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a) (Dec. 2010).   The recently amended Rule 56(c) governs Procedures, and provides as follows:

> *(1) Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> *(2) Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
>
> *(3) Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record.
>
> *(4) Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

---

[4]  Hedgeman testified that he was laid off in retaliation for bringing a race discrimination claims against Austal.  (Doc. 279-2 (Dep. Hedgeman II at 94, 96)).  Hedgeman has not pursued his retaliation claim.  <u>See</u> footnote 2.

FED.R.CIV.P. Rule 56(c) (Dec. 2010).

Defendant, as the party seeking summary judgment, bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). If the nonmoving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment. Celotex, 477 U.S. at 323. "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992), cert. den., 507 U.S. 911 (1993) (internal citations and quotations omitted).

## III.      Failure to Exhaust Administrative Remedies for "Discrete" Title VII Claims

Austal contends that Hedgeman's Title VII claim that he was denied promotions during his second term of employment (January 21, 2008-May 8, 2009), fails due to his failure to exhaust the necessary administrative remedies. A plaintiff may not sue under Title VII unless he first exhausts administrative remedies by filing a timely charge of discrimination with the appropriate agency. See, e.g., Wilkerson v. Grinnell Corp., 270 F.3d 1314, 1317 (11th Cir. 2001). A failure to file a timely charge with the EEOC results in a bar of the claims contained in the untimely charge.

5

Hedgeman signed his EEOC Charge for race discrimination on November 13, 2006 and it was "received" on November 20, 2006. (Doc. 279-6 at 1). In his EEOC Charge, Hedgeman described conduct occurring from the time he started at Austal, January 3, 2006, through the date he filed his charge, November 13, 2006. (Id. at 2). The EEOC issued a Notice of Right to Sue letter on December 26, 2007. (Doc. 279-7). Two (2) days later, Hedgeman reapplied for employment with Austal and was rehired on January 9, 2008.

There is no evidence that Hedgeman amended the November 20, 2006 EEOC charge. There is no evidence that Hedgeman filed a new EEOC charge concerning the allegedly discriminatory conduct occurring between January 2008-May 2009 (during his second term of employment). As such, Hedgeman's claims must be limited by the scope of the EEOC investigation which could reasonably have been expected to grow out of the charges of racial discrimination asserted on November 20, 2006.

Nevertheless, "[t]he failure to specifically articulate a claim in an EEOC charge is not necessarily fatal[,]" as a Title VII action may be based "'upon any kind of discrimination like or related to the charges' allegations, limited only by the scope of the EEOC investigation that could reasonably be expected to grow out of the initial charges of discrimination.'" Lampkin v. United Parcel Service, 2008 WL 1925120, *3 (M.D. Ala. May 1, 2008). Thus, judicial claims may be permitted if they "amplify, clarify, or more clearly focus the allegations in the EEOC complaint," but judicial claims that allege "new acts of discrimination are inappropriate." Gregory v. Ga. Dep't of Human Res., 355 F.3d 1277, 1280 (11th Cir. 2004) (per curiam) (internal quotation marks omitted).

Austal contends that Hedgeman's Title VII claims that he was denied promotions from January 2008-May 2009, is barred. Hedgeman's EEOC charge complained of a failure to promote as of November 13, 2006. Even assuming that Hedgeman's failure to promote claim relating to his second term of employment are "like or related to the charge's allegations" for the 2006 alleged instances of failing to promote, the EEOC investigatory scope could not possibly have encompassed incidents after November 13, 2006, because they had not yet occurred. See, e.g., Lampkin, 2008 WL 1925120. Hedgeman's initial charge of discrimination does not cover post November 13, 2006 promotion claims and a new charge of discrimination was required for these discrete, unlawful employment practices. Thus, Hedgeman failed to exhaust his administrative remedies prior to bringing these particular discrete Title VII promotion claims in federal court. Accordingly, it is **ORDERED** that Austal's motion for summary judgment, on Hedgeman's discrete Title VII failure to promote claims occurring after November 13, 2006, due to his failure to exhaust administrative remedies, is **GRANTED.**

IV.     **Whether Certain Title VII Claims are Time Barred**

A plaintiff may not sue under Title VII unless he first exhausts administrative remedies by filing a timely charge of discrimination with the appropriate agency. See, e.g., Wilkerson, 270 F.3d at 1317. "In a non-deferral state such as Alabama, the deadline for filing is 180 days after the alleged discriminatory act." Carter v. University of South Alabama Children's & Women's Hosp., 510 F. Supp. 2d 596, 606 (S.D. Ala. 2007). See also Tipp v. AmSouth Bank, 76 F. Supp. 2d 1315, 1327 (S.D. Ala. 1998). "If the victim of an employer's unlawful employment practice does not file a timely complaint, the unlawful practice ceases to have legal significance, and the employer is entitled to treat the unlawful practice as if it were lawful." City of Hialeah, Fla. v.

Rojas, 311 F.3d 1096, 1102 (11th Cir. 2002). <u>See</u> <u>also</u> <u>Sheffield v. United Parcel Service, Inc</u>.,

2010 WL 4721613, *2 (11th Cir. Nov. 22, 2010) (unpublished); <u>Jordan v. City of Montgomery</u>,

2008 WL 2529573, *1 (11th Cir. Jun. 26, 2008) (unpublished).  A failure to file a timely charge

with the EEOC results in a bar of the claims contained in the untimely charge.  <u>Id</u>.

Hedgeman started working at Austal on January 3, 2006.  Hedgeman signed his EEOC

Charge for race discrimination on November 13, 2006 and it was "received" on November 20,

2006.  (Doc. 279-6 at 1).  Calculating from the November 20, 2006 date, Austal contends that

only those discriminatory acts occurring between May 24, 2006 and November 20, 2006 – within

the 180 days prior to November 20, 2006 -- are timely.  From this, Austal asserts that it is

entitled to summary judgment on: 1) "[a]ll alleged acts" occurring between Hedgeman's January

3, 2006 hire date and May 24, 2006; and 2) his claim that in the first two (2) months of

employment (January–February 2006) he overheard a co-worker tell his supervisor "he was tired

of working with these niggers."  (Doc. 279 at 9-10).

Hedgeman contends that Austal's interpretation is incorrect and contrary to well

established law, as although many acts upon which a plaintiff's Title VII claims rely may occur

outside the 180 filing period, "they are part of the same actionable hostile environment claim."

(Doc. 321 at 16 (citing <u>McKenzie v. Citation Corp., LLC</u>, 2007 WL 1424555 (S.D. Ala. 2007)).

Hedgeman is correct as it relates to his hostile work environment claim.  The U.S. Supreme

Court has clarified that there are different standards for claims involving "discrete acts" versus

"hostile environment" allegations.  <u>See</u> <u>generally</u> <u>National R.R. Passenger Corp. v. Morgan</u>, 536

U.S. 101 (2002).  Under the continuing violation doctrine, a plaintiff's charge of discrimination

regarding a hostile work environment is considered timely if "an act contributing to the claim

occurs within the filing period," even if "some of the component acts of the hostile work environment fall outside the statutory time period." Id. at 117. As explained in Smiley v. Alabama Dept. of Transp., Slip Copy, 2011 WL 1188506, *5 (M.D. Ala. Mar. 30, 2011):

> Unlike claims involving discrete discriminatory acts, hostile environment claims may be litigated so long as at least one of the events contributing to the hostile environment was presented to the EEOC in a Charge of Discrimination in a timely fashion. Indeed, in *Morgan*, the United States Supreme Court held that "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period." *Morgan*, 536 U.S. at 106.

As such, concerning Hedgeman's claim that in the first two (2) months of employment he overheard a co-worker tell his supervisor "he was tired of working with these niggers," this comment is part of Hedgeman's hostile work environment claim, which is a continuing action claim. Hedgeman's EEOC Charge alleges not just "at least one of the events" but a variety of "events contributing to the hostile work environment" -- sufficient to have placed Austal on notice that such a claim (and various incidents tied to same) exists in the litigation so that Austal could have investigated the details during discovery. Accordingly, Austal's motion for summary judgment on the Title VII hostile work environment claim is **DENIED.**

Regarding Austal's claim that "[a]ll alleged acts" occurring between Hedgeman's January 3, 2006 hire date and May 24, 2006 are barred, this would include Hedgeman's alleged denials of promotions before May 24, 2006 – as these would also have been discrete discriminatory acts. See e.g., Morgan and Ledbetter, *supra*. Accordingly, Austal's motion for summary judgment as to Hedgeman's Title VII claims for denial of promotions prior to May 24, 2006, based on the statutory time period, is **GRANTED.**

**V.**     <u>Section 1981 Claims</u>

Austal makes no argument in its motion for summary judgment concerning the timeliness of any of Hedgeman's Section 1981 claims. Rather, Austal makes a new Section 1981 argument in its Reply to Plaintiff's Response to its motion for summary judgment. The Court will not consider this "new" claim because Austal cannot assert new allegations or arguments raised for the first time on Reply. <u>See</u>, <u>e.g.</u>, <u>New Hampshire Ins. Co. v. Wiregrass Const. Co.</u>, Slip Copy, 2011 WL 206191, *2 at note 2 (S.D. Ala. Jan. 20, 2011); <u>Abrams v. Ciba Specialty Chemicals Corp.</u>, 663 F. Supp. 2d 1220, 1232 at note 16 (S.D. Ala. 2009) (providing that "new arguments are impermissible in reply briefs"); <u>Evans v. Infirmary Health Services, Inc.</u>, 634 F. Supp. 2d 1276, 1285 at note 14 (S.D. Ala. 2009) (instructing that "this Court's general practice is not to consider new arguments raised in a reply brief").

**VI.**     <u>Section 1981/Title VII – Hostile Work Environment (Race)</u>

Racial harassment is actionable under Section 1981 or Title VII where the conduct is sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment. <u>See</u>, <u>e.g.</u>, <u>Freeman v. City of Riverdale</u>, 330 Fed. Appx. 863, 865 (11th Cir. 2009).[5] To establish a prima facie case of hostile work environment and/or racial harassment under Section 1981 or Title VII, the plaintiff must prove that: 1) he belongs to a protected group; 2) he has been subject to unwelcome harassment; 3) the harassment was based on a protected characteristic of the employee (such as race); 4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily

---

[5] This is an unpublished decision and is persuasive, but not binding, authority pursuant to Eleventh Circuit Rule 36-2. The Court notes this same rule applies to other Fed. Appx. cases cited herein.

abusive working environment; and 5) the employer is responsible for such environment under a theory of vicarious or direct liability.  See, e.g., Reeves v. DSI Sec. Servs., Inc., 395 Fed. Appx. 544, 545-546 (11th Cir. 2010); McCann v. Tillman, 526 F.3d 1370, 1378 (11th Cir. 2008); Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002).  See also e.g., Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999).

Austal contends that: 1) Hedgeman did not subjectively perceive the environment to be racially hostile or abusive; 2) Hedgeman's evidence of sporadic and isolated incidents of racially hostile comments, conduct and graffiti during the time he was employed do not meet the severe or pervasive threshold; 3) Hedgeman makes no allegations and presents no evidence that the allegedly hostile environment unreasonably interfered with his ability to work on a day-to-day basis; 4) Austal maintained a policy establishing how an employee should report discriminatory conduct, but Hedgeman failed to report certain conduct; and 5) Austal took reasonable preventative and corrective/remedial measures to prevent a hostile work environment.

A.    **Severe or Pervasive**

As to whether the conduct was severe and pervasive, Hedgeman points to the following evidence.[6]  Regarding racially and hostile discriminatory comments by co-workers, Hedgeman

---

[6] Hedgeman also relies on the allegations of the other 22 plaintiffs (Doc. 321 at 3-4, 21-22, 25-26) to support that an overall racially charged work atmosphere exists at Austal (i.e., viewed through the lens of the plaintiffs' collective allegations versus each plaintiff's specific allegations).  "To rely on the evidence, each [plaintiff] must show that he *was aware* of those incidents at the relevant time he alleges the hostile work environment."  See, e.g., Melton v. National Dairy, LLC, 705 F. Supp. 2d 1303, 1342 (M.D. Ala. 2010) (citing Edwards Wallace Comm. College, 49 F.3d 1517, 1522 (11th Cir. 1995)) (emphasis in original).  See also e.g., Head v. Pitts Enterprises, Inc., Slip Copy, 2010 WL 2773376, *8 (M.D. Ala. Jul. 14, 2010); McKenzie v. Citation Corp., LLC, 2007 WL 1424555, *13 (S.D. Ala. May 11, 2007).  Courts in the Eleventh Circuit may consider statements not directed at a plaintiff and even hearsay statements, so long as the plaintiff was aware of the statements at the time he was employed.  See, e.g., Yeomans v. Forster and Howell, Inc., Slip Copy, 2010 WL 3716394, *5-6 (M.D. Ala. Sept. 10, 2010). (Continued)

overheard Caucasian co-worker Blanchett tell supervisor Terry Crawley: "I'm tired of working with these niggers." (Doc. 279-2 (Dep. Hedgeman II at 177-178)). Hedgeman saw Crawley "bump" Blanchett on the knee in response to let Blanchett know that Hedgeman was present. (Doc. 322-1 (Dep. Hedgeman I at 180)). "It shocked me[;]" Hedgeman walked away. (Doc. 279-2 (Dep. Hedgeman at 178)). Hedgeman reported Blanchett's comment to supervisor Sullivan who responded that he "got it" and would take care of it. (Doc. 322-1 (Dep. Hedgeman I at 183)). However, Blanchett's racial comments continued and he continued to be hostile. (Id. (Dep. Hedgeman I at 183-184)). Blanchett used the word "nigger" in Hedgeman's presence on a daily basis. (Doc. 322-1 (Dep. Hedgeman I at 185)). Hedgeman continued to report "[p]retty regular" (but not every time) Blanchett's remarks to his supervisors Terry Crawley and James Sullivan. (Doc. 297-2 (Dep. Hedgeman II at 187-188)). In response to Hedgeman's complaints, supervisor Crawley "laugh[ed] it off" and said "[i]t's going to be all right." (Doc. 322-1 (Dep. Hedgeman I at 188-189)). Hedgeman also complained numerous times (around 10) to supervisor Sullivan about Blanchett's use of the word "nigger;" he responded "it's taken care of." (Id. (Dep. Hedgeman I at 190)). Further, Hedgeman complained to supervisor Crawley about Blanchett's conduct not changing numerous times (about 10), but when Hedgeman saw that Blanchett's conduct was not being "taken care of," he stopped complaining to supervisor Crawley. (Doc. 322-1 (Dep. Hedgeman I at 189, 191)).

Hedgeman heard Caucasian co-workers (who he does not know by name) use the word "nigger" and "monkey" on a "[r]egular basis" in his presence or where he could hear them, as

The Court has only considered the evidence of which Hedgeman testified that he was aware.

12

well as direct "monkeys" comments to him.  (Doc. 322-1 (Dep. Hedgeman I at 117, 204, 206-207, 225).  Hedgeman also had to "listen to so-called jokes wasn't funny, black jokes as people call them."  (<u>Id</u>. (Dep. Hedgeman I at 117)).  Hedgeman reported the conduct, "[w]ent through the chain of command[]" reporting it to supervisors Terry Crawley, Gary Logan, James Sullivan and Lance Leincool.  (<u>Id</u>. (Dep. Hedgeman I at 117, 207)).  Hedgeman went "[n]umerous times" (around 10 times each) to supervisors Terry Crawley, to Gary Logan and to James Sullivan, to complain about the comments he heard on a regular basis; they all responded that they would "take care of it," and "[p]retty much, I "got it."  (<u>Id</u>. (Dep. Hedgeman I at 208-209)).  In response to Hedgeman's complaints, supervisor Leincool also told Hedgeman that he "pretty much call[s] his children monkeys….It's a joke. You [are] grown. Let it go."  (<u>Id</u>. (Dep. Hedgeman I at 209).

Hedgeman has heard another African American co worker use the word "nigger" when referring to another co-worker, in his presence.  (Doc. 279-2 (Dep. Hedgeman II at 227)).  Hedgeman did not report the comment.  (<u>Id</u>. (Dep. Hedgeman II at 228)).

Hedgeman also heard Caucasian supervisor James Sullivan use the word "nigger" and make racially discriminatory or hostile comments – "pretty much nigger this, nigger that[]" -- a "couple times."  (Doc. 322-1 (Dep. Hedgeman I at 196-197)).  On a daily basis, Hedgeman alleges that he was also called a "monkey" and "boy" by supervisor Lance Leincool, and Leincool also (daily) called other African American employees "boys."  (Doc. 279-2 (Dep. Hedgeman II at 200); Doc. 322-1 (Dep. Hedgeman I at 196, 199)).  Leincool "called us boys. He called us black boys…I was older……I just pretty much told him I ain't no boy."  (Doc. 322-1 (Dep. Hedgeman I at 124-125)).  Hedgeman complained to Leincool about his comments; he responded that he calls his children "monkey" and said "[p]eople just playing. Y'all don't take it

serious[.]" (Doc. 279-2 (Dep. Hedgeman II at 200). Hedgeman and others also complained to supervisor Gary Logan about Leincool's comments. (Id.)

Additionally, Hedgeman was subjected to displays of the Confederate flag, which he considers racially discriminatory or harassing, on Caucasian co-workers' t-shirts for "[m]any days" and "[o]n a regular basis." (Doc. 322-1 (Dep. Hedgeman I at 228-229, 231)). Hedgeman complained "numerous" times about the employees wearing shirts displaying the flag to the "[c]hain of command[]" (supervisors Crawley, Logan, Sullivan and Leincool) who told him "[i]t'll be all right[]" and that they would "take care of it." (Id. (Dep. Hedgeman I at 229, 231)). Hedgeman interpreted Austal's response as to not worry about it and for him to just let it go. (Id. (Dep. Hedgeman I at 229-230)). Hedgeman also complained directly to some of the co-workers he "worked around[]" – such as African American Robert Allen and others -- about the flags on Caucasian co-workers' t-shirts. (Doc. 279-2 (Dep. Hedgeman II at 230)). Despite Hedgeman's numerous complaints, the Caucasian co-workers continued to wear the flags on t-shirts during the entire period he worked at Austal. (Id. (Dep. Hedgeman II at 230-231)). The displays of the Confederate flag were not addressed by Austal.

Moreover, Hedgeman regularly saw racial epithets in graffiti on bathroom walls and stalls. (Doc. 279-2 (Dep. Hedgeman II at 212, 222)). Austal "kept getting a lot of complaints" about the graffiti. (Id. (Dep. Hedgeman II at 216)). The racial graffiti included: "see niggers travel in packs just like monkeys;" "need more nigger women;" and "this is not a place for niggers." (Doc. 322-1 (Dep. Hedgeman I at 215, 217-218, 220. 223)). Hedgeman saw the word "nigger" on the bathroom walls on a regular basis. (Id. (Dep. Hedgeman I at 117)). Hedgeman reported the graffiti (numerous times but not every time he saw it), by going through the chain of

14

command (Crawley, Sullivan, Logan and Leincool); the response was that "we'll take care of it." (Id. (Dep. Hedgeman I at 215-218, 220-221)). Hedgeman has also been in the bathrooms with his supervisors Gary Logan, Terry Crawley, James Sullivan and Lance Leincool, when the graffiti was present. (Doc. 279-2 (Dep. Hedgeman II at 223)).

The record reveals that starting in August 2007, Austal responded to complaints about the graffiti by cleaning the bathrooms and painting black over the graffiti on a regular basis. (Doc. 285-2 (Dep. Browning at 16, 110). However, according to Hedgeman, Austal only began painting the restrooms black at the end of his second term of employment (near May 2009). (Doc. 322-1 (Dep. Hedgeman I at 213-214)). Nevertheless, the painting did not deter the offending scribblers, as the walls would soon be filled again with racially offensive graffiti. (Doc. 284-4 (Dep. Lindley II at 95-96, 166-168, 188-190, 195-196, 202-203); Doc. 284-5 (Dep. Lindley III at 254); Doc. 284-11 (Dep. O'Dell at 74-75); Doc. 284-7 (Dep. Friedlieb I at 84)).

Further, Hedgeman once confronted a Caucasian employee who had written the word "monkeys" on another wall at Austal (not in the bathroom. (Id. (Dep. Hedgeman I at 225-226)). After he complained, he does not recall that employee using the word "nigger" or "monkey" in his presence again. (Id. (Dep. Hedgeman at 226)). Hedgeman reported this to the chain of command (Crawley, Logan, Sullivan and Leincool) and the offending language was removed from that wall. (Id.)

To be actionable as severe or pervasive, the harassment "must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceive[s]…to be abusive." Miller, 277 F.3d at 1276 (internal citation and quotation marks omitted). In other words, the severe or pervasive element has an objective and

subjective component.  <u>McCann</u>, 526 F.3d at 1378.  To determine the objective severity of the harassment, courts look at the totality of the circumstances and consider: 1) the frequency of the discriminatory conduct; 2) the severity of the conduct; 3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and 4) whether the conduct unreasonably interferes with an employee's job performance.  <u>Reeves</u>, 395 Fed. Appx. at 546.  <u>See also</u> <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 787-788 (1998); <u>Allen v. Tyson Foods</u>, 121 F.3d 642, 647 (11th Cir. 1997) (citing <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 23 (1993)).  "The conduct is considered cumulatively instead of in isolation."  <u>Reeves</u>, 395 Fed. Appx. at 546.

Despite Austal's contention to the contrary, there is sufficient evidence, if believed by a jury, that Hedgeman subjectively perceived his work environment to be racially hostile.  Thus, the Court need only determine whether Hedgeman's perception was objectively reasonable.

When viewing the facts in the light most favorable to Hedgeman, a reasonable jury could find that the harassing conduct alleged was frequent and severe.  According to Hedgeman, on an almost daily basis during his employment, he heard Caucasian co-workers and supervisors refer to African Americans as "nigger(s)", "boy"[7] and/or "monkeys" (as well as was regularly called these names himself) – comments which found racially discriminatory and hostile; he regularly

---

[7] The word "boy" said to African American employees is not always evidence of racial animus -- other factors must be consulted such as context, inflection, tone of voice, local custom and historical usage.  <u>See</u>, <u>e.g.</u>, <u>Ash v. Tyson Foods, Inc.</u>, 546 U.S. 454, 456 (2006).  Hedgeman alleges that he and other African Americans were called "boy" on a regular basis by a supervisor who interchangeably called them "monkeys" and/or "black boys."  As such, the Court is satisfied that Hedgeman has explained the context and usage of the "boy" remarks made to him and his co-workers, to establish that there is at least an issue of fact as to whether the remarks were racially motivated.  <u>See</u>, <u>e.g.</u>, <u>Ash v. Tyson Foods, Inc.</u>, 2006 WL 2219749, *2 (11th Cir. Aug. 2, 2006).  Moreover, these remarks were made on a regular basis by a Caucasian supervisor to African American employees.

encountered racial graffiti (using the word "nigger") in the workplace bathrooms; and images of the Confederate flag (which he found racially discriminatory and harassing) permeated the workplace as regularly displayed and/or worn on Caucasian co-workers' t-shirts.  See, e.g., Webb v. Worldwide Flight Serv., Inc., 407 F.3d 1192, 1193 and 1194 note 3 (11th Cir. 2005) (finding without merit defendant's argument that the evidence was insufficient for jury to find hostile work environment where supervisor referred to plaintiff on a daily basis for two years as a "nigger" and a "monkey," and described him as being "from the tribe[]"); Mack v. ST Mobile Aerospace Engineering, Inc., 195 Fed. Appx. 829, 837-838 (11th Cir. 2006).

While much of the repeated conduct may not have been physically threatening, it is not unreasonable to infer from Hedgeman's allegations that the conduct was racially demeaning, humiliating and degrading.  McKenzie v. Citation Corp., LLC, 2007 WL 1424555, *13 (S.D. Ala. May 11, 2007).  The nature of the comments, Confederate imagery and graffiti that Hedgeman encountered, along with the regular (almost daily) exposure to same (i.e., not just a few isolated incidents) supports this finding.  Thus, a jury could reasonably find that the incidents alleged were severe and pervasive.

The evidence upon which Hedgeman relies to demonstrate that the conduct unreasonably interfered with his job performance is not as persuasive.  In contrast to interfering with his job performance, Hedgeman received four (4) raises from February 2006-April 2007; and two (2) more raises between April 2008-June 2008, one of which noted that he was a "good, motivated employee, will do anything asked of him. Deserves a raise[]").  See supra.  Moreover, in December 2007, Hedgeman re-applied for employment at Austal and was rehired.  Nevertheless, Eleventh Circuit precedent mandates that courts consider "the totality of the circumstances" such

17

that the absence of one factor (such as unreasonable interference) is not dispositive.  See, e.g., Miller, 277 F.3d at 1277 (finding that a failure by an employee to show how harassing conduct unreasonably interfered with the employee's work performance did not necessarily constitute a failure to satisfy the objectiveness prong).  The U.S. Supreme Court has cautioned further, that harassment need not be shown to be so extreme that it produces tangible effects on job performance to be actionable.  Harris, 510 U.S. at 22.  See also e.g., Miller, 277 F.3d at 1277. Having established the frequency, severity and the humiliating and demeaning nature of the conduct, Hedgeman's weak demonstration of how the conduct interfered with his job is not fatal to his claim.  Miller, 277 F.3d at 1277; Head v. Pitts Enterprises, Inc., Slip Copy, 2010 WL 2773376, *12 (M.D. Ala. Jul. 14, 2010).

In sum, under the totality of the circumstances and considering the allegations in the light most favorable to Hedgeman, he has produced sufficient evidence – if believed by a jury -- to create an issue of fact as to whether he was subjected to racial harassment that was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment.  Thus, the Court turns to element five: employer liability.

## B.  Element Five: Employer Liability

This last element of Hedgeman's proof requires a basis for employer liability.   In Faragher v. City of Boca Raton, 524 U.S. 775 (1998) and Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998), the U.S. Supreme Court held that employer liability is automatic when the supervisor's harassment culminates in a "tangible employment action, such as discharge, demotion, or undesirable reassignment."  Faragher, 524 U.S. at 807, 808; Ellerth, 524 U.S. at 762, 763.  Where no such action has occurred, "[a]n employer is subject to vicarious liability to a

victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." <u>Faragher</u>, 524 U.S. at 807; <u>Ellerth</u>, 524 U.S. at 745. An employer may avoid vicarious liability by raising as an affirmative defense that it: 1) exercised reasonable care to prevent and correct promptly any harassing behavior, and 2) the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. <u>Faragher</u>, 524 U.S. at 807, 809; <u>Miller</u>, 277 F.3d at 1278. This is known as the <u>Faragher</u> defense. "Both elements must be satisfied…and the defendant bears the burden of proof on both elements." <u>Frederick v. Sprint/United Mgmt. Co.</u>, 246 F.3d 1305, 1313 (11th Cir. 2001) (citations omitted).

Moreover, Austal is directly liable for co-worker harassment if Austal knew (actual notice) or should have known (constructive notice) of the harassing conduct but failed to take prompt remedial action. <u>See</u>, <u>e.g.</u>, <u>Miller</u>, 277 F.3d at 1278; <u>Breda v. Wolf Camera & Video</u>, 222 F.3d 886, 889 (11th Cir. 2000). Once notice is established, a plaintiff must show that the employer "failed to take immediate and appropriate corrective action." <u>Watson v. Blue Circle, Inc.</u>, 324 F.3d 1252, 1261 (11th Cir. 2003). <u>See also</u> <u>Frederick</u>, 246 F.3d at 1314; <u>Minix v. Jeld-Wen, Inc.</u>, 237 Fed. Appx. 578 (11th Cir. 2007). The prompt remedial action must be "reasonably likely to prevent the misconduct from recurring." <u>See</u>, <u>e.g.</u>, <u>Baldwin v. Blue Cross/Blue Shield of Ala.</u>, 480 F.3d 1287, 1305 (11th Cir. 2007); <u>Kilgore v. Thompson & Brock Mgt., Inc.</u>, 93 F.3d 752, 754 (11th Cir. 1996); <u>Tipp v. AmSouth Bank</u>, 76 F. Supp. 2d 1315, 1333 (S.D. Ala. 1998). Specifically, the employer's action must be "effective action" and "must be 'reasonably calculated to end the harassment,' and the promptness and adequacy of the employer's response must be evaluated on a case-by-case basis. Of special importance is

19

whether the…harassment ended after the remedial action was taken." Munn v. Mayor and Aldermen of City of Savannah, Ga., 906 F. Supp. 1577, 1583 (S.D. Ga. 1995). See also Saville v. Houston Cty. Healthcare Auth., 852 F. Supp. 1512, 1528 (M.D. Ala. 1994).

Throughout Hedgeman's employment (January 3, 2006 to August 17, 2007 and subsequently January 21, 2008 to May 8, 2009), Austal maintained in its Employee Handbook a Non-Discrimination and Anti-Harassment policy which all employees are required to read and sign. (Doc. 279-5 at 3 (Decltn. Lindley); Doc. 285-2 (Dep. Browning at 56-57); Doc. 283-56 (Austal's November 2005-Issue E Hourly Employee Orientation Booklet; Doc. 283-58 (Austal's April 2006-Issue F Hourly Employee Orientation Booklet); and Doc. 283-60 (Austal's November 2007-Issue A Employee Handbook)). During his first term of employment (approximately 20 months), Hedgeman does not recall whether he received an hourly employee orientation booklet, but believes he probably received "[s]ome of it." (Doc. 279-2 (Dep. Hedgeman II at 51-53)). Hedgeman, however, did review and sign an orientation checklist – after completing orientation. (Doc. 322-1 (Dep. Hedgeman I at 48)). During his second term of employment, Hedgeman received the hourly employee orientation booklet as indicated on the checklist he signed on January 21, 2008. (Doc. 279-2 (Dep. Hedgeman II at 77)).

Austal's November 2005, April 2006 and November 2007 anti-harassment policies inform employees about the grievance procedure for reporting incidents of discrimination and harassment. (Doc. 283-56 at 25-26; Doc. 283-58 at 23-24; Doc. 283-60 at 6). The November 2005 and April 2006 policies provide, in relevant part: 1) that employees are "urged to inform" their Supervisor of suspected violations of the policy, and that the Supervisors are then required to report same to the Department Manager and 2) if for any reason the employee does not feel

comfortable discussing the situation with his or her immediate Supervisor, he or she should report the matter to the Departmental Manager. (Doc. 283-56 at 25-26; Doc. 283-58 at 23-24). The Revised Handbook issued in November 2007, further provides that an employee should report incidents of harassment to his Supervisor, but if not comfortable doing so, may talk to the Department Coordinator or Manager and then if still needing to talk with someone after completing both of those steps, may contact HR. (Doc. 283-60 at 6).

Taking the facts in the light most favorable to Hedgeman, it is clear that he complied with Austal's reporting policy[8] and that that Austal had notice of the harassing behavior. However, there remains a genuine issue of material fact as to whether Austal exercised reasonable care to correct promptly the harassing behavior; an element of the defense to liability for both supervisory and co-employee harassment. Specifically, Hedgeman has presented evidence that even after he repeatedly reported the racially offensive language and comments, graffiti, and Confederate flags, the work environment remained unchanged with the exception that the bathrooms were periodically painted. These facts, combined with Austal's admissions regarding failure to train[9] its supervisors on Austal's harassment policy prior to the Summer of 2008,[10] create an issue of fact for the jury as to whether Austal should be held liable for the actions of its employees. As such, Austal's motion for summary judgment on this claim is **DENIED.**

---

[8]  Austal's contention that Hedgeman waived his right to include certain "misconduct" as a basis for his claims because he "elected not to report" every single instance of misconduct "in accordance with Austal's policy" (Doc. 279 at 16) lacks any merit. Hedgeman was not required to report every single instance in order to comply with the policy.

[9]  Doc. 284-3 (Dep. Lindley I at 174); Doc. 284-9 (Dep. Carver I at 60); Doc. 284-11 (Dep. O'Dell at 210); Doc. 285-1 (Dep. Keeler at 47, 65, 97); Doc. 285-2 (Dep. Browning at 56-57)).

[10]  (Doc. 284-3 (Dep. Lindley I at 174); Doc. 284-4 (Dep. Lindley II at 74-75).

**VII.    Section 1981/Title VII – Disparate Treatment (Race)**

Hedgeman contends that he was intentionally discriminated against with respect to "terms and conditions of his employment" because of his race in violation of Title VII and Section 1981. Austal moves for summary judgment on Hedgeman's disparate treatment claims for failure to promote.

In individual disparate treatment claims, "the plaintiff bears the burden of proving that the employer discriminated against him because of his race." Cooper v. Southern Co., 390 F.3d 695, 723 (11th Cir. 2004), *overruled on other grounds,* Ash v. Tyson Foods, Inc., 546 U.S. 454, 456-457 (2006). See also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000); Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981). Where there is no direct evidence of discrimination or a statistical pattern of discrimination, the burden shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) applies.  Under this framework, the plaintiff must establish a prima facie case of intentional race discrimination.[11] Id. at 802.  See also e.g., E.E.O.C. v. Joe's Stone Crabs, Inc., 296 F.3d 1265, 1272 (11th Cir. 2002).  If a prima facie case is established, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions.  Id.  Once the employer satisfies its burden, the burden shifts back to the plaintiff to offer evidence that the alleged reason of the employer is a pretext for unlawful discrimination.  Id. at 1272-1273.

To establish a prima facie case of failure to promote, a plaintiff must show that: 1) he is a member of a protected class; 2) who sought and was qualified for positions that the employer

---

[11] "Claims of race discrimination under § 1981 are analyzed in the same manner as claims brought under Title VII."  DeLeon v. ST Mobile Aerospace Eng'g, Inc., 2010 WL 500446, *15 (S.D. Ala. Feb. 9, 2010).

was attempting to fill; 3) despite his qualifications he was rejected; and 4) the employer either continued to attempt to fill the positions or in fact filled the positions with persons outside the plaintiff's protected class. See, e.g., Harrington v. Disney Regional Ent., Inc., 276 Fed. Appx. 863, 872 (11th Cir. 2007) (citing Crawford v. Western Electric Co., Inc., 614 F.2d 1300, 1315 (5th Cir. 1980)). A plaintiff claiming that he was discriminatorily denied a promotion usually must show that he actually applied for the position as part of his prima facie case. Taylor v. Runyon, 175 F.3d 861, 866 (11th Cir. 1999); Combs v. Plantation Patterns, 106 F.3d 1519, 1539 at n. 11 (11th Cir. 1997). Where an employer has an informal promotion procedure (i.e., job openings are not posted or applications are not required), however, an employee may establish this element by showing that the position was available and that the employer had some reason or duty to consider him for same. Jones v. Firestone Tire and Rubber Co., Inc., 977 F.2d 527, 533 (11th Cir. 1992); Carmichael v. Birmingham Saw Works, 738 F.2d 1126, 1133-1134 (11th Cir. 1984).

Hedgeman contends that he was denied a promotion to be a welding inspector/tester, and that the position was given instead to a lesser qualified Caucasian co-worker. (Doc. 279-2 (Dep. Hedgeman II at 246-247)).

Austal contends that Hedgeman is unable to establish a prima facie case of discrimination. Specifically Austal argues that Hedgeman has no knowledge of the experience, background or qualifications of his proposed comparator (a younger Caucasian employee), such that he has wholly failed to provide any evidence that he was treated less favorably than a Caucasian employee who was "nearly identical" in all relevant respects including experience, background and disciplinary history. (Doc. 279 at 21).

As to the prima facie case, Austal conflates the prima facie requirements of a discriminatory pay claim with the prima facie requirements to establish a failure to promote claim. Similarly situated comparators are not necessary to establish a prima facie claim of failure to promote, rather plaintiff must only show that the position was filled with a person outside his protected class. See Harrington v. Disney Regional Ent., Inc., 276 Fed. Appx. 863, 872-873 (11th Cir. 2007) ("The elements are different for disparate pay and promotion claims…").

Concerning Hedgeman's specific failure to promote claim tied to a welder tester/inspector position, Hedgeman testified that the Caucasian employee who received the position was only 18 years old and that he did not have the work experience of Hedgeman, who had "been through welding school, different schools. I was qualified for the job." (Doc. 279-2 (Dep. Hedgeman II at 247). Although the Hedgeman was unable to name the person, the description of the person and the fact of the promotion has not been rebutted by Austal. Moreover, Hedgeman is a member of a protected class and Hedgeman testified that he applied for the welder/tester position. Thus, Hedgeman has established a prima facie case which has not been addressed by Austal. As such, Austal's motion for summary judgment on this failure to promote claim is **DENIED.**[12]

Plaintiff also claims, pursuant to §1981, that Austal failed to promote him during the second term of his employment (January 2008-May 2009) and that this failure to promote was

---

[12] Hedgeman's Title VII failure to promote claims (but not Section 1981 failure to promote claims) are limited to his first term of employment -- specifically to any such incidents occurring between May 24, 2006 and November 13, 2006. No argument has been made that the failure to promote to the welding inspector/tester position occurred outside of the relevant dates. Even if it was, the claim would survive as a §1981 claim.

based on his race. The plaintiff summarily states that the following Caucasian individuals received promotions soon after beginning employment with Austal: Jerry Cockroft acting as Step-Up Supervisor in March 2008; Cockroft's promotion to HVAC Supervisor in April 2008; Cockroft's promotion to HVAC Foreman in July 2008; Michael Osburn acting as Step-Up Supervisor in June 2008; and Richard Buckalew acting as Step-Up Supervisor in May 2008. The plaintiff has cited no evidence that he applied for these positions. However, there is sufficient evidence that the promotion process, at least to the step-up supervisors, remained an informal process such that plaintiff has established a prima facie case.

Austal has responded with a nondiscriminatory reason for the failure to promote Hedgeman to these step-up supervisory positions. Austal has presented evidence that Cockroft, Osburn and Buckalew all had previous supervisory experience at their previous jobs. (Doc. 352-6). Hedgeman's effort to show pretext consists of arguing that the named employees were promoted soon after arriving on the job; the implication being that Hedgeman should have received the same treatment. There is no evidence before the court that Hedgeman had supervisory experience. Accordingly, Hedgeman has not rebutted Austal's nondiscriminatory reason with sufficient evidence to show that Austal's reason is a pretext for unlawful discrimination. Therefore, Austal's motion for summary judgment on the §1981 failure to promote to step-up supervisor claims is **GRANTED.**

**VIII.**    **Punitive Damages**

Hedgeman seeks an award of punitive damages against Austal. Upon consideration, the Court finds that resolution of the punitive damages issue is a matter better suited for trial. Thus, it is **ORDERED** that Austal's motion for summary judgment regarding Hedgeman's punitive

damages claim is **CARRIED TO TRIAL.**

IX.     **Conclusion**

Accordingly, it is **ORDERED** that Austal's motion for summary judgment is **DENIED** as to Hedgeman's hostile work environment claims; **GRANTED in part** and **DENIED in part** as to Hedgeman's disparate promotion claims; **GRANTED** as to Hedgeman's retaliation claims; **GRANTED** as to Hedgeman's denial of training claims.  Hedgeman's punitive damages request is **CARRIED TO TRIAL.**

**DONE** and **ORDERED** this the **24th** day of **May 2011.**

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**