IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| FRANKLIN THOMAS, *et al.*, ) | |
|     Plaintiffs, ) | |
| v. ) | CIVIL ACTION 08-00155-KD-N |
| ) | |
| AUSTAL, U.S.A., L.L.C., ) | |
|     Defendant. ) | |

**ORDER**

This matter is before the Court on Defendant's motion for summary judgment (Docs. 189, 190), Plaintiff's Opposition (Doc. 309), and Defendants' Reply (Doc. 338).

**I.    Factual Background**

On March 20, 2008, multiple Plaintiffs initiated this action against Austal for legal and equitable relief to redress unlawful discrimination and harassment on the basis of race.[1] (Doc. 1). Plaintiff Franklin Thomas ("Thomas") asserts claims for hostile work environment based on race in violation of Title VII and 42 U.S.C. § 1981. (Doc. 37 at 129-133).[2]

---

[1] While initiated as a purported class action, this is no longer a class action case. (Doc. 293). Additionally, some of the Plaintiffs allege gender and disability discrimination in addition to asserting Title VII claims.

[2] Originally, Thomas alleged a separate claim for retaliation (Doc. 37 at 131-132 at ¶¶ 687-688, 690-692). Thomas did not address this claims in response to Austal's motion and moreover, in his opposition brief now specifically represents that he "is *pursuing* claims against Austal for *only* hostile work environment and discrimination on the basis of race in regards to pay and promotion" under Title VII and Section 1981. (Doc. 309 at 2 (emphasis added)). Accordingly, the Court construes Thomas' intentional exclusion of his retaliation claim as a concession of that claim. Thus, it is **ORDERED** that Austal's motion for summary judgment, as to Thomas' retaliation claim, is **GRANTED.** Additionally, while Thomas initially alleged disparate impact claims against Austal, said claims have been dismissed from this litigation. (Doc. 366).

Moreover, Austal has moved for summary judgment on claims not included in the Third Amended Complaint (disparate pay and promotion and failure to post job openings) (Doc. 190 at 4, 17-20). Thomas also addresses these claims even though they were not included in the Third Amended
(Continued)

1

A.  **Austal**

Defendant Austal USA ("Austal") is an Australian shipbuilding company dedicated to the design and construction of customized aluminum commercial and military vessels, located in Mobile, Alabama. (Doc. 190 at 2; Doc. 283-48 at 2-3 (Austal's 3/7/07 EEOC Position Statement)). The Operations Division has four (4) major Departments (Aluminum (divided into Fabrication and Components), Electrical, Engineering, and Fit Out (divided into HVAC, Insulation and Fit Out)). (Doc. 283-48 at 3-4). Job classifications within the Fabrication Departments include Trade Assistant (trainee position), Apprentice, Welders, Fitters and Fabricators. (Id. at 4).

B.  **Thomas' Employment**

Franklin Thomas was hired by (and started work with) Austal on October 23, 2003 as a Trades Assistant ("TA") in the Maintenance Department at the rate of $12/hour. (Doc. 212-1 (Dep. Thomas at 15, 18-19); Doc. 212-1 at 52-61; Doc. 212-2 at 12 (Decltn. Lindley)). At the

---

Complaint. In Pleming v. Universal-Rundle Corp., 142 F.3d 1354, 1357 (11th Cir. 1998), the Court held that the "parties frame the scope of the litigation at the time the complaint is filed." Moreover, in Davis v. Coca-Cola Bottling Co., Consol., 516 F.3d 955 (11th Cir. 2008), the court highlighted the difficulty in appellate review of voluminous pleadings involving multiple defendants. In so doing it is clear that the 11th Circuit expects the District Court to "strip the case down and identify each claim and defense." Id. at 982. In an effort to do so the court must rely on the claims asserted in the Third Amended Complaint. Thus, claims asserted in depositions and not included in the complaint have not been considered and will not be addressed. See Smith v. Books-A-Million, 398 Fed. Appx. 437 (11th Cir. 2010) (Claims not included in the complaint were not required to be considered by the District Court).

Further, while Thomas simply states "failure to adequately train" in the Third Amended Complaint (Doc. 37 at 132 at ¶695) – yet provides no definite statement concerning same – Thomas did not specifically address, with argument or facts, a failure to train claim in response to Austal's motion for summary judgment**.**  As such, the Court construes Thomas' intentional exclusion of his purported training claim as a concession of that claim. Thus, it is **ORDERED** that Austal's motion for summary judgment, as to Thomas' training claim, is **GRANTED.**

time he was hired, Thomas had two (2) years of experience with Bender Shipbuilding as a maintenance electrician and repairmen for electrical equipment in the shipyard and buildings, and received a high school education and an Associates' Degree for Electrician from Bishop State Community College. (Doc. 286-34 at 5, 13).

During his employment, Thomas received nine (9) pay raises dated January 19, 2004 from $12/hour to $13.50/hour; March 8, 2004 from $13.50/hour to $14.50/hour ("$1.00 basic for increased responsibility/job rate"); February 17, 2005 from $14.50/hour to $15/hour ("Franklin has made a 100% turnaround"); August 19, 2005 from $15/hour to $15.50/hour; January 6, 2006 from $15.50/hour to $16.50/hour ("effort/experience, adjusted [ ] with [ ] cost for new hires"); May 22, 2006 from $16.50/hour to $18/hour; November 27, 2006 from $18.50/hour to $19.75/hour ("effort/competitive to other companies"); July 2, 2007 from $19.75/hour to $20/hour ("merit increase"); and June 30, 2008 from $20/hour to $20.60/hour. (Doc. 212-1 at 52-61; Doc. 295 at 37 (Exhibit 105-Sealed); Doc. 212-2 at 12 (Decltn. Lindley)).

Also during his employment, Thomas received four (4) Warnings dated April 20, 2004 for being tardy five (5) times stating he "needs to break this pattern and get back on track;" July 6, 2004 for unexcused absences twice, stating he "needs to improve this" because it is grounds for termination; August 11, 2004 for unexcused absence, stating that he was advised he would be suspended for one day but was out again yet brought doctor's excuse; and September 29, 2004 for needing to communicate, noting he should be aware that "my supervisor is not thrilled with his work performance" and he did not fill out an equipment repair sheet to show what repairs he did during a day. (Doc. 212-3 at 55-58).

On July 1, 2009, Thomas was fired for fighting on the job. (Doc. 212-2 at 12 (Decltn.

3

Lindley); Doc. 212-1 (Dep. Thomas at 15)).

## II. <u>**Standard of Review**</u>

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (Dec. 2010). The recently amended Rule 56(c) governs Procedures, and provides as follows:

> *(1) Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> *(2) Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
>
> *(3) Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record.
>
> *(4) Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

FED.R.CIV.P. Rule 56(c) (Dec. 2010).

Defendant, as the party seeking summary judgment, bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

4

affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). If the nonmoving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment. Celotex, 477 U.S. at 323. "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992), cert. den., 507 U.S. 911 (1993) (internal citations and quotations omitted).

**III.    Timeliness of Claims**

A plaintiff may not sue under Title VII unless he first exhausts administrative remedies by filing a timely charge of discrimination with the appropriate agency. See, e.g., Wilkerson v. Grinnell Corp., 270 F.3d 1314, 1317 (11th Cir. 2001). "In a non-deferral state such as Alabama, the deadline for filing is 180 days after the alleged discriminatory act." Carter v. University of South Alabama Children's & Women's Hosp., 510 F. Supp. 2d 596, 606 (S.D. Ala. 2007). See also Tipp v. AmSouth Bank, 76 F. Supp. 2d 1315, 1327 (S.D. Ala. 1998). "If the victim of an employer's unlawful employment practice does not file a timely complaint, the unlawful practice ceases to have legal significance, and the employer is entitled to treat the unlawful practice as if it were lawful." City of Hialeah, Fla. v. Rojas, 311 F.3d 1096, 1102 (11th Cir. 2002). See also Sheffield v. United Parcel Service, Inc., 2010 WL 4721613, *2 (11th Cir. Nov. 22, 2010) (unpublished); Jordan v. City of Montgomery, 2008 WL 2529573, *1 (11th Cir. Jun. 26, 2008)

(unpublished). A failure to file a timely charge with the EEOC results in a bar of the claims contained in the untimely charge. Id.

Thomas signed his EEOC Charge for race discrimination (continuing action) and retaliation on November 13, 2006 and it was "received" on November 20, 2006. (Doc. 286-26). Calculating from the November 20, 2006 date, Austal contends that only those discriminatory acts occurring between May 24, 2006 and November 20, 2006 – within the 180 days prior to November 20, 2006 -- are timely. From this, Austal asserts that it is entitled to summary judgment on "[a]ll alleged acts" occurring between Thomas' hire date of October 2003, and May 24, 2006. (Doc. 190 at 7).[3]

Thomas contends that Austal's interpretation is incorrect and contrary to well established law, as although many acts upon which a plaintiff's Title VII claims rely may occur outside the 180 filing period, "they are part of the same actionable hostile environment claim." (Doc. 309 at 13-14 (citing McKenzie v. Citation Corp., LLC, 2007 WL 1424555 (S.D. Ala. 2007)). Thomas is correct as it relates to his hostile work environment claim. The U.S. Supreme Court has clarified that there are different standards for claims involving "discrete acts" versus "hostile environment" allegations. See generally National R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002). Under the continuing violation doctrine, a plaintiff's charge of discrimination regarding a hostile work environment is considered timely if "an act contributing to the claim occurs within the filing period," even if "some of the component acts of the hostile work environment fall outside the statutory time period." Id. at 117. As explained in Smiley v. Alabama Dept. of

---

[3] While Austal also asserts that Thomas' claim that George Calkins was hired at a higher hourly rate is time-barred, as noted *supra* footnote 2, Thomas has not alleged disparate pay claims in this case.

Transp., Slip Copy, 2011 WL 1188506, *5 (M.D. Ala. Mar. 30, 2011):

> Unlike claims involving discrete discriminatory acts, hostile environment claims may be litigated so long as at least one of the events contributing to the hostile environment was presented to the EEOC in a Charge of Discrimination in a timely fashion. Indeed, in *Morgan*, the United States Supreme Court held that "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period." *Morgan*, 536 U.S. at 106.

Thomas' EEOC Charge alleges not just "at least one of the events" but a variety of "events contributing to the hostile work environment" -- sufficient to have placed Austal on notice that such a claim (and various incidents tied to same) exists in the litigation so that Austal could have investigated the details during discovery. Additionally, Thomas testified that despite the filing of his EEOC charge, the racial discrimination "just continued on[.]" (Doc. 285-26 (Dep. Thomas at 29-30)). Accordingly, Austal's motion for summary judgment on this hostile work environment claim is **DENIED.**

### IV. Section 1981/Title VII – Hostile Work Environment (Race)

Racial harassment is actionable under Section 1981 or Title VII where the conduct is sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment. See, e.g., Freeman v. City of Riverdale, 330 Fed. Appx. 863, 865 (11th Cir. 2009).[4] To establish a prima facie case of hostile work environment and/or racial harassment under Section 1981 or Title VII, the plaintiff must prove that: 1) he belongs to a protected group; 2) he has been subject to unwelcome harassment; 3) the harassment was based on a protected characteristic of the employee (such as race); 4) the harassment was sufficiently

---

[4] This is an unpublished decision and is persuasive, but not binding, authority pursuant to Eleventh Circuit Rule 36-2. The Court notes this same rule applies to other Fed. Appx. cases cited herein.

severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and 5) the employer is responsible for such environment under a theory of vicarious or direct liability. See, e.g., Reeves v. DSI Sec. Servs., Inc., 395 Fed. Appx. 544, 545-546 (11th Cir. 2010); McCann v. Tillman, 526 F.3d 1370, 1378 (11th Cir. 2008); Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002). See also e.g., Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999).

Austal contends that: 1) Thomas' evidence of sporadic and isolated incidents of racially hostile comments, conduct and graffiti during the time she was employed do not meet the severe or pervasive threshold; 2) Thomas makes no allegations and presents no evidence that the allegedly hostile environment unreasonably interfered with her ability to work on a day-to-day basis; 3) Austal maintained a policy establishing how an employee should report discriminatory conduct, but Thomas failed to report certain conduct; and 4) Austal took reasonable preventative and corrective/remedial measures to prevent a hostile work environment.

### A. Severe or Pervasive

As to whether the conduct was severe and pervasive, Thomas points to the following evidence.[5] Regarding racially and hostile discriminatory comments,[6] Thomas heard lead man

---

[5] Thomas also relies on the allegations of the other 22 plaintiffs (Doc. 309 at 3-4, 18-19, 22-23) to support that an overall racially charged work atmosphere exists at Austal (*i.e.*, viewed through the lens of the plaintiffs' collective allegations versus each plaintiff's specific allegations). "To rely on the evidence, each [plaintiff] must show that he *was aware* of those incidents at the relevant time he alleges the hostile work environment." See, e.g., Melton v. National Dairy, LLC, 705 F. Supp. 2d 1303, 1342 (M.D. Ala. 2010) (citing Edwards Wallace Comm. College, 49 F.3d 1517, 1522 (11th Cir. 1995)) (emphasis in original). See also e.g., Head v. Pitts Enterprises, Inc., Slip Copy, 2010 WL 2773376, *8 (M.D. Ala. Jul. 14, 2010); McKenzie v. Citation Corp., LLC, 2007 WL 1424555, *13 (S.D. Ala. May 11, 2007). Courts in the Eleventh Circuit may consider statements not directed at a plaintiff and even hearsay statements, so long as the plaintiff was aware of the statements at the time he was employed. See, e.g., Yeomans v. Forster and Howell, Inc., Slip Copy, 2010 WL 3716394, *5-6 (M.D. Ala. Sept. 10, 2010). The Court has
(Continued)

Michael Bolin say, once, "[w]hen he get home, he was going to beat that nigger ass[]" in his office in front of Thomas and another co-worker. (Doc. 212-1 (Dep. Thomas at 55-56, 82)). Thomas and the co-worker looked at each other and asked Bolin "not to use that word around us no more." (Id. (Dep. Thomas at 56)). Bolin responded "sorry about that, I wasn't talking about you all[]" and Thomas never heard him made that comment again. (Id. (Dep. Thomas at 56, 82); Doc. 285-26 (Dep. Thomas at 65-66)). Thomas did not report Bolin's comment. (Doc. 285-26 (Dep. Thomas at 82)).

Thomas alleges that a Caucasian supervisor called Caucasian co-worker Roy Hall on the Austal work radio and stated "could you have one of your monkeys come move this scaffolding equipment for me"), which Thomas believed was racial, as referring to African American employees. (Doc. 212-1 (Dep. Thomas at 114); Doc. 286-34 at 7; Doc. 285-26 (Dep. Thomas at 116-117)). At that time, Roy Hall "had all black employees working for him." (Doc. 212-1 (Dep. Thomas at 114)). "Everyone on the channel four over the radio heard it[.]" (Id.) When Thomas confronted Hall about the comment, Hall acted like he did not know what Thomas was

---

only considered the evidence of which Wells testified that he was aware.

[6] Thomas alleges that a Caucasian co-worker John Pitts called him "boy." (Doc. 212-1 (Dep. Thomas at 56-57)). Thomas asked Pitts not to call him "boy" again and Pitts did not. (Id.) Thomas did not report Pitts' comment. (Doc. 285-26 (Dep. Thomas at 58, 65)). The word "boy" said to African American employees is not always evidence of racial animus -- other factors must be consulted such as context, inflection, tone of voice, local custom and historical usage. See, e.g., Ash v. Tyson Foods, Inc., 546 U.S. 454, 456 (2006). Thomas does not provide any further testimony about the context of the "boy" comment. As such, the Court is not satisfied that Thomas has explained the context and usage of the "boy" remark made to him, to establish that there is at least an issue of fact as to whether the remark was racially motivated. See, e.g., Ash v. Tyson Foods, Inc., 2006 WL 2219749, *2 (11th Cir. Aug. 2, 2006). Moreover, this remark was made once to Thomas, by a co-worker. While Thomas contends that he frequently heard "boy" by others, his deposition testimony does not validate that claim. (Doc. 285-26 (Dep. Thomas at 56-57)).

9

talking about. (Doc. 285-26 (Dep. Thomas at 115)).

Thomas alleges that in 2005, Caucasian supervisor David Abear directed a racial joke towards him "in front of his buddies" (other Caucasian supervisors) saying "hey Frank, I told you I'm not a racist, at home I have a color TV[]"); he told the supervisor never to make another racial comment to him again and the supervisor said "okay, laughing," but did not make any further such comments to Thomas. (Doc. 286-34 at 8; Doc. 212-1 (Dep. Thomas at 55, 66); Doc. 285-26 (Dep. Thomas at 54-55, 65)). A day or so later, Thomas reported supervisor Abear's comment to coordinator Robert Shephard, who told him "without no witness, there's nothing that he can do about it." (Doc. 212-1 (Dep. Thomas at 66); Doc. 285-26 (Dep. Thomas at 66-67)). When Abear said the comment, he was surrounded by his "buddies. They was all white." (Id.)

Thomas could not recall whether he reported other racially discriminatory and/or hostile comments or conduct but testified "it could be more[]" explaining that "for everything that happened since I've been there…I just can't remember every single thing happened[.]" (Doc. 285-26 (Dep. Thomas at 67)). Thomas also testified that he also saw and heard from other African-American employees about the racially hostile environment they experienced in other places at Austal. (Doc. 285-26 (Dep. Thomas at 60-62, 68)). Thomas, however, did not testify as to what he was made aware of by others.

Moreover, Thomas was subjected to displays and/or the wearing of the Confederate flag on t-shirts, helmets, pants pockets, welding shields and on the back window of a vehicle, by "a lot of people" at work, including welder Sam Peach. (Doc. 212-1 (Dep. Thomas at 30, 84-86)). Thomas did not report that he was uncomfortable with the Caucasian employees displaying and/or wearing the Confederate flag imagery. (Id. (Dep. Thomas at 86)). Thomas did not testify

10

as to the frequency with which he saw the flag imagery. The displays of the Confederate flag imagery were not addressed by Austal.

Further, Thomas saw (or was made aware of) racial epithets in graffiti on bathroom walls and stalls. (Doc. 212-1 (Dep. Thomas at 30, 68-70, 75-77); Doc. 285-26 (Dep. Thomas at 68-69, 71, 74-77, 80-81); Doc. 286-34 at 6-7). The racial graffiti included: "black people only belong on cotton fields," "KKK rules," "all blacks need to go back to their motherland in Africa," "niggers are hired from the neck down not to think," "too many niggers in the warehouse," "see, niggers travel in packs just like monkeys," "White Power" with a drawing of a hooded Klansman, "how many niggers do you see around here wearing white hats," "why don't niggers use aspirin? Because they don't want to pick cotton out of the top,"[7] and a hangman's noose drawn on the stalls. (Doc. 286-34 at 6-7; Doc. 212-1 (Dep. Thomas at 30, 68-70, 75-77; Doc. 285-26 (Dep. Thomas at 71, 74-77, 80-81)). Additionally, the racial graffiti included a drawing of Thomas with a noose hanging around his neck. (Doc. 286-34 at 7). According to Thomas, the first time he saw graffiti, he reported it to Wilbur Lee and cleaners painted over the graffiti on the bathroom wall but the graffiti just reappeared and when Thomas asked Lee about it, Lee responded there was nothing he could do to stop it. (Doc. 286-34 at 6-7; Doc. 212-1 (Dep. Thomas at 72-73)). Thomas reported the graffiti to Charles Stills, and in response the graffiti was removed. (Doc. 212-1 (Dep. Thomas at 73)). Thomas also reported the "nigger graffiti" in November 2006 to supervisor Chris Robinson, asking him if "they were going to do anything" and he replied "there was nothing they could do about it. It seemed to be a never ending battle

---

[7] Myron Barnes and Jerome Pettibone told Thomas about this particular graffiti. (Doc. 285-26 (Dep. Thomas at 81)).

with nobody caring that this graffiti continued to be all over the bathroom walls, even after they were painted over." (Doc. 286-34 at 7; Doc. 285-26 (Dep. Thomas at 100-101, 103)). Additionally, Thomas was aware that a Caucasian security manager took photographs of the racial graffiti in the bathrooms and gave them to Austal management. (Doc. 286-34 at 8). Moreover, Thomas reported "all the nigger graffiti" to his coordinator Kurk Freeman and his supervisor Robert Bechtol during a morning meeting. (Doc. 285-26 (Dep. Thomas at 103-105)). On another occasion, Thomas reported some graffiti that used the word "nigger." (Id. (Dep. Thomas at 73-74)). Once, Caucasian supervisor Roy Hall took Thomas into a bathroom stall to point out to him graffiti that said "something about dealing with niggers[;]" Hall told Thomas "that's a shame people still think that way." (Id. (Dep. Thomas at 78-80)). Thomas did not report that graffiti. (Id. (Dep. Thomas at 80)).

Thomas explained that the reason he did not report each instance of graffiti was "because of the supervisors – some of those supervisors using the restroom saw them, too, so I didn't report." (Doc. 212-1 (Dep. Thomas at 78)). "It's a lot of supervisors saw that [graffiti] on the wall." (Id.)

The record reveals that starting in August 2007, Austal responded to complaints about the graffiti by cleaning the bathrooms and painting black over the graffiti on a regular basis. (Doc. 285-2 (Dep. Browning at 16, 110; Doc. 212-1 (Dep. Thomas at 70, 75-78)). Nevertheless, the painting did not deter the offending scribblers, as the walls would soon be filled again with racially offensive graffiti; as noted by Thomas "the only thing that happened was the walls were painted and the graffiti reappeared[]" and "it's just pitiful, repaint the walls and each time anyone come out of a stall, they can go check it[.]" (Doc. 285-26 (Dep. Thomas at 108); Doc. 212-1

(Dep. Thomas at 70, 75-78); Doc. 286-34 at 6; Doc. 284-4 (Dep. Lindley II at 95-96, 166-168, 188-190, 195-196, 202-203); Doc. 284-5 (Dep. Lindley III at 254); Doc. 284-11 (Dep. O'Dell at 74-75); Doc. 284-7 (Dep. Friedlieb I at 84)).

Finally, at some point during his employment Thomas completed a questionnaire for Austal in which he wrote "will the racism ever stop?" and turned in the form to his supervisor. (Doc. 285-26 (Dep. Thomas at 117-119)).

To be actionable as severe or pervasive, the harassment "must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceive[s]…to be abusive." Miller, 277 F.3d at 1276 (internal citation and quotation marks omitted). In other words, the severe or pervasive element has an objective and subjective component. McCann, 526 F.3d at 1378. To determine the objective severity of the harassment, courts look at the totality of the circumstances and consider: 1) the frequency of the discriminatory conduct; 2) the severity of the conduct; 3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and 4) whether the conduct unreasonably interferes with an employee's job performance. Reeves, 395 Fed. Appx. at 546. See also Faragher v. City of Boca Raton, 524 U.S. 775, 787-788 (1998); Allen v. Tyson Foods, 121 F.3d 642, 647 (11th Cir. 1997) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)). "The conduct is considered cumulatively instead of in isolation." Reeves, 395 Fed. Appx. at 546.

There is sufficient evidence, if believed by a jury, that Thomas subjectively perceived his work environment to be racially hostile. Thus, the Court need only determine whether Thomas' perception was objectively reasonable.

When viewing the facts in the light most favorable to Thomas, a reasonable jury could not find that the harassing conduct alleged was frequent and severe. According to Thomas, he was not regularly subjected to racially discriminatory comments or conduct. While Thomas testified that he regularly encountered offensive racial "nigger" graffiti during his employment (including a drawing of himself with a hangman's noose around his neck) in the workplace bathrooms, when he reported the graffiti it was painted over. Additionally, while Thomas testified that he saw images of the Confederate flag as displayed and/or worn on Caucasian co-workers' t-shirts, welding shields, etc., he did not testify as to the frequency with which he encountered such graffiti and moreover, appeared to focus his exposure to such imagery on one Caucasian co-worker's display of same.

While much of the repeated conduct may not have been physically threatening, it is not unreasonable to infer from Thomas' allegations that the conduct was racially demeaning, humiliating and degrading. McKenzie, 2007 WL 1424555 at *13. Indeed, Thomas testified that he felt like he was being judged by the color of his skin and because of that, has missed out on life: "[o]ver the years of being subjected to this workplace and dealing with the kind of environment that you're not used to. The company knowing about these situations going on and they are not taking care of it the proper way….And a lot you miss out of life, because the way people mistreat you and the way you being judged off of your—the color of your skin. You read about it, but I ain't never have to deal with it. This is my first time ever dealing with this type of stuff." (Doc. 285-26 (Dep. Thomas at 107-108)). Thomas also explained in discovery responses as follows: "I feel I have suffered emotional damages due to the way I have been treated at Austal…I am not accustomed to this type of environment. It is making me angry at work and

giving me lack of concentration. I really don't enjoy my work anymore. I have trouble sleeping, and I have noticed an increase in headaches, I am also short tempered with my family members and co-workers." (Doc. 286-34 at 9).

Despite Thomas' testimony, there is no indication in the record that Thomas was exposed to regular and/or daily racial comments or conduct (rather, he experienced only a few isolated instances of same); that he was exposed to regular and/or daily displays of Confederate imagery; and/or that the racial graffiti he regularly encountered in the bathrooms was not painted over by Austal when he reported same. At best, Thomas has provided evidence of encountering constantly racially offensive graffiti at Austal. However, while he may have regularly encountered offensive graffiti, he has not established that any of this repeated conduct was severe, physically threatening or that it unreasonably interfered with his job performance. Indeed, Thomas received nine (9) pay raises from October 2003-July 2009. See *supra*. Thus, a jury could not reasonably find that the incidents alleged were severe and pervasive.[8]

Eleventh Circuit precedent mandates that courts consider "the totality of the circumstances" such that the absence of one factor is not dispositive. See, e.g., Miller, 277 F.3d at 1277. In this case, Thomas has not submitted sufficient evidence demonstrating that the conduct – apart from the racially offensive graffiti -- was frequent, severe, physically threatening, humiliating, demeaning and/or unreasonably interfered with his job. See, e.g., Barrow v. Georgia Pacific Corp., 144 Fed. Appx. 54, 57-58 (11th Cir. 2005) (concluding that evidence of "displays of the rebel flag on tool boxes and hard hats, the letters 'KKK' on a

---

[8] The Court has considered the evidence presented by each plaintiff in isolation. Accordingly, on the claim of hostile work environment there are different determinations amongst plaintiffs based on the specificity and quantity of evidence presented by each plaintiff.

bathroom wall and on a block-saw console, and a noose in another employee's locker,'" as well as several threats to "kick plaintiff's 'black ass'" or threats that if he looked at a white girl he was going to get "cut," and the use of racial epithets including "nigger," "boy," and "black boy," reflected conduct that was "isolated," "sporadic," and "random" and did not amount to "severe and pervasive" harassment).

While there is "not simply some magic number of racial or ethnic insults" that preclude summary judgment, it is repeated incidents of...harassment that continue despite the employee's objections [that] are indicative of a hostile work environment." Miller, 277 F.3d at 1276 (citation and quotation omitted). In this instance, Thomas admits that he did not complain about two of the only three instances concerning his co-employees offensive behavior (racial comments), about any of the Confederate flag imagery, and about some of the racial graffiti. In sum, under the totality of the circumstances and considering the allegations in the light most favorable to Thomas, he has not produced sufficient evidence – if believed by a jury – to create an issue of fact as to whether he was subjected to racial harassment that was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment.

As a result, because Thomas has failed to satisfy this fourth element of his prima facie case for hostile work environment, the Court need not reach the fifth element (employer liability) and summary judgment is **GRANTED** in favor of Austal on this claim.

## V. Conclusion

Accordingly, it is **ORDERED** that Austal's motion for summary judgment is **GRANTED** as to Thomas' hostile work environment claims; **GRANTED** as to Thomas'

retaliation claim; and **GRANTED** as to Thomas' training claim. As such, Thomas' punitive damages request is **MOOT.**

**DONE** and **ORDERED** this the **26th** day of **May 2011.**

        /s/ Kristi K. DuBose
        **KRISTI K. DuBOSE**
        **UNITED STATES DISTRICT JUDGE**