**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| CARLOS JOHNSON, *et al.*, | ) | |
|     **Plaintiffs,** | ) | |
| **v.** | ) | **CIVIL ACTION 08-00155-KD-N** |
| | ) | |
| AUSTAL, U.S.A., L.L.C., | ) | |
|     **Defendant.** | ) | |

## ORDER

This matter is before the Court on Defendant's partial[1] motion for summary judgment (Docs. 171, 172), Plaintiff's Opposition (Doc. 304), and Defendant's Reply (Doc. 330).

## I.    Factual Background

On March 20, 2008, multiple Plaintiffs initiated this action against Austal for legal and equitable relief to redress unlawful discrimination and harassment on the basis of race.[2] (Doc. 1). Carlos Johnson ("Johnson") asserts claims for hostile work environment and disparate treatment (discriminatory pay and promotions) based on race, in violation of Title VII and 42 U.S.C. § 1981. (Doc. 37 at 74-79).[3]

---

[1] Austal did not move for summary judgment on the merits of Johnson's disparate pay claims and/or failure to promote claims (as to the position given to Benjamin Hoffner). Also, Johnson did not allege a punitive damages claim in the Third Amended Complaint, such that punitive damages are not at issue in his case.

[2] While initiated as a purported class action, this is no longer a class action case. (Doc. 293).

[3] Originally, Johnson separate claims for disparate treatment for retaliation (Doc. 37 at 77-79 at ¶¶379-382), discipline (unwarranted counseling) (Id. at 75 at ¶364), lower evaluations (Id. at 75-76 at ¶368-369), and denials of training (Id. at 75, 78 at ¶364, 381). Johnson did not address these claims in response to Austal's motion and moreover, in his opposition brief now specifically represents that he "is pursuing claims against Austal for *only* hostile work environment and discrimination on the basis of race in regards to pay and promotions" under Title VII and Section 1981. (Doc. 304 at 2 (emphasis added)). Accordingly, the Court construes Johnson's intentional exclusion of his retaliation, discipline, evaluations and training claims as concessions of these claim. Thus, it is **ORDERED** that Austal's motion for summary judgment, as to Johnson's retaliation, discipline, evaluations and training claims, is (Continued)

## A.    Austal

Defendant Austal USA ("Austal") is an Australian shipbuilding company dedicated to the design and construction of customized aluminum commercial and military vessels, located in Mobile, Alabama. (Doc. 172 at 2; Doc. 283-48 at 2-3 (Austal's 3/7/07 EEOC Position Statement)). The Operations Division has four (4) major Departments (Aluminum (divided into Fabrication and Components), Electrical, Engineering, and Fit Out (divided into HVAC, Insulation and Fit Out)). (Doc. 283-48 at 3-4).

## B.    Johnson's Employment

Carlos Johnson was hired by Austal as Trades Assistant ("TA")[4] on May 22, 2006, in the Fabrication Department at the rate of $11/hour. (Doc. 172-1 (Dep. Johnson at 41, 43, 48); Doc. 295 at 19 (Exhibit 105-Sealed); Doc. 172-1 at 46; Doc. 172-2 (Decltn. Lindley at 7)). During his employment, Johnson received at least seven (7) pay raises, including August 28, 2006 (from $11/hour to $12/hour--"continued improvement"); November 1, 2006 (from $12/hour to $14/hour – "keep up the good work Carlos"); June 25, 2007 (from $14/hour to $15/hour); October 1, 2007 (from $15/hour to $16.50/hour – "Carlos has come along [sic] way since coming over from the Fab dept. He works hard and try's [sic]"); February 4, 2008 (from $16.50/hour to $17.50/hour – "excelent [sic] performance of duties, B-class welder"); June 30,

---

**GRANTED.**

Additionally, while Johnson initially alleged disparate impact claims against Austal, said claims have been dismissed from this litigation. (Doc. 366).

[4] A Trades Assistant is an employee who assists a Fitter or Welder in his job duties and is a stepping stone to the Fitter or Welder position. (Doc. 330-3 at 2 (Decltn. Combs at ¶4)). See also Doc. 172-1 (Dep. Johnson at 43)) ("[y]ou assist a trade….trade assistant in fabrication."

3008 (from \$17.50/hour to \$18.03/hour – "cost of living adjustment[]"); March 9, 2009 (from \$18.03/hour to \$20.03/hour)).[5] (Doc. 172-1 at 48-49, 51-54; Doc. 295 at 19 (Exhibit 105-Sealed); Doc. 172-2 (Decltn. Lindley at 7); Doc. 330-6 at 4 (Decltn. Expert Dr. Steward)). As of October 2009, Johnson earned \$18.57/hour; Johnson remains employed at Austal and currently works as an Inspector in the Quality Control Department earning \$20.25/hour. (Doc. 172-2 (Decltn. Lindley at 7)).

## II.     Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (Dec. 2010). The recently amended Rule 56(c) governs Procedures, and provides as follows:

> *(1) Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> *(2) Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
>
> *(3) Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record.

---

[5] Johnson also had the following decrease in pay: December 4, 2006 (from \$14/hour to \$12/hour); May 4, 2009 (from \$20.03 to \$18.03/hour (a decrease in pay). (Id.)

> *(4) Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed.R.Civ.P. Rule 56(c) (Dec. 2010).

Defendant, as the party seeking summary judgment, bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). If the nonmoving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment. Celotex, 477 U.S. at 323. "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992), cert. den., 507 U.S. 911 (1993) (internal citations and quotations omitted).

## III.    Timeliness of Claims under Title VII

A plaintiff may not sue under Title VII unless he first exhausts administrative remedies by filing a timely charge of discrimination with the appropriate agency. See, e.g., Wilkerson v. Grinnell Corp., 270 F.3d 1314, 1317 (11th Cir. 2001). "In a non-deferral state such as Alabama, the deadline for filing is 180 days after the alleged discriminatory act." Carter v. University of South Alabama Children's & Women's Hosp., 510 F. Supp. 2d 596, 606 (S.D. Ala. 2007). See

also <u>Tipp v. AmSouth Bank</u>, 76 F. Supp. 2d 1315, 1327 (S.D. Ala. 1998). "If the victim of an employer's unlawful employment practice does not file a timely complaint, the unlawful practice ceases to have legal significance, and the employer is entitled to treat the unlawful practice as if it were lawful." <u>City of Hialeah, Fla. v. Rojas</u>, 311 F.3d 1096, 1102 (11th Cir. 2002). <u>See</u> <u>also</u> <u>Sheffield v. United Parcel Service, Inc.</u>, 2010 WL 4721613, *2 (11th Cir. Nov. 22, 2010) (unpublished); <u>Jordan v. City of Montgomery</u>, 2008 WL 2529573, *1 (11th Cir. Jun. 26, 2008) (unpublished). A failure to file a timely charge with the EEOC results in a bar of the claims contained in the untimely charge. <u>Id</u>.

Johnson signed his EEOC Charge (for race and "continuing action") on May 21, 2008 and it was stamped "received" on May 29, 2008. (Doc. 286-8). Calculating from the May 21, 2008 date, Austal contends that only those discrete discriminatory acts occurring within the 180 days prior (between November 24, 2007 and May 29, 2008) are timely.[6] (Doc. 172 at 7). From this, Austal seeks summary judgment on "[a]ll alleged [discriminatory] acts" occurring between Johnson's hire date of May 22, 2006 and 180 days prior to the EEOC filing (actually December 1, 2007, not November 24, 2007 as Austal asserts). (<u>Id</u>.)[7]

Johnson contends that Austal's interpretation is incorrect and contrary to well established law, as although many acts upon which a plaintiff's Title VII claims rely may occur outside the 180 filing period, "they are part of the same actionable hostile environment claim." (Doc. 304 at

_____

[6] EEOC regulations provide that charges are "filed with the Commission upon receipt[]" (*i.e.*, not when signed). 29 C.F.R. § 1601.13(a). Thus, the receipt date indicated on the official stamp is the date that Johnson's EEOC Charge was filed -- May 29, 2008.

[7] Austal also moved for summary judgment based on untimeliness, on Johnson's retaliation claim (concerning vacuuming water out of the ship) and "all [other] alleged acts" (*i.e.*, Johnson's discipline, training and evaluations claims); however, as noted *supra*, Austal has already been granted summary judgment on these claims due to Johnson's failure to address same in his opposition.

14 (citing <u>McKenzie v. Citation Corp., LLC</u>, 2007 WL 1424555 (S.D. Ala. 2007)).  Johnson is correct as it relates to his hostile work environment claim.  The U.S. Supreme Court has clarified that there are different standards for claims involving "discrete acts" versus "hostile environment" allegations.  <u>See</u> <u>generally</u> <u>National R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101 (2002).  Under the continuing violation doctrine, a plaintiff's charge of discrimination regarding a hostile work environment is considered timely if "an act contributing to the claim occurs within the filing period," even if "some of the component acts of the hostile work environment fall outside the statutory time period."  <u>Id</u>. at 117.  As explained in <u>Smiley v. Alabama Dept. of Transp.</u>, Slip Copy, 2011 WL 1188506, *5 (M.D. Ala. Mar. 30, 2011):

> Unlike claims involving discrete discriminatory acts, hostile environment claims may be litigated so long as at least one of the events contributing to the hostile environment was presented to the EEOC in a Charge of Discrimination in a timely fashion. Indeed, in *Morgan*, the United States Supreme Court held that "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period." *Morgan*, 536 U.S. at 106.

Johnson's EEOC Charge alleges not just "at least one of the events" but a variety of "events contributing to the hostile work environment" -- sufficient to have placed Austal on notice that such a claim (and various incidents tied to same) exists in the litigation so that Austal could have investigated the details during discovery.  Accordingly, Austal's motion for summary judgment on Johnson's hostile work environment claim ("all alleged acts") is **DENIED.**

As to Austal's untimeliness claim pertaining to "all alleged discriminatory acts" between May 22, 2006-December 1, 2007, the Court first addresses Johnson's disparate treatment claim for failure to promote concerning the position given to Everett Maylin.  The EEOC charge includes the details surrounding this failure to promote claim (Doc. 286-8 at 3 (EEOC Charge)),

and moreover, this promotion claim dates to a time in May 2008 prior to the filing of the EEOC Charge, and so is timely. Thus, Austal's motion is **DENIED** as to the untimeliness of this Title VII promotion claim.

Concerning Johnson's failure to promote claim relating to the position given to Benjamin Hoffner, according to Johnson, Hoffner was promoted to Fitout Supervisor on June 1, 2007 and then promoted to Engineering Supervisor on February 18, 2008. (Doc. 304 at 10). Austal claims that "[a]ll alleged acts" occurring between Johnson's May 22, 2006 hire date and 180 days prior to the EEOC filing (December 1, 2007) are barred, which would include Johnson's alleged denials of promotions before December 1, 2007 -- as these would have been discrete discriminatory acts. See e.g., National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114 (2002): "Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable "unlawful employment practice." Id. (emphasis added). In Morgan, the U.S. Supreme Court drew a distinction between discrete acts of discrimination and hostile work environment claims, noting that "discrete acts such as…failure to promote….are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable unlawful employment practice." Morgan, 536 U.S. at 114. Additionally, the Eleventh Circuit has held that the denial of a promotion is a one time violation, the present consequences of which only are felt at the present time, and not a continuing violation. Id. (citing Roberts v. Gadsden Memorial Hosp., 835 F.2d 793 (11th Cir. 1988), modified, 850 F.2d 1549 (11th Cir. 1988) and Price v. M & H Valve Co., 2006 WL 897231, *7 (11th Cir. Apr. 7, 2006) (unpublished)). Accordingly, Austal's motion for summary judgment as to Johnson's Title VII claims for denial of promotions prior to December 1, 2007

(thus including the June 1, 2007 promotion of Hoffner), based on untimeliness, is **GRANTED.**

As for Johnson's Title VII claim for Hoffner's February 18, 2008 promotion, this February 18, 2008 promotion of Hoffner occurred after December 1, 2007 and so is within the 180 days prior to Johnson's May 29, 2008 filing.

Regarding Johnson's Title VII claims of discriminatory pay (for pay raise and initial hourly rate/hourly wages) – the Court finds as follows. At the outset, based on the record and the facts of this case, Johnson's singular pay raise claim is a discrete act,[8] rather than a continuing violation. See, e.g., Powell v. Duval County School Bd., Slip Copy, 2009 WL 3157588, *7 and note 12 (M.D. Fla. Sept. 28, 2009). Specifically, Johnson alleges that he acted as step-up supervisor in the piping and welding department for approximately six months and while he had the position's responsibilities, he did not receive a corresponding pay raise. (Doc. 304 at 8; Doc.

---

[8] Johnson makes no claim that the recently enacted Fair Pay Act applies to his case and/or that the facts of his pay raise claim implicates the recently enacted legislation called the "Lily Ledbetter Fair Pay Act of 2009," Pub.L. No. 111-2, 123 Stat. 5 (2009) (amending 42 U.S.C. § 2000e-5(e)), signed into law by President Obama on January 29, 2009. See, e.g., Bush v. Orange County Corrections Dept., 597 F. Supp. 2d 1293, 1296 (M.D. Fla. 2009). See also e.g., Smithers v. Wynne, 319 Fed. Appx. 755, 757 (11th Cir. 2008); Ledbetter v. Goodyear Tire & Rubber Co., Inc., 421 F.3d 1169, 1179-1180 (11th Cir. 2005). The Lily Ledbetter Pay Act, which overturned the Supreme Court's holding in Ledbetter v. Goodyear Tire & Rubber Co., 550 U.S. 618 (2007) (holding that where there is no evidence that the employer "initially adopted its [pay-rate system] in order to discriminate ... or that it later applied this system ... within the [statutory] period with any discriminatory animus," the mere fact that "this discrimination reduced the amount of later paychecks" does not mean that "each new paycheck constitutes a new violation"), provides as follows:

> For purposes of this section, an unlawful practice occurs, with respect to discrimination in compensation in violation of this chapter, when a discriminatory compensation decision or other practice is adopted, when a person becomes subject to a discriminatory compensation decision or other practice, or when a person is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice.

29 U.S.C.A. § 626(d)(3) (2011).

286-8 at 2 (EEOC Charge)). Johnson specifies that he reported the concern about his lack of pay raise to his Manager Johnson, and was told to wait until the ship was launched; however, on February 25, 2008, another Caucasian employee (Everett Maylin) received the step-up pay raise along with the permanent step up supervisor position. (Id.) As such, Johnson brought the fact that he did not receive an expected pay raise to Austal's attention on or about February 25, 2008. Thus, this pay raise claim arose after December 1, 2007 and so is timely under Title VII. As such, Austal's motion for summary judgment on this Title VII pay raise claim (that "[a]ll alleged acts" occurring between Johnson's May 22, 2006 hire date and December 1, 2007 are barred based on untimeliness), is **DENIED.**

Concerning Johnson's initial hourly rate/hourly wage claim (that certain Caucasians were paid a higher starting salary than African Americans), this claim is tied to Johnson's starting salary ($11/hour) and the pay (hourly wages) he received thereafter (as compared to Caucasian employees), and thus is framed by Johnson as a discriminatory compensation decision claim (*i.e.*, paychecks received as a periodic implementation of a previously made discriminatory employment decision).[9] Accordingly, Johnson's pay claim is not untimely and Austal's motion

---

[9] See Ruffin v. General Motors Acceptance Corp., 2011 WL 1602075, *9 (Ala. Civ. App. Apr. 29, 2011) ("the FPA [Fair Pay Act] has superseded the supreme court's holding in Ledbetter and provides that the issuance of a paycheck reflecting a discriminatory pay decision or practice is itself an unlawful employment practice under Title VII. Moreover, the FPA provides that if the issuance of paychecks reflecting the discriminatory pay decision during the 180 days before the plaintiff filed his or her EEOC charge was "similar or related to unlawful employment practices with regard to discrimination in compensation that occurred outside the time for filing a charge," the plaintiff can recover "back pay for up to two years preceding the filing of the charge[]"). See also e.g., Wang v. Prudential Ins. Co. of Am., Slip Copy, 2010 WL 1640182, *4 (N.D. Tex. Apr. 2, 2010) ("…the Ledbetter Act, however, only has significance where a plaintiff alleges a series of discriminatory payments. The Ledbetter Act overturned the Supreme Court's opinion in *Ledbetter v. Goodyear*, which held that the first discriminatory payment is the sole point of reference as to whether a discriminatory compensation claim was timely filed….("Because Ledbetter did not file timely EEOC charges relating to her employer's discriminatory pay decisions in the past, she cannot maintain a suit based on that past discrimination at this time."). The Ledbetter Act simply renews a plaintiff's cause of action each time the plaintiff receives a discriminatory (Continued)

for summary judgment on this Title VII claim (that "[a]ll alleged acts" occurring between Johnson's May 22, 2006 hire date and December 1, 2007 are barred based on untimeliness), is **DENIED.**

## IV. <u>Austal's "Reply" Claims</u>

Austal asserts new arguments in its Reply concerning the timeliness of certain claims (including claims for which Austal did not move for summary judgment). (Doc. 330 at 2-4 and 8-14). The Court will not consider these "new" claims. Austal cannot assert new allegations or arguments raised for the first time on Reply. As set forth recently in <u>New Hampshire Ins. Co. v. Wiregrass Const. Co.</u>, Slip Copy, 2011 WL 206191, *2 at note 2 (S.D. Ala. Jan. 20, 2011):

> *See Park City Water Authority v. North Fork Apartments, L.P.*, 2009 WL 4898354 at *1 n. 2 (S.D.Ala.2009) (citing cases from over 40 districts applying the rule in 2009 alone). The Eleventh Circuit follows a similar rule. *E.g., Herring v. Secretary, Department of Corrections*, 397 F.3d 1338, 1342 (11th Cir.2005) ("As we have repeatedly admonished, arguments raised for the first time in a reply brief are not properly before a reviewing court.") (internal quotes omitted).
>
> The Court has identified some of the reasons supporting the rule. "In order to avoid a scenario in which endless sur-reply briefs are filed, or the Court is forced to perform a litigant's research for it on a key legal issue because that party has

---

paycheck[]"); <u>Bush v. Orange County Corrections Dept.</u>, 597 F. Supp. 2d 1293, 1295 (M.D. Fla. 2009) (holding that while plaintiffs' complaint about demotions and pay reductions that occurred sixteen years before EEOC charge was filed would plainly be barred under Supreme Court's <u>Ledbetter</u> decision, "with the passage of the [Lilly Ledbetter Fair Pay Act] Plaintiffs' Title VII claims [were] no longer administratively barred"); <u>Vuong v. New York Life Ins. Co.</u>, Slip Copy, 2009 WL 306391, *7-9 (S.D.N.Y. Feb. 6, 2009) (holding that the plaintiff's Title VII compensation claims were resurrected by the Lilly Ledbetter Act); <u>Shea v. Rice</u>, 409 F.3d 448, 451-453 (D.C. Cir. 2005) (holding that the plaintiff's claims for discriminatory treatment in pay level that occurred after the filing of his sole administrative charge were not barred, because each paycheck he received was a discrete, actionable act and he "allege[d] a persistent discriminatory salary structure " rather than "isolated discriminatory acts that had continuing consequences under neutral salary systems" (citing <u>Morgan</u>, 536 U.S. at 111-112) (emphasis added)). <u>See</u> <u>also</u> <u>e.g.</u>, <u>Gentry v. Jackson State University</u>, 610 F. Supp. 2d 564, 566-567 (S.D. Miss. 2009) (holding that the Supreme Court's <u>Ledbetter</u> decision continues to control disparate treatment claims involving discrete discriminatory acts other than claims related to pay); <u>Mikula v. Allegheny Cty. of PA.</u>, 583 F.3d 181, 186 (3rd Cir. 2009).

not had an opportunity to be heard, or a movant is incentivized to save his best arguments for his reply brief so as to secure a tactical advantage based on the nonmovant's lack of opportunity to rebut them, this Court does not consider arguments raised for the first time in a reply brief." *Hardy v. Jim Walter Homes, Inc*., 2008 WL 906455 at *8 (S.D.Ala.2008).

In sum, because Austal failed to raise these arguments in its motion for summary judgment, they are impermissible and will not be considered. See also e.g., Abrams v. Ciba Specialty Chemicals Corp., 663 F. Supp. 2d 1220, 1232 at note 16 (S.D. Ala. 2009) (providing that "new arguments are impermissible in reply briefs"); Evans v. Infirmary Health Services, Inc., 634 F. Supp. 2d 1276, 1285 at note 14 (S.D. Ala. 2009) (instructing that "this Court's general practice is not to consider new arguments raised in a reply brief").

## V.    Title VII/Section 1981 – Hostile Work Environment (Race)

Racial harassment is actionable under Title VII/Section 1981 where the conduct is sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment. See, e.g., Freeman v. City of Riverdale, 330 Fed. Appx. 863, 865 (11th Cir. 2009).[10]   To establish a prima facie case of hostile work environment and/or racial harassment under Title VII/Section 1981, the plaintiff must prove that: 1) he belongs to a protected group; 2) he has been subject to unwelcome harassment; 3) the harassment was based on a protected characteristic of the employee (such as race); 4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and 5) the employer is responsible for such environment under a theory of vicarious or direct liability. See, e.g., Reeves v. DSI Sec. Servs., Inc., 395 Fed. Appx. 544, 545-546 (11th Cir. 2010); McCann v. Tillman, 526 F.3d 1370, 1378 (11th Cir. 2008); Miller

----

[10]    This is an unpublished decision and is persuasive, but not binding, authority pursuant to Eleventh Circuit Rule 36-2.  The Court notes this same rule applies to other Fed. Appx. cases cited herein.

v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002).  See also e.g., Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999).

Austal contends that: 1) Johnson's evidence of sporadic and isolated incidents of racially hostile comments, conduct and graffiti during the time he was employed do not meet the severe or pervasive threshold; 2) Johnson makes no allegations and presents no evidence that the allegedly hostile environment unreasonably interfered with his ability to work on a day-to-day basis; 3) Austal maintained a policy establishing how an employee should report discriminatory conduct, but Johnson failed to report certain conduct; and 4) Austal took reasonable preventative and corrective/remedial measures to prevent a hostile work environment.

## A.    Severe or Pervasive

As to whether the conduct was severe and pervasive, Johnson points to the following evidence.[11]  Regarding racially and hostile discriminatory comments, Johnson alleges that "[n]umerous" Caucasian employees call African American employees, including him, "boy:"[12]

---

[11] Johnson also relies on the allegations of the other 22 plaintiffs (Doc. 304 at 2-4, 16-17, 19, 23, 30-33),  to support that an overall racially charged work atmosphere exists at Austal (*i.e.*, viewed through the lens of the plaintiffs' collective allegations versus each plaintiff's specific allegations).  "To rely on the evidence, each [plaintiff] must show that he *was aware* of those incidents at the relevant time he alleges the hostile work environment."  See, e.g., Melton v. National Dairy, LLC, 705 F. Supp. 2d 1303, 1342 (M.D. Ala. 2010) (citing Edwards Wallace Comm. College, 49 F.3d 1517, 1522 (11th Cir. 1995)) (emphasis in original).  See also e.g., Head v. Pitts Enterprises, Inc., Slip Copy, 2010 WL 2773376, *8 (M.D. Ala. Jul. 14, 2010); McKenzie v. Citation Corp., LLC, 2007 WL 1424555, *13 (S.D. Ala. May 11, 2007).  Courts in the Eleventh Circuit may consider statements not directed at a plaintiff and even hearsay statements, so long as the plaintiff was aware of the statements at the time he was employed.  See, e.g., Yeomans v. Forster and Howell, Inc., Slip Copy, 2010 WL 3716394, *5-6 (M.D. Ala. Sept. 10, 2010). The Court has only considered the evidence of which Johnson testified that he was aware.

[12] The word "boy" said to African American employees is not always evidence of racial animus – other factors must be consulted such as context, inflection, tone of voice, local custom and historical usage. See, e.g., Ash v. Tyson Foods, Inc., 546 U.S. 454, 456 (2006). Johnson's testimony suggests that the use of "boy" was a term used only with Johnson and other African Americans at Austal, by Caucasian employees, and through the examples he has referenced, the term – as used – could reasonably be determined by a jury to contain racial animus.  Notably, given Caucasian employee Sullivan's usage of (Continued)

12

"they call you that so much…it's like…you can't even get mad over it no more."  (Doc. 172-1 (Dep. Johnson at 135); Doc. 285-12 (Dep. Johnson at 202)).  "Numerous of people[]" call Johnson "boy" – for example, once "a guy came in and told me…what time y'all boys getting off, y'all boys need to tighten up."  (Doc. 172-1 (Dep. Johnson at 202-203)).  As another example, co-worker John Rupert said to Johnson: "hey, boy, we need to go on and get this done. Boy, what you doing tonight[]" about 2-3 times.  (Doc. 172-1 (Dep. Johnson at 206, 211)). Johnson "had to go on and put him in his place and tell him I'm not a boy, I'm a man[;]" Rupert stopped calling him boy after that.  (Id. (Dep. Johnson at 206)).  Likewise, co-worker Mike Boutwell called Johnson "boy" 2-3 times ("it was you or boy. Not Carolos, but boy[]"—like "[b]oy, you know you can weld[]"); Johnson told him to stop and he did after 2-3 times.  (Doc. 172-1 (Dep. Johnson at 211); Doc. 285-12 (Dep. Johnson at 207-208)).

Johnson alleges that Caucasian co-worker James Sullivan grabbed an African American supervisor by the arm saying "don't turn your back on me, boy."  (Doc. 285-12 (Dep. Johnson at 125-126)).  Sullivan's actions were reported "several times."  (Id. (Dep. Johnson at 126)).  For instance, African American co-worker Markell complained to Austal that Sullivan had grabbed him and said "hey boy, don't walk away from me."  (Id. (Dep. Johnson at 126, 131, 133)). While there were witnesses to that incident, nothing was done to Sullivan: "he would grab you by your arm, hey, boy, don't walk away from me. And people would go to the office on him. But….wasn't nothing said [by Austal]."  (Id. (Dep. Johnson at 126)).  Similarly, Sullivan (who

the word in what appears to be an aggressive manner (by grabbing African Americans by the arm while simultaneously calling them "boy").  As such, the Court is satisfied that Johnson has sufficiently explained the context and usage of the "boy" remark made to him to establish that there is at least an issue of fact as to whether the remark was racially motivated. See, e.g., Ash v. Tyson Foods, Inc., 2006 WL 2219749, *2 (11th Cir. Aug. 2, 2006).

became a project manager) and African American co-worker Joe Coleman argued over a job that had not been done, and when Coleman tried to walk away, Sullivan grabbed him by his arm and said "don't walk away when I'm talking to you, boy. We can go to the parking lot." (Id. (Dep. Johnson at 131, 133)).

Johnson saw Caucasian supervisor Tim Clements act like a monkey to an African American co-worker – swinging upside down on the scaffolding and scratching under his arm. (Doc. 172-1 (Dep. Johnson at 120-121); Doc. 285-12 (Dep. Johnson at 133)). Additionally, supervisor Clements also had a "habit of, the black guys, he would come up and kick us. Instead of calling our name, he'll come up and kick us." (Doc. 172-1 (Dep. Johnson at 120)). Supervisor Clements kicked Johnson as well. (Id. (Dep. Johnson at 121)). Johnson went to his supervisor Chris Moore and complained about Clements' actions, stating that he was "very offended by him kicking[]" and "I feel like this guy's prejudiced[;]"in response, Moore told him that he would "look into it." (Id.) Johnson did not hear back from Moore. (Id.) Clements was subsequently promoted to stand-in manager even though the Austal handbook provided for zero tolerance; "he should have been terminated for it." (Doc. 285-12 (Dep. Johnson at 122)).

One Caucasian co-worker and supervisor Clements commented on Johnson's tattoos[13] saying "why thugs always got to get tattoos" (co-worker) and "what, you can't remember your children name or your wife's name, why you got to get you a tattoo with your kids and your wife?" (Clements); made "made derogatory comments" about Johnson's hair (which he was growing out for dreadlocks) – "[h]ow you braid Velcro…[h]ow y'all take care of Velcro" (Randy McCall); and commented on Johnson's car. (Doc. 172-1 (Dep. Johnson at 135-136, 200-

---

[13] Johnson has tattoos on his arms and stomach of his wife and children's names. (Doc. 172-1 (Dep. Johnson at 200)).

201); Doc. 285-12 (Dep. Johnson at 134, 137)).  Johnson complained to his foreman (supervisor) Robbie Sheppard about the tattoo comments.  (Doc. 172-1 Dep. Johnson at 137)).  Supervisor Joe Johnson also made comments to Johnson about his tattoos and "stuff like that. He would get me in front of…Wayne Jacobs and them and do me like this. You know, pick my arm up and….look at them, and…shake his head."  (Doc. 172-1 (Dep. Johnson at 136)).  Johnson reported the "Velcro" comments about his hair to his supervisor Chad Guyett, who responded "I'm getting sick of him [the Caucasian co-worker who said the comments] ….He need to grow up."  (Id. (Dep. Johnson at 201-202)).  Nothing else was done in response to Johnson's complaints.  (Id. (Dep. Johnson at 202)).

Johnson alleges that he was told by a co-worker, that Caucasian co-worker Michael Waters told another Caucasian "about how he wished these niggers …would do something." (Doc. 172-1 (Dep. Johnson at 137, 178).  One day, Waters said to Johnson "I don't like black guys. You know, I don't like thugs….I said, well, like, what's your problem. He told me, for one, y'all's is bigger than ours."  (Id. (Dep. Johnson at 139)).  Johnson did not complain about Waters' comment because "when you go to a foreman or a manager [to complain], your next two weeks you're going to be in a dark hole…upside down on your back…They all knew each other. So…if you messed around and got…on the[ir] bad side, you would have a bad job by that next day."  (Id. (Dep. Johnson at 139-140)).

Johnson heard a Caucasian employee tell a joke once that had the word "nigger" in it: "little Johnny asked a black kid to go to a Klan meeting. Told him to just have on a hood…when the black kid got home his parents whopped him. And the ..little Johnny, asked him do he want to go back. He say, no, I want to kill two niggers already..."  (Doc. 172-1 (Dep. Johnson at 178-179).  Johnson reported the co-worker's joke to his supervisor Chad Guyett; Guyett "slapped

Randy [McCall] on the hand, pretty much. Told him, you know, you can't tell them jokes on the clock. You got to tell them off the clock."  (Id. (Dep. Johnson at 179); Doc. 285-12 (Dep. Johnson at 179-181)).

Johnson also alleges that once, after he and another African American employee moved a heavy hatch, Caucasian employee Michael Waters commented "all you need is a little slave power."  (Doc. 172-1 (Dep. Johnson at 203)).  When Waters made the comment, his supervisor and supervisor Chad Guyett were standing "right there[];" Guyett was the supervisor Johnson would have reported the incident to, but Johnson did not report it though because Guyett witnessed the comment.  (Id. (Dep. Johnson at 204)).

Johnson was subjected to displays of the Confederate flag on t-shirts and a tattoo, as worn "[n]umerous times" by Caucasian co-workers ("Big Eagle"), Everett Maylin, and "more."  (Doc. 172-1 (Dep. Johnson at 191-192)).  Johnson finds the Confederate flag racially offensive.  (Id. (Dep. Johnson at 192)).  Johnson did not complain about the flag imagery because, for example, for Big Eagle, "his supervisor seen him with the shirt on and he wore it over and over and over again after they still had said zero tolerance."  (Id.)  See also Doc. 283-50.  Austal took no action regarding the displays of the Confederate flag in the workplace.

From the first day of employment at Austal, Johnson saw racial graffiti written on the walls of "every bathroom" at Austal – "all kind[s] of derogatory, racist remarks[.]"  (Doc. 172-1 (Dep. Johnson at 156-157)).  "You couldn't even see what color the walls was there was so much writing on the walls."  (Id. (Dep. Johnson at 157)).  The racial graffiti included: "the only nigger supervisor you will see is the cleaners," "why does a nigger don't take aspirin, because he don't want to pick the cotton from the bottle," "how many niggers you see with white hats around here," "why do niggers run in packs, because monkeys run in packs," "how do you starve a

nigger to death, hide his food stamp card in his work boots," "niggers always find the easy way out, shooting people," and numerous stick figure drawings showing stick figure men hanging from trees "and stuff like that." (Doc. 172-1 (Dep. Johnson at 163); Doc. 285-12 (Dep. Johnson at 159-160); Doc. 283-50). "Almost every [bathroom] stall…it's a racial discrimination comment." (Doc. 285-12 (Dep. Johnson at 168)). Johnson did not report the racial graffiti in the bathrooms because "it's all over[]" and "the supervisor go in the same bathroom we go in." (Doc. 172-1 (Dep. Johnson at 163, 165)). According to Johnson, Austal never tried to stop or find out who was writing the derogatory comments in the bathrooms, even though Austal did take such steps for bomb threats. (Doc. 285-12 (Dep. Johnson at 134)). The record reveals that starting in August 2007, Austal responded to complaints about the graffiti by cleaning the bathrooms and painting black over the graffiti on a regular basis. (Doc. 285-2 (Dep. Browning at 16, 110). According to Johnson, however, the walls were only painted after the lawsuit was filed. (Doc. 172-1 (Dep. Johnson at 170-171)). Nevertheless, the painting did not deter the offending scribblers, as the walls would soon be filled again with racially offensive graffiti. (Doc. 172-1 (Dep. Johnson at 165, 170); Doc. 284-4 (Dep. Lindley II at 95-96, 166-168, 188-190, 195-196, 202-203); Doc. 284-5 (Dep. Lindley III at 254); Doc. 284-11 (Dep. O'Dell at 74-75); Doc. 284-7 (Dep. Friedlieb I at 84)).

Johnson was also aware that two (2) nooses were found on Austal property; he only witnessed one of them (not the May 1, 2008 noose). (Doc. 172-1 (Dep. Johnson at 99)).

Johnson was also made aware of another noose which had been made and hung by a Caucasian co-worker; the noose was photographed by an employee and HR was notified. (Doc. 285-12 (Dep. Johnson at 109)). Johnson was told about the noose and shown the photograph of the noose, which was hung on the bulkhead of the Hawaiian Superferry. (Id. (Dep. Johnson at

113)). Caucasian supervisor "Waldo" responded to a co-worker's concern about the presence of the noose as follows: "hey, man, that ain't nothin, that's just something to hold tape up on there…" (Id.)

Johnson alleges further, that a co-worker found a "zip tie" figurine with a noose around its neck and the word "nigger" written across its chest, on a boat at Austal, and showed it to him. (Doc. 172-1 (Dep. Johnson at 117-118); Doc. 285-12 (Dep. Johnson at 122-123)). Johnson and others reported this figurine to Caucasian supervisor Chris Moore, who only asked if they had seen who did it. (Doc. 285-12 (Dep. Johnson at 123-124)).

Johnson was also made aware that an African American co-worker found three (3) other (additional) nooses hanging in the ship at Austal. (Doc. 172-1 (Dep. Johnson at 118)).[14]

Johnson witnessed a Caucasian employee make a noose during a meeting; in response, Austal gave him a 3 day lay-off when the company was supposed to have a zero tolerance policy: "the guy that sat up in the meeting and made a noose…they've seen him do it and they gave him a three-day layoff. So, I mean, it's kind of hard to…when you got stuff doing on and…foremens [sic] on the shift is catching them doing it and not doing nothing to them." (Doc. 285-12 (Dep. Johnson at 63)). According to Johnson, despite Austal being notified about these racial incidents and having a zero tolerance policy, "wasn't nothing brought up about race discrimination" at any of the daily morning safety meetings. (Doc. 285-12 (Dep. Johnson at 124-

---

[14] Johnson was referring to African American co-worker Earaton Adams (also a plaintiff in this case), who actually saw one noose and was shown photographs of a second noose. Specifically, as noted in this Court's Order on Austal's motion for summary judgment as to Earaton Adams, the record reveals that Earaton Adams testified that he found a noose in his personal workspace. (Doc. 285-4 (Dep. E.Adams at 71-73, 76-78)). He reported this to his supervisor David Abear and to Coordinator Pearson. Pearson responded, "don't worry, mate, they were just using it to pull something." (Id. (Dep. E.Adams at 73, 76-77)). Later, Adams was told (and shown photographs) that a second noose had been found by co-employees. (Id. (Dep. E.Adams at 78-79)).

125)).

To be actionable as severe or pervasive, the harassment "must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceive[s]…to be abusive." Miller, 277 F.3d at 1276 (internal citation and quotation marks omitted). In other words, the severe or pervasive element has an objective and subjective component. McCann, 526 F.3d at 1378. To determine the objective severity of the harassment, courts look at the totality of the circumstances and consider: 1) the frequency of the discriminatory conduct; 2) the severity of the conduct; 3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and 4) whether the conduct unreasonably interferes with an employee's job performance. Reeves, 395 Fed. Appx. at 546. See also Faragher v. City of Boca Raton, 524 U.S. 775, 787-788 (1998); Allen v. Tyson Foods, 121 F.3d 642, 647 (11th Cir. 1997) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)). "The conduct is considered cumulatively instead of in isolation." Reeves, 395 Fed. Appx. at 546.

There is sufficient evidence, if believed by a jury, that Johnson subjectively perceived this work environment to be racially hostile. Thus, the Court need only determine whether Johnson's perception was objectively reasonable.

When viewing the facts in the light most favorable to Johnson, a reasonable jury could find that the harassing conduct alleged was frequent and severe. According to Johnson, "numerous times" (and Johnson's testimony suggests this was fairly regular) during his employment, Caucasian co-workers referred to African Americans as "boy" (including himself); he encountered racial graffiti in the workplace bathrooms on a daily basis; and images of the Confederate flag permeated the workplace "numerous times" as displayed and/or worn on

Caucasian co-workers' shirts.  Additionally, a Caucasian supervisor who acted like a monkey in front of an African American co-worker and who had a "habit" of regularly "kicking" African American employees to get their attention (apparently as a habitual form of communication), was promoted rather than disciplined by Austal.  See, e.g., Webb v. Worldwide Flight Serv., Inc., 407 F.3d 1192, 1193 and 1194 note 3 (11th Cir. 2005) (finding without merit defendant's argument that the evidence was insufficient for jury to find hostile work environment where supervisor referred to plaintiff on a daily basis for two years as a "nigger" and a "monkey," and described him as being "from the tribe[]"); Mack v. ST Mobile Aerospace Engineering, Inc., 195 Fed. Appx. 829, 837-838 (11th Cir. 2006).  Moreover, Johnson was aware of at least five (5) nooses found at Austal (including one made by a Caucasian employee in front of Johnson and a Caucasian foreman during an Austal meeting), as well as one figurine with a noose around its neck.  The nooses Johnson saw and/or was made aware of, could reasonably be deemed threatening to Johnson: "[c]learly, the display of nooses in the workplace should not be cast aside as a light joke or teasing. A noose is a historical symbol of racial hatred for African-Americans and can represent a severe physical threat."  McKenzie v. Citation Corp., LLC, 2007 WL 1424555, *13 (S.D.Ala. May 11, 2007).

The evidence upon which Johnson relies to demonstrate that the conduct unreasonably interfered with his job performance is not as persuasive.  In contrast to interfering with his job performance, Johnson received at least seven (7) raises which noted "continued improvement," "keep up the good work," "Carlos has come along [sic] way…He works hard and try's [sic]," and "excelent [sic] performance of duties, B-class welder."  Johnson also testified that he "[h]ate the negative things that happened…But I refuse to let that bring my positive attitude down." (Doc. 330-2 (Dep. Johnson at 34)).  However, the Court also notes that the record reveals that

Johnson's pay was reduced at least two (2) times.

Nevertheless, Eleventh Circuit precedent mandates that courts consider "the totality of the circumstances" such that the absence of one factor (*i.e.*, unreasonable interference) is not dispositive. See, e.g., Miller, 277 F.3d at 1277 (finding that a failure by an employee to show how harassing conduct unreasonably interfered with the employee's work performance did not necessarily constitute a failure to satisfy the objectiveness prong). The U.S. Supreme Court has cautioned further, that harassment need not be shown to be so extreme that it produces tangible effects on job performance to be actionable. Harris, 510 U.S. at 22. See also e.g., Miller, 277 F.3d at 1277. Having established the frequency, severity and the humiliating and demeaning nature of the conduct, Johnson's weak demonstration of how the conduct interfered with his job is not fatal to his claim. Miller, 277 F.3d at 1277; Head v. Pitts Enterprises, Inc., Slip Copy, 2010 WL 2773376, *12 (M.D. Ala. Jul. 14, 2010).

In sum, under the totality of the circumstances and considering the allegations in the light most favorable to Johnson, he has produced sufficient evidence – if believed by a jury -- to create an issue of fact as to whether he was subjected to racial harassment that was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment. Thus, the Court turns to element five: employer liability.

**B.      Element Five: Employer Liability**

This last element of Johnson's proof requires a basis for employer liability. In Faragher v. City of Boca Raton, 524 U.S. 775 (1998) and Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998), the U.S. Supreme Court held that employer liability is automatic when the supervisor's harassment culminates in a "tangible employment action, such as discharge, demotion, or undesirable reassignment." Faragher, 524 U.S. at 807, 808; Ellerth, 524 U.S. at 762, 763.

Where no such action has occurred, "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." Faragher, 524 U.S. at 807; Ellerth, 524 U.S. at 745. An employer may avoid vicarious liability by raising as an affirmative defense that it: 1) exercised reasonable care to prevent and correct promptly any harassing behavior, and 2) the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. Faragher, 524 U.S. at 807, 809; Miller, 277 F.3d at 1278. This is known as the Faragher defense. "Both elements must be satisfied…and the defendant bears the burden of proof on both elements." Frederick v. Sprint/United Mgmt. Co., 246 F.3d 1305, 1313 (11th Cir. 2001) (citations omitted).

Moreover, Austal is directly liable for co-worker harassment if Austal knew (actual notice) or should have known (constructive notice) of the harassing conduct but failed to take prompt remedial action. See, e.g., Miller, 277 F.3d at 1278; Breda v. Wolf Camera & Video, 222 F.3d 886, 889 (11th Cir. 2000). Once notice is established, a plaintiff must show that the employer "failed to take immediate and appropriate corrective action." Watson v. Blue Circle, Inc., 324 F.3d 1252, 1261 (11th Cir. 2003). See also Frederick, 246 F.3d at 1314; Minix v. Jeld-Wen, Inc., 237 Fed. Appx. 578 (11th Cir. 2007). The prompt remedial action must be "reasonably likely to prevent the misconduct from recurring." See, e.g., Baldwin v. Blue Cross/Blue Shield of Ala., 480 F.3d 1287, 1305 (11th Cir. 2007); Kilgore v. Thompson & Brock Mgt., Inc., 93 F.3d 752, 754 (11th Cir. 1996); Tipp v. AmSouth Bank, 76 F. Supp. 2d 1315, 1333 (S.D. Ala. 1998). Specifically, the employer's action must be "effective action" and "must be 'reasonably calculated to end the harassment,' and the promptness and adequacy of the employer's response must be evaluated on a case-by-case basis. Of special importance is

whether the…harassment ended after the remedial action was taken." Munn v. Mayor and Aldermen of City of Savannah, Ga., 906 F. Supp. 1577, 1583 (S.D. Ga. 1995). See also Saville v. Houston Cty. Healthcare Auth., 852 F. Supp. 1512, 1528 (M.D. Ala. 1994).

Throughout Johnson's employment Austal maintained in its Employee Handbook a Non-Discrimination and Anti-Harassment policy which all employees are required to read and sign. (Doc. 172-2 at 3 (Decltn. Lindley); Doc. 285-2 (Dep. Browning at 56-57); Doc. 172-2 at 15-66 (Austal's April 2006-Issue F Hourly Employee Orientation Booklet and Austal's November 2007-Issue A Employee Handbook)).

Austal's April 2006 and November 2007 anti-harassment policies inform employees about the grievance procedure for reporting incidents of discrimination and harassment. (Doc. 172-2 at 36-37, 50-51). The April 2006 policy provides, in relevant part: 1) that employees are "urged to inform" their Supervisor of suspected violations of the policy, and that the Supervisors are then required to report same to the Department Manager and 2) if for any reason the employee does not feel comfortable discussing the situation with his or her immediate Supervisor, he or she should report the matter to the Departmental Manager. (Doc. 172-2 at 37). The Revised Handbook issued in November 2007, further provides that an employee should report incidents of harassment to his Supervisor, but if not comfortable doing so, may talk to the Department Coordinator or Manager and then if still needing to talk with someone after completing both of those steps, may contact HR. (Doc. 172-2 at 50).

Taking the facts in the light most favorable to Johnson, it is clear that Johnson complied with Austal's reporting policy[15] and that that Austal had notice of the harassing behavior

---

[15] Austal's contention that Johnson "waived his right" to include certain "misconduct" as a basis for his claims because he "elected not to report" same "in accordance with Austal's policy" and/or "he
(Continued)

(including several instances where Austal supervisors witnessed racial incidents). However, there remains a genuine issue of material fact as to whether Austal exercised reasonable care to correct promptly the harassing behavior; an element of the defense to liability for both supervisory and co-employee harassment. Specifically, Johnson has presented evidence that even after he reported the offensive comments, racial graffiti, nooses, and Confederate flag imagery, the work environment remained unchanged with the exception that *one* noose incident was investigated (May 1, 2008), a few of the Caucasian employees no longer called him "boy" and the bathroom walls were periodically painted. These facts, combined with Austal's admissions regarding failure to train[16] its supervisors on Austal's harassment policy prior to the Summer of 2008,[17] create an issue of fact for the jury as to whether Austal should be held liable for the actions of its employees. As such, Austal's motion for summary judgment on Johnson's hostile work environment claim is **DENIED.**

## VI.  Title VII/Section 1981 Disparate Treatment

Johnson contends that he was intentionally discriminated against with respect to "terms and conditions of his employment" due to his race in violation of Title VII and Section 1981. Austal moves for partial summary judgment on Johnson's disparate treatment claim for discriminatory promotion concerning the step-up supervisor position (given to Everett Maylin).

---

failed to report any of the alleged incidents to Human Resources" (Doc. 172 at 13-14), lacks any merit as he clearly was not required to report each and every incident and/or any incidents to HR. This finding applies also to Johnson's complaints about his supervisors' and co-workers' conduct.

[16]  Doc. 284-3 (Dep. Lindley I at 174); Doc. 284-9 (Dep. Carver I at 60); Doc. 284-11 (Dep. O'Dell at 210); Doc. 285-1 (Dep. Keeler at 47, 65, 97); Doc. 285-2 (Dep. Browning at 56-57)).

[17]  (Doc. 284-3 (Dep. Lindley I at 174); Doc. 284-4 (Dep. Lindley II at 74-75).

In individual disparate treatment claims, "the plaintiff bears the burden of proving that the employer discriminated against him because of his race." Cooper v. Southern Co., 390 F.3d 695, 723 (11th Cir. 2004), *overruled on other grounds,* Ash v. Tyson Foods, Inc., 546 U.S. 454, 456-457 (2006). See also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000); Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981). Where there is no direct evidence of discrimination or a statistical pattern of discrimination, the burden shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) applies. Under this framework, the plaintiff must establish a prima facie case of intentional race discrimination.[18] Id. at 802. See also e.g., E.E.O.C. v. Joe's Stone Crabs, Inc., 296 F.3d 1265, 1272 (11th Cir. 2002). If a prima facie case is established, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. Id. Once the employer satisfies its burden, the burden shifts back to the plaintiff to offer evidence that the alleged reason of the employer is a pretext for unlawful discrimination. Id. at 1272-1273.

A.     **Failure to Promote**

To establish a prima facie case of failure to promote, a plaintiff must show that: 1) he is a member of a protected class; 2) who sought and was qualified for positions that the employer was attempting to fill; 3) despite his qualifications he was rejected; and 4) the employer either continued to attempt to fill the positions or in fact filled the positions with persons outside the plaintiff's protected class. See, e.g., Harrington v. Disney Regional Ent., Inc., 276 Fed. Appx. 863, 872 (11th Cir. 2007) (citing Crawford v. Western Electric Co., Inc., 614 F.2d 1300, 1315 (5th

---

[18] "Claims of race discrimination under § 1981 are analyzed in the same manner as claims brought under Title VII." DeLeon v. ST Mobile Aerospace Eng'g, Inc., 2010 WL 500446, *15 (S.D. Ala. Feb. 9, 2010).

Cir. 1980)). A plaintiff claiming that he was discriminatorily denied a promotion usually must show that he actually applied for the position as part of his prima facie case. <u>Taylor v. Runyon</u>, 175 F.3d 861, 866 (11th Cir. 1999); <u>Combs v. Plantation Patterns</u>, 106 F.3d 1519, 1539 at n. 11 (11th Cir. 1997). Where an employer has an informal promotion procedure (*i.e.*, job openings are not posted or applications are not required), however, an employee may establish this element by showing that the position was available and that the employer had some reason or duty to consider him for same. <u>Jones v. Firestone Tire and Rubber Co., Inc</u>., 977 F.2d 527, 533 (11th Cir. 1992); <u>Carmichael v. Birmingham Saw Works</u>, 738 F.2d 1126, 1133-1134 (11th Cir. 1984).

### 1. <u>Everett Maylin Position</u>

Johnson contends that he was denied a promotion to be a step-up supervisor in the Summer of 2008, and that the position was given instead to a lesser qualified Caucasian co-worker named Everett Maylin. Austal contends that Johnson is unable to establish a prima facie case of discrimination because Johnson has failed to provide evidence that "he was qualified and applied for the promotion or that the employee promoted was equally or less qualified." (Doc. 330 at 15).

Concerning Johnson's specific failure to promote claim tied to the step-up supervisor position, Johnson testified that Maylin was hired on February 25, 2008 "as a machinist" but because Austal did not have any machinist openings, they sent Maylin to hydro testing. (Doc. 285-12 (Dep. Johnson at 79)). However, Maylin did "not know testing" and that is why Johnson trained Maylin and showed him how to operate the valves, put the plugs in, etc. (Doc. 172-1 (Dep. Johnson at 98-99)).

Johnson contends that he had been acting as a step-up supervisor for six (6) months and requested (to his supervisors) to have the pay and position on a permanent basis. (Doc. 172-1

(Dep. Johnson at 65-66); Doc. 285-12 (Dep. Johnson at 75)).   When Johnson asked his supervisor Joe Johnson about when he would get his pay raise -- as he was performing the supervisor duties – he felt that supervisor Johnson was leading him on telling him in response, "well, you got to wait 'til we launch the ship and…we post it, you'll get it."  (Doc. 285-12 (Dep. Johnson at 75)). Johnson added that supervisor Joe Johnson told him on "several occasions[]" that he would be made permanent step-up supervisor.  (Doc. 330-2 (Dep. Johnson at 91)). When that did not happen, Johnson complained to his supervisor Joe Johnson and then "[w]hen I seen nothing happen[]" after that, went to Jeff O'Dell in HR.  (Doc. 172-1 (Dep. Johnson at 68)). Supervisor Joe Johnson told Johnson that he was "not ready" to be a supervisor.  (Id. (Dep. Johnson at 83)).  Johnson also complained to Albert Kittrell and C.J. Noletto (Doc. 285-12 (Dep. Johnson at 68)).

Johnson is a member of a protected class.  Moreover, there is evidence that Johnson repeatedly expressed interest in the step-up supervisor promotion and thus the Court finds that there is sufficient evidence that Austal had reason to consider Johnson for the promotion that he was denied.  Johnson also had 1½ years of managerial experience, in addition to six (6) months of experience in the job which was the promotion, and Austal has not disputed that Johnson was qualified for the promotion.  The step-up supervisor promotion position was filled with an individual outside of Johnson's protected class.  Thus, Johnson has made his prima facie case. As such, Austal's motion for summary judgment, as to Johnson's Title VII and Section 1981 claim of failure to promote for the step-up supervisor position, is **DENIED.**

### 2.     <u>Benjamin Hoffner Position</u>

Austal only moved for summary judgment on the untimely nature of "all alleged acts" before November 24, 2007 (thus including the Hoffner Title VII failure to promote claim), which

has been addressed *supra*. Austal, however, did not move for summary judgment on the merits of Johnson's failure to promote claims relating to Hoffner's June 1, 2007 or February 18, 2008 promotions. In fact, Austal's motion does not even mention a failure to promote claim as to Hoffner. As such, Johnson's Title VII and Section 1981 failure to promote claims relating to Hoffner are **CARRIED TO TRIAL.**[19]

B. **Disparate Pay**

Austal only moved for summary judgment on the untimely nature of "all alleged acts" before November 24, 2007 (thus including Johnson's pay claims), which has been addressed *supra*. Austal, however, did not move for summary judgment on the merits of Johnson's disparate pay claims, but rather only addressed this claim in their reply. In fact, Austal's motion does not even mention disparate pay as an issue in this case in its motion for summary judgment. As such, Johnson's Title VII and Section 1981 disparate pay claims are **CARRIED TO TRIAL.**

VII. **Conclusion**

Accordingly, it is **ORDERED** that Austal's partial motion for summary judgment is **DENIED** as to Johnson's hostile work environment claim; **DENIED** as to Johnson's failure to promote claim relating to Everett Maylin; **GRANTED** as to Johnson's Title VII failure to promote claim relating to Benjamin Hoffner's June 1, 2007 promotion; and **GRANTED** as to Johnson's retaliation, discipline, evaluations and training claims.

It is further **ORDERED** that Johnson's disparate treatment claims for discriminatory pay and failure to promote (concerning Benjamin Hoffner), the merits of which were not placed at

---

[19] Austal's motion for summary judgment based on untimeliness was granted as to Johnson's failure to promote Title VII claim for the June 1, 2007 Hoffner promotion. As such, only Johnson's Section 1981 claim for the June 1, 2007 Hoffner promotion and Johnson's Title VII/Section 1981 claims for the February 18, 2008 Hoffner promotion remain at issue.

issue by Austal on summary judgment, are **CARRIED TO TRIAL.**

      **DONE** and **ORDERED** this the **1**st day of **August 2011.**

                     /s/ Kristi K. DuBose
                     **KRISTI K. DuBOSE**
                     **UNITED STATES DISTRICT JUDGE**