**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

ALVIN CUNNINGHAM, *et al.*,      )
    **Plaintiffs,**             )
v.                       )      **CIVIL ACTION 08-00155-KD-N**
                        )
AUSTAL, U.S.A., L.L.C.,       )
    **Defendant.**           )

## ORDER

This matter is before the Court on Defendant's (partial)[1] motion for summary judgment (Docs. 173, 174), Plaintiff's Opposition (Doc. 305), and Defendants' Reply (Doc. 349).

## I.    Factual Background

On March 20, 2008, multiple Plaintiffs initiated this action against Austal for legal and equitable relief to redress unlawful discrimination and harassment on the basis of race.[2] (Doc. 1). Plaintiff Alvin Cunningham ("Cunningham") asserts claims for hostile work environment and discrimination (pay and promotion) based on race, in violation of Title VII and 42 U.S.C. § 1981. (Doc. 37 at 149-155).[3]

---

[1] Austal did not move for summary judgment on the time barred nature of any of Cunningham's Section 1981 claims. Likewise, Austal did not move for summary judgment on Cunningham's Title VII/Section 1981 disparate treatment claims for failure to promote.

[2] While initiated as a purported class action, this is no longer a class action case. (Doc. 293). Additionally, some of the Plaintiffs allege gender and disability discrimination in addition to asserting Title VII claims.

[3] Originally, Cunningham alleged a separate claim for retaliation (Doc. 37 at 152-155 at ¶¶811, 817, 822-823, 825-827). Cunningham also alleged disparate treatment in terms of training, evaluations and discipline as well as an Americans with Disabilities Act claim (Id. at 150-153, 155 at ¶802-804, 812, 816, 827, 830). Moreover, Cunningham alleged a constructive discharge claim against Austal. (Id. at 150-151, 153 at ¶¶801, 804, 818-819). Cunningham now represents that he "is *pursuing* claims against Austal for *only* hostile work environment and discrimination on the basis of race in regards to pay and promotion" under Title VII and Section 1981. (Doc. 305 at 2 (emphasis added)). Accordingly, the Court (Continued)

A.     **Austal**

Defendant Austal USA ("Austal") is an Australian shipbuilding company dedicated to the design and construction of customized aluminum commercial and military vessels, located in Mobile, Alabama.  (Doc. 174 at 2; Doc. 283-48 at 2-3 (Austal's 3/7/07 EEOC Position Statement)).  The Operations Division has four (4) major Departments (Aluminum (divided into Fabrication and Components), Electrical, Engineering, and Fit Out (divided into HVAC, Insulation and Fit Out)).  (Doc. 283-48 at 3-4).

B.     **Cunningham's Employment**

Alvin Cunningham was hired to work for Austal on April 10, 2006 as a Pipe Fitter in the Engineering Department, at the rate of $15.50/hour. (Doc. 174-1 (Dep. Cunningham at 47); Doc. 174-1 at 63; Doc. 174-2 at 7 (Decltn. Lindley); (Doc. 295 at 9 (Exhibit 105-Sealed); Doc. 349-4; Doc. 349-3 at 4 (Decltn. Dr. Steward)). While employed at Austal, Cunningham received one (1) pay raise dated May 22, 2006 (from $15.50/hour to $17/hour).  (Doc. 295 at 9 (Exhibit 105-Sealed); Doc. 174-1 at 65). On December 11, 2006, Cunningham left Austal: "abandonment of employment" was the stated reason on his employment record.  (Doc. 174-1 at 67).

II.    **Standard of Review**

"The court shall grant summary judgment if the movant shows that there is no genuine

---

construes Cunningham's intentional exclusion of his retaliation claim, his ADA claim, his disparate treatment claims for training, evaluations and discipline, and his constructive discharge claim, as concessions of these claims.  Thus, it is **ORDERED** that Austal's motion for summary judgment as to Cunningham's retaliation claim, ADA claim, disparate treatment claims for training, evaluations and discipline, and his constructive discharge claim, is **GRANTED.**   Additionally, while Cunningham initially alleged disparate impact claims against Austal, said claims have been dismissed from this litigation. (Doc. 366).

dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (Dec. 2010).   The recently amended Rule 56(c) governs Procedures, and provides as follows:

> *(1) Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> > **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> >
> > **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> *(2) Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
>
> *(3) Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record.
>
> *(4) Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

FED.R.CIV.P. Rule 56(c) (Dec. 2010).

Defendant, as the party seeking summary judgment, bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  If the nonmoving party fails to make "a sufficient showing

3

on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment.  Celotex, 477 U.S. at 323.  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992), cert. den., 507 U.S. 911 (1993) (internal citations and quotations omitted).

## III.   Whether Some of Cunningham's Title VII Claims are Time Barred

A plaintiff may not sue under Title VII unless he first exhausts administrative remedies by filing a timely charge of discrimination with the appropriate agency.  See, e.g., Wilkerson v. Grinnell Corp., 270 F.3d 1314, 1317 (11th Cir. 2001).  "In a non-deferral state such as Alabama, the deadline for filing is 180 days after the alleged discriminatory act." Carter v. University of South Alabama Children's & Women's Hosp., 510 F. Supp. 2d 596, 606 (S.D. Ala. 2007). See also Tipp v. AmSouth Bank, 76 F. Supp. 2d 1315, 1327 (S.D. Ala. 1998). "If the victim of an employer's unlawful employment practice does not file a timely complaint, the unlawful practice ceases to have legal significance, and the employer is entitled to treat the unlawful practice as if it were lawful." City of Hialeah, Fla. v. Rojas, 311 F.3d 1096, 1102 (11th Cir. 2002). See also Sheffield v. United Parcel Service, Inc., 2010 WL 4721613, *2 (11th Cir. Nov. 22, 2010); Jordan v. City of Montgomery, 2008 WL 2529573, *1 (11th Cir. Jun. 26, 2008).  A failure to file a timely charge with the EEOC results in a bar of the claims contained in the untimely charge.  Id.

Cunningham signed his EEOC Charge on May 30, 2007 and it was "received" on May 31, 2007.  (Doc. 174-3 at 7-9).  Calculating from the May 31, 2007 date, Austal contends that

only those "discrete discriminatory acts" occurring between December 2, 2006 and May 31, 2007 – the 180 days prior to May 31, 2007-- are timely.  Austal asserts that "[a]ll alleged acts occurring between Cunningham's hire date of April 10, 2006, and the beginning of the statutory period date of December 2, 2006, are not actionable under Title VII. Based on the foregoing, the following … [is]… time barred: … that he was denied a pay increase three months into his employment (July 2006)…"  (Doc. 174 at 8 (internal citations omitted)).

Cunningham contends that Austal's interpretation is incorrect and contrary to well established law, as although many acts upon which a plaintiff's Title VII claims rely may occur outside the 180 filing period, "they are part of the same actionable hostile environment claim." (Doc. 305 at 12-13 (citing McKenzie v. Citation Corp., LLC, 2007 WL 1424555 (S.D. Ala. 2007)).  Cunningham is correct, as to his hostile work environment claim. The U.S. Supreme Court has clarified that there are different standards for claims involving "discrete acts" versus "hostile environment" allegations.  See generally National R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002).  Under the continuing violation doctrine, a plaintiff's charge of discrimination regarding a hostile work environment is considered timely if "an act contributing to the claim occurs within the filing period," even if "some of the component acts of the hostile work environment fall outside the statutory time period." Id. at 117. As explained in Smiley v. Alabama Dept. of Transp., Slip Copy, 2011 WL 1188506, *5 (M.D. Ala. Mar. 30, 2011):

> Unlike claims involving discrete discriminatory acts, hostile environment claims may be litigated so long as at least one of the events contributing to the hostile environment was presented to the EEOC in a Charge of Discrimination in a timely fashion. Indeed, in *Morgan*, the United States Supreme Court held that "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period." *Morgan*, 536 U.S. at 106.

5

Cunningham's EEOC Charge alleges not just "at least one of the events" but a variety of "events contributing to the hostile work environment" -- sufficient to have placed Austal on notice that such a claim (and various incidents tied to same) exists in the litigation so that Austal could have investigated the details during discovery. Indeed, on his EEOC Charge, Cunningham checked the "Continuing Action" Box.  (Doc. 174-3 at 7).  As such, to the extent Austal seeks summary judgment on "[a]ll alleged acts occurring between Cunningham's hire date of April 10, 2006, and the beginning of the statutory period date of December 2, 2006," under Title VII for hostile work environment, Austal's motion is **DENIED.**

The Court now turns to Austal's Title VII time-barred argument regarding Cunningham's claim that he was denied a pay increase in July 2006.  Cunningham's assertion that he was denied a pay increase in July 2006 (tied to a review after 90 days of employment) is part of his claim that he was denied proper pay raises throughout his employment (that he did not receive the same raises as Caucasian co-workers).  Thus the claim is framed by Cunningham as a discriminatory compensation decision claim (*i.e.*, paychecks received as a periodic implementation of a previously made discriminatory employment decision).[4]  Accordingly, Cunningham's starting hourly rate pay claims and the pay raise claims tied to same, are not untimely and Austal's motion for summary judgment on this Title VII claim is **DENIED.**

---

[4] As set forth in 29 U.S.C.A. § 626(d)(3): "….an unlawful practice occurs, with respect to discrimination in compensation in violation of this Act, when a discriminatory compensation decision or other practice is adopted, when a person becomes subject to a discriminatory compensation decision or other practice, or when a person is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice."

**IV.**    **Section 1981/Title VII – Hostile Work Environment (Race)**

Racial harassment is actionable under Section 1981 or Title VII where the conduct is sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment.  See, e.g., Freeman v. City of Riverdale, 330 Fed. Appx. 863, 865 (11th Cir. 2009).[5] To establish a prima facie case of hostile work environment and/or racial harassment under Section 1981 or Title VII, the plaintiff must prove that: 1) he belongs to a protected group; 2) he has been subject to unwelcome harassment; 3) the harassment was based on a protected characteristic of the employee (such as race); 4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and 5) the employer is responsible for such environment under a theory of vicarious or direct liability.  See, e.g., Reeves v. DSI Sec. Servs., Inc., 395 Fed. Appx. 544, 545-546 (11th Cir. 2010); McCann v. Tillman, 526 F.3d 1370, 1378 (11th Cir. 2008); Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002).  See also e.g., Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999).

Austal contends that: 1) Cunningham's evidence of sporadic and isolated incidents of racially hostile comments, conduct and graffiti during the time he was employed do not meet the severe or pervasive threshold; 2) Cunningham makes no allegations and presents no evidence that the allegedly hostile environment unreasonably interfered with his ability to work on a day-to-day basis; 3) Austal maintained a policy establishing how an employee should report discriminatory conduct, but Cunningham failed to report certain conduct; and 4) Austal took

---

[5] This is an unpublished decision and is persuasive, but not binding, authority pursuant to Eleventh Circuit Rule 36-2.  The Court notes this same rule applies to other Fed. Appx. cases cited herein.

7

reasonable preventative and corrective/remedial measures to prevent a hostile work environment.

### A.    Severe or Pervasive

As to whether the conduct was severe and pervasive, Carter points to the following evidence.[6]  Concerning racial comments, Cunningham alleges that once a Caucasian supervisor "walked right" passed Cunningham and referred to a co-worker as "[y]ou stupid…nigger." (Doc. 174-1 (Dep. Cunningham at 112, 129)).  Cunningham reported the comment to his supervisor Wayne Jacobs, who told him not to worry about it "we'll look into it, more or less, that's all that was ever said."  (Doc. 285-10 (Dep. Cunningham at 116)).  Additionally, Cunningham once heard an employee use the word nigger.  (Id. (Dep. Cunningham at 137)).  Moreover, while not specifying how many times, Cunningham heard supervisors refer to African American employees as "boy" and "ole nigger."  (Id. (Dep. Cunningham at 165, 167)).  He reported the comments to Wayne Jacobs.  (Id. (Dep. Cunningham at 167)).  After Cunningham reported these comments, he did not hear the supervisor use "boy" again.  (Id.)

Additionally, Cunningham was subjected to displays of the Confederate flag with unspecified frequency, as Caucasian employees -- "several people" -- wore t-shirts with the flag. (Doc. 174-1 (Dep. Cunningham at 137)).  Cunningham reported to supervisors Wayne Jacobs

---

[6] Cunningham also relies on the allegations of the other 22 plaintiffs (Doc. 305 at 3-4, 18, 21-22, 29-30) to support that an overall racially charged work atmosphere exists at Austal (*i.e.*, viewed through the lens of the plaintiffs' collective allegations versus each plaintiff's specific allegations).  "To rely on the evidence, each [plaintiff] must show that he *was aware* of those incidents at the relevant time he alleges the hostile work environment."  See, e.g., Melton v. National Dairy, LLC, 705 F. Supp. 2d 1303, 1342 (M.D. Ala. 2010) (citing Edwards Wallace Comm. College, 49 F.3d 1517, 1522 (11th Cir. 1995)) (emphasis in original).  See also e.g., Head v. Pitts Enterprises, Inc., Slip Copy, 2010 WL 2773376, *8 (M.D. Ala. Jul. 14, 2010); McKenzie v. Citation Corp., LLC, 2007 WL 1424555, *13 (S.D. Ala. May 11, 2007).  Courts in the Eleventh Circuit may consider statements not directed at a plaintiff and even hearsay statements, so long as the plaintiff was aware of the statements at the time he was employed.  See, e.g., Yeomans v. Forster and Howell, Inc., Slip Copy, 2010 WL 3716394, *5-6 (M.D. Ala. Sept. 10, 2010).  The Court has only considered the evidence of which Cunningham testified that he was aware.

and Joe Fairsong and possibly "Randy," that he did not like that employees wore the flags on their clothing. (Doc. 285-10 (Dep. Cunningham at 138-139)). In response to Cunningham's complaint, supervisor Jacobs told him: "[y]ou can't tell people what to wear[.]" (Id. (Dep. Cunningham at 139)). Despite Cunningham's complaint, the displays of the Confederate flag were not addressed by Austal.

Moreover, Cunningham saw racial epithets in graffiti on bathroom walls and stalls with unspecified frequency. (Doc. 174-1 (Dep. Cunningham at 117, 119, 121-122); Doc. 285-10 (Dep. Cunningham at 124-128, 133)). The graffiti included: "how many niggers do you see around here wearing white hats[;]" "White Power" with a picture of a hooded Klansman; "why don't niggers use aspirin-because they don't want to pick cotton out of the top;" and pictures depicting black women with nooses and descriptions as to "what they do to them and stuff like that." (Doc. 285-10 (Dep. Cunningham at 124-128, 133)). Cunningham reported some of the graffiti to supervisors Wayne Jacobs and Joe Fairsong. (Doc. 174-1 (Dep. Cunningham at 117, 125-127); Doc. 285-10 (Dep. Cunningham at 133)). Fairsong told Cunningham, at one point, that if he saw graffiti, to let him know. (Doc. 174-1 (Dep. Cunningham at 119)). As of Cunningham's departure in December 2006, the graffiti was still present. (Id. (Dep. Cunningham at 121)). The record reveals that starting in August 2007, Austal responded to complaints about the graffiti by cleaning the bathrooms and painting black over the graffiti on a regular basis. (Doc. 285-2 (Dep. Browning at 16, 110).

Further, Cunningham testified that he was shown a noose by Caucasian co-worker Jeremy Hull, who swung a noose around in front of him. (Doc. 174-1 (Dep. Cunningham at 149-150); Doc. 285-10 (Dep. Cunningham at 147)). Cunningham told Hull to stop; Hull said he was

"more or less just playing….being silly."   (Id. (Dep. Cunningham at 150-151)).   Cunningham reported the incident to his supervisor Wayne Jacobs who told him he would "handle it."   (Id. (Dep. Cunningham at 151)). Hull did not show Cunningham a noose again and he became Cunningham's "somewhat…best friend." (Id.)

To be actionable as severe or pervasive, the harassment "must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceive[s]…to be abusive."  Miller, 277 F.3d at 1276 (internal citation and quotation marks omitted).  In other words, the severe or pervasive element has an objective and subjective component.  McCann, 526 F.3d at 1378.  To determine the objective severity of the harassment, courts look at the totality of the circumstances and consider: 1) the frequency of the discriminatory conduct; 2) the severity of the conduct; 3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and 4) whether the conduct unreasonably interferes with an employee's job performance.  Reeves, 395 Fed. Appx. at 546. See also Faragher v. City of Boca Raton, 524 U.S. 775, 787-788 (1998); Allen v. Tyson Foods, 121 F.3d 642, 647 (11th Cir. 1997) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)). "The conduct is considered cumulatively instead of in isolation."  Reeves, 395 Fed. Appx. at 546.

There is sufficient evidence, if believed by a jury, that Cunningham subjectively perceived his work environment to be racially hostile.  Thus, the Court need only determine whether Cunningham's  perception was objectively reasonable.

When viewing the facts in the light most favorable to Cunningham, a reasonable jury could not find that the harassing conduct alleged was frequent and severe.   According to

10

Cunningham, while he was aware of the isolated and random racial comments "stupid nigger" and "nigger" each said once to co-workers, and "ole nigger" said to co-workers "more than once," he did not encounter such racial comments on a daily or frequent basis and he was not called these comments by either co-workers and/or supervisors. As such, these statements are not sufficiently severe or pervasive to alter the terms and conditions of Cunningham's employment, as required to sustain a claim for hostile work environment.  See, e.g., Barrow v. Georgia Pacific Corp., 2005 WL 1926420, *3 (11th Cir. Aug. 12, 2005) (concluding that evidence that supervisors and co-workers *occasionally* used terms like "nigger," "boy," and "black ass" towards plaintiff was not sufficiently severe or pervasive to alter conditions of employment).

Concerning potentially consistent incidents which were possibly humiliating, Cunningham encountered graffiti with racial epithets in the workplace bathrooms (including drawings of a noose around a black woman once) but did not always report the graffiti and did not testify as to how often he discovered same; and images of the Confederate flags were displayed only on "several employees" t-shirts rather than the majority of employees.  However, Cunningham has not provided any evidence as to the frequency of the graffiti and/or flag imagery, or that these types of occurrences were sufficiently severe or pervasive to alter the terms or conditions of his employment.  While the racial graffiti he observed in the Austal bathrooms, as alleged, was vulgar and offensive, Cunningham has not established that the graffiti constitutes more than mere offensive utterances rather than severe or threatening comments directed at him personally.  Cunningham also has not alleged that exposure to the graffiti and/or flag imagery interfered with his work performance.

Further, while a co-worker once showed Cunningham a noose, he thought "he was silly"

11

and told the co-worker to stop. The Court recognizes that "[c]learly, the display of nooses in the workplace should not be cast aside as a light joke or teasing. A noose is a historical symbol of racial hatred for African-Americans and can represent a severe physical threat[,]" McKenzie, 2007 WL 142555, *13. However, the Eleventh Circuit has not held that the temporary display of a noose by a rogue employee creates a *per se* hostile work environment.[7] Cunningham has also not shown that Austal failed to respond to his complaint. In contrast, after reporting the noose to supervisor Wayne Jacobs, Jacobs told Cunningham that he would "handle it" and the co-worker did not show Cunningham a noose again and actually became Cunningham's best friend.

Eleventh Circuit precedent mandates that courts consider "the totality of the circumstances" such that the absence of one factor is not dispositive. See, e.g., Miller, 277 F.3d at 1277. Even when all the conduct is considered under the totality of the circumstances, the evidence does not satisfy Cunningham's burden of establishing that the alleged incidents were sufficiently severe or pervasive to alter the terms and conditions of his employment and create a hostile work environment. Cunningham has not submitted sufficient evidence demonstrating that the conduct – apart from the graffiti and flag imagery -- was regular, much less frequent, severe, physically threatening, humiliating, demeaning and/or interfered with his job.[8] There is "not

---

[7] See, e.g., Barrow, 2005 WL 1926420, *2–3 (finding no hostile work environment where plaintiff observed a noose in another employee's locker, saw the letters "KKK" emblazoned on company premises, and was called a "nigger" three times by a superintendent); Washington v. Kroger Co., 2007 WL 433519, *3 (11th Cir. Feb. 8, 2007) (finding no hostile work environment where employee hung plastic figurine, meant to represent plaintiff, with a rope); Quarles v. Con–Way Freight, Inc., 2008 WL 1994916, *8 (M.D.Fla. May 8, 2008) (finding that the plaintiff failed to show sufficiently severe or pervasive conduct where white employee tied a noose and showed it to black employee, other employees used term "nigger" freely, and employees depicted black supervisor as a gorilla, where noose incident was "objectively offensive and physically threatening" but lacked necessary severity or pervasiveness).

[8] *Cf.* Webb v. Worldwide Flight Service, Inc., 407 F.3d 1192, 1193 (11th Cir. 2005) (finding (Continued)

12

simply some magic number of racial or ethnic insults" that preclude summary judgment, it is repeated incidents of...harassment that continue despite the employee's objections [that] are indicative of a hostile work environment." Miller, 277 F.3d at 1276 (citation and quotation omitted).   In sum, even when considering the allegations in the light most favorable to Cunningham, he has not produced sufficient evidence – if believed by a jury – to create an issue of fact as to whether he was subjected to racial harassment that was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment.[9]

As a result, because Cunningham has failed to satisfy this fourth element of his prima facie case for hostile work environment, the Court need not reach the fifth element (employer

---

evidence sufficient for hostile work environment claim where supervisor referred to plaintiff on a daily basis for two years as a "nigger" and a "monkey," and described him as being "from the tribe"); E.E.O.C. v. Beverage Canners, Inc., 897 F.2d 1067, 1068-69 n. 3 (11th Cir. 1990) (indicating that supervisor's racist slurs, including "niggers," "ignorant niggers," and "swahilis," and his statements that "blacks were meant to be slaves" and were of lower intelligence, and "[t]hose niggers out there will not get anywhere in this company" created racially hostile work environment); Johnson v. Booker T. Washington Broadcasting Service, Inc., 234 F.3d 501, 509 (11th Cir .2000) (concluding that "roughly fifteen separate instances of harassment over the course of four months" were actionably pervasive).

[9] See, e.g., Barrow v. Georgia Pacific Corp., 144 Fed. Appx. 54, 57-58 (11th Cir. 2005) (concluding that evidence of "displays of the rebel flag on tool boxes and hard hats, the letters 'KKK' on a bathroom wall and on a block-saw console, and a noose in another employee's locker,'" as well as several threats to "kick plaintiff's 'black ass'" or threats that if he looked at a white girl he was going to get "cut," and the use of racial epithets including "nigger," "boy," and "black boy," reflected conduct that was "isolated," "sporadic," and "random" and did not amount to "severe and pervasive harassment[]"); Quarles v. Con-Way Freight, Inc., 2008 WL 1994916, *6-7 (M.D. Fla. 2008) (granting summary judgment for the employer, finding that "six instances of racially-related conduct over a period of a few years" witnessed by the plaintiff and "approximately four other instances that were reported to him" were insufficient as a matter of law to support a claim for hostile work environment. The evidence included use by a supervisor and co-worker of offensive racial terms, showing a stuffed animal gorilla that was captioned with the name of a black employee, and being told of a noose that had been shown to another black employee. The court held that this conduct fell "well short of the required level of severity and frequency to support a hostile environment claim[]").  See also Penn v. USF Holland, Inc., 2010 WL 6185610, *13-14 (N.D.Ala. Nov. 16, 2010).

liability) and summary judgment is **GRANTED** in favor of Austal on this claim.

**V.**       **Section 1981/Title VII – Disparate Treatment (Race)**

Cunningham contends that he was intentionally discriminated against with respect to "terms and conditions of his employment" because of his race in violation of Title VII and Section 1981.  Austal moves for summary judgment on Cunningham's remaining claims that: 1) he was hired in at a lower hourly rate than similarly situated Caucasian employees; and 2) he was denied pay increases.

In individual disparate treatment claims, "the plaintiff bears the burden of proving that the employer discriminated against him because of his race."  Cooper v. Southern Co., 390 F.3d 695, 723 (11th Cir. 2004), *overruled on other grounds,* Ash v. Tyson Foods, Inc., 546 U.S. 454, 456-457 (2006).  See also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000); Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981). Where there is no direct evidence of discrimination or a statistical pattern of discrimination, the burden shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) applies.  Under this framework, the plaintiff must establish a prima facie case of intentional race discrimination.[10] Id. at 802.  See also e.g., E.E.O.C. v. Joe's Stone Crabs, Inc., 296 F.3d 1265, 1272 (11th Cir. 2002).  If a prima facie case is established, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions.  Id.  Once the employer satisfies its burden, the burden shifts back to the plaintiff to offer evidence that the alleged reason of the employer is a pretext for unlawful discrimination.  Id. at 1272-1273.

---

[10] "Claims of race discrimination under § 1981 are analyzed in the same manner as claims brought under Title VII."  DeLeon v. ST Mobile Aerospace Eng'g, Inc., 2010 WL 500446, *15 (S.D. Ala. Feb. 9, 2010).

Cunningham contends that 1) he did not receive the same starting hourly rate as other employees who were hired for the same job position; and 2) he did not receive proper pay raises during his employment at Austal.

In order to establish a prima facie case of disparate pay, Cunningham must establish that he held a position "similar to that of a higher paid employee who is not a member of [his] protected class." Crawford v. Carroll, 529 F.3d 961, 974-975 (11th Cir. 2008) (citing Meeks v. Computer Assocs. Int'l, 15 F.3d 1013, 1019 (11th Cir. 1994)).  The employee whom the plaintiff identifies as a comparator "must be similarly situated in all relevant respects."  Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1091 (11th Cir. 2004).  See also e.g., Drake-Sims v. Burlington Coat Factory Warehouse of Ala., Inc., 330 Fed. Appx. 795, 803 (11th Cir. 2009) (unpublished). It is necessary that a comparator must be "nearly identical" to the plaintiff "to prevent courts from second-guessing a reasonable decision by the employer."  Wilson, 376 F.3d at 1091.  See also e.g., Head v. Pitts Enterp., Inc., Slip Copy, 2010 WL 2773376, *13 (M.D. Ala. Jul. 14, 2010); Drake-Sims, 380 Fed. Appx. at 803; Sylva-Kalonji v. Board of School Comm'rs of Mobile Cty., 2009 WL 1418808, *5-6 (S.D. Ala. May 20, 2009); Hill v. Emory Univ., 346 Fed. Appx. 390, 395 (11th Cir. 2009); Beard v. 84 Lumber Co., 206 Fed. Appx. 852, 857 (11th Cir. 2006) (unpublished) (finding the plaintiff and a proposed comparator had different numbers of years of experiences such that they were not similarly situated in all relevant respects).

Austal contends that Cunningham's claims that he was denied proper pay increases and was hired in at less per hour than similarly situated Caucasian employees fail because he has not sufficiently identified similarly situated Caucasian employees who were treated more favorably.

Cunningham does not submit sufficient evidence or argument regarding subjective

similarity of the comparators, such as experience, education, previous salary, or salary demand.[11] Rather, Cunningham relies on <u>Miranda v. B&B Cash Grocery Store, Inc</u>., 975 F.2d 1518, 1529 (11th Cir. 1992) (finding that the plaintiff established a prima facie case of sex discrimination under Title VII by demonstrating that she is female and that the job she occupied was similar to higher paying jobs occupied by males) and <u>Mulhall v. Advance Sec., Inc</u>., 19 F.3d 586 (11th Cir. 1994), and argues that he meets his burden of producing evidence of a similarly situated comparator by pointing to Caucasian employees who held jobs with identical titles.

The Eleventh Circuit has counseled "[t]he methods of presenting a prima facie case are not fixed; they are flexible and depend to a large degree upon the employment situation." <u>Wilson,</u> 376 F.3d at 1087.  In more recent Eleventh Circuit precedent, the Court has pointed to the absence of relevant similarities amongst comparators, outside of job similarity, and held that plaintiff failed to meet his/her prima facie case.   For example, in <u>Cooper,</u> 390 F.3d 695,[12] the Court determined that the comparators for purpose of a disparate pay claim were not appropriate, *i.e*. similarly situated, when the plaintiff did not establish: 1) "that the proposed comparators had similar levels of experience or education" <u>id</u>. at 745; 2) "similar levels of seniority" <u>id.</u> at 743; and 3) similar disciplinary records  <u>id.</u> at 741.

When the Eleventh Circuit has reached beyond job similarities in its similarly situated

---

[11] While Cunningham alleges that he is aware of both Weed and Ryan's experience as it pertains to their prior employment with Atlantic Marine, he admits that he does not know anything about their experience and/or educational background prior to working at Atlantic Marine. Additionally, Cunningham stopped working at Atlantic Marine in March 2004  and  has not presented any basis for knowledge of their work experience from March 2004 to their hire dates at Austal in early/mid 2006.

[12] The Court in <u>Cooper</u> cited both <u>Miranda</u> and <u>Mulhall</u> in reaching its conclusions.

analyses, unrebutted evidence was in the record to show that there existed a relevant factor (*e.g.*, experience, education, starting pay demand) which rendered the comparators dissimilar.  For example, in <u>Mack v. ST Mobile Aerospace Eng., Inc.</u>, 195 Fed. Appx. 829 (11th Cir. 2006) (unpublished), the court stated "[w]e affirm the court's entry of summary judgment as to this claim because MAE produced uncontroverted evidence that Frye and Wicks were paid more than Mack because each had specialized experience and training in aeronautics and avionics, while Mack had only general electronic training. Consequently, Mack failed to show that they were 'similarly situated in all relevant respects.'" <u>Id</u>. at 843.  Thus, although the burden of production at the prima facie stage does not shift to the defendant to produce any evidence, the failure of the defendant to point to other traits that are "relevant" to the particular employment situation dictates that the Court should look strictly to job similarities. Therefore, the Court will first examine the record to determine if Cunningham has submitted evidence of basic job similarities, and if so, whether there is evidence that the comparators are dissimilar in other relevant respects.

### A.    <u>Starting Hourly Rate</u>

Cunningham was hired on April 10, 2006 at the hourly rate of $15.50/hour for the position of Pipe Fitter in the Engineering Department.  (Doc. 295 at 9 (Exhibit 105-Sealed); Doc. 174-1 (Dep. Cunningham at 32); Doc. 349-4.  When hired, he was unemployed but had prior work experience as a self-employed carpenter, and had worked as a pipe fitter at Atlantic Marine (February 1996-March 2004, where he was a First Class Pipe Fitter during the last three (3) years of his employment); Cunningham had 12 years of pipe work "behind me."  (Doc. 174-1 (Dep. Cunningham at 21, 73); Doc. 285-10 (Dep. Cunningham at 30-31); Doc. 349-4 at 3-4).  Cunningham listed his desired salary as "open."  (Doc. 349-4 at 2).  When he left Brasfield &

17

Gorrie he was earning $15/hour as a carpenter.  (Id. at 4).

In the Third Amended Complaint, Cunningham alleges that he: "had approximately eight (8) years of prior work experience when he was hired and Defendant refused to give him credit for this prior experience when it established his beginning hourly rate of pay. White employees with less experience were started at higher hourly rates, and … were given credit for their prior work experience when establishing their beginning hourly rate of pay."  (Doc. 37 at 152 at ¶813). Cunningham contends that he reported his complaints about the difference in starting hourly rates.  (Doc. 285-10 (Dep. Cunningham at 163)).

Cunningham identifies eight (8) comparators to support his disparate pay claim that Caucasian employees were hired in at Austal at a higher hourly rate for the same job position of Pipe Fitter: 1) Lonzo Weed, Jr.; 2) John Karl Ryan; 3) James Adams, Jr.; 4) Michael Barfield; 5) Glen Bosarge; 6) Waynick Rooney, Jr.; 7) Eugene Waldrop; and 8) Robert Brantley.  (Doc. 305 at 7-8); Doc. 285-10 (Dep. Cunningham at 71)).  Austal contends that Cunningham has failed to show that the alleged comparators are similarly situated not only in job similarity but also experience, education and skills and the comparators were more steadily employed, earned higher wages, had more experience and/or had management experience.  (Doc. 349 at 11).

Austal contends that these comparators were hired as pipe fitters *in the Pipe & Machinery Department* or *Pipe Department* and Cunningham essentially concedes that these employees were _not_ hired by Austal to work as pipe fitters in the same department as Cunningham (the Engineering Department).  (Doc. 305 at 7-8).  It cannot be said then, that these comparators are substantially similar to Cunningham in terms of job duties even though they were pipe fitters, particularly as Cunningham has failed to present any evidence of the similarities of pipe fitting

duties in the Pipe & Machinery (or Pipe) Department at Austal, when compared to the Engineering Department.  This lack of evidence undermines Cunningham's starting hourly rate claim as fitters are apparently employed at Austal in more than one (1) department; within each department pay rates are based on a number of factors including experience (at Austal or elsewhere), education/training, productivity (quantity and quality), and attendance; and "[t]he difference in pay scales is well known to the employees[]" as some employees have transferred from one department to another to qualify for higher pay or different working conditions.  (Doc. 283-48 at 4-5, 11 (Austal's 3/7/07 EEOC Statement)).

Even when the threshold focus is only on job similarity, Cunningham must still establish basic job similarities between his job and that of his purportedly higher paid comparator(s). Cunningham has failed to do this because he "relies merely on a comparison of generic job titles and points to…no evidence regarding the actual job functions and the skill and effort required to perform those functions."  See, e.g., Hooper v. Total System Servs., Inc., 2011 WL 2604752, *8 (M.D. Ga. Jun. 30, 2011).  See also e.g., Mulhall, 19 F.3d at 590 (finding that a plaintiff must show "equal work on jobs the performance of which requires equal skill, effort, and responsibility[]").  In sum, Cunningham has not established what he asserts is the only requirement -- "job similarity."  (Doc. 305 at 35).  Accordingly, Austal's motion for summary judgment, on Cunningham's starting hourly rate disparate pay claim, is **GRANTED.**

### B.    <u>Pay Increases</u>

Cunningham alleges that he did not receive proper pay increases, and that specifically, within three (3) months of his hire date, he should have received a raise to $18/hour; and within six (6) months should have earned top pay at $20/hour.  The record reveals that Cunningham

19

received a pay increase less than six (6) weeks after being hired (from $15.50/hour to $17/hour).[13]   Cunningham, however, alleges that this raise was "through a yard raise that everybody was getting a raise[]" but that "[w]hen I spoke with them, I told them my three months [June 2006], that they was supposed to have reevaluated me and that's when I didn't get no more money[]"  (Doc. 174-1 (Dep. Cunningham at 67)). "[A]fter my evaluation, there was never a raise given me from that point to the point that I left there."  (Id.)  "I should have had two [more] raises."  (Id. (Dep. Cunningham at 67-68, 70)).

Despite Cunningham's characterization of two (2) raises in June 2006 and December 2006 that "I should have had[,]" the record reveals that at Austal "[t]here is no set timetable for raises. New hires are normally evaluated after ninety days. They may be considered for an increase at that time, but none is guaranteed. Employees are normally reviewed in June and in December, once again, raises may be considered at that time, but are not guaranteed…."  (Doc. 283-48 at 11 (Austal's 3/7/07 EEOC Statement)).  Additionally, Cunningham has not submitted evidence of Caucasian employees who were hired at or around the same time as Cunningham for the same position in the same department, but who received raises at three (3) months of employment and six (6) months of employment.  Accordingly, Austal's motion for summary judgment on Cunningham's disparate pay claim concerning these pay raises is **GRANTED.**

## VI.   Conclusion

Accordingly, it is **ORDERED** that Austal's (partial)[14] motion for summary is **GRANTED** as to Cunningham's hostile work environment claim; **GRANTED** as to

---

[13] Dated May 22, 2006. (Doc. 295 at 9 (Exhibit 105-Sealed); Doc. 174-1 at 65).

[14] Austal did not move for summary judgment on Cunningham's Title VII/Section 1981 claim of
(Continued)

Cunningham's constructive discharge claim; **GRANTED** a**s** to Cunningham's disparate treatment in training, evaluations and discipline claims;  **GRANTED** as to Cunningham's ADA claim; **GRANTED** as to Cunningham's disparate pay claims; **GRANTED** as to Cunningham's retaliation claim; and **DENIED** as to Cunningham's punitive damages request as that issue will be **CARRIED TO TRIAL.**

      **DONE** and **ORDERED** this the **7**[th] day of **September 2011.**

                            /s/ Kristi K. DuBose
                            **KRISTI K. DuBOSE**
                            **UNITED STATES DISTRICT JUDGE**

---

disparate treatment for failure to promote.  Rather, Austal addressed the claim in its reply. The court has not addressed the claim because it is not properly before the court.  However, the court notes that based on the evidentiary record currently before the court, Cunningham's failure to promote claim is not likely to survive a Rule 50 motion.