**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **CAROLYN SLAY,** *et al.*, | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **CIVIL ACTION 08-00155-KD-N** |
| | ) | |
| **AUSTAL, U.S.A., L.L.C.,** | ) | |
| **Defendant.** | ) | |

**ORDER**

This matter is before the Court on Defendant's motion for summary judgment (Docs. 192, 218), Plaintiff's Opposition (Doc. 303) and Defendant's Reply (Doc. 333).

## I.   Factual Background

On March 20, 2008, multiple Plaintiffs initiated this action against Austal for legal and equitable relief to redress unlawful discrimination and harassment on the basis of race.[1]  (Doc. 1). Carolyn Slay ("Slay") asserts claims for hostile work environment and discrimination (disparate pay raises and failure to promote), based on race in violation of Title VII and 42 U.S.C. § 1981.  (Doc. 37 at 116-120).[2]

---

[1] While initiated as a purported class action, this is no longer a class action case.  (Doc. 293). Additionally, some of the Plaintiffs allege gender and disability discrimination in addition to asserting Title VII claims.

[2] Originally, Slay alleged a separate claim for retaliation (Doc. 37 at 118-119 at ¶¶608, 613-614, 615-618) and training (Id. at 118, 120 at ¶¶609-610, 621).  Slay did not address these claims in response to Austal's motion and moreover, in her opposition brief Slay now specifically represents that she "is *pursuing* claims against Austal for *only* hostile work environment and discrimination on the basis of race in regards to pay and promotions" under Title VII and Section 1981.  (Doc. 303 at 2 (emphasis added)). Accordingly, the Court construes Slay's intentional exclusion of her retaliation and training claims as a concession of these claims.  Thus, it is **ORDERED** that Austal's motion for summary judgment, as to Slay's retaliation and training claims, is **GRANTED.**

Moreover, any and all disparate impact claims against Austal have been dismissed from this litigation. (Doc. 366).
(Continued)

A.   **Austal**

Defendant Austal USA ("Austal") is an Australian shipbuilding company dedicated to the design and construction of customized aluminum commercial and military vessels, located in Mobile, Alabama.  (Doc. 192-1 at 2; Doc. 283-48 at 2-3 (Austal's 3/7/07 EEOC Position Statement)).  The Operations Division has four (4) major Departments (Aluminum (divided into Fabrication and Components), Electrical, Engineering, and Fit Out (divided into HVAC, Insulation and Fit Out)).  (Doc. 283-48 at 3-4).

B.   **Slay's Employment**

Slay began working for Austal on November 1, 2004 as a Welder in the Aluminum Fabrication Department, at the rate of $13.50/hour. (Doc. 295 at 34 (Exhibit 105-Sealed); Doc. 218-1 (Dep. Slay at 28, 128); Doc. 218-1 at 38; Doc. 218-2 at 11 (Decltn. Lindley); Doc. 285-21 (Dep. Slay at 34)). Slay later transferred to a Welder position in the Electrical Department.  (Doc. 333-5 at 3 (Decltn. Combs)). Slay received five (5) pay raises dated May 16, 2005 (from $13.50/hour to $14.75/hour); April 10, 2006 (from $14.75/hour to $16/hour "big improvement

---

Further, Austal moved for summary judgment on claims not included in the Third Amended Complaint including that Slay was hired in at a lower rate than Caucasians, she was given unfair evaluations, was required to clock out, was written up for smoking and alleged gender discrimination. (Doc. 192-1 at 3 note 1, 4, 17-20). Likewise, Austal argues claims not alleged by Slay, in its Reply (*e.g.*, that Slay was denied supervisor positions between 2005-2006).  (Doc. 333 at 2). In Pleming v. Universal-Rundle Corp., 142 F.3d 1354, 1357 (11th Cir. 1998), the Court held that the "parties frame the scope of the litigation at the time the complaint is filed."  Moreover, in Davis v. Coca-Cola Bottling Co., Consol., 516 F.3d 955 (11th Cir. 2008), the court highlighted the difficulty in appellate review of voluminous pleadings involving multiple defendants.  In so doing it is clear that the 11th Circuit expects the District Court to "strip the case down and identify each claim and defense." Id. at 982.  In an effort to do so the court must rely on the claims asserted in the Third Amended Complaint.  Thus, claims asserted in depositions and not included in the complaint have not been considered and will not be addressed.  See Smith v. Books-A-Million, 398 Fed. Appx. 437 (11th Cir. 2010) (Claims not included in the complaint were not required to be considered).

no increase since May"); May 22, 2006 (from $16/hour to $18/hour); June 18, 2007 (to $18.50/hour); January 7, 2008 (to $19.25/hour). (Doc. 295 at 34 (Exhibit 105-Sealed); Doc. 218-1 at 38, 40-42).  On March 25, 2008, when she was earning $19.25/hour, Slay was terminated for sleeping on the job.  (Doc. 218-1 (Dep. Slay at 35); Doc. 218-2 at 11 (Decltn. Lindley)).

## II.    <u>Standard of Review</u>

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (Dec. 2010).   The recently amended Rule 56(c) governs Procedures, and provides as follows:

> *(1) Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> *(2) Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
>
> *(3) Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record.
>
> *(4) Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

FED.R.CIV.P. Rule 56(c) (Dec. 2010).

Defendant, as the party seeking summary judgment, bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  If the nonmoving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment. Celotex, 477 U.S. at 323.  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992), cert. den., 507 U.S. 911 (1993) (internal citations and quotations omitted).

## III.   Timeliness of Title VII Claims

A plaintiff may not sue under Title VII unless she first exhausts administrative remedies by filing a timely charge of discrimination with the appropriate agency. See, e.g., Wilkerson v. Grinnell Corp., 270 F.3d 1314, 1317 (11th Cir. 2001).  "In a non-deferral state such as Alabama, the deadline for filing is 180 days after the alleged discriminatory act." Carter v. University of South Alabama Children's & Women's Hosp., 510 F. Supp. 2d 596, 606 (S.D. Ala. 2007). See also Tipp v. AmSouth Bank, 76 F. Supp. 2d 1315, 1327 (S.D. Ala. 1998). "If the victim of an employer's unlawful employment practice does not file a timely complaint, the unlawful practice ceases to have legal significance, and the employer is entitled to treat the unlawful practice as if

it were lawful." <u>City of Hialeah, Fla. v. Rojas</u>, 311 F.3d 1096, 1102 (11th Cir. 2002). <u>See</u> <u>also</u> <u>Sheffield v. United Parcel Service, Inc.</u>, 2010 WL 4721613, *2 (11th Cir. Nov. 22, 2010) (unpublished); <u>Jordan v. City of Montgomery</u>, 2008 WL 2529573, *1 (11th Cir. Jun. 26, 2008) (unpublished).  A failure to file a timely charge with the EEOC results in a bar of the claims contained in the untimely charge.  <u>Id</u>.

Slay signed her EEOC Charge (for race, retaliation and "continuing action") on November 13, 2006 and it was received on November 20, 2006.  (Doc. 218-3 at 2-4).  Slay completed a Supplemental Information form for the EEOC, which was received by the EEOC on March 12, 2007.  (Doc. 286-31).  Calculating from November 20, 2006,[3] Austal contends that "[a]ll alleged acts" occurring between Slay's hire date of November 1, 2004 and May 24, 2006[4] (180 days prior to November 20, 2006) are time barred under Title VII.  (Doc. 192-1 at 6-7).

Slay contends that Austal's interpretation is incorrect and contrary to well established law, as although many acts upon which a plaintiff's Title VII claims rely may occur outside the 180 filing period, "they are part of the same actionable hostile environment claim."  (Doc. 303 at 14-15 (citing <u>McKenzie v. Citation Corp., LLC</u>, 2007 WL 1424555 (S.D. Ala. 2007)).  Slay is correct as it relates to her hostile work environment claim.  The U.S. Supreme Court has clarified that there are different standards for claims involving "discrete acts" versus "hostile environment" allegations.  <u>See</u> <u>generally</u> <u>National R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101

___

[3] Austal incorrectly calculated from the date of signing, November 13, 2006, rather than the date the EEOC Charge was received.  (Doc. 192-1 at 7).  EEOC regulations provide that charges are "filed with the Commission upon receipt[]" (*i.e.*, not when signed).  29 C.F.R. § 1601.13(a).  Thus, the receipt date indicated on the official stamp is the date that Slay's EEOC Charge was filed – November 20, 2006.

[4] Austal also incorrectly calculated the "180 days prior" date as May 17, 2006.  (Doc. 192-1 at 7).

(2002).  Under the continuing violation doctrine, a plaintiff's charge of discrimination regarding a hostile work environment is considered timely if "an act contributing to the claim occurs within the filing period," even if "some of the component acts of the hostile work environment fall outside the statutory time period."  Id. at 117.  As explained in Smiley v. Alabama Dept. of Transp., Slip Copy, 2011 WL 1188506, *5 (M.D. Ala. Mar. 30, 2011):

> Unlike claims involving discrete discriminatory acts, hostile environment claims may be litigated so long as at least one of the events contributing to the hostile environment was presented to the EEOC in a Charge of Discrimination in a timely fashion. Indeed, in *Morgan*, the United States Supreme Court held that "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period." *Morgan*, 536 U.S. at 106.

Slay's EEOC Charge alleges not just "at least one of the events" but a variety of "events contributing to the hostile work environment" -- sufficient to have placed Austal on notice that such a claim (and various incidents tied to same) exists in the litigation so that Austal could have investigated the details during discovery.  Accordingly, Austal's motion for summary judgment on the untimeliness of this Title VII hostile work environment claim is **DENIED.**

Concerning "any alleged acts" for which Austal has moved for summary judgment, this includes only Slay's claims for disparate treatment (pay raises and promotions)[5] as there are no other claims alleged in the Third Amended Complaint and which have not been abandoned by Slay on summary judgment (if alleged).  See *supra* at Page 1 footnote 2.[6]

---

[5]  Austal did not move for summary judgment on the untimeliness of either of Slay's Section 1981 failure to promote claims.

[6]  Austal alleges that Slay asserted a claim for starting hourly rates. (Doc. 333 at 2).  Slay did not allege this claim in the Third Amended Complaint and thus it is not at issue in this case.

First, as for Slay's failure to promote claims, Austal contends that Slay's allegation that she was denied a supervisor position ("they denied me December 2006" (Doc. 218-1 (Dep. Slay at 55-56)), is time-barred. (Doc. 192-1 at 7). Obviously it is not as it occurred *after* May 24, 2006. Failure to promote claims are "discrete acts." See, e.g., Morgan, 536 U.S. at 114: "Discrete acts such as termination, *failure to promote*, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable "unlawful employment practice." Id. (emphasis added). In Morgan, the U.S. Supreme Court drew a distinction between discrete acts of discrimination and hostile work environment claims, noting that "discrete acts such as…failure to promote….are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable unlawful employment practice." Morgan, 536 U.S. at 114. Additionally, the Eleventh Circuit has held that the denial of a promotion is a one time violation, the present consequences of which only are felt at the present time, and not a continuing violation. See, e.g., Roberts v. Gadsden Memorial Hosp., 835 F.2d 793 (11th Cir. 1988), *modified*, 850 F.2d 1549 (11th Cir. 1988) and Price v. M & H Valve Co., 177 Fed. Appx. 1 (11th Cir. Apr. 7, 2006) (unpublished)). Moreover, Slay contends that in August 2006, she became aware of a supervisor position becoming open when she saw a Caucasian supervisor "tap" a Caucasian employee on the shoulder and tell him to apply for the position. The August 2006 Title VII promotion claim is timely as it also occurred *after* May 24, 2006. Thus, Austal's motion as to these Title VII claims, based on untimeliness, is **DENIED.**

Next, concerning Slay's pay raise claim, the Court finds as follows. Based on the record and the facts – as alleged by Slay – her pay raise claim consists of: 1) not receiving a post

certification test $1/hour raise one (1) month after being hired; and 2) not receiving a post 90-day employment raise.[7]  These are part of her overall claim that she was repeatedly denied proper pay raises throughout her employment while similarly situated Caucasian co-workers received such pay raises.  (Doc. 37 at 118 at ¶607).  Thus, the claim is framed by Slay as a discriminatory compensation decision claim (*i.e.*, paychecks received as a periodic implementation of a previously made discriminatory employment decision).[8]  As such, Austal's motion for summary judgment on this Title VII pay raise claim, based on untimeliness, is **DENIED.**

## IV.   <u>Austal's Reply</u>

Austal asserts new arguments in its Reply concerning the timeliness of certain Section 1981 claims.  (Doc. 333 at 2-3).  The Court will not consider these "new" claims.  Austal cannot assert new allegations or arguments raised for the first time on Reply. As set forth recently in <u>New Hampshire Ins. Co. v. Wiregrass Const. Co.</u>, Slip Copy, 2011 WL 206191, *2 at note 2 (S.D. Ala. Jan. 20, 2011):

> *See Park City Water Authority v. North Fork Apartments, L.P.*, 2009 WL 4898354 at *1 n. 2 (S.D.Ala.2009) (citing cases from over 40 districts applying the rule in 2009 alone). The Eleventh Circuit follows a similar rule. *E.g., Herring v. Secretary, Department of Corrections*, 397 F.3d 1338, 1342 (11th Cir.2005) ("As we have repeatedly admonished, arguments raised for the first time in a

---

[7] Austal moves for summary judgment on the untimeliness of Slay's Title VII claim that between 2005 and 2006, Caucasian employees earned  more than she did. (Doc. 192-1 at 7).  However, Slay has not asserted such a claim.  And even if she had, Slay has not responded to this claim in her opposition to the motion for summary judgment, and thus, said claim is deemed abandoned.

[8] As set forth in 29 U.S.C.A. § 626(d)(3): "….an unlawful practice occurs, with respect to discrimination in compensation in violation of this Act, when a discriminatory compensation decision or other practice is adopted, when a person becomes subject to a discriminatory compensation decision or other practice, or when a person is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice."

reply brief are not properly before a reviewing court.") (internal quotes omitted).

> The Court has identified some of the reasons supporting the rule. "In order to avoid a scenario in which endless sur-reply briefs are filed, or the Court is forced to perform a litigant's research for it on a key legal issue because that party has not had an opportunity to be heard, or a movant is incentivized to save his best arguments for his reply brief so as to secure a tactical advantage based on the nonmovant's lack of opportunity to rebut them, this Court does not consider arguments raised for the first time in a reply brief." *Hardy v. Jim Walter Homes, Inc*., 2008 WL 906455 at *8 (S.D.Ala.2008).

In sum, because Austal failed to raise these arguments in its motion for summary judgment, they are impermissible and will not be considered.  See also e.g., Abrams v. Ciba Specialty Chemicals Corp., 663 F. Supp. 2d 1220, 1232 at note 16 (S.D. Ala. 2009) (providing that "new arguments are impermissible in reply briefs"); Evans v. Infirmary Health Services, Inc., 634 F. Supp. 2d 1276, 1285 at note 14 (S.D. Ala. 2009) (instructing that "this Court's general practice is not to consider new arguments raised in a reply brief").

## V.      Section 1981/Title VII – Hostile Work Environment (Race)

Racial harassment is actionable under Section 1981 or Title VII where the conduct is sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment.  See, e.g., Freeman v. City of Riverdale, 330 Fed. Appx. 863, 865 (11th Cir. 2009).[9] To establish a prima facie case of hostile work environment and/or racial harassment under Section 1981 or Title VII, the plaintiff must prove that: 1) she belongs to a protected group; 2) she has been subject to unwelcome harassment; 3) the harassment was based on a protected characteristic of the employee (such as race); 4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily

---

[9]      This is an unpublished decision and is persuasive, but not binding, authority pursuant to Eleventh Circuit Rule 36-2.  The Court notes this same rule applies to other Fed. Appx. cases cited herein.

abusive working environment; and 5) the employer is responsible for such environment under a theory of vicarious or direct liability. See, e.g., Reeves v. DSI Sec. Servs., Inc., 395 Fed. Appx. 544, 545-546 (11th Cir. 2010); McCann v. Tillman, 526 F.3d 1370, 1378 (11th Cir. 2008); Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002). See also e.g., Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999).

Austal contends that: 1) Slay's evidence of sporadic and isolated incidents of racially hostile comments, conduct and graffiti during the time she was employed do not meet the severe or pervasive threshold; 2) Slay makes no allegations and presents no evidence that the allegedly hostile environment unreasonably interfered with her ability to work on a day-to-day basis; 3) Austal maintained a policy establishing how an employee should report discriminatory conduct, but Slay failed to report certain conduct; and 4) Austal took reasonable preventative and corrective/remedial measures to prevent a hostile work environment.

### A. Severe or Pervasive

As to whether the conduct was severe and pervasive, Slay points to the following evidence.[10] At the outset, according to Slay, "[a]nything I complained about [including racial slurs, graffiti, etc.], I put in writing, got copies of it, and I gave it to management[]" to Jeff

---

[10] Slay also relies on the allegations of the other 22 plaintiffs (Doc. 303 at 2-4, 16, 19-24, 27, 31-33, 40, 42-46) to support that an overall racially charged work atmosphere exists at Austal (i.e., viewed through the lens of the plaintiffs' collective allegations versus each plaintiff's specific allegations). "To rely on the evidence, each [plaintiff] must show that he was aware of those incidents at the relevant time he alleges the hostile work environment." See, e.g., Melton v. National Dairy, LLC, 705 F. Supp. 2d 1303, 1342 (M.D. Ala. 2010) (citing Edwards Wallace Comm. College, 49 F.3d 1517, 1522 (11th Cir. 1995)) (emphasis in original). See also e.g., Head v. Pitts Enterprises, Inc., Slip Copy, 2010 WL 2773376, *8 (M.D. Ala. Jul. 14, 2010); McKenzie v. Citation Corp., LLC, 2007 WL 1424555, *13 (S.D. Ala. May 11, 2007). Courts in the Eleventh Circuit may consider statements not directed at a plaintiff and even hearsay statements, so long as the plaintiff was aware of the statements at the time he was employed. See, e.g., Yeomans v. Forster and Howell, Inc., Slip Copy, 2010 WL 3716394, *5-6 (M.D. Ala. Sept. 10, 2010). The Court has only considered the evidence of which Slay testified that she was aware.

O'Dell, Stephanie Pate, "my immediate supervisor and my coordinator. I made sure everybody had a copy of whatever I had a complaint about." (Doc. 285-21 (Dep. Slay at 100-101)).[11]

Regarding racially and hostile discriminatory comments, Slay alleges that she (and other employees) overheard a supervisor get on the radio and say "[s]end some of those monkeys over here to clean this up[,]" referencing the African American clean up crew. (Doc. 285-21 (Dep. Slay at 98-99, 108-110)). Slay did not complain to management or HR, as others did. (Id. (Dep. Slay at 110)). Slay alleges that African-American co-worker Jill Jernigan told her that she overheard Caucasian supervisors make derogatory remarks about African American employees to Andrew Carver in HR ("going off" on him "about hiring blacks"). (Doc. 285-21 (Dep. Slay at 141-144); Doc. 286-31 at 9). One of the potential employees (who was African American) heard the comments and confronted Carver; this potential employee then told Jernigan what had happened and she complained to Carver but no action was taken. (Id.) Slay is aware that Caucasian supervisor Dane Thomas "harassed" black employees, resulting in him being "jumped" and beaten up at work. (Id. (Dep. Slay at 180-181)). According to Slay, African American employees complained about racially offensive comments "all the time" to supervisors at weekly safety meetings. (Doc. 285-21 (Dep. Slay at 146-148); Doc. 286-31 at 10). In response, "a lot" of the supervisors would cut them off and say "let's not talk about that now…They always want to get you alone so that no one can hear their response." (Id.)

Additionally, "[e]very day," Slay was subjected to Confederate flag imagery "out in the open" as worn and/or displayed on Caucasian co-workers t-shirts and toolboxes (flag stickers).

---

[11]  Slay testified to numerous incidents of vandalism to her tools and verbal harassment by co-employees and a supervisor. However, there is no indication that any of the alleged incidents were racially motivated.

(Doc. 285-21 (Dep. Slay at 98, 110-111, 113)).  The displays of the Confederate flag imagery was not addressed by Austal.

Slay testified that another African American co-worker found (and showed her) a black wire figurine fashioned from tie wraps with white tape around the middle with the word "nigger" written across its chest on both sides, and a noose around its neck, hanging from scaffolding in the area where she and this co-worker worked.  (Doc. 285-21 (Dep. Slay at 246-247)).  Slay told her co-worker to immediately take it to HR.  (Id.)[12]

Slay was aware of racial epithets in graffiti on bathroom walls and stalls (men's and women's), on co-workers' lunchboxes/toolboxes.  (Doc. 218-1 (Dep. Slay at 97, 128)).  Slay was made aware of the racial graffiti in the men's bathroom because "my friends went in there and they were upset, they would e-mail those pictures [of the graffiti] to me."  (Id. (Dep. Slay at 97)).  She received pictures "[e]very week, maybe."  (Doc. 285-21 (Dep. Slay at 111-113)).  Slay never told them not to e-mail her the pictures because they were offensive; "[i]t was offensive to them. So they wanted me to see it so they would have a witness to it."  (Id. (Dep. Slay at 98-100)).  "We was telling management that it was offensive and they needed to do something about it. That's who you tell."  (Doc. 218-1 (Dep. Slay at 100)).

Additionally, Slay saw the racial graffiti "don't feed the monkeys" on a Caucasian co-worker's toolbox.  (Doc. 218-1 (Dep. Slay at 104); Doc. 285-21 (Dep. Slay at 98)).  Austal

_____

[12] Slay testified that she saw the noose that was found by her co-workers at Austal in the employee break room, but she "wasn't with them, though. They had got[ten] there earlier that morning. (Doc. 285-21 (Dep. Slay at 248-249)).  However, this is an impossibility because Slay was terminated from Austal on March 25, 2008 and thus, she was no longer employed at Austal as of May 2008, when a noose was found in the employee break room.  Thus, even if her former co-workers told Slay about it or showed her a photograph of the noose, the evidence contradicts that this racial incident occurred while she was employed with Austal and thus, cannot be part of her hostile work environment claim.

"didn't' make them take it off, so I guess they didn't care[]" as the graffiti remained on the toolbox "for months." (Doc. 218-1 (Dep. Slay at 105)). Slay did not complain to management or HR about this graffiti because other employees had already complained. (Id. (Dep. Slay at 106; Doc. 285-21 (Dep. Slay at 107)). Slay also saw graffiti stating "the South will rise again" on a toolbox of a Caucasian co-worker. (Doc. 285-21 (Dep. Slay at 98)).

Slay saw racial graffiti in the women's bathroom in April 2006; she complained to her supervisor Jeremy Gainous but the graffiti remained until the supplies in the boxes (on which the graffiti was written) were depleted and the boxes were thrown away. (Doc. 285-21 (Dep. Slay at 128, 149-151)). The racial graffiti stated: "we don't want to get any nasty black and lazy people." (Id.) At that time, Slay also complained to Gainous and supervisor Yancey Allen about men being in the women's bathroom (who were temporarily using the bathroom due to the ship building process and available adjacent bathrooms); he responded that he "could not go in there" and there was nothing he could do about it. (Id. (Dep. Slay at 129, 154)).

The record reveals that starting in August 2007, Austal responded to complaints about the graffiti by cleaning the men's bathrooms and painting black over the graffiti on a regular basis. (Doc. 285-20 (Dep. Browning at 16, 110). Nevertheless, the painting did not deter the offending scribblers, as the walls would soon be filled again with racially offensive graffiti. (Doc. 285-20 (Dep. Roberson at 313); Doc. 284-4 (Dep. Lindley II at 95-96, 166-168, 188-190, 195-196, 202-203); Doc. 284-5 (Dep. Lindley III at 254); Doc. 284-11 (Dep. O'Dell at 74-75); Doc. 284-7 (Dep. Friedlieb I at 84)).

Further, Slay testified that Austal caused her high blood pressure condition to become more problematic: "[w]hen I was at Austal, it [blood pressure] stayed up." (Doc. 285-21 (Dep.

13

Slay at 239-241)). In her EEOC Supplement, Slay asserted that the discrimination "really stressed me out. I cry all the time, I'm moody and snappy at my children and other family members. My attitude towards work has changed tremendously. I have that 'I don't care' attitude now. I still do my work and I do a good job, but I've changed my attitude. My blood pressure stays up and if I didn't need to work, I would quit this job." (Doc. 286-31 at 10).

To be actionable as severe or pervasive, the harassment "must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceive[s]…to be abusive." Miller, 277 F.3d at 1276 (internal citation and quotation marks omitted).  In other words, the severe or pervasive element has an objective and subjective component. McCann, 526 F.3d at 1378.  To determine the objective severity of the harassment, courts look at the totality of the circumstances and consider: 1) the frequency of the discriminatory conduct; 2) the severity of the conduct; 3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and 4) whether the conduct unreasonably interferes with an employee's job performance.  Reeves, 395 Fed. Appx. at 546. See also Faragher v. City of Boca Raton, 524 U.S. 775, 787-788 (1998); Allen v. Tyson Foods, 121 F.3d 642, 647 (11th Cir. 1997) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)). "The conduct is considered cumulatively instead of in isolation."  Reeves, 395 Fed. Appx. at 546.

There is sufficient evidence, if believed by a jury, that Slay subjectively perceived her work environment to be racially hostile.  Thus, the Court need only determine whether Slay's perception was objectively reasonable.

When viewing the facts in the light most favorable to Slay, a reasonable jury could not find that all of the harassing conduct alleged was frequent and severe.[13]  According to Slay, she only experienced isolated and random racial comments and only once found a zip tie figurine with the word "nigger" on it.  As for consistent or regular incidents which were potentially humiliating, on a daily basis, images of the Confederate flag were displayed and/or worn on co-workers' t-shirts and toolboxes, and on a weekly basis, Slay encountered racial graffiti in the bathrooms (as shown to her by her male co-workers).  However, while Slay may have regularly encountered offensive Confederate imagery and graffiti, she has not established that any of this repeated conduct was severe, physically threatening or that it unreasonably interfered with her job performance.  At most, Slay testified to her blood pressure condition – which existed before being hired at Austal – as "staying up" and her attitude changing towards her job.

Eleventh Circuit precedent mandates that courts consider "the totality of the circumstances" such that the absence of one factor is not dispositive. See, e.g., Miller, 277 F.3d at 1277.  In this case, Slay has not submitted sufficient evidence demonstrating that the conduct was frequent or severe, physically threatening, humiliating, demeaning and/or unreasonably interfered with her job.  See, e.g., Barrow v. Georgia Pacific Corp., 144 Fed. Appx. 54, 57-58 (11th Cir. 2005) (concluding that evidence of "displays of the rebel flag on tool boxes and hard hats, the letters 'KKK' on a bathroom wall and on a block-saw console, and a noose in another employee's locker,'" as well as several threats to "kick plaintiff's 'black ass'" or threats that if he looked at a white girl he was going to get "cut," and the use of racial epithets including "nigger,"

---

[13] The Court has considered the evidence presented by each Plaintiff in isolation.  Accordingly, there are different determinations among the Plaintiffs, regarding the claim of a hostile work environment, based on the specificity and quality of evidence presented by the individual Plaintiff.

15

"boy," and "black boy," reflected conduct that was "isolated," "sporadic," and "random" and did not amount to "severe and pervasive harassment). While there is "not simply some magic number of racial or ethnic insults" that preclude summary judgment, it is repeated incidents of...harassment that continue despite the employee's objections [that] are indicative of a hostile work environment." Miller, 277 F.3d at 1276 (citation and quotation omitted). In sum, under the totality of the circumstances and considering the allegations in the light most favorable to Slay, she has not produced sufficient evidence – if believed by a jury – to create an issue of fact as to whether she was subjected to racial harassment that was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment.

As a result, because Slay has failed to satisfy this fourth element of her prima facie case for hostile work environment, the Court need not reach the fifth element (employer liability) and summary judgment is **GRANTED** in favor of Austal on this claim.

**VI.** **Title VII/Section 1981 – Disparate Treatment (Race)**

Slay contends that she was intentionally discriminated against with respect to "terms and conditions of her employment" because of her race in violation of Title VII and Section 1981. Specifically, Slay alleges that she was "denied [pay] raises and promotions, while similarly situated white employees received pay increases and promotions." (Doc. 37 at 118 at ¶607).

In individual disparate treatment claims, "the plaintiff bears the burden of proving that the employer discriminated against him because of his race." Cooper v. Southern Co., 390 F.3d 695, 723 (11th Cir. 2004), *overruled on other grounds,* Ash v. Tyson Foods, Inc., 546 U.S. 454, 456-457 (2006). See also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000);

16

Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981). Where there is no direct evidence of discrimination or a statistical pattern of discrimination, the burden shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) applies.  Under this framework, the plaintiff must establish a prima facie case of intentional race discrimination.[14]  Id. at 802.  See also e.g., E.E.O.C. v. Joe's Stone Crabs, Inc., 296 F.3d 1265, 1272 (11th Cir. 2002).  If a prima facie case is established, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions.  Id.  Once the employer satisfies its burden, the burden shifts back to the plaintiff to offer evidence that the alleged reason of the employer is a pretext for unlawful discrimination.  Id. at 1272-1273.

A.     **Pay Raises**[15]

According to Slay, "I'm claiming that I was denied raises…I had the experience and they had excuses. They didn't have reasons."  (Doc. 218-1 (Dep. Slay a 44)).  She asserts that she "was denied raises while white employees with similar or less training and experience were given raises."  (Doc. 303 at 9).

In order to establish a prima facie case of disparate pay, Slay must establish that she held a position "similar to that of a higher paid employee who is not a member of [her] protected class." Crawford v. Carroll, 529 F.3d 961, 974-975 (11th Cir. 2008) (citing Meeks v. Computer Assocs. Int'l, 15 F.3d 1013, 1019 (11th Cir. 1994)).  The employee whom the plaintiff identifies

---

[14]  "Claims of race discrimination under § 1981 are analyzed in the same manner as claims brought under Title VII."  DeLeon v. ST Mobile Aerospace Eng'g, Inc., 2010 WL 500446, *15 (S.D. Ala. Feb. 9, 2010).

[15]  While Slay submitted evidence relating to pay raises in March 2007 and June 2007 (Doc. 286-32 at 8-9, 13-14), Slay has not alleged on summary judgment that she was denied any pay raises at that time, or that such is part of any of her pay raise claims in this case.

as a comparator "must be similarly situated in all relevant respects." Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1091 (11th Cir. 2004). See also e.g., Drake-Sims v. Burlington Coat Factory Warehouse of Ala., Inc., 330 Fed. Appx. 795, 803 (11th Cir. 2009) (unpublished). It is necessary that a comparator must be "nearly identical" to the plaintiff "to prevent courts from second-guessing a reasonable decision by the employer." Wilson, 376 F.3d at 1091. See also e.g., Head v. Pitts Enterp., Inc., Slip Copy, 2010 WL 2773376, *13 (M.D. Ala. Jul. 14, 2010); Drake-Sims, 380 Fed. Appx. at 803; Sylva-Kalonji v. Board of School Comm'rs of Mobile Cty., 2009 WL 1418808, *5-6 (S.D. Ala. May 20, 2009); Hill v. Emory Univ., 346 Fed. Appx. 390, 395 (11th Cir. 2009); Beard v. 84 Lumber Co., 206 Fed. Appx. 852, 857 (11th Cir. 2006) (finding the plaintiff and a proposed comparator had different numbers of years of experiences such that they were not similarly situated in all relevant respects).

Slay does not submit any evidence or argument regarding subjective similarity of the comparators, such as experience, education, previous salary, or salary demand. Rather, Slay relies on Miranda v. B&B Cash Grocery Store, Inc., 975 F.2d 1518, 1529 (11th Cir. 1992) (finding that the plaintiff established a prima facie case of sex discrimination under Title VII by demonstrating that she is female and that the job she occupied was similar to higher paying jobs occupied by males) and Mulhall v. Advance Sec., Inc., 19 F.3d 586 (11th Cir. 1994). Based on these cases, Slay then contends that she has met her burden of producing evidence of a similarly situated comparator "through evidence that job titles are the same or that plaintiff performed the same types of tasks [and job duties] as his/her comparator." (Doc. 303 at 37-38).

However, as the Eleventh Circuit has counseled "[t]he methods of presenting a prima facie case are not fixed; they are flexible and depend to a large degree upon the employment situation." Wilson, 376 F.3d at 1087.  In more recent Eleventh Circuit precedent, we have seen the application of this flexibility.  Specifically, the Court has pointed to the absence of relevant similarities amongst comparators, outside of job similarity, and held that plaintiff failed to meet his/her prima facie case.   For example, in Cooper, 390 F.3d 695,  the Court determined that the comparators for purpose of a disparate pay claim were not appropriate, *i.e.* similarly situated, when the plaintiff did not establish: 1) "that the proposed comparators had similar levels of experience or education" id. at 745; 2) "similar levels of seniority" id. at 743; and 3) similar disciplinary records, id. at 741.

When the Eleventh Circuit has reached beyond job similarities in its similarly situated analyses, unrebutted evidence was in the record to show that there existed a relevant factor (e.g., experience, education, starting pay demand) which rendered the comparators dissimilar.  For example, in Mack v. ST Mobile Aerospace Eng., Inc., 195 Fed. Appx. 829 (11th Cir. 2006) (unpublished), the court stated "[w]e affirm the court's entry of summary judgment as to this claim because MAE produced uncontroverted evidence that Frye and Wicks were paid more than Mack because each had specialized experience and training in aeronautics and avionics, while Mack had only general electronic training. Consequently, Mack failed to show that they were 'similarly situated in all relevant respects.'" Id. at 843.  Thus, although the burden of production at the prima facie stage does not shift to the defendant to produce any evidence, the failure of the defendant to point to other traits that are "relevant" to the particular employment situation dictates that the Court should look strictly to job similarities. Therefore, the Court will first

examine the record to determine if Slay has submitted evidence of basic job similarities, and if so, whether there is evidence that the comparators are dissimilar in other relevant respects.

> ### 1.    <u>Pay Raise ($1/hour) Post-Certification Testing</u>

According to Slay, "[w]hen I was hired I was told that I would be hired at thirteen-fifty an hour, and after I passed Austal's welding test I would get a dollar raise." (Doc. 218-1 (Dep. Slay at 117)).  During orientation, a supervisor told the new employees including Slay, that they would receive a $1/hour raise after passing the welding test. (Doc. 285-21 (Dep. Slay at 31-34)). Slay alleges that while she passed her test within one month of being hired, she "never did get that raise I was supposed to have gotten after I passed the test." (Doc. 218-1 (Dep. Slay at 75-76); Doc. 285-21 (Dep. Slay at 75-79, 117)). Slay complained to her supervisor Joe Stevens, who told her she did not receive a raise because she did not know how to read blueprints, even though blueprint reading was listed on her resume. (Doc. 285-21 (Dep. Slay at 55, 117-122)). Slay does not know anyone who passed the test and received a $1/hour raise around the same time; she testified "[n]ot really. The blacks that I talked to wasn't getting their raise…they were telling me they didn't get their raise after they passed the test." (<u>Id</u>. (Dep. Slay at 78)).  As to whether Slay knew of any Caucasian co-workers who received the $1/hour raise after passing the welding test, she testified "I don't know if they did or not." (<u>Id</u>. (Dep. Slay at 78-79)).

However, approximately seven (7) months after she was hired, Slay again complained to her supervisor about not receiving the $1/hour pay raise, and the coordinator at the time, Lee, reviewed her work and said she was overdue for a raise and "he gave me a raise. A dollar twenty-five." (Doc. 218-1 (Dep. Slay at 75, 79); Doc. 285-21 (Dep. Slay at 75-79, 118-122)). Slay then earned $14.25/hour as an A-Class welder. (Doc. 285-21 (Dep. Slay at 118)).

As noted *supra*, Slay contends that she has met her burden of producing evidence of a similarly situated comparator "through evidence that job titles are the same or that plaintiff performed the same types of tasks [and job duties] as his/her comparator." (Doc. 303 at 37-38). Specifically, Slay's sole proposed comparator, for this "post certification" $1/hour pay raise claim, is Caucasian co-worker Judith Grabhorn.[16]   (Doc. 303 at 9; Doc. 286-31 at 4).   Slay alleges that Grabhorn received a raise at the same time as Slay, but that Grabhorn's raise was more than twice Slay's raise: Slay received a $1.25/hour raise (to $14.25/hour) seven (7) months after being hired whereas Grabhorn received a raise of "three dollars, which put her" at $14.50/hour[]" only five (5) months after being hired.  (Doc. 285-21 (Dep. Slay at 118-121)).

As an initial matter, while Slay offers Grabhorn as a comparator for her $1/hour pay raise post-certification test, Slay has not produced evidence that Grabhorn's raise was related, in any way, to the passing of a certification test within one (1) month of being employed at Austal. Indeed, Grabhorn received her raise approximately three (3) months after being employed, not after one (1) month. Slay has also produced no evidence as to Grabhorn's job title/position, or job duties/tasks, much less her prior work experience.  In contrast, Austal has produced evidence that Grabhorn had better qualifications and "significantly more" work experience and training than Slay (when hired, she was State Certified for aluminum welding and had prior work experience welding for other shipyards including working in a lead role at Bender shipyard). (Doc. 333-5 at 3 (Decltn. Combs)). When hired, Slay had only one (1) year of welding

---

[16] Slay also references, as proposed comparators, JB Craig, III, Desther Machin and Jonas Steele (Doc. 303 at 9-10); however, she does not allege disparate pay raises as to these comparators but rather, disparate initial "hired in" hourly rates.  A starting rate pay claim is not part of Slay's disparate pay allegations in the Third Amended Complaint.  As such, starting pay is not a claim at issue in this case.

experience at a shipyard and had not yet completed training for aluminum welding.  (Id.)

Additionally, the Court's review of the record reveals that Grabhorn was hired on February 26, 2005 at $11.50/hour, she received a pay raise of $3.25/hour (to $14.75/hour) on May 16, 2005, and she is _now_ a Welder in the Fabrication Department (her position at the time of the pay raise in dispute is unknown). (Doc. 295 at 14 (Exhibit 105-Sealed).  Slay received a $1.25/hour raise on May 16, 2005, which increased her hourly rate to $14.75/hour (not $14.25/hour as she testified).  (Doc. 295 at 34 (Exhibit 105-Sealed)).  As such, after they received their raises, Slay was actually earning _the very same amount_ as Grabhorn, on May 16, 2005 ($14.75/hour).  (Doc. 295 at 14, 34 (Exhibit 105-Sealed)).  Accordingly, Slay has not met her burden of proof such that Austal's motion for summary judgment, as to this Title VII/Section 1981 pay raise claim, is **GRANTED.**

### 2.    Pay Raise Post 90-days of Employment

Slay's sole proposed comparator for her "post 90 days" pay raise claim is "Joey" (LNU). (Doc. 303 at 9).  Specifically, Slay alleges that Caucasian co-worker "Joey" (LNU), who was hired in July 2007, received a pay raise to "top pay" after his 90-day probationary period (after he had already undergone Level 1 training to be the second lead man in charge).  (Doc. 285-21 (Dep. Slay at 233-236); Doc. 286-32 at 24).  Slay testified that she does not know anything about Joey's prior work experience.  (Doc. 285-21 (Dep. Slay at 234)).

Slay has produced no evidence as to "Joey's" job title/position, or job duties/tasks, much less his prior work experience (as compared to Slay), or even his last name.  In other words, Slay has produced _no_ evidence that she and "Joey" are similarly situated with regards to the receipt of a pay raise in connection with 90-days of employment.  Thus, Slay has failed to produce any

evidence to sufficiently identify this proposed comparator, much less establish that "Joey" is similarly situated.   Moreover, at Austal "[t]here is no set timetable for raises. New hires are normally evaluated after ninety days. They may be considered for an increase at that time, but *none is guaranteed*. Employees are normally reviewed in June and in December, once again, raises may be considered at that time, but are *not guaranteed*[.]" (Doc. 283-48 at 11 (Austal's 3/7/07 EEOC Statement) (emphasis added)).   As such, Austal's motion for summary judgment, as to this Title VII/Section 1981 pay raise claim, is **GRANTED.**

### B.   Promotion

To establish a prima facie case of failure to promote, a plaintiff must show that: 1) he is a member of a protected class; 2) who sought and was qualified for positions that the employer was attempting to fill; 3) despite his qualifications he was rejected; and 4) the employer either continued to attempt to fill the positions or in fact filled the positions with persons outside the plaintiff's protected class. See, e.g., Harrington v. Disney Regional Ent., Inc., 276 Fed. Appx. 863, 872 (11th Cir. 2007) (citing Crawford v. Western Electric Co., Inc., 614 F.2d 1300, 1315 (5th Cir. 1980)).   A plaintiff claiming that he was discriminatorily denied a promotion usually must show that he actually applied for the position as part of his prima facie case.   Taylor v. Runyon, 175 F.3d 861, 866 (11th Cir. 1999); Combs v. Plantation Patterns, 106 F.3d 1519, 1539 at n. 11 (11th Cir. 1997).   Where an employer has an informal promotion procedure (*i.e.*, job openings are not posted or applications are not required), however, an employee may establish this element by showing that the position was available and that the employer had some reason or duty to consider him for same. Jones v. Firestone Tire and Rubber Co., Inc., 977 F.2d 527, 533 (11th Cir. 1992); Carmichael v. Birmingham Saw Works, 738 F.2d 1126, 1133-1134 (11th Cir. 1984).

1.    **August 2006**

Slay testified that she became aware of a supervisor position in August 2006, when she saw a Caucasian supervisor "tap" a Caucasian employee on the shoulder telling him to apply for the "open" position.  (Doc. 218-1 (Dep. Slay at 90-91, 117); Doc. 285-21 (Dep. Slay at 116-117); Doc. 286-31 at 3); Doc. 303 at 10). There is no information or evidence regarding who was hired for this supervisor position. Similarly, there is no evidence, or allegation by Slay, that the individual who ultimately filled the position in August 2006 was even outside of her protected class.  As such, Slay has failed to establish the requisite elements for a prima facie case for failure to promote.  Thus, Austal's motion for summary judgment as to this August 2006 failure to promote claim is **GRANTED.**

2.    **December 2006**

Slay contends that she was denied a promotion to supervisor in December 2006, and that the position was given instead to "[a] white male with less experience than Slay[]" (name unknown).  (Doc. 303 at 10).

Austral contends that Slay is unable to establish a case of discrimination because Slay has failed to provide any evidence concerning her proposed comparator – a male Caucasian co-worker -- asserting that the failure to identify a similarly situated Caucasian employee is fatal to her claim.  (Doc. 192-1 at 17).  Austal explains that Slay has failed to identify a Caucasian employee who was "nearly identical" is all relevant respects including experience, background, and disciplinary history.

As to the prima facie case, Austal conflates the prima facie requirements of a discriminatory pay claim with those for a failure to promote claim.  Similarly situated

24

comparators are not necessary to establish a prima facie claim of failure to promote, rather plaintiff must only show that the position was filled with a person outside his protected class. See Harrington v. Disney Regional Ent., Inc., 276 Fed. Appx. 863, 872-873 (11th Cir. 2007) (providing that "[t]he elements are different for disparate pay and promotion claims…").

According to Slay, in November 2006, Austal posted a supervisor position on bulletin boards in the building; she and another African-American co-worker Beverly Thomas applied for the position, along with others. (Doc. 218-1 (Dep. Slay at 55-56); Doc. 285-21 (Dep. Slay at 45, 88); Doc. 286-31 at 2-3). Slay then interviewed for the position with Scott Pearson and another supervisor (possibly Harley Combs). (Doc. 218-1 (Dep. Slay at 56-57)). The position was given to a Caucasian male co-worker. (Id. (Dep. Slay at 58)). In December 2006, Slay learned from Andrew Carver in HR that she had been rejected for the position; Carver told Slay that she had been denied because she did not have enough experience and could not "build a module" by herself. (Doc. 218-1 (Dep. Slay at 55-56, 59-60); Doc. 285-21 (Dep. Slay at 115-116)). Slay does not have any information about the Caucasian individual who was hired for the supervisor position (such as experience). (Doc. 218-1 (Dep. Slay at 58-59)). Moreover, according to Slay, while she admits she cannot build a module (a whole section of a ship) by herself, she adds that "I don't' know nobody on the yard that can build a module by their self[]" because you need help to do that as the tasks require more than one person. (Doc. 285-21 (Dep. Slay at 45, 61-62)). Slay simply contends that the Caucasian co-worker who was given the promotion had less experience than she did. (Id. (Dep. Slay at 45, 58-59)).

Although Slay is unable to name the specific person who received the promotion to supervisor in December 2006, she has alleged that the position was given to a less experienced

Caucasian male co-worker.  The fact of the promotion, and that it was given to a Caucasian male, has not been rebutted by Austal.  As such, the Court finds that Slay is a member of a protected class and the supervisor position was filled with an individual outside of her protected class. Additionally, the evidence establishes that Slay applied for the supervisor position, interviewed with management for same, but was denied the promotion.  Moreover, the Court notes that Slay's employment application with Austal reveals that she had three (3) years of collegiate study at Jackson State University in the majors of Office Administration and Management. (Doc. 333-6 at 2). Thus, Slay has established a prima facie case.

Austal has failed to articulate any "legitimate non-discriminatory reason" for promoting a Caucasian co-worker to the supervisor position over Slay.  Austal has not responded to Slay's testimony or rebutted this assertion.  As such, genuine issues of material fact exist, and Austal's motion for summary judgment as to Slay's December 2006 failure to promote claim is **DENIED.**

## VII.  Punitive Damages

Slay seeks an award of punitive damages against Austal.  Upon consideration, the Court finds that resolution of the punitive damages issue is a matter better suited for trial.  Thus, it is **ORDERED** that Austal's motion for summary judgment regarding Slay's punitive damages claim is **DENIED** as her request for punitive damages is **CARRIED TO TRIAL.**

## VIII.  Conclusion

Accordingly, it is **ORDERED** that Austal's motion for summary judgment is **GRANTED** as to Slay's hostile work environment claim; **GRANTED** as to Slay's Title VII/Section 1981 pay raise claims; **GRANTED in part** and **DENIED in part** as to Slay's Title

VII/Section 1981 failure to promote claims, as detailed herein; and **GRANTED** as to Slay's

retaliation and training claims.  Slay's punitive damages request will be **CARRIED TO TRIAL.**

**DONE** and **ORDERED** this the **19**[th] day of **September 2011.**

<u>/s/ Kristi K. DuBose</u>
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**