**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **TESHA HOLLIS,** *et al.*, | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **CIVIL ACTION 08-00155-KD-N** |
| | ) | |
| **AUSTAL, U.S.A., L.L.C.,** | ) | |
| **Defendant.** | ) | |

**ORDER**

This matter is before the Court on Defendant's (partial)[1] motion for summary judgment

(Docs. 168, 170), Plaintiff's Opposition (Doc. 311), and Defendant's Reply (Doc. 329).

## I.    Factual Background

On March 20, 2008, multiple Plaintiffs initiated this action against Austal for legal and

equitable relief to redress unlawful discrimination and harassment on the basis of race.[2]  (Doc.

1).  Tesha Hollis ("Hollis") asserts claims for hostile work environment and discrimination (pay)

based on race in violation of Title VII and 42 U.S.C. § 1981.  (Doc. 37 at 69-74).[3]

---

[1] Austal did not move for summary judgment on Hollis' 90-day pay raise claim.

[2]    While initiated as a purported class action, this is no longer a class action case.  (Doc. 293).
Additionally, some of the Plaintiffs allege gender and disability discrimination in addition to asserting
Title VII claims. Moreover, any and all disparate impact claims against Austal have been dismissed from
this litigation. (Doc. 366).

[3]  Originally, Hollis alleged a separate claim for retaliation (Doc. 37 at 71-73 at ¶¶ 342, 349-350,
352-354) and discipline (Id. at 71-72 at ¶345-346).  Hollis did not address these claims in response to
Austal's motion and moreover, in her opposition brief Hollis now specifically represents that she "is
*pursuing* claims against Austal for *only* hostile work environment and discrimination on the basis of race
in regards to pay and promotions" under Title VII and Section 1981. (Doc. 311 at 2 (emphasis added)).
Accordingly, the Court construes Hollis' intentional exclusion of her retaliation and discipline claims as a
concession of these claims.  Thus, it is **ORDERED** that Austal's motion for summary judgment, as to
Hollis' retaliation and discipline claims, is **GRANTED.**

Additionally, Austal has moved for summary judgment on claims not included in the Third
(Continued)

1

## A.  Austal

Defendant Austal USA ("Austal") is an Australian shipbuilding company dedicated to the design and construction of customized aluminum commercial and military vessels, located in Mobile, Alabama.  (Doc. 170 at 2; Doc. 283-48 at 2-3 (Austal's 3/7/07 EEOC Position Statement)).  The Operations Division has four (4) major Departments (Aluminum (divided into Fabrication and Components), Electrical, Engineering, and Fit Out (divided into HVAC, Insulation and Fit Out)).  (Doc. 283-48 at 3-4).

## B.  Hollis' Employment

Tesha Hollis began working for Austal on June 6, 2006 as a Fitter Trades Assistant ("TA") in the Mobile Works Program (AIDT class) at the rate of $11/hour.  (Doc. 170-1 (Dep. Hollis at 35-37); Doc. 170-1 at 70; Doc. 170-2 at 7 (Decltn. Lindley)).  Prior to working at Austal, Hollis worked at Standard Furniture earning $7.70/hour.  (Doc. 170-1 (Dep. Hollis at 37)).  Hollis received five (5) pay raises dated December 20, 2006 (from $11/hour to $12/hour – "has shown great improvement since she started working for me"); June 11, 2007 (from $12/hour to $13/hour–"merit increase"); October 8, 2007 (from $13/hour to $15/hour); March

Amended Complaint (discriminatory evaluations and a gender claim).  (Doc. 170 at 4, 18 and footnote 5). Hollis also raises a discriminatory promotion claim in her opposition brief (Doc. 311 at 38), yet she did not allege a failure to promote claim in the Third Amended Complaint. In Pleming v. Universal-Rundle Corp., 142 F.3d 1354, 1357 (11th Cir. 1998), the Court held that the "parties frame the scope of the litigation at the time the complaint is filed."  Moreover, in Davis v. Coca-Cola Bottling Co., Consol., 516 F.3d 955 (11th Cir. 2008), the court highlighted the difficulty in appellate review of voluminous pleadings involving multiple defendants.  In so doing it is clear that the 11th Circuit expects the District Court to "strip the case down and identify each claim and defense."  Id. at 982.  In an effort to do so the court must rely on the claims asserted in the Third Amended Complaint.  Thus, claims asserted in depositions and not included in the complaint have not been considered and will not be addressed.  See Smith v. Books-A-Million, 398 Fed. Appx. 437 (11th Cir. 2010) (Claims not included in the complaint were not required to be considered by the District Court).

17, 2008, she was promoted to Welder but with no pay raise; June 30, 2008 (from $15/hour to $15.45/hour); and July 7, 2008 (from $15.45/hour to $18.55/hour). (Doc. 295 at 17 (Exhibit 105-Sealed); Doc. 170-1 at 72; Doc. 170-2 at 7 (Decltn. Lindley); Doc. 329-6 at 5 (Decltn. Dr. Steward)). On September 18, 2006, Hollis received a warning about "making her 45 hours." (Doc. 170-4 at 6). On February 28, 2008, Hollis received a documented verbal warning about time-keeping, end of shift tasks, work performance and use of tobacco. (Doc. 170-4 at 9). On March 21, 2008, Hollis received a verbal warning for excessive absenteeism. (Doc. 170-4 at 8). Hollis' last pay rate at Austal was $18.55/hour. (Doc. 170-1 (Dep. Hollis at 60); Doc. 170-2 at 7 (Decltn. Lindley)). Hollis was terminated on May 5, 2009, due to failing a drug test. (Doc. 170-2 at 7 (Decltn. Lindley); Doc. 170-1 (Dep. Hollis at 37-39, 48)).

## II.     Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (Dec. 2010). The recently amended Rule 56(c) governs Procedures, and provides as follows:

> *(1) Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> *(2) Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or dispute a fact cannot be presented

in a form that would be admissible in evidence.

> *(3) Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record.

> *(4) Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

FED.R.CIV.P. Rule 56(c) (Dec. 2010). Defendant, as the party seeking summary judgment, bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). If the nonmoving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment. Celotex, 477 U.S. at 323. "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992), cert. den., 507 U.S. 911 (1993) (internal citations and quotations omitted).

## III.   Austal's "Reply" Claims

Austal asserts new arguments in its Reply concerning the timeliness of certain claims premised on a failure to exhaust remedies argument (including claims for which Austal did not move for summary judgment); namely, any claim which arose after December 26, 2007

including the claim that Walker Franklin improperly received a promotion on January 28, 2008. (Doc. 329 at 2). The Court will not consider these "new" claims. Austal cannot assert new allegations or arguments raised for the first time on Reply. As set forth recently in <u>New Hampshire Ins. Co. v. Wiregrass Const. Co</u>., Slip Copy, 2011 WL 206191, *2 at note 2 (S.D. Ala. Jan. 20, 2011):

> *See Park City Water Authority v. North Fork Apartments, L.P*., 2009 WL 4898354 at *1 n. 2 (S.D.Ala.2009) (citing cases from over 40 districts applying the rule in 2009 alone). The Eleventh Circuit follows a similar rule. *E.g., Herring v. Secretary, Department of Corrections*, 397 F.3d 1338, 1342 (11th Cir.2005) ("As we have repeatedly admonished, arguments raised for the first time in a reply brief are not properly before a reviewing court.") (internal quotes omitted). The Court has identified some of the reasons supporting the rule. "In order to avoid a scenario in which endless sur-reply briefs are filed, or the Court is forced to perform a litigant's research for it on a key legal issue because that party has not had an opportunity to be heard, or a movant is incentivized to save his best arguments for his reply brief so as to secure a tactical advantage based on the nonmovant's lack of opportunity to rebut them, this Court does not consider arguments raised for the first time in a reply brief." *Hardy v. Jim Walter Homes, Inc*., 2008 WL 906455 at *8 (S.D.Ala.2008).

In sum, because Austal failed to raise these arguments in its motion for summary judgment, they are impermissible and will not be considered. <u>See</u> <u>also</u> <u>e.g.</u>, <u>Abrams v. Ciba Specialty Chemicals Corp</u>., 663 F. Supp. 2d 1220, 1232 at note 16 (S.D. Ala. 2009) (providing that "new arguments are impermissible in reply briefs"); <u>Evans v. Infirmary Health Services, Inc</u>., 634 F. Supp. 2d 1276, 1285 at note 14 (S.D. Ala. 2009) (instructing that "this Court's general practice is not to consider new arguments raised in a reply brief").

## IV.     Section 1981/Title VII – Hostile Work Environment (Race)

Racial harassment is actionable under Section 1981 or Title VII where the conduct is sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment. <u>See, e.g.</u>, <u>Freeman v. City of Riverdale</u>, 330 Fed. Appx. 863, 865 (11th

Cir. 2009).[4]   To establish a prima facie case of hostile work environment and/or racial harassment under Section 1981 or Title VII, the plaintiff must prove that: 1) she belongs to a protected group; 2) she has been subject to unwelcome harassment; 3) the harassment was based on a protected characteristic of the employee (such as race); 4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and 5) the employer is responsible for such environment under a theory of vicarious or direct liability.  See, e.g., Reeves v. DSI Sec. Servs., Inc., 395 Fed. Appx. 544, 545-546 (11th Cir. 2010) (unpublished); McCann v. Tillman, 526 F.3d 1370, 1378 (11th Cir. 2008); Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002).  See also e.g., Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999).

Austal contends that: 1) Hollis' evidence of sporadic and isolated incidents of racially hostile comments, conduct and graffiti during the time she was employed do not meet the severe or pervasive threshold; 2) Hollis makes no allegations and presents no evidence that the allegedly hostile environment unreasonably interfered with her ability to work on a day-to-day basis; 3) Austal maintained a policy establishing how an employee should report discriminatory conduct, but Hollis failed to report certain conduct; and 4) Austal took reasonable preventative and corrective/remedial measures to prevent a hostile work environment.

A.     **Severe or Pervasive**

As to whether the conduct was severe and pervasive, Hollis points to the following

_____

[4]   This is an unpublished decision and is persuasive, but not binding, authority pursuant to Eleventh Circuit Rule 36-2.  The Court notes this same rule applies to other Fed. Appx. cases cited herein.

evidence.[5]  Regarding racially and hostile discriminatory comments, no comments were directed towards her, but she heard Tim Clements called "black people monkeys and you boys."  (Doc. 170-1 (Dep. Hollis at 222); Doc. 285-11 (Dep. Hollis at 223)).  Hollis heard other Caucasian employees (including supervisors) call African American employees "boy" or "boy, get away…plenty of times." (Doc. 285-11 (Dep. Hollis at 229); Doc. 170-1 (Dep. Hollis at 256)).  According to Hollis, it is primarily the supervisors, lead men and their buddies who do all the "trash talking." (Doc. 285-11 (Dep. Hollis at 229)).  Hollis heard a Caucasian supervisor tell a Caucasian co-worker over the "walky talky" to "send the monkeys over here to clean up this mess."  (Id. (Dep. Hollis at 223, 225)).  Hollis also witnessed Tim Clements kick an African American employee (Jermaine Roberson).  (Doc. 170-1 (Dep. Hollis at 222); Doc. 285-11 (Dep. Hollis at 223)).  Hollis did not report any of the comments to anyone in management or HR.  (Doc. 170-1 (Dep. Hollis at 226)).

Hollis was subjected to displays of the Confederate flag in the workplace on t-shirts, "little rags" and welding hats. (Doc. 285-11 (Dep. Hollis at 244-245, 247, 252); Doc. 170-1 (Dep. Hollis at 248)).  To Hollis, the wearing of the flag is discriminatory because "it's just a blow in the face…that's just like walking around like they hang the nooses and stuff."  (Doc.

---

[5] Hollis also relies on the allegations of the other 22 plaintiffs (Doc. 311 at 2-4, 14, 17, 19-20, 22-23 ) to support that an overall racially charged work atmosphere exists at Austal (*i.e.*, viewed through the lens of the plaintiffs' collective allegations versus each plaintiff's specific allegations).  "To rely on the evidence, each [plaintiff] must show that he *was aware* of those incidents at the relevant time he alleges the hostile work environment."  See, e.g., Melton v. National Dairy, LLC, 705 F. Supp. 2d 1303, 1342 (M.D. Ala. 2010) (citing Edwards Wallace Comm. College, 49 F.3d 1517, 1522 (11th Cir. 1995)) (emphasis in original).  See also e.g., Head v. Pitts Enterprises, Inc., Slip Copy, 2010 WL 2773376, *8 (M.D. Ala. Jul. 14, 2010); McKenzie v. Citation Corp., LLC, 2007 WL 1424555, *13 (S.D. Ala. May 11, 2007).  Courts in the Eleventh Circuit may consider statements not directed at a plaintiff and even hearsay statements, so long as the plaintiff was aware of the statements at the time he was employed.  See, e.g., Yeomans v. Forster and Howell, Inc., Slip Copy, 2010 WL 3716394, *5-6 (M.D. Ala. Sept. 10, 2010).  The Court has only considered the evidence of which Hollis testified that she was aware.

285-11 (Dep. Hollis at 253)). Hollis only testified that she saw one (1) Caucasian co-worker, Sam Peach, wear a t-shirt with flag imagery once or twice per week. (Doc. 170-1 (Dep. Hollis at 245, 254))). Hollis (and other African American co-workers) told Sam Peach that she found his shirt to be offensive; he responded to Hollis that "it's just a shirt." (Doc. 285-11 (Dep. Hollis at 252, 254)). Hollis and another African American co-worker also complained to Matt Hobson about the flags on t-shirts but nothing was done about it. (Id. (Dep. Hollis at 246-247)). The displays of the Confederate flag were not addressed by Austal.

Hollis was aware of racial epithets in graffiti on the men's' bathroom walls and stalls. The racial graffiti included: "why niggers don't like aspirin—because they hate to pick the cotton out of the top," "how do you keep a nigger out your front yard –hang one in the back," "niggers travel in packs just like monkeys," "do you see any niggers around here with white hats," "white power," "how to you stop a nigger from coming over to your house—hang a nigger in the back," "go back to Africa," drawings of crosses with black stick figures and black people with nooses around their necks, and a drawing of a Lysol bottle labeled "this shit kills niggers." (Doc. 170-1 (Dep. Hollis at 177, 202-203, 205-206, 240)). Hollis and others complained to the supervisors but nothing was done to fix the graffiti and the supervisors thought the graffiti was funny. (Id. (Dep. Hollis at 200-202)). Additionally, the racial graffiti included a writing specific to Hollis, which she actually saw in the men's bathroom after her Caucasian supervisor Jeremy Gainous told her about it: a drawing of her with the writing "y'all got a bad nigger bitch over here in LCS, a white man like me would love to split that dark oak." (Doc. 285-11 (Dep. Hollis at 90); Doc. 170-1 (Dep. Hollis at 199-202, 205)). Supervisor Gainous thought the graffiti about Hollis was funny and pretended to masturbate when he told her about it. (Doc. 170-1 (Dep. Hollis at 199-

200)).  Hollis reported the incident to Caucasian coordinator Scott Pearson.  (Doc. 285-11 (Dep. Hollis at 215-216)).  The drawing of Hollis and comments stayed up in the bathroom for several weeks.  (Id. (Dep. Hollis at 217-218)).  Hollis complained to Caucasian supervisor Jeremy Gainous about the racial graffiti.  (Id. (Dep. Hollis at 236)).

The record reveals that starting in August 2007, Austal responded to complaints about the graffiti by cleaning the bathrooms and painting black over the graffiti on a regular basis.  (Doc. 285-2 (Dep. Browning at 16, 110). However, according to Hollis, Austal did not began painting the bathroom walls until after the lawsuit was filed.  (Doc. 285-11 (Dep. Hollis at 216-217, 241)).

Hollis saw a noose in the Austal break room.  (Doc. 170-1 (Dep. Hollis at 213; Doc. 285-11 (Dep. Hollis at 285); Doc. 285-11 at 69; Doc. 329-2 (Dep. Hollis at 288)).  She immediately notified HR and stated that she wanted to go home as she felt racial tension and pressure in the Austal shipyard; she was given permission to leave early.  (Doc. 170-1 (Dep. Hollis at 213-214, 287)). Hollis' African American co-worker showed her one (1) other noose he found on the boat, which was made from aluminum scrap; she did not report that noose.  (Doc. 170-1 (Dep. Hollis at 286); Doc. 285-11 (Dep. Hollis at 285-286)). Hollis was aware of four (4) nooses being found at the workplace while employed with Austal. (Doc. 285-11 (Dep. Hollis at 285)).

To be actionable as severe or pervasive, the harassment "must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceive[s]…to be abusive."  Miller, 277 F.3d at 1276 (internal citation and quotation marks omitted).  In other words, the severe or pervasive element has an objective and subjective component.  McCann, 526 F.3d at 1378.  To determine the objective severity of the

harassment, courts look at the totality of the circumstances and consider: 1) the frequency of the discriminatory conduct; 2) the severity of the conduct; 3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and 4) whether the conduct unreasonably interferes with an employee's job performance. Reeves, 395 Fed. Appx. at 546. See also Faragher v. City of Boca Raton, 524 U.S. 775, 787-788 (1998); Allen v. Tyson Foods, 121 F.3d 642, 647 (11th Cir. 1997) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)). "The conduct is considered cumulatively instead of in isolation." Reeves, 395 Fed. Appx. at 546.

There is sufficient evidence, if believed by a jury, that Hollis subjectively perceived her work environment to be racially hostile. Thus, the Court need only determine whether Hollis' perception was objectively reasonable.

When viewing the facts in the light most favorable to Hollis, a reasonable jury could not find that the harassing conduct alleged was frequent and severe. According to the evidence, Hollis was not personally subjected racially discriminatory comments and conduct, and thus, she was not subjected to regular, racially discriminatory comments or conduct. As for the comments that she overheard which were directed to others ("monkey" and "boy"), she did not report any of these comments. Additionally, Hollis testified that she saw one (1) Caucasian co-worker wear a t-shirt with the Confederate flag a few times per week; yet, she only complained about the imagery once. Moreover, Hollis did not see the racial graffiti in the bathrooms on a daily basis because the graffiti was only in the men's bathrooms. Indeed, there is no indication in the record that Hollis was exposed to any sort of regular/daily racial comments and/or discriminatory conduct. Moreover, Hollis has not established that the alleged comments and/or conduct was

severe and/or physically threatening (apart from the presence of nooses).  Further, there is insufficient evidence of record that Hollis believed that the environment unreasonably interfered with her job performance.  Notably, while employed at Austal between June 2006 and May 2009, Hollis received five (5) pay raises.

Eleventh Circuit precedent mandates that courts consider "the totality of the circumstances" such that the absence of one factor is not dispositive.  See, e.g., Miller, 277 F.3d at 1277.  In this case, Hollis has not submitted sufficient evidence demonstrating that any of the allegedly discriminatory conduct was frequent, severe, physically threatening (apart from the nooses), humiliating or demeaning (apart from the one drawing of her in the men's bathroom) and/or unreasonably interfered with her job.  See, e.g., Barrow v. Georgia Pacific Corp., 144 Fed. Appx. 54, 57-58 (11th Cir. 2005) (concluding that evidence of "displays of the rebel flag on tool boxes and hard hats, the letters 'KKK' on a bathroom wall and on a block-saw console, and a noose in another employee's locker,'" as well as several threats to "kick plaintiff's 'black ass'" or threats that if he looked at a white girl he was going to get "cut," and the use of racial epithets including "nigger," "boy," and "black boy," reflected conduct that was "isolated," "sporadic," and "random" and did not amount to "severe and pervasive" harassment).  While there is "not simply some magic number of racial or ethnic insults" that preclude summary judgment, it is repeated incidents of...harassment that continue despite the employee's objections [that] are indicative of a hostile work environment." Miller, 277 F.3d at 1276 (citation and quotation omitted).  Such circumstances of "repeated incidents….that continue…," is not the case here.

In sum, under the totality of the circumstances and considering the allegations in the light most favorable to Hollis, she has not produced sufficient evidence – if believed by a jury – to

create an issue of fact as to whether she was subjected to racial harassment that was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment.[6]  As a result, because Hollis has failed to satisfy this fourth element of her prima facie case for hostile work environment, the Court need not reach the fifth element (employer liability) and summary judgment is **GRANTED** in favor of Austal on Hollis' Title VII/Section 1981 hostile work environment claim.

## V.      Section 1981/Title VII – Disparate Treatment (Race)

Hollis contends that she was intentionally discriminated against with respect to "terms and conditions of her employment" because of her race in violation of Title VII and Section 1981. Specifically, Hollis alleges that: 1) Caucasian employees who held the same initial job, Trades Assistant – namely David Lee, Jon Erik-Reeves, Charles Villagran, Sam Peach, Joseph Allen, Kenneth Allison, Walker Franklin, and Christopher Mordecai -- were "hired in" at *more* than $11/hour (yet she was "hired in" at $11/hour even though she held a B-Class welding certification); and 2) Caucasian employees received raises sooner than she did and in higher amounts (including that she did not receive a raise at the 90 day mark of her employment).

In individual disparate treatment claims, "the plaintiff bears the burden of proving that the employer discriminated against him because of his race."  Cooper v. Southern Co., 390 F.3d 695, 723 (11th Cir. 2004), *overruled on other grounds,* Ash v. Tyson Foods, Inc., 546 U.S. 454, 456-457 (2006).  See also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000); Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981). Where there is no direct evidence

_____

[6] The Court has considered the evidence presented by each plaintiff in isolation.  Accordingly, on the claim of hostile work environment there are different determinations amongst plaintiffs based on the specificity and quantity of evidence presented by each plaintiff.

of discrimination or a statistical pattern of discrimination, the burden shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) applies. Under this framework, the plaintiff must establish a prima facie case of intentional race discrimination.[7] Id. at 802. See also e.g., E.E.O.C. v. Joe's Stone Crabs, Inc., 296 F.3d 1265, 1272 (11th Cir. 2002). If a prima facie case is established, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. Id. Once the employer satisfies its burden, the burden shifts back to the plaintiff to offer evidence that the alleged reason of the employer is a pretext for unlawful discrimination. Id. at 1272-1273.

In order to establish a prima facie case of disparate pay, Hollis must establish that she held a position "similar to that of a higher paid employee who is not a member of [her] protected class." Crawford v. Carroll, 529 F.3d 961, 974-975 (11th Cir. 2008) (citing Meeks v. Computer Assocs. Int'l, 15 F.3d 1013, 1019 (11th Cir. 1994)). The employee whom the plaintiff identifies as a comparator "must be similarly situated in all relevant respects." Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1091 (11th Cir. 2004). See also e.g., Drake-Sims v. Burlington Coat Factory Warehouse of Ala., Inc., 330 Fed. Appx. 795, 803 (11th Cir. 2009) (unpublished). It is necessary that a comparator must be "nearly identical" to the plaintiff "to prevent courts from second-guessing a reasonable decision by the employer." Wilson, 376 F.3d at 1091. See also e.g., Head v. Pitts Enterp., Inc., Slip Copy, 2010 WL 2773376, *13 (M.D. Ala. Jul. 14, 2010); Drake-Sims, 380 Fed. Appx. at 803; Sylva-Kalonji v. Board of School Comm'rs of Mobile Cty., 2009 WL 1418808, *5-6 (S.D. Ala. May 20, 2009); Hill v. Emory Univ., 346 Fed. Appx. 390, 395 (11th

---

[7] "Claims of race discrimination under § 1981 are analyzed in the same manner as claims brought under Title VII." DeLeon v. ST Mobile Aerospace Eng'g, Inc., 2010 WL 500446, *15 (S.D. Ala. Feb. 9, 2010).

Cir. 2009) (unpublished); <u>Beard v. 84 Lumber Co</u>., 206 Fed. Appx. 852, 857 (11th Cir. 2006) (finding the plaintiff and a proposed comparator had different numbers of years of experiences such that they were not similarly situated in all relevant respects) (unpublished).

Hollis does not submit sufficient evidence or argument regarding subjective similarity of the comparators, such as experience, education, previous salary, or salary demand.  Rather, Hollis relies on <u>Miranda v. B&B Cash Grocery Store, Inc</u>., 975 F.2d 1518, 1529 (11th Cir. 1992) (finding that the plaintiff established a prima facie case of sex discrimination under Title VII by demonstrating that she is female and that the job she occupied was similar to higher paying jobs occupied by males) and <u>Mulhall v. Advance Sec., Inc</u>., 19 F.3d 586 (11th Cir. 1994), and argues that she meets her burden of producing evidence of a similarly situated comparator by pointing to Caucasian employees who allegedly held jobs with identical titles (*i.e*., Trades Assistant).

However, as the Eleventh Circuit has counseled "[t]he methods of presenting a prima facie case are not fixed; they are flexible and depend to a large degree upon the employment situation."  <u>Wilson</u>, 376 F.3d at 1087.  In more recent Eleventh Circuit precedent, we have seen the application of this flexibility.  Specifically, the Court has pointed to the absence of relevant similarities amongst comparators, outside of job similarity, and held that plaintiff failed to meet his/her prima facie case.   For example, in <u>Cooper</u>, 390 F.3d 695,  the Court determined that the comparators for purpose of a disparate pay claim were not appropriate, *i.e.* similarly situated, when the plaintiff did not establish: 1) "that the proposed comparators had similar levels of experience or education" <u>id</u>. at 745; 2) "similar levels of seniority" <u>id</u>. at 743; and 3) similar disciplinary records, <u>id</u>. at 741.

When the Eleventh Circuit has reached beyond job similarities in its similarly situated

analyses, unrebutted evidence was in the record to show that there existed a relevant factor (*e.g.*, experience, education, starting pay demand) which rendered the comparators dissimilar. For example, in <u>Mack v. ST Mobile Aerospace Eng., Inc.</u>, 195 Fed. Appx. 829 (11th Cir. 2006) (unpublished), the court stated "[w]e affirm the court's entry of summary judgment as to this claim because MAE produced uncontroverted evidence that Frye and Wicks were paid more than Mack because each had specialized experience and training in aeronautics and avionics, while Mack had only general electronic training. Consequently, Mack failed to show that they were 'similarly situated in all relevant respects.'" <u>Id</u>. at 843. Thus, although the burden of production at the prima facie stage does not shift to the defendant to produce any evidence, the failure of the defendant to point to other traits that are "relevant" to the particular employment situation dictates that the Court should look strictly to job similarities. Therefore, the Court will first examine the record to determine if Hollis has submitted evidence of basic job similarities, and if so, whether there is evidence that the comparators are dissimilar in other relevant respects.

### 1. <u>Starting Pay: Initial Hourly Wage</u>

Hollis alleges that Caucasian co-workers David Lee, Jon Erik-Reeves, Charles Villagran, Sam Peach, Joseph Adams,[8] Kenneth Allison, Walker Franklin, and Christopher Mordecai[9] were

---

[8] Hollis references this individual in her Opposition as "Joseph Allen" but in support, cites a portion of her deposition testimony which discusses a Joseph Adams. The Court's review of the record indicates that Joseph Adams was employed, but not Joseph Allen. (Doc. 295 at 2 (Exhibit 105-Sealed)).

[9] Hollis also claims that a Caucasian employee named "Josh" (LNU) was hired in at a higher starting wage (Doc. 311 at 8); however, Hollis has submitted no evidence concerning Josh on summary judgment. The same holds true for Hollis' claim that Joseph Adams was hired in at a higher starting rate; in fact, Hollis has submitted no evidence regarding Adams apart from her vague deposition testimony which is not supported by the evidence of record. (Doc. 311 at 9 (citing Doc. 285-11 (Dep. Hollis at 191-192)).

"hired in" as Trades Assistants at a starting hourly wage of $15-16/hour – whereas she, who is "a B-Class welder," was "hired in" as a Trades Assistant at a starting hourly wage of $11/hour.[10] (Doc. 37 at 71 at ¶344; Doc. 170-1 (Dep. Hollis at 82, 116); (Doc. 285-11 (Dep. Hollis at 119-120)). According to Hollis, "the Caucasian males coming in started with no experience just as I did. They come in making $15. I came in at $11. And at that time I was a B class welder. They wasn't certified to do anything. And they're making more money than me coming in the door." (Doc. 170-1 (Dep. Hollis at 82-84)).

At the outset, Hollis' claim regarding Joseph Adams, Kenneth Allison, Walker Franklin and Christopher Mordecai as comparators is not supported by the evidence. Hollis cites Exhibit 106 as evidence of starting pay for Allison, Franklin and Mordecai. Hollis explains that Exhibit 106 is a summary of pay data contained in Exhibit 105.[11] (Doc. 353 at 17). However, a review of Exhibit 105 shows no support for Hollis' assertion of starting pay for Allison, Franklin or Mordecai. Specifically, Hollis has submitted no evidence establishing that Kenneth Allison was initially hired at the rate of $12.50/hour; that Walker Franklin was initially hired at the rate of $13.50/hour; that Christopher Mordecai was initially hired at the rate of $14/hour; or any starting hourly pay rate as to Joseph Adams. (Doc. 311 at 9-10). Exhibit 105 does not indicate these employees' starting pay.

Additionally, the record reveals that the only position noted in connection with Joseph

---

[10] This starting hourly wage rate was $3.30 more than she earned in her most recent prior employment with Standard Furniture. (Doc. 170-1 (Dep. Hollis at 37)).

[11] As noted in the Order regarding Earaton Adams (Doc. 364 at 19 at note 14), the Court previously ruled that Doc. 286-3 (Exhibit 105 (Sealed)), also filed as Doc. 295, can be reduced to a form admissible at trial and thus Austal's objection to Exhibit 105 was overruled; however, to the extent Exhibit 106 has no foundation in Exhibit 105, Austal's objection was sustained.

Adams is the job of Fitter A-Class. (Doc. 295 at 2 (Exhibit 105-Sealed)). Similarly, the record reveals that while Allison "applied for a Trades Assistant/Welder position" (Doc. 329-5 at 3 (Decltn. Combs)), the only position noted in connection with Allison is the job title of Fitter A-Class. Likewise, Mordecai's job position is that of Welder A-Class.[12] The record also reveals that Charles Villagran was hired as a Welder not a Trades Assistant. (Doc. 329-6 (Decltn. Dr. Steward at ¶5 and 5)). Similarly, Sam Peach was hired as a Fabricator not a Trades Assistant. (Doc. 329-6 (Decltn. Dr. Steward at ¶7 and 5)). Moreover, Jon Erik-Reeves' job position is that of a Fitter and there is no evidence as to his starting position and/or starting pay. (Doc. 295 at 30 (Exhibit 105-Sealed)). Further, no evidence has been presented that Hollis' starting position as Trades Assistant[13] and a Fitter, Fitter A-Class, Fabricator, Welder and/or Welder A-Class, are substantially similar jobs. The only proposed comparator for which the record confirms a starting position of Trades Assistant is Franklin, who "started at Austal as a Trades Assistant[]" (Doc. 329-5 at 4 (Decltn. Combs)). However, as noted *supra*, there is no evidence as to his starting pay for that position (only what he requested). Thus, there is insufficient evidence that these employees are proper comparators for purposes of Hollis' claim of discriminatory starting pay.

Concerning David Lee, Hollis alleges that Lee was hired at a starting rate of $17/hour, yet had no shipyard experience because "people always talked about him[]" and "he come from Target[;]" according to the people who worked under him, "[h]e never fit or welded anything."

---

[12] Exhibit 105 only delineates the last position held by the employee.

[13] A Trades Assistant is an employee who assists the Fitter or Welder in his job duties and is a stepping stone to the Fitter or Welder position. (Doc. 329-5 at 2 (Decltn. Combs at ¶4)).

(Doc. 285-11 (Dep. Hollis at 119-120, 123)).  The record reveals that Lee was hired at the rate of $10/hour in March 2005 ($1/hour *less* than Hollis' starting hourly wage).  (Doc. 329-5  at 2-3 (Decltn. Combs at ¶6)).  Additionally, there is no information as to Lee's starting position, only that he is a Supervisor.  (Doc. 295 at 22 (Exhibit 105-Sealed)).  Thus, David Lee is not a proper comparator for purposes of Hollis' claim of discriminatory starting pay.

In sum, none of Hollis' proposed comparators are valid comparators for purposes of establishing her discriminatory starting pay claim relating to her initial job position as Trades Assistant.  As such, Austal's motion for summary judgment as to this claim is **GRANTED.**

## 2.   **Pay Raises**

Hollis alleges that she was told that after her 90 day probationary period she would receive a raise, but did not, despite her certification as a B class welder.  (Doc. 37 at 71 at ¶343; Doc. 285-11 (Dep. Hollis at 80-81)). Also, Hollis contends that similarly situated Caucasian co-workers received raises throughout their employment, while she did not.[14]   (Doc. 37 at 71).

Austal contends that Hollis' claim that Caucasian co-workers received raises more frequently than African-American employees (including herself) fails because "Hollis has not presented any admissible evidence to demonstrate that any of the…employees were similarly situated…Hollis admits that her 'knowledge' concerning their experience and qualifications consist of rumors she overheard….Hollis has made no effort to demonstrate that the foregoing individuals were 'nearly identical' in all other relevant respects." (Doc. 170 at 18-19).

In response, Hollis generally claims that Jon-Erik Reeves, Charles Villagran, Samuel

---

[14] Hollis' contention that she did not receive pay raises prior to the lawsuit being filed is not supported by the record.  According to documentary evidence, Hollis received three (3) pay raises before March 2008, and two (2) additional pay raises before she was terminated for drug use.

Peach, Joseph Adams,[15] Kenneth Allison, Walker Franklin and Christopher Mordecai, received raises when she did not, and received such raises sooner than she did, even when they lacked certification.  (Doc. 311 at 7-10).  However, for her disparate pay argument as to pay raises, Hollis actually asserts *only* that Villagran, Peach, Allison, Franklin and Mordecai received raises sooner than she did.  (Doc. 311 at 7-10).  For the other named co-workers, Hollis simply alleges disparate pay in terms of different hourly wages, which has already been addressed *supra*.  As such, the Court addresses only the disparity for pay raises as to Villagran, Peach, Allison, Franklin and Mordecai.

As noted supra, Hollis began working for Austal on June 6, 2006 as a Fitter Trades Assistant ("TA") at the rate of $11/hour.  (Doc. 170-1 (Dep. Hollis at 35-37); Doc. 170-1 at 70; Doc. 170-2 at 7 (Decltn. Lindley)).  During her employment, Hollis received five (5) pay raises dated December 20, 2006 (from $11/hour to $12/hour – "has shown great improvement since she started working for me"); June 11, 2007 (from $12/hour to $13/hour–"merit increase"); October 8, 2007 (from $13/hour to $15/hour); June 30, 2008 (from $15/hour to $15.45/hour); and July 7, 2008 (from $15.45/hour to $18.55/hour). (Doc. 295 at 17 (Exhibit 105-Sealed); Doc. 170-1 at 72; Doc. 170-2 at 7 (Decltn. Lindley)).  On March 17, 2008, Hollis was promoted to Welder.  (Doc. 329-6 at 5 (Decltn. Dr. Steward)).

Concerning Villagran, Hollis contends that within one (1) year and three (3) months of being hired, he had already received at least four (4) pay raises.  (Doc. 311 at 8).  The evidence reveals that Villagran received a total of three (3) pay raises during his employment; was hired on February 20, 2006 at the rate of $12/hour; on April 10, 2006, received a raise to $14/hour; on

---

[15] See *supra* footnote 8.

May 22, 2006, received a raise to $15/hour; and on January 1, 2007, received a raise to $17.50/hour. (Doc. 295 at 38 (Exhibit 105-Sealed)). However, as noted *supra*, Villagram was hired as a Welder not a Trades Assistant. When Villagran received his raises he was a Welder whereas at the time Hollis was a Trades Assistant. As such, Villagran is not a valid comparator.

As for Peach, Hollis contends that within two (2) months of being hired, he was given a pay raise to $15/hour and was paid more than she for "doing the same job." (Doc. 311 at 8-9). The record reveals that Peach received a total of four (4) pay raises during his employment; he was hired on April 3, 2006 at the rate of $13.50/hour; received a raise to $15/hour on May 22, 2006; received a raise to $15.50/hour on June 18, 2007; received a raise to $17/hour on October 8, 2007; and received a raise to $17.51/hour on August 30, 2008. (Doc. 295 at 28 (Exhibit 105-Sealed)). Thus, Hollis is correct that Peach received a raise to $15/hour within the first two (2) months of his employment. However, as noted *supra*, Peach was hired as a Fabricator not Trades Assistant. Thus Peach is not a valid comparator for Hollis' disparate pay claim. Additionally, the record reveals that Peach had nine (9) years of work experience in an electronic factory and 2½ years of experience in a welding factory. (Doc. 329-5 (Decltn. Combs at 3)).

Regarding Allison, Hollis alleges that he received three (3) raises by July 2008 such that he was earning $8.10 more than when he was hired on July 31, 2006 (Doc. 311 at 9). The record reveals that Allison was hired on July 31, 2006 and received at least three (3) pay raises during his employment. (Doc. 295 at 2 (Exhibit 105-Sealed)). The record reveals that Allison received raises on October 8, 2007 from $19/hour to $20/hour, on June 30, 2008 to $20.60/hour, and on September 14, 2009 to $21.22/hour. (Id.) There is no information as to Allison's starting rate of pay, however, from which to compare pay raise rates. Moreover, as noted *supra*, there is no

evidence that Allison was hired for the same starting job position of Trades Assistant such that he is not a valid comparator.[16]

As to Mordecai, Hollis alleges that within five (5) months of being hired, he received a raise to $16.50/hour, within another month was raised to $17/hour, five (5) months later received another raise to $18/hour, 6 (six) months later received another raise to $19/hour and six (6) months after that, was raised to $19.57/hour. (Doc. 311 at 10). The record reveals that Mordecai was hired on July 10, 2006 and received at least four (4) pay raises during his employment. (Doc. 295 at 26 (Exhibit 105-Sealed)). The record reveals that Mordecai received raises on January 15, 2007 from $16.50/hour to $17/hour, on June 18, 2007 to $18/hour, on January 7, 2008 to $19/hour, and on June 30, 2008 to $19.57/hour. (Id.) As noted *supra*, there is no evidence regarding Mordecai's starting position, what his position was when he received the pay raise, or when he became a Welder A-Class, such that the evidence is insufficient and he is not a valid comparator.

Concerning Franklin, Hollis contends that within four (4) months of being hired he received a pay raise from $13.50/hour to $16/hour; one (1) month later received another raise to $17/hour; within four (4) more months received another raise to $18/hour; and by December 11, 2008, he earned $19.06/hour. (Doc. 311 at 9). The record reveals that Franklin was hired on July 17, 2006 and received at least four (4) pay raises during his employment. (Doc. 295 at 13 (Exhibit 105-Sealed)). The record reveals that Franklin received raises on December 18, 2006 from $16/hour to $17/hour, on March 12, 2007 to $18/hour, on October 1, 2007 to $18.50/hour, and on June 30, 2008 to $19.06/hour. (Id.)

_____

[16] It is only indicated that he was a Fitter A-Class.

There is no information as to Franklin's starting rate of pay. Specifically, Franklin and Hollis were hired in the Summer of 2006 as Trades Assistants (Hollis on 6/6/06 at $11/hour and Franklin on 7/17/06 at an _unknown_ starting hourly rate (the record reveals only that Franklin requested a salary or $13-$14/hour, Doc. 329-5 (Decltn. Combs at 4))). Approximately five (5) months later, by mid-December 2006, Franklin earned $17/hour whereas Hollis earned $12/hour, with each having received one (1) pay raise. Additionally, by December 2007 (one (1) year later), Franklin earned $18.50/hour (an unknown increase from his starting wage), whereas Hollis earned $15/hour (an increase of $4/hour from her starting wage). Again, each received the same number of raises – two (2) – during that time period.

However, as articulated by Austal, "Franklin…had previous welding training and other relevant construction experience." (Doc. 329 at 13). According to Manager Harley Combs, Franklin "had previously completed welding/ship fitter school at Bender Shipbuilding" and was a "Class B welder" when he started at Austal. (Doc. 329-5 at 4 (Decltn. Combs)). Franklin had worked for approximately seven (7) months at Bender Shipbuilding before applying, where he earned when he left $11/hour. (Doc. 329-5 at 36-39 (Employment Application)). Franklin had also worked construction for three (3) months before he applied. (Id. at 38). Also, by March 2007, Franklin had received A-Class Welder status. In contrast, Hollis' employment application does not reveal any relevant work experience. (Doc. 329-5 at 5-8).

In sum, Hollis has not established a valid comparator for her pay raise claim such that Austal's motion for summary judgment is **GRANTED** on this claim.

## VI.   Conclusion

Accordingly, it is **ORDERED** that Austal's motion for summary judgment is **GRANTED** as to Hollis' hostile work environment claims; **GRANTED** as to Hollis' disparate pay claims; **GRANTED** as to Hollis' retaliation claim; and **GRANTED** as to Hollis' disparate treatment claims for discriminatory discipline.   It is further **ORDERED** that Hollis' punitive damages request is thus **MOOT.**

DONE and **ORDERED** this the **21st** day of **September 2011.**

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**