**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| NATHANIEL REED, *et al.*, | ) | |
|     **Plaintiffs,** | ) | |
| **v.** | ) | **CIVIL ACTION 08-00155-KD-N** |
| | ) | |
| AUSTAL, U.S.A., L.L.C., | ) | |
|     **Defendant.** | ) | |

**ORDER**

This matter is before the Court on Defendant's motion for summary judgment (Docs. 198, 199, 213), Plaintiff's Opposition (Doc. 307) and Defendant's Reply (Doc. 336); and Defendant's Motion to Strike (Doc. 347) and Plaintiff's opposition thereto (Doc. 353).

**I.**  **Factual Background**

On March 20, 2008, multiple Plaintiffs initiated this action against Austal for legal and equitable relief to redress unlawful discrimination and harassment on the basis of race.[1]  (Doc. 1).  Nathaniel Reed ("Reed") asserts claims for hostile work environment and disparate treatment (discriminatory pay)[2] based on race, in violation of Title VII and 42 U.S.C. § 1981.  (Doc. 37 at 103-108).[3]

---

[1]  While initiated as a purported class action, this is no longer a class action case.  (Doc. 293). Additionally, some of the Plaintiffs allege gender and disability discrimination in addition to asserting Title VII claims.

[2]  Reed alleges a failure to train as a part of his pay raise claim.

[3]  Originally, Reed alleged a separate claim for retaliation (Doc. 37 at 105, 107-108 at ¶¶536, 550, 552-554).  Reed did not address this claim in response to Austal's motion and moreover, in his opposition brief now specifically represents that he "is pursuing claims against Austal for *only* hostile work environment and discrimination on the basis of race in regards to pay and promotions" under Title VII and Section 1981.  (Doc. 307 at 2 (emphasis added)).  Accordingly, the Court construes Reed's intentional exclusion of his retaliation claim as a concession of that claim.  Thus, it is **ORDERED** that (Continued)

1

### A.    <u>Austal</u>

Defendant Austal USA ("Austal") is an Australian shipbuilding company dedicated to the design and construction of customized aluminum commercial and military vessels, located in Mobile, Alabama. (Doc. 199 at 2; Doc. 283-48 at 2-3 (Austal's 3/7/07 EEOC Position Statement)). The Operations Division has four (4) major Departments (Aluminum (divided into Fabrication and Components), Electrical, Engineering, and Fit Out (divided into HVAC, Insulation and Fit Out)). (Doc. 283-48 at 3-4).

### B.    <u>Reed's Employment</u>

Nathaniel Reed was hired by Austal as a Fitter on November 29, 2004, in the Aluminum Fabrication Department at the rate of $11/hour. (Doc. 295 at 30 (Exhibit 105-Sealed); Doc. 213-1 (Dep. Reed at 32-33); Doc. 213-1 at 40; Doc. 213-2 (Decltn. Lindley at 10)). During his employment, Reed became B-class certified in welding. (Doc. 285-18 (Dep. Reed at 50)). Reed received three (3) pay raises dated June 12, 2005 ($11/hour to $13.50/hour—"shown huge

---

Austal's motion for summary judgment, as to Reed's retaliation claim, is **GRANTED.**

Additionally, while Reed initially alleged disparate impact claims against Austal, said claims have been dismissed from this litigation. (Doc. 366).

Moreover, Austal moved for summary judgment on claims not included in the Third Amended Complaint. Likewise, Reed raised claims in his opposition brief that are not included in the Third Amended Complaint (failure to promote). In <u>Pleming v. Universal-Rundle Corp.</u>, 142 F.3d 1354, 1357 (11th Cir. 1998), the Court held that the "parties frame the scope of the litigation at the time the complaint is filed." Moreover, in <u>Davis v. Coca-Cola Bottling Co., Consol.</u>, 516 F.3d 955 (11th Cir. 2008), the court highlighted the difficulty in appellate review of voluminous pleadings involving multiple defendants. In so doing it is clear that the 11th Circuit expects the District Court to "strip the case down and identify each claim and defense." <u>Id.</u> at 982. In an effort to do so the court must rely on the claims asserted in the Third Amended Complaint. Thus, claims asserted in depositions and not included in the complaint have not been considered and will not be addressed. <u>See</u> <u>Smith v. Books-A-Million</u>, 398 Fed. Appx. 437 (11th Cir. 2010) (Claims not included in the complaint were not required to be considered by the District Court).

improvement since hiring on at Austal. Needs to be brought into line for his skill level"); January 30, 2006 ($13.50/hour to $14.50/hour); and May 22, 2006 ($14.50/hour to $15.50/hour). (Doc. 213-1 at 42-43, 45; Doc. 285-18 (Dep. Reed at 54); Doc. 213-2 (Decltn. Lindley at 10)). In June 2007, Reed resigned. (Doc. 213-1 (Dep. Reed at 33); Doc. 213-2 (Decltn. Lindley at 10)).

## II. <u>Standard of Review</u>

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (Dec. 2010). The recently amended Rule 56(c) governs Procedures, and provides as follows:

> *(1) Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> *(2) Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
>
> *(3) Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record.
>
> *(4) Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed.R.Civ.P. Rule 56(c) (Dec. 2010). Defendant, as the party seeking summary judgment, bears

the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the nonmoving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment. Celotex, 477 U.S. at 323. "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992), cert. den., 507 U.S. 911 (1993) (internal citations and quotations omitted).

## III.    Timeliness of Claims under Title VII

A plaintiff may not sue under Title VII unless he first exhausts administrative remedies by filing a timely charge of discrimination with the appropriate agency. See, e.g., Wilkerson v. Grinnell Corp., 270 F.3d 1314, 1317 (11th Cir. 2001). "In a non-deferral state such as Alabama, the deadline for filing is 180 days after the alleged discriminatory act." Carter v. University of South Alabama Children's & Women's Hosp., 510 F. Supp. 2d 596, 606 (S.D. Ala. 2007). See also Tipp v. AmSouth Bank, 76 F. Supp. 2d 1315, 1327 (S.D. Ala. 1998). "If the victim of an employer's unlawful employment practice does not file a timely complaint, the unlawful practice ceases to have legal significance, and the employer is entitled to treat the unlawful practice as if it were lawful." City of Hialeah, Fla. v. Rojas, 311 F.3d 1096, 1102 (11th Cir. 2002). See also

<u>Sheffield v. United Parcel Service, Inc.</u>, 2010 WL 4721613, *2 (11th Cir. Nov. 22, 2010) (unpublished); <u>Jordan v. City of Montgomery</u>, 2008 WL 2529573, *1 (11th Cir. Jun. 26, 2008) (unpublished). A failure to file a timely charge with the EEOC results in a bar of the claims contained in the untimely charge. <u>Id.</u>

Reed signed his EEOC Charge (for race, retaliation and "continuing action") on November 13, 2006 and it was "received" on November 20, 2006. (Doc. 286-22). Calculating from the November 20, 2006 date, Austal contends that only those discrete discriminatory acts occurring within the 180 days prior (between May 25, 2006 and November 20, 2006) are timely. From this, Austal seeks summary judgment on: 1) "[a]ll alleged [discriminatory] acts" occurring between Reed's hire date of November 28, 2004 and May 25, 2006; 2) Reed's claim that he was denied a pay raise after he started working at Austal; and 3) Reed's starting hourly rate claim that Caucasian employees earned more per hour than he did. (Doc. 199 at 6-7).

Reed contends that Austal's interpretation is incorrect and contrary to well established law, as although many acts upon which a plaintiff's Title VII claims rely may occur outside the 180 filing period, "they are part of the same actionable hostile environment claim." (Doc. 307 at 14 (citing <u>McKenzie v. Citation Corp., LLC</u>, 2007 WL 1424555 (S.D. Ala. 2007)). Reed is correct as it relates to his hostile work environment claim. The U.S. Supreme Court has clarified that there are different standards for claims involving "discrete acts" versus "hostile environment" allegations. <u>See generally</u> <u>National R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101 (2002). Under the continuing violation doctrine, a plaintiff's charge of discrimination regarding a hostile work environment is considered timely if "an act contributing to the claim occurs within the filing period," even if "some of the component acts of the hostile work environment fall

outside the statutory time period." Id. at 117. As explained in Smiley v. Alabama Dept. of Transp., Slip Copy, 2011 WL 1188506, *5 (M.D. Ala. Mar. 30, 2011):

> Unlike claims involving discrete discriminatory acts, hostile environment claims may be litigated so long as at least one of the events contributing to the hostile environment was presented to the EEOC in a Charge of Discrimination in a timely fashion. Indeed, in *Morgan*, the United States Supreme Court held that "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period." *Morgan*, 536 U.S. at 106.

Reed's EEOC Charge alleges not just "at least one of the events" but a variety of "events contributing to the hostile work environment" -- sufficient to have placed Austal on notice that such a claim (and various incidents tied to same) exists in the litigation so that Austal could have investigated the details during discovery. Accordingly, Austal's motion for summary judgment on Reed's hostile work environment claim ("all alleged acts") is **DENIED.**

Concerning Reed's Title VII claims of discriminatory pay -- that he was denied a promised pay raise after he started working at Austal and that Caucasian employees earned more per hour than he did – the Court finds that based on the record and the facts of this case as alleged by Reed, his Title VII disparate pay claims are framed as a discriminatory compensation decision claim (*i.e.*, paychecks received as a periodic implementation of a previously made discriminatory employment decision).[4] As such, Austal's motion for summary judgment on Reed's Title VII pay raise claims is **DENIED.**

---

[4] As set forth in 29 U.S.C.A. § 626(d)(3): "….an unlawful practice occurs, with respect to discrimination in compensation in violation of this Act, when a discriminatory compensation decision or other practice is adopted, when a person becomes subject to a discriminatory compensation decision or other practice, or when a person is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice."

# IV.   Austal's "Reply" Claims

Austal asserts new arguments in its Reply concerning the timeliness of certain claims. Austal did not move for summary judgment on these claims. The Court will not consider these "new" claims because Austal cannot assert new allegations or arguments raised for the first time on Reply. As set forth recently by this Court in <u>New Hampshire Ins. Co. v. Wiregrass Const. Co.</u>, Slip Copy, 2011 WL 206191, *2 at note 2 (S.D. Ala. Jan. 20, 2011):

> *See Park City Water Authority v. North Fork Apartments, L.P.*, 2009 WL 4898354 at *1 n. 2 (S.D.Ala.2009) (citing cases from over 40 districts applying the rule in 2009 alone). The Eleventh Circuit follows a similar rule. *E.g., Herring v. Secretary, Department of Corrections*, 397 F.3d 1338, 1342 (11th Cir.2005) ("As we have repeatedly admonished, arguments raised for the first time in a reply brief are not properly before a reviewing court.") (internal quotes omitted).
>
> The Court has identified some of the reasons supporting the rule. "In order to avoid a scenario in which endless sur-reply briefs are filed, or the Court is forced to perform a litigant's research for it on a key legal issue because that party has not had an opportunity to be heard, or a movant is incentivized to save his best arguments for his reply brief so as to secure a tactical advantage based on the nonmovant's lack of opportunity to rebut them, this Court does not consider arguments raised for the first time in a reply brief." *Hardy v. Jim Walter Homes, In*c., 2008 WL 906455 at *8 (S.D.Ala.2008).

In sum, because Austal failed to raise these arguments in its motion for summary judgment, they are impermissible and will not be considered. <u>See</u> <u>also</u> <u>e.g.</u>, <u>Abrams v. Ciba Specialty Chemicals Corp</u>., 663 F. Supp. 2d 1220, 1232 at note 16 (S.D. Ala. 2009) (providing that "new arguments are impermissible in reply briefs"); <u>Evans v. Infirmary Health Services, Inc</u>., 634 F. Supp. 2d 1276, 1285 at note 14 (S.D. Ala. 2009) (instructing that "this Court's general practice is not to consider new arguments raised in a reply brief").

# V.   Title VII/Section 1981 – Hostile Work Environment (Race)

Racial harassment is actionable under Section 1981 where the conduct is sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment. See, e.g., Freeman v. City of Riverdale, 330 Fed. Appx. 863, 865 (11th Cir. 2009) (unpublished).[5] To establish a prima facie case of hostile work environment and/or racial harassment under Section 1981, the plaintiff must prove that: 1) he belongs to a protected group; 2) he has been subject to unwelcome harassment; 3) the harassment was based on a protected characteristic of the employee (such as race); 4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and 5) the employer is responsible for such environment under a theory of vicarious or direct liability. See, e.g., Reeves v. DSI Sec. Servs., Inc., 395 Fed. Appx. 544, 545-546 (11th Cir. 2010) (unpublished); McCann v. Tillman, 526 F.3d 1370, 1378 (11th Cir. 2008); Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002). See also e.g., Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999).

Austal contends that: 1) Reed's evidence of sporadic and isolated incidents of racially hostile comments, conduct and graffiti during the time he was employed do not meet the severe or pervasive threshold; 2) Reed makes no allegations and presents no evidence that the allegedly hostile environment unreasonably interfered with his ability to work on a day-to-day basis; 3) Austal maintained a policy establishing how an employee should report discriminatory conduct, but Reed failed to report certain conduct; and 4) Austal took reasonable preventative and corrective/remedial measures to prevent a hostile work environment.

---

[5] This is an unpublished decision and is persuasive, but not binding, authority pursuant to Eleventh Circuit Rule 36-2. The Court notes this same rule applies to other Fed. Appx. cases cited herein.

**A.    Motion to Strike**[6]

Austal objects to certain portions of the Declaration of Nathaniel Reed (Doc. 285-19). Specifically, Austal contends that Paragraph 2 and Paragraph 7 of his Declaration directly contradict his prior sworn deposition testimony (*i.e*., a sham affidavit).

Concerning Paragraph 2, Austal objects only to the first and second sentences, which state that "[d]uring my employment I heard white supervisors and white co-workers use racial slurs. I was called 'boy' several times by my supervisor Ron Moore."  Austal contends first, that the second sentence directly contradicts his deposition testimony: "Ron Moore, himself, called and told me on one occasion, Hurry up – he was with another white supervisor and I guess he was trying to – he got the – I thought he think it was a joke. He said, Hurry up, boy; go up there and get that."  (Doc. 347-4 at 5 (Dep. Reed at 73)).  The Court's review of Reed's deposition indicates that Reed reiterated further, that Moore only "called me a boy that day[]" and there were "[n]o other instance[s], not with me."  (Doc. 285-18 (Dep. Reed at 73, 76-78, 134-135)). Thus, Austal's Objection as to the second sentence is **SUSTAINED** as to the phrase "several times" contained therein.

---

[6] As noted in the Court's prior Order (Doc. 357), Austal's Motion to Strike is construed as a Rule 56(c)(2) Objection. With the December 1, 2010 rules change to Rule 56, it no longer appears that motions to strike exhibits submitted on summary judgment are appropriate. Revised Rule 56(c)(2) provides instead, that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." FED.R.CIV.P. 56(c)(2). The Advisory Committee Notes specify further as follows: "Subdivision (c)(2) provides that a party may object that material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence. The objection functions much as an objection at trial, adjusted for the pretrial setting. The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated. There is no need to make a separate motion to strike. If the case goes to trial, failure to challenge admissibility at the summary-judgment stage does not forfeit the right to challenge admissibility at trial."  FED.R.CIV.P. Adv.Comm.Notes (2010 Amendments).

Regarding Austal's objection to the first sentence's mentioning of racial slurs, the Court finds that Austal's objection is merited. In his deposition, Reed testified that there were no other racially discriminatory and/or hostile comments from Caucasian employees towards him, and that he did not ever observe anyone using the "N" word and that there were "[n]o other instances" of racial, discriminatory and hostile comments from Caucasian employees, lead persons and supervisors apart from when Moore called him "boy that day." (Doc. 285-18 at 50, 54-55 (Dep. Reed at 134, 139-140)). Thus, Reed's statement that he heard supervisors and co-workers use racial slurs contradicts his deposition testimony. Thus, Austal's Objection to the first sentence is also **SUSTAINED.**

Moreover, Austal also objects to the following portion of Paragraph 2 of Reed's Declaration: "[t]here were many other slurs all over the shipyard. There was a new one everyday. I personally saw the racial slur 'I hate niggers' written on the ship on which I was working. I personally saw racial slurs written on picnic tables in the shipyard like 'I hate niggers' and 'go back to Africa.'" Austal contends that when asked during his deposition about racial graffiti being located anywhere at Austal other than the bathrooms, Reed testified yes, "on the boat sometimes[,]" that he saw graffiti on the boat on "not too many occasions….every now and then."[7] (Doc. 347-4 at 7-8 (Dep. Reed at 139-140)). In sum, Reed testified that he saw the racial graffiti only on the bathroom walls and on the boat. Thus, Austal's Objection is **SUSTAINED** as to the following set forth in the aforementioned portion of Paragraph 2 of Reed' Declaration:

---

[7]    Austal notes that Reed testified, when asked if he saw graffiti anywhere other than the bathrooms, "no, sir." However, when reading pages 139-140 of Reed's deposition, it is clear that Reed's testimony is a response of "no" to the question of whether there was anywhere else -- *other than the boats* -- he saw graffiti while employed at Austal.

"all over the shipyard" and "I personally saw racial slurs written on picnic tables in the shipyard like 'I hate niggers' and 'go back to Africa.'"

Further, Austal objects to the last sentence of Paragraph 7 of Reed's Declaration: "I was also promised a raise when Austal got the government contract, but I never received this raise." Austal contends that in his deposition, Reed testified that he received a raise close to the time the contract was awarded. (Doc. 347-4 at 2-4 (Dep. Reed at 67-69)). The Court's review of the deposition reveals that Reed clearly testified that he received the raise that he had expected to receive in conjunction with the government contract:

> Q: So you had some understanding that with the award of the contract, that the people that had been there a while were going to be taken care of and you assumed that would be a pay raise?
> A: (Witness nods head).
> Q: And, then, shortly thereafter, you got a raise to fourteen twenty-five?
> A: Yes…
> Q So you were expecting a raise, fourteen twenty-five or maybe fourteen-fifty and you, in fact, got a raise to fourteen twenty-five?
> A Okay.

(Doc. 213-1 (Dep. Reed at 68-69)). As such, Reed's deposition testimony directly contradicts the last sentence of Paragraph 7 of his Declaration. Thus, Austal's Objection as to this sentence of Paragraph 7 is **SUSTAINED.**

**B.**    **Hostile Work Environment**[8]

As to whether the conduct was severe and pervasive, Reed points to the following

---

[8] Reed also alleges that he was treated differently at Austal by "not getting work assignments like the white crew members." (Doc. 285-19 (Decltn. Reed at 3 at ¶9)). However, Reed did not allege a disparate treatment for work assignments claim in the Third Amended Complaint. As such, such claim is not at issue in this case.

evidence.[9]  Regarding racially and hostile discriminatory comments, Reed alleges that _once_, his Caucasian supervisor Ron Moore told him to "hurry up, boy" in front of another Caucasian supervisor; "I thought he think it was a joke." (Doc. 285-18 (Dep. Reed at 73, 134-135)).  Reed complained to supervisor Moore about the comment; in response, Moore "just laughed it off and walked away." (Id. (Dep. Reed at 135)).  This was the _only_ verbal racial comment he was subjected to while employed at Austal. (Id. (Dep. Reed at 140)).  Moore only "called me a boy that day[]" and there were "[n]o other instance[s], not with me." (Id. (Dep. Reed at 76-78, 134-135, 139-140)).  However, Reed was aware that his co-workers heard the word "nigger" at Austal. (Doc. 285-19 (Decltn. Reed at 2)).

Reed was subjected to displays of the Confederate flag "almost every day that I worked at Austal[,]" as worn by a Caucasian co-workers on their t-shirts, on the back of trucks, on toolboxes, welding hats and drawn on the bathroom walls. (Doc. 213-1 (Dep. Reed at 73, 90-92); Doc. 285-19 (Decltn. Reed at 2-3 at ¶3)). Some of the Caucasian co-workers and supervisors who wore the flag include "Wayne," "Bryce," Robert Sheppard, and "others." (Doc. 213-1 (Dep. Reed at 91)).  Reed found the imagery "very disturbing." Reed complained about the imagery to his supervisor Robert Hall, who responded "there was nothing he could do about it."

_____

[9] Reed also relies on the allegations of the other 22 plaintiffs (Doc. 307 at 3-5,13 16-17, 19-20, 23, 27-28, 31-32) to support that an overall racially charged work atmosphere exists at Austal (_i.e._, viewed through the lens of the plaintiffs' collective allegations versus each plaintiff's specific allegations).  "To rely on the evidence, each [plaintiff] must show that he _was aware_ of those incidents at the relevant time he alleges the hostile work environment." See, e.g., Melton v. National Dairy, LLC, 705 F. Supp. 2d 1303, 1342 (M.D. Ala. 2010) (citing Edwards Wallace Comm. College, 49 F.3d 1517, 1522 (11th Cir. 1995)) (emphasis in original). See also e.g., Head v. Pitts Enterprises, Inc., Slip Copy, 2010 WL 2773376, *8 (M.D. Ala. Jul. 14, 2010); McKenzie v. Citation Corp., LLC, 2007 WL 1424555, *13 (S.D. Ala. May 11, 2007).  Courts in the Eleventh Circuit may consider statements not directed at a plaintiff and even hearsay statements, so long as the plaintiff was aware of the statements at the time he was employed. See, e.g., Yeomans v. Forster and Howell, Inc., Slip Copy, 2010 WL 3716394, *5-6 (M.D. Ala. Sept. 10, 2010).  The Court has only considered the evidence of which Reed testified that he was aware.

(Doc. 285-19 (Decltn. Reed at 3 at ¶3)). Austal took no action regarding the display of the Confederate flag in the workplace.

On a daily basis, Reed saw racial graffiti on the bathroom walls at Austal. (Doc. 213-1 (Dep. Reed at 72-73, 80-81, 140, 158); Doc. 285-19 (Decltn. Reed at 2 at ¶2)). "I saw the word 'nigger' at Austal so frequently, it unfortunately became part of my work environment. I could not use the restroom without seeing a racial slur or remark on the wall." (Doc. 285-19 (Decltn. Reed at 2 at ¶2)). The racial graffiti included: "I hate niggers," "if a nigger--something about food stamps in their boot," "why niggers do not like using aspirin because they don't like picking the cotton out of the top," "how do you get an nigger not to go to work, put food stamps in their work boots," and Confederate flag drawings. (Doc. 213-1 (Dep. Reed at 80-81); Doc. 285-18 (Dep. Reed at 84-86, 139-140); Doc. 285-19 (Decltn. Reed at 2 at ¶2)). Reed complained -- "my only complaint[]" -- about the racial graffiti to one of his Caucasian supervisors Robert Hall. (Doc. 285-18 (Dep. Reed at 80-81, 86)). Reed asked Hall what could be done; Hall responded "when you're bored, there's nothing to do but sit on the toilet and write little things on the wall. You can't control that." (Id. (Dep. Reed at 81-82)). The racial graffiti "was up there for a long period of time…[and only] after the [EEOC] complaints [and after the lawsuit]…they [Austal] started taking action[;]" at some point Reed also photographed the offensive graffiti and drawings and showed them to supervisor Hall. (Id. (Dep. Reed at 82, 84-86, 167); Doc. 213-1 (Dep. Reed at 83))). "I showed it [the photographs] to them [Hall and others in a safety meeting] and they just laughed it off." (Doc. 285-18 (Dep. Reed at 86)).

Reed also saw racial graffiti on the ship at Austal "every now and then[,]" including "I hate niggers." (Doc. 285-18 (Dep. Reed at 139-140)).

13

To be actionable as severe or pervasive, the harassment "must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceive[s]…to be abusive." Miller, 277 F.3d at 1276 (internal citation and quotation marks omitted). In other words, the severe or pervasive element has an objective and subjective component. McCann, 526 F.3d at 1378. To determine the objective severity of the harassment, courts look at the totality of the circumstances and consider: 1) the frequency of the discriminatory conduct; 2) the severity of the conduct; 3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and 4) whether the conduct unreasonably interferes with an employee's job performance. Reeves, 395 Fed. Appx. at 546. See also Faragher v. City of Boca Raton, 524 U.S. 775, 787-788 (1998); Allen v. Tyson Foods, 121 F.3d 642, 647 (11th Cir. 1997) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)). "The conduct is considered cumulatively instead of in isolation." Reeves, 395 Fed. Appx. at 546.

There is sufficient evidence, if believed by a jury, that Reed subjectively perceived his work environment to be racially hostile. Thus, the Court need only determine whether Reed's perception was objectively reasonable.

When viewing the facts in the light most favorable to Reed, a reasonable jury could not find that the harassing conduct alleged was frequent and severe. According to the evidence, Reed was not personally subjected to racially discriminatory comments and conduct *(and if at all, only once for the "boy" comment)*, and thus, he was by no means subjected to regular, racially discriminatory comments or conduct. The only consistent or regular racial comments that Reed encountered consists of the written racial graffiti in the workplace bathrooms.

14

Additionally, while Reed testified that he daily saw Caucasian co-workers and supervisors display Confederate flag imagery at work, he only complained about the imagery once. While much of the repeated conduct may not have been physically threatening, it is not unreasonable to infer from Reed's allegations that some of the conduct was racially demeaning, humiliating and degrading. McKenzie, 2007 WL 1424555 at *13. However, there is no indication in the record that Reed was exposed to regular/daily racial comments and/or conduct, apart from the bathroom graffiti and Confederate flag imagery. Reed has not established then, that the repeated conduct was severe and/or physically threatening.

Further, there is insufficient evidence of record that Reed believed that the environment _unreasonably_ interfered with his job performance. Reed testified that when he saw discriminatory conduct at Austal, he would just "go to work, do what I have to do." (Doc. 285-18 (Dep. Reed at 44)). And even though Reed testified that the discrimination at Austal caused him stress and worry and that he developed high blood pressure due to same -- "I wasn't getting paid the money…I was supposed to be getting paid[]" and "I went home worrying about it all the time, wondering why I'm not advancing, wondering why I'm getting treated a certain way…I believe that caused…my pressure to go up….just seeing this hostile work environment…every day seeing three hundred white supervisors and no one black in no kind of power[]") -- he was diagnosed with high blood pressure _after_ his employment with Austal. (Doc. 285-18 (Dep. Reed at 160-162)). Moreover, while employed at Austal between November 2004 and June 2007, Reed received three (3) pay raises.

Eleventh Circuit precedent mandates that courts consider "the totality of the circumstances" such that the absence of one factor is not dispositive. See, e.g., Miller, 277 F.3d

at 1277. In this case, Reed has not submitted sufficient evidence demonstrating that any of the allegedly discriminatory conduct was frequent (apart from the bathroom graffiti and flag imagery), severe, physically threatening, humiliating, demeaning and/or unreasonably interfered with his job. See, e.g., Barrow v. Georgia Pacific Corp., 144 Fed. Appx. 54, 57-58 (11th Cir. 2005) (concluding that evidence of "displays of the rebel flag on tool boxes and hard hats, the letters 'KKK' on a bathroom wall and on a block-saw console, and a noose in another employee's locker,'" as well as several threats to "kick plaintiff's 'black ass'" or threats that if he looked at a white girl he was going to get "cut," and the use of racial epithets including "nigger," "boy," and "black boy," reflected conduct that was "isolated," "sporadic," and "random" and did not amount to "severe and pervasive" harassment). While there is "not simply some magic number of racial or ethnic insults" that preclude summary judgment, it is repeated incidents of...harassment that continue despite the employee's objections [that] are indicative of a hostile work environment." Miller, 277 F.3d at 1276 (citation and quotation omitted). Such circumstances of "repeated incidents….that continue…," is not the case here.

In sum, under the totality of the circumstances and considering the allegations in the light most favorable to Reed, he has not produced sufficient evidence – if believed by a jury – to create an issue of fact as to whether he was subjected to racial harassment that was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment.[10] As a result, because Reed has failed to satisfy this fourth element of his prima facie case for hostile work environment, the Court need not reach the fifth

---

[10] The Court has considered the evidence presented by each plaintiff in isolation. Accordingly, on the claim of hostile work environment there are different determinations amongst plaintiffs based on the specificity and quantity of evidence presented by each plaintiff.

element (employer liability) and summary judgment is **GRANTED** in favor of Austal on Reed's Title VII/Section 1981 hostile work environment claim.

## VI.    Title VII/Section 1981 Disparate Treatment[11]

Reed contends that he was intentionally discriminated against with respect to "terms and conditions of his employment" due to his race in violation of Title VII and Section 1981. Austal moves for summary judgment on Reed's disparate treatment claims for discriminatory pay.

In individual disparate treatment claims, "the plaintiff bears the burden of proving that the employer discriminated against him because of his race." Cooper v. Southern Co., 390 F.3d 695, 723 (11th Cir. 2004), *overruled on other grounds,* Ash v. Tyson Foods, Inc., 546 U.S. 454, 456-457 (2006). See also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000); Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981). Where there is no direct evidence of discrimination or a statistical pattern of discrimination, the burden shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) applies. Under this framework, the plaintiff must establish a prima facie case of intentional race discrimination.[12] Id. at 802. See also e.g., E.E.O.C. v. Joe's Stone Crabs, Inc., 296 F.3d 1265, 1272 (11th Cir. 2002). If a prima facie case is established, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. Id. Once the employer satisfies its burden, the burden

---

[11] As noted *supra* footnote three, Austal also moved for summary judgment on claims not included in the Third Amended Complaint (Doc. 200-1 at 16). Likewise, Reed appears to assert a new pay claim in his Declaration (Doc. 285-19 (Decltn. Reed at 3 at ¶4); however, Reed did not allege this pay claim in the Third Amended Complaint. Such claims merit no discussion here.

[12] "Claims of race discrimination under § 1981 are analyzed in the same manner as claims brought under Title VII." DeLeon v. ST Mobile Aerospace Eng'g, Inc., 2010 WL 500446, *15 (S.D. Ala. Feb. 9, 2010).

shifts back to the plaintiff to offer evidence that the alleged reason of the employer is a pretext for unlawful discrimination. Id. at 1272-1273.

In order to establish a prima facie case of disparate pay, Reed must establish that he held a position "similar to that of a higher paid employee who is not a member of [his] protected class." Crawford v. Carroll, 529 F.3d 961, 974-975 (11th Cir. 2008) (citing Meeks v. Computer Assocs. Int'l, 15 F.3d 1013, 1019 (11th Cir. 1994)). The employee whom the plaintiff identifies as a comparator "must be similarly situated in all relevant respects." Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1091 (11th Cir. 2004). See also e.g., Drake-Sims v. Burlington Coat Factory Warehouse of Ala., Inc., 330 Fed. Appx. 795, 803 (11th Cir. 2009). It is necessary that a comparator must be "nearly identical" to the plaintiff "to prevent courts from second-guessing a reasonable decision by the employer." Wilson, 376 F.3d at 1091. See also e.g., Head v. Pitts Enterp., Inc., Slip Copy, 2010 WL 2773376, *13 (M.D. Ala. Jul. 14, 2010); Drake-Sims, 380 Fed. Appx. at 803; Sylva-Kalonji v. Board of School Comm'rs of Mobile Cty., 2009 WL 1418808, *5-6 (S.D. Ala. May 20, 2009); Hill v. Emory Univ., 346 Fed. Appx. 390, 395 (11th Cir. 2009); Beard v. 84 Lumber Co., 206 Fed. Appx. 852, 857 (11th Cir. 2006) (finding the plaintiff and a proposed comparator had different numbers of years of experiences such that they were not similarly situated in all relevant respects).

Austal contends that Reed cannot establish a prima facie case of race discrimination because Reed cannot demonstrate that any similarly situated Caucasian employee was paid more than Reed.[13] Reed responds by identifying the following Caucasian employees who were

---

[13] Reed also asserts a failure to train claim in conjunction with his discriminatory pay claim. (Doc. 307 at 10).

allegedly paid more than he was while employed at Austal: 1) Bryce Goram, 2) Jared Kerr, 3) Kevin Lewis and 4) Richard Baskin.[14]  Austal then offers the legitimate non-discriminatory reason that the proposed Caucasian comparators had more, and prior, work experience, and some of the individuals simply had different jobs.  (Doc. 336-4 (Decltn. Combs)).

Reed does not submit sufficient evidence or argument regarding subjective similarity of the comparators, such as experience, education, previous salary, or salary demand.  Rather, Reed relies on Miranda v. B&B Cash Grocery Store, Inc., 975 F.2d 1518, 1529 (11th Cir. 1992) (finding that the plaintiff established a prima facie case of sex discrimination under Title VII by demonstrating that she is female and that the job she occupied was similar to higher paying jobs occupied by males) and Mulhall v. Advance Sec., Inc., 19 F.3d 586 (11th Cir. 1994), and argues that he meets his burden of producing evidence of a similarly situated comparator by pointing to the aforementioned Caucasian employees.

However, as the Eleventh Circuit has counseled "[t]he methods of presenting a prima facie case are not fixed; they are flexible and depend to a large degree upon the employment situation."  Wilson, 376 F.3d at 1087.  In more recent Eleventh Circuit precedent, we have seen the application of this flexibility.  Specifically, the Court has pointed to the absence of relevant similarities amongst comparators, outside of job similarity, and held that plaintiff failed to meet

---

[14] Reed also references a "Bobby Moreno" -- Reed specified that he trained Moreno on how to be a fitter and that Moreno told him that he earned $17.50/hour even though he was hired the same day as Reed (but as a helper, not a fitter).  (Doc. 213-1 (Dep. Reed at 47-48); Doc. 285-19 (Decltn. Reed at 3 at ¶6)).  Moreno's prior work experience was as a chef in a restaurant.  (Doc. 285-18 (Dep. Reed at 61-62)).  However, there is no record of any such employee by that name working at Austal.(Doc. 336-4 (Decltn. Combs at 4)).  Reed's testimony is hearsay in regards to Moreno's pay and background, and would therefore be inadmissible.  Thus, Reed is unable to sustain his burden of showing that Moreno is a proper comparator.  As such, Austal's motion for summary judgment concerning Bobby Moreno (and Reed's higher starting wage pay disparity claim tied to same) is **GRANTED.**

his/her prima facie case.   For example, in <u>Cooper,</u> 390 F.3d 695,[15] the Court determined that the comparators for purpose of a disparate pay claim were not appropriate, *i.e.* similarly situated, when the plaintiff did not establish: 1) "that the proposed comparators had similar levels of experience or education" <u>id</u>. at 745; 2) "similar levels of seniority" <u>id.</u> at 743; and 3) similar disciplinary records, <u>id.</u> at 741.

When the Eleventh Circuit has reached beyond job similarities in its similarly situated analyses, unrebutted evidence was in the record to show that there existed a relevant factor (*e.g.*, experience, education, starting pay demand) which rendered the comparators dissimilar.   For example, in <u>Mack</u>, 195 Fed. Appx. 829, the court stated "[w]e affirm the court's entry of summary judgment as to this claim because MAE produced uncontroverted evidence that Frye and Wicks were paid more than Mack because each had specialized experience and training in aeronautics and avionics, while Mack had only general electronic training. Consequently, Mack failed to show that they were 'similarly situated in all relevant respects.'"   <u>Id</u>. at 843.   Thus, although the burden of production at the prima facie stage does not shift to the defendant to produce any evidence, the failure of the defendant to point to other traits that are "relevant" to the particular employment situation dictates that the Court should look strictly to job similarities.

Therefore, the Court will first examine the record to determine if Reed has submitted evidence of basic job similarities, and if so, whether there is evidence that the comparators are dissimilar in other relevant respects.

Reed alleges that Caucasians were paid a higher salary than African Americans at Austal. "Reed was assigned first class work, yet was only paid for second class work[]" – "[y]et,

---

[15] The Court in <u>Cooper</u> cited both <u>Miranda</u> and <u>Mulhall</u> in reaching its conclusions.

similarly situated white employees continually made a higher hourly wages than Reed for similar work performed." (Doc. 37 at 106 at ¶¶540-541)). <u>See</u> <u>also</u> Doc. 285-19 (Decltn. Reed at 3 at ¶7). Reed contends that his initial pay of $11/hour was less than the pay should have been for the amount of skill that he possessed and that Caucasian employees received higher pay rates than African American employees. Specifically, in his Declaration, Reed alleges that "[w]hite guys continued to come in making more than $15.50 per hour, which is what I was paid and they had far less qualifications and experience than I had." (Doc. 285-19 (Decltn. Reed at 3 at ¶7)).

Reed was hired on November 29, 2004 at the hourly rate of $11/hour for the position of Fitter in the Aluminum Fabrication Department. <u>See</u> *supra*. Reed testified to prior work experience as a lead man at Havolvicks Engineering (where he worked on a ship doing structural fitting, and building steel platforms. (Doc. 213-1 (Dep. Reed at 55; Doc. 285-18 (Dep. Reed at 59)). Reed testified that he also worked at General Marine Contractor as a sheet metal mechanic (duct sheet metal and fabricating for HVAC systems), at the Bender shipyard, Atlantic Marine shipyard, Jacksonville shipyard in Florida, and Omega shipyard in Mississippi. (Doc. 285-18 (Dep. Reed at 57-58)).

As noted *supra*, to support his disparate hourly rate claim, Reed compares his starting hourly rate and his work experience against four (4) proposed comparators -- Caucasian employees who were hired within seven (7) months[16] after Reed: 1) Bryce Goram, 2) Jared Kerr, 3) Kevin Lewis and 4) Richard Baskin.

Specifically, while Reed alleges that Goram was hired as a fitter helper, Goram was

---

[16] Goram was hired on 5/9/05; Kerr was hired on 5/2/05; Lewis was hired on 6/27/05; and Baskin was hired on 2/7/05. (Doc. 295 at 2, 14, 20 and 22 (Exhibit 105-Sealed)).

actually hired on May 9, 2005 at Austal to be a _welder_, he requested a starting salary of $30,000/year and he had prior welding experience (approximately 1 year and 8 months experience at Threaded Fasteners as a shop worker, mig welder, threader and forklift operator). (Doc. 336-4 (Decltn. Combs at 4); Doc. 336-4 at 22-25; Doc. 295 at 14 (Exhibit 105-Sealed)). Additionally, while Reed alleges that Kerr was hired as a Fitter, Kerr was actually hired on May 2, 2005 at Austal to be a _welder_ and requested $15/hour; he had prior experience in welding, machining and fabrication as he had worked at Copper & Weller in mechanics and fabrication (1996-1997) as well as at Herndon and Marry, Inc. in metal fabrication (since 1999). (Doc. 336-4 (Decltn. Combs at 4); Doc. 336-4 at 10-13; Doc. 295 at 20 Exhibit 105-Sealed)). Thus because Goram and Kerr held different jobs, they are not proper comparators.

Reed alleges that Richard Baskin is an appropriate comparator. Baskins applied to be a 2nd Class Shipfitter on January 31, 2005 and was hired on February 7, 2005; he requested $12.65/hour; at that time, he had completed a shipfitter apprenticeship program at Bender Shipbuilding and was employed as a 1st Class Fitter at Bender in the process of obtaining 2nd Class fluxcore welding status (employed since August 2003); and he could read blueprints; he could operate manlifts, rigs and flug cranes. (Doc. 336-4 (Decltn. Combs at 3-4); Doc. 336-4 at 6-9; Doc. 295 at 3 (Exhibit 105-Sealed)). Thus, Baskin was not similarly situated because he had previous experience as a 1st Class Fitter.

However, the court does not reach the same conclusion as to Lewis. Reed alleges that Lewis was hired as a Fitter at $15.25 an hour. Austal does not dispute either the job title or

wage.[17]  The court then turns to whether Reed and Lewis were similar in other relevant respects, *i.e.* work experience and training.  Reed testified that in addition to his four (4) years of service as a fireman for the Navy, he had extensive experience and training at shipyard and building ships because for 1½ years he worked at General and Marine Sheet Metals as a sheet metal mechanic (responsible for fabricating and welding ship ventilation systems which entailed working at four (4) different shipyards); and that he worked as a "lead man" for approximately two (2) years at Havlovick Engineering (where he worked on a Navy test ship performing structural fitting and building metal (steel) platforms).  (Doc. 285-18 (Dep. Reed at 55-61)).  In comparison, Lewis had prior construction and aviation construction experience dating back to 1998 (he was working as a supervisor at Mobile Aerospace at the time he applied); he was able to read drawings and blueprints; and he attended Faulkner Community College for Industrial Electricity.  (Doc. 336-4 (Decltn. Combs at 4); Doc. 336-4 at 14-17; Doc. 295 at 22 (Exhibit 105-Sealed)).  The Court finds that Reed has established sufficient similarity and thus his prima facie case.  The Court also finds that Austal has failed to sufficiently address Reed's prima facie case such that Austal's motion for summary judgment is **DENIED** on this claim.

Additionally, Reed alleges that he "was promised he would receive a raise when the Defendant received a particular government contract. However, once the contract was in place he never received the raise. Similarly situated white employees received raises[]" and he "complained about not receiving a raise while white employees had their wages increased." (Doc. 37 at 106 at ¶¶542-543)).  See also Doc. 285-19 (Decltn. Reed at 3 at ¶7).  Reed testified

---

[17] As to Lewis' starting salary, the Court relies on Austal's notation on Lewis' application of $15.25.  (Doc. 336-4 at 17).

that while he started at $11/hour, Austal subsequently was awarded a contract "where we all was supposed to…have been making the same amount of money. But I noticed that I wasn't making what everybody else was making."  (Doc. 213-1 (Dep. Reed at 46)).  Reed explained that he thought based on safety meetings where manager Harley Combs talked about the contract (telling the employees that "it'll be in your best interest to stick around and for those guys who have been with us, we're going to take care of you, something to that notion[]") that with the new contract -- "from what my understanding was" -- Austal "was going to …put us in …that pay rank [earning $14/hour]. But it never happened."  (Id. (Dep. Reed at 64-65)).  Additionally, Reed testified that supervisor Chris Robinson specifically told Reed that because of the contract, Reed would receive a raise to $14.25 or $14.50 per hour.  (Id. (Dep. Reed at 65-67)).  Reed did not receive the raise and when Reed complained, and asked supervisor Robinson "how come, and he couldn't give me an answer."  (Id. (Dep. Reed at 46); Doc. 285-18 (Dep. Reed at 72)).  "I didn't get my money."  (Doc. 285-18 (Dep. Reed at 92)).

However, Reed simultaneously testified that he received a raise to $14.25/hour close to the time that the contract was awarded to Austal, just after he was assigned to work on another supervisor's crew: "he immediately got me the fourteen twenty-five."  (Doc. 213-1 (Dep. Reed at 67-68)).  Reed clearly testified that he received the raise that he had expected to receive.  (Doc. 213-1 (Dep. Reed at 68-69)).  Notably, Reed testified that after he complained to supervisor Robinson about not receiving the raise he expected, he was transferred to work on supervisor Ron Moore's crew, at which time he received a pay raise to $14.25/hour.  (Doc. 285-18 (Dep. Reed at 93)).  Accordingly, Reed's own sworn deposition testimony undermines his denial of a pay raise claim.  As such, Austal's motion for summary judgment on Reed's Section 1981 pay

raise claim tied to the government contract awarded to Austal, is **GRANTED.**

**VII.** <u>**Conclusion**</u>

Accordingly, it is **ORDERED** that Austal's motion for summary judgment is **GRANTED** as to Reed's hostile work environment claim; **DENIED** as to Reed's discriminatory pay claims as detailed herein; and **GRANTED** as to Reed's retaliation claim. Reed's punitive damages request is **CARRIED TO TRIAL.**

**DONE** and **ORDERED** this the **23**[rd] day of **September 2011.**

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**
