**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **LARRY LAFIETTE,** *et al.*, | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **CIVIL ACTION 08-00155-KD-N** |
| | ) | |
| **AUSTAL, U.S.A., L.L.C.,** | ) | |
| **Defendant.** | ) | |

**ORDER**

This matter is before the Court on Defendant's motion for summary judgment (Docs. 180, 181), Plaintiff's Opposition (Doc. 306) and Defendant's Reply (Doc. 331).

I.    **Factual Background**

On March 20, 2008, multiple Plaintiffs initiated this action against Austal for legal and equitable relief to redress unlawful discrimination and harassment on the basis of race.[1]  (Doc. 1). Larry Lafiette ("Lafiette") asserts claims for hostile work environment and discrimination (pay, promotion and training), based on race in violation of Title VII and 42 U.S.C. § 1981. (Doc. 37 at 79-83).[2]

---

[1] While initiated as a purported class action, this is no longer a class action case.  (Doc. 293). Additionally, some of the Plaintiffs allege gender and disability discrimination in addition to asserting Title VII claims.

[2] Originally, Lafiette  alleged a separate claim for retaliation (Doc. 37 at 80-82 at ¶¶391, 399-400, 402-404).  Lafiette did not address this claim in response to Austal's motion and moreover, in his opposition brief now specifically represents that he "is *pursuing* claims against Austal for *only* hostile work environment and discrimination on the basis of race in regards to pay and promotions" under Title VII and Section 1981. (Doc. 306 at 2 (emphasis added)).  Accordingly, the Court construes Lafiette's intentional exclusion of his retaliation claim as a concession of that claim.  Thus, it is **ORDERED** that Austal's motion for summary judgment, as to Lafiette's retaliation claim, is **GRANTED.**

While Austal also contends in its Reply that Lafiette abandoned his training claims, the Court cannot agree.  In his opposition to summary judgment, Lafiette contends in connection with his denial of promotion claims that he was denied welding/blueprint training and alleged such general denials in the (Continued)

**A.**     **Austal**

Defendant Austal USA ("Austal") is an Australian shipbuilding company dedicated to the design and construction of customized aluminum commercial and military vessels, located in Mobile, Alabama. (Doc. 181 at 2; Doc. 283-48 at 2-3 (Austal's 3/7/07 EEOC Position Statement)).  The Operations Division has four (4) major Departments (Aluminum (divided into Fabrication and Components), Electrical, Engineering, and Fit Out (divided into HVAC, Insulation and Fit Out)).  (Doc. 283-48 at 3-4).

**B.**     **Lafiette's Employment**

Lafiette began working for Austal on January 30, 2006 as a Fabrication Apprentice at the rate of $10/hour. (Doc. 209-1 (Dep. Lafiette at 36, 51); Doc. 285-13 (Dep. Lafiette at 36-37, 52); Doc. 295 at 21 (Exhibit 105-Sealed); Doc. 209-2 at 8 (Decltn. Lindley)).  Lafiette received four (4) pay raises dated May 22, 2006 (to $12.50/hour); January 1, 2007 (to $15/hour); January 7, 2008 (to $16/hour – "Larry has made a great improvement. Larry will do anything you tell him to do."); and June 30, 2008 (to $16.48/hour).  (Doc. 295 at 21 (Exhibit 105-Sealed); Doc. 209-1 at 47-48, 50; Doc. 209-2 at 8 (Decltn. Lindley)).  In March 2008, Lafiette's job position changed from Fabrication Apprentice to Trades Assistant.  (Doc. 209-2 at 8 (Decltn. Lindley)).  On May 6, 2009, Lafiette was laid off due to downsizing.  (Doc. 209-1 (Dep. Lafiette at 46-47, 49).

**II.**     **Standard of Review**

"The court shall grant summary judgment if the movant shows that there is no genuine

---

Third Amended Complaint.  (Doc. 306 at 10-11).

Moreover, any and all disparate impact claims against Austal have been dismissed from this litigation. (Doc. 366).

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a) (Dec. 2010). The recently amended Rule 56(c) governs Procedures, and provides

as follows:

> *(1) Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> > **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> > **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> *(2) Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
>
> *(3) Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record.
>
> *(4) Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed.R.Civ.P. Rule 56(c) (Dec. 2010). Defendant, as the party seeking summary judgment, bears

the "initial responsibility of informing the district court of the basis for its motion, and

identifying those portions of 'the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence

of a genuine issue of material fact." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir.

1991). (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). If the nonmoving party

fails to make "a sufficient showing on an essential element of her case with respect to which she

has the burden of proof," the moving party is entitled to summary judgment.  Celotex, 477 U.S. at 323.  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992), cert. den., 507 U.S. 911 (1993) (internal citations and quotations omitted).

## III.    Timeliness of Title VII Claims

A plaintiff may not sue under Title VII unless he first exhausts administrative remedies by filing a timely charge of discrimination with the appropriate agency. See, e.g., Wilkerson v. Grinnell Corp., 270 F.3d 1314, 1317 (11th Cir. 2001).  "In a non-deferral state such as Alabama, the deadline for filing is 180 days after the alleged discriminatory act." Carter v. University of South Alabama Children's & Women's Hosp., 510 F. Supp. 2d 596, 606 (S.D. Ala. 2007). See also Tipp v. AmSouth Bank, 76 F. Supp. 2d 1315, 1327 (S.D. Ala. 1998). "If the victim of an employer's unlawful employment practice does not file a timely complaint, the unlawful practice ceases to have legal significance, and the employer is entitled to treat the unlawful practice as if it were lawful." City of Hialeah, Fla. v. Rojas, 311 F.3d 1096, 1102 (11th Cir. 2002). See also Sheffield v. United Parcel Service, Inc., 2010 WL 4721613, *2 (11th Cir. Nov. 22, 2010) (unpublished); Jordan v. City of Montgomery, 2008 WL 2529573, *1 (11th Cir. Jun. 26, 2008) (unpublished).  A failure to file a timely charge with the EEOC results in a bar of the claims contained in the untimely charge.  Id.

Lafiette signed his EEOC Charge (for race, retaliation and "continuing action") on November 13, 2006 and it was "received" on November 20, 2006.  (Doc. 286-17 at 3-5).

4

Calculating from November 20, 2006, Austal contends that "[a]ll alleged acts" occurring between Lafiette's hire date of January 30, 2006 and May 25, 2006 (180 days prior to November 20, 2006) are time barred under Title VII.  (Doc. 181 at 7).

Lafiette contends that Austal's interpretation is incorrect and contrary to well established law, as although many acts upon which a plaintiff's Title VII claims rely may occur outside the 180 filing period, "they are part of the same actionable hostile environment claim."  (Doc. 306 at 14-15 (citing McKenzie v. Citation Corp., LLC, 2007 WL 1424555 (S.D. Ala. 2007)).  Lafiette is correct as it relates to his hostile work environment claim.  The U.S. Supreme Court has clarified that there are different standards for claims involving "discrete acts" versus "hostile environment" allegations.  See generally National R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002).  Under the continuing violation doctrine, a plaintiff's charge of discrimination regarding a hostile work environment is considered timely if "an act contributing to the claim occurs within the filing period," even if "some of the component acts of the hostile work environment fall outside the statutory time period."  Id. at 117.  As explained in Smiley v. Alabama Dept. of Transp., Slip Copy, 2011 WL 1188506, *5 (M.D. Ala. Mar. 30, 2011):

> Unlike claims involving discrete discriminatory acts, hostile environment claims may be litigated so long as at least one of the events contributing to the hostile environment was presented to the EEOC in a Charge of Discrimination in a timely fashion. Indeed, in *Morgan*, the United States Supreme Court held that "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period." *Morgan*, 536 U.S. at 106.

Lafiette's EEOC Charge alleges not just "at least one of the events" but a variety of "events contributing to the hostile work environment" -- sufficient to have placed Austal on notice that such a claim (and various incidents tied to same) exists in the litigation so that Austal could have

5

investigated the details during discovery.  Accordingly, Austal's motion for summary judgment on the untimeliness of this Title VII hostile work environment claim is **DENIED.**

Concerning failure to promote, Lafiette asserts that Caucasian co-workers were promoted instead of and/or before him including Kenneth Parnell[3] (promoted to lead man in October 2007 (Doc. 209-1 (Dep. Lafiette at 81, 98)), Jeremy Donald (promoted to lead man) (Id. at 99-103, 109), Jeffrey Goodwin (promoted to Trades Assistant), Nicholas Mayo (promoted to Trades Assistant), and Justin Hatfield (promoted to Fitter). Failure to promote claims are "discrete acts." See, e.g., Morgan, 536 U.S. at 114: "Discrete acts such as termination, *failure to promote*, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable "unlawful employment practice." Id. (emphasis added).  In Morgan, the U.S. Supreme Court drew a distinction between discrete acts of discrimination and hostile work environment claims, noting that "discrete acts such as…failure to promote….are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable unlawful employment practice." Morgan, 536 U.S. at 114.  Additionally, the Eleventh Circuit has held that the denial of a promotion is a one time violation, the present consequences of which only are felt at the present time, and not a continuing violation.  See, e.g., Roberts v. Gadsden Memorial Hosp., 835 F.2d 793 (11th Cir. 1988), *modified*, 850 F.2d 1549 (11th Cir. 1988) and Price v. M & H Valve Co., 177 Fed. Appx. 1 (11th Cir. Apr. 7, 2006) (unpublished)).

The record reveals that Lafiette was hired on January 30, 2006, as Fabrication Apprentice, became a Trades Assistant on March 17, 2008 and became a Fitter on June 30, 3008.

---

[3] Referenced by Lafiette as "Kenneth Payne." (Doc. 37 at 81 at ¶396).

See *supra*.  Concerning Jeremy Donald's promotion to lead man, he was hired on April 4, 2005 (Doc. 295 at 10 (Exhibit 105-Sealed).  However, on summary judgment the parties do not provide evidence as to the actual date of Donald's promotion, from which the Court can determine whether Lafiette's claims is timely, and given the voluminous record, the Court will not unilaterally endeavor to ascertain the specific date.  Regarding Kenneth Parnell, he was hired on June 25, 2007 and thus, his October 2007 promotion to lead man would have occurred after May 25, 2006.  (Doc. 295 at 28 (Exhibit 105-Sealed)).  Nicholas Mayo was hired on June 5, 2006 and thus, his promotion to Trades Assistant would have occurred after May 25, 2006. (Id. at 24).  Similarly, Jeffrey Goodwin was hired on June 12, 2006 and thus, his first promotion (to Trades Assistant) would have occurred after May 25, 2006.  (Id. at 14).  Likewise, Justin Hatfield was hired on January 2, 2007 and thus, his promotion to Fitter would have occurred after May 25, 2006.  (Id. at 15).  As such, Austal's motion for summary judgment as to Lafiette's failure to promote claims, based on untimeliness, is **DENIED.**

Next, concerning Lafiette's hourly wages disparate pay claim, the Court finds as follows.  As alleged by Lafiette, he contends that he was "paid less per hour than similarly situated white employees."  (Doc. 37 at 81 at ¶395).  Thus, the claim is framed by Lafiette as a discriminatory compensation decision claim (*i.e.*, paychecks received as a periodic implementation of a previously made discriminatory employment decision).[4]  As such, Austal's motion for summary

---

[4] As set forth in 29 U.S.C.A. § 626(d)(3): "….an unlawful practice occurs, with respect to discrimination in compensation in violation of this Act, when a discriminatory compensation decision or other practice is adopted, when a person becomes subject to a discriminatory compensation decision or other practice, or when a person is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice."

judgment on this Title VII pay raise claim, based on untimeliness, is **DENIED.**

Further, Lafiette contends that he was denied welding and blueprint training. Specifically, Lafiette alleges that he asked his supervisor Chris Robinson for welding and blueprint training which was denied and given instead to Caucasian co-workers.  (Doc. 37 at  81 at ¶¶392-394; Doc. 306 at 10).  Similar to failure to promote claims, failure to train claims are one-time employment events or "discrete acts." See, e.g., O'Connor v. City of Newark, 440 F.3d 125, 127 (3rd Cir. 2006) (quoting Morgan, 536 U.S. at 114); Pegram v. Honeywell, Inc., 361 F.3d 272, 280 (5th Cir. 2004); Hunter v. Secretary of U.S. Army, 565 F.3d 986, 993 (6th Cir. 2009); Copeland v. CVS Pharmacy, Inc., 2006 WL 2699045, *35 (N.D. Ga. Sept. 15, 2006).  However, on summary judgment, the parties have not provided sufficient evidence as to the actual dates of the training denials, from which the Court can determine whether Lafiette's claims are timely, and given the voluminous record, the Court will not unilaterally endeavor to ascertain those specific dates. At best, Lafiette's deposition testimony reveals that Robinson's denial of training occurred after November 13, 2006.  (Doc. 209-1 (Dep. Lafiette at 80-81)).  As such, this denial of training (and any others thereafter) occurred after May 25, 2006.  Thus, Austal's motion as to Lafiette's Title VII denials of training claims, based on untimeliness, is **DENIED.**

**IV.    Section 1981/Title VII – Hostile Work Environment (Race)**

Racial harassment is actionable under Section 1981 or Title VII where the conduct is sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment.  See, e.g., Freeman v. City of Riverdale, 330 Fed. Appx. 863, 865 (11th

Cir. 2009) (unpublished).[5]  To establish a prima facie case of hostile work environment and/or racial harassment under Section 1981 or Title VII, the plaintiff must prove that: 1) he belongs to a protected group; 2) he has been subject to unwelcome harassment; 3) the harassment was based on a protected characteristic of the employee (such as race); 4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and 5) the employer is responsible for such environment under a theory of vicarious or direct liability.  See, e.g., Reeves v. DSI Sec. Servs., Inc., 395 Fed. Appx. 544, 545-546 (11th Cir. 2010) (unpublished); McCann v. Tillman, 526 F.3d 1370, 1378 (11th Cir. 2008); Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002).  See also e.g., Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999).

Austal contends that: 1) Lafiette's evidence of sporadic and isolated incidents of racially hostile comments, conduct and graffiti during the time she was employed do not meet the severe or pervasive threshold; 2) Lafiette makes no allegations and presents no evidence that the allegedly hostile environment unreasonably interfered with his ability to work on a day-to-day basis; 3) Austal maintained a policy establishing how an employee should report discriminatory conduct, but Lafiette failed to report certain conduct; and 4) Austal took reasonable preventative and corrective/remedial measures to prevent a hostile work environment.

A.    **Severe or Pervasive**

As to whether the conduct was severe and pervasive, Lafiette points to the following

---

[5]   This is an unpublished decision and is persuasive, but not binding, authority pursuant to Eleventh Circuit Rule 36-2.  The Court notes this same rule applies to other Fed. Appx. cases cited herein.

evidence.[6]  Regarding racially and hostile discriminatory comments, Lafiette alleges that he was possibly called "nigger" once by leadman "Gorham" on another crew, but is not sure ("where you been, nigger").  (Doc. 209-1 (Dep. Lafiette at 151-153, 155)).  A few weeks later, Lafiette told Gorham that he found the word "nigger" offensive and Gorham responded "[d]on't worry about it. That ain't me[]" and "[i[f I really say something to you like that, I don't mean it." (Id. (Dep. Lafiette at 154-155)).  Lafiette did not report the comment because he was not really sure what Gorham had said.  (Id.) Lafiette alleges that his supervisor Dane Tomberlin called him "'[b]oy,' and stuff like that all the time[]" – over 10 times.  (Id. (Dep. Lafiette at 156-158)).  Lafiette told Tomberlin "don't be calling me that[]" as he did not like it; in response, Tomberlin said "I'm just playing with you."  (Id. (Dep. Lafiette at 157)).  Lafiette did not report Tomberlin's comment to management or HR, and Tomberlin "would [still] say it from time to time." (Id. Dep. Lafiette at 157-158)).  Lafiette adds that Wesley Fiveash (leadman on Lafiette's crew) and Curt Hunt (co-worker who then became leadman after Fiveash was promoted to supervisor) also called him "boy" sometimes (Fiveash over 10 times and Hunt over 50 times).  (Doc. 209-1 (Dep. Lafiette at 156, 158, 161)).  Lafiette testified that "they were saying it [boy]

---

[6] Lafiette also relies on the allegations of the other 22 plaintiffs (Doc. 306 at 2-4, 14, 17, 18, 20-21, 23-24, 28, 30-32, 44-46) to support that an overall racially charged work atmosphere exists at Austal (i.e., viewed through the lens of the plaintiffs' collective allegations versus each plaintiff's specific allegations).  "To rely on the evidence, each [plaintiff] must show that he was aware of those incidents at the relevant time he alleges the hostile work environment."  See, e.g., Melton v. National Dairy, LLC, 705 F. Supp. 2d 1303, 1342 (M.D. Ala. 2010) (citing Edwards Wallace Comm. College, 49 F.3d 1517, 1522 (11th Cir. 1995) (emphasis in original).  See also e.g., Head v. Pitts Enterprises, Inc., Slip Copy, 2010 WL 2773376, *8 (M.D. Ala. Jul. 14, 2010); McKenzie v. Citation Corp., LLC, 2007 WL 1424555, *13 (S.D. Ala. May 11, 2007).  Courts in the Eleventh Circuit may consider statements not directed at a plaintiff and even hearsay statements, so long as the plaintiff was aware of the statements at the time he was employed. See, e.g., Yeomans v. Forster and Howell, Inc., Slip Copy, 2010 WL 3716394, *5-6 (M.D. Ala. Sept. 10, 2010).  The Court has only considered the evidence of which Lafiette testified that he was aware while employed at Austal.

like in a playing gesture, but I didn't take that too kindly, though[;]" he complained, after which it stopped.  (Id. (Dep. Lafiette at 156)).  Lafiette did not report the comments to management or HR, but told all of them that he did not like the term: Fiveash responded just as Tomberlin did but he was moved and they no longer saw each other so the comments stopped; and Hunt responded by telling him "[s]hut up, you need to go back to work" or something like that.  (Id. (Dep. Lafiette at 160-162)).

Lafiette was subjected to Confederate flag imagery as displayed on several Caucasian co-workers' t-shirts who worked in another department.  (Doc. 209-1 (Dep. Lafiette at 192); Doc. 285-13 (Dep. Lafiette at 166)).  Lafiette is aware that another African American co-worker told the Caucasian co-workers that she found the flag imagery offensive.  (Doc. 285-13 (Dep. Lafiette at 193)). Lafiette told his supervisor Chris Robinson at morning safety meetings that he found the flag imagery offensive; his response was that there was no dress code so there "ain't nothing he can do about it."  (Id. (Dep. Lafiette at 194)).

Lafiette was constantly subjected to racial epithets in graffiti on bathroom walls and stalls.  (Doc. 209-1 (Dep. Lafiette at 182); Doc. 285-13 (Dep. Lafiette at 163-164, 166, 175, 235-236)).  Lafiette "always" reported the racial graffiti; in response, he would be told "we can't do nothing about it[]" or "[i]t's not like we can just watch the bathrooms all day."  (Doc. 209-1 (Dep. Lafiette at 182, 186, 189, 191); Doc. 285-13 (Dep. Lafiette at 177-178, 181-182, 186, 229)).  The graffiti included the following: White power with a drawing of a hooded Klansman (a photograph of this on the bathroom wall on someone's phone); "why don't niggers use aspirin-because they don't want to pick the cotton out of the top;" "why do you think a white man loves to F a black girl;" and "see niggers travel in packs just like monkeys." (Doc. 209-1

11

(Dep. Lafiette at 182, 186, 189); Doc. 285-13 (Dep. Lafiette at 163-164, 166, 175-179, 182-183, 188-189, 191)).

The record reveals that starting in August 2007, Austal responded to complaints about the graffiti by cleaning the men's bathrooms and painting black over the graffiti on a regular basis. (Doc. 285-20 (Dep. Browning at 16, 110); Doc. 331-2 (Dep. Lafiette at 180)). According to Lafiette, Austal "started trying to paint the walls probably about every three to four weeks." (Doc. 209-1 (Dep. Lafiette at 182, 189)). Nevertheless, the painting did not deter the offending scribblers, as the walls would soon be filled again with racially offensive graffiti. (Doc. 285-20 (Dep. Roberson at 313); Doc. 284-4 (Dep. Lindley II at 95-96, 166-168, 188-190, 195-196, 202-203); Doc. 284-5 (Dep. Lindley III at 254); Doc. 284-11 (Dep. O'Dell at 74-75); Doc. 284-7 (Dep. Friedlieb I at 84)).

Approximately 3½ years after being hired, Lafiette was shown a photograph of one noose, found by others in the break room at work. (Doc. 209-1 (Dep. Lafiette at 170-171)).

To be actionable as severe or pervasive, the harassment "must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceive[s]…to be abusive." Miller, 277 F.3d at 1276 (internal citation and quotation marks omitted). In other words, the severe or pervasive element has an objective and subjective component. McCann, 526 F.3d at 1378. To determine the objective severity of the harassment, courts look at the totality of the circumstances and consider: 1) the frequency of the discriminatory conduct; 2) the severity of the conduct; 3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and 4) whether the conduct unreasonably interferes with an employee's job performance. Reeves, 395 Fed. Appx. at 546.

See also Faragher v. City of Boca Raton, 524 U.S. 775, 787-788 (1998); Allen v. Tyson Foods, 121 F.3d 642, 647 (11th Cir. 1997) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)). "The conduct is considered cumulatively instead of in isolation."   Reeves, 395 Fed. Appx. at 546.

There is sufficient evidence, if believed by a jury, that Lafiette subjectively perceived his work environment to be racially hostile.  Thus, the Court need only determine whether Lafiette's perception was objectively reasonable.

When viewing the facts in the light most favorable to Lafiette, a reasonable jury could not find that all of the harassing conduct alleged was frequent and severe.[7]  According to Lafiette, he experienced isolated and random racial comments and only once was made aware that a noose had been found.  As for consistent or regular incidents which were potentially humiliating, Lafiette regularly encountered racial graffiti in the bathrooms.  However, Lafiette has not established that any of this repeated conduct was severe, physically threatening or that it unreasonably interfered with his job performance (e.g., Lafiette received four (4) raises while employed at Austal).

Eleventh Circuit precedent mandates that courts consider "the totality of the circumstances" such that the absence of one factor is not dispositive. See, e.g., Miller, 277 F.3d at 1277.  In this case, Lafiette has not submitted sufficient evidence demonstrating that the conduct was frequent or severe, physically threatening, humiliating, demeaning and/or unreasonably interfered with his job. See, e.g., Barrow v. Georgia Pacific Corp., 144 Fed. Appx.

_____

[7] The Court has considered the evidence presented by each Plaintiff in isolation.  Accordingly, there are different determinations among the Plaintiffs, regarding the claim of a hostile work environment, based on the specificity and quality of evidence presented by the individual Plaintiff.

54, 57-58 (11th Cir. 2005) (concluding that evidence of "displays of the rebel flag on tool boxes and hard hats, the letters 'KKK' on a bathroom wall and on a block-saw console, and a noose in another employee's locker,'" as well as several threats to "kick plaintiff's 'black ass'" or threats that if he looked at a white girl he was going to get "cut," and the use of racial epithets including "nigger," "boy," and "black boy," reflected conduct that was "isolated," "sporadic," and "random" and did not amount to "severe and pervasive harassment).  While there is "not simply some magic number of racial or ethnic insults" that preclude summary judgment, it is repeated incidents of...harassment that continue despite the employee's objections [that] are indicative of a hostile work environment." <u>Miller</u>, 277 F.3d at 1276 (citation and quotation omitted). In sum, under the totality of the circumstances and considering the allegations in the light most favorable to Lafiette, he has not produced sufficient evidence – if believed by a jury – to create an issue of fact as to whether he was subjected to racial harassment that was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment.

As a result, because Lafiette has failed to satisfy this fourth element of his prima facie case for hostile work environment, the Court need not reach the fifth element (employer liability) and summary judgment is **GRANTED** in favor of Austal on this claim.

## V.   <u>Title VII/Section 1981 – Disparate Treatment (Race)</u>

Lafiette contends that he was intentionally discriminated against with respect to "terms and conditions of his employment" because of his race in violation of Title VII and Section 1981. Specifically, Lafiette asserts that: 1) he was paid less per hour than similarly situated Caucasian employees; 2) Austal failed to promote him to lead man and other positions; and 3) he was

14

denied training.

In individual disparate treatment claims, "the plaintiff bears the burden of proving that the employer discriminated against him because of his race." Cooper v. Southern Co., 390 F.3d 695, 723 (11th Cir. 2004), *overruled on other grounds,* Ash v. Tyson Foods, Inc., 546 U.S. 454, 456-457 (2006). See also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000); Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981). Where there is no direct evidence of discrimination or a statistical pattern of discrimination, the burden shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) applies. Under this framework, the plaintiff must establish a prima facie case of intentional race discrimination.[8] Id. at 802. See also e.g., E.E.O.C. v. Joe's Stone Crabs, Inc., 296 F.3d 1265, 1272 (11th Cir. 2002). If a prima facie case is established, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. Id. Once the employer satisfies its burden, the burden shifts back to the plaintiff to offer evidence that the alleged reason of the employer is a pretext for unlawful discrimination. Id. at 1272-1273.

### A.    **Hourly Wages**

In response to summary judgment, Lafiette contends that he "has been denied pay increases" and suggests -- within his discussion of comparators -- that he was hired in at a lower hourly rate. (Doc. 306 at 8-9).[9] Lafiette offers Brad Chunn, Brandon Myers, Jeffrey Goodwin,

---

[8] "Claims of race discrimination under § 1981 are analyzed in the same manner as claims brought under Title VII." DeLeon v. ST Mobile Aerospace Eng'g, Inc., 2010 WL 500446, *15 (S.D. Ala. Feb. 9, 2010).

[9] The only pay discrimination claim asserted in the Third Amended Complaint is that "[w]hile an apprentice, Lafiette was also paid less per hour than similarly situated white employees." The Court has only considered this claim.

Nicholas Mayo, Justin Hatfield, Jamey Breland, Daniel Chambers, Richard Chounn, and Daniel Floyd, as proposed comparators for his hourly wage claim (based in part on "hired in" rates). (Doc. 306 at 8-9, 37 at note 30).

In order to establish a prima facie case of disparate pay, Lafiette must establish that he held a position "similar to that of a higher paid employee who is not a member of [his] protected class." Crawford v. Carroll, 529 F.3d 961, 974-975 (11th Cir. 2008) (citing Meeks v. Computer Assocs. Int'l, 15 F.3d 1013, 1019 (11th Cir. 1994)).  The employee whom the plaintiff identifies as a comparator "must be similarly situated in all relevant respects." Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1091 (11th Cir. 2004).  See also e.g., Drake-Sims v. Burlington Coat Factory Warehouse of Ala., Inc., 330 Fed. Appx. 795, 803 (11th Cir. 2009) (unpublished).  It is necessary that a comparator must be "nearly identical" to the plaintiff "to prevent courts from second-guessing a reasonable decision by the employer." Wilson, 376 F.3d at 1091. See also e.g., Head v. Pitts Enterp., Inc., Slip Copy, 2010 WL 2773376, *13 (M.D. Ala. Jul. 14, 2010); Drake-Sims, 380 Fed. Appx. at 803; Sylva-Kalonji v. Board of School Comm'rs of Mobile Cty., 2009 WL 1418808, *5-6 (S.D. Ala. May 20, 2009); Hill v. Emory Univ., 346 Fed. Appx. 390, 395 (11th Cir. 2009); Beard v. 84 Lumber Co., 206 Fed. Appx. 852, 857 (11th Cir. 2006) (finding the plaintiff and a proposed comparator had different numbers of years of experiences such that they were not similarly situated in all relevant respects).  Austal contends that Lafiette cannot establish a prima facie case of race discrimination because Lafiette cannot demonstrate that any similarly situated non-African American employee was paid more than Lafiette.

Lafiette does not submit any evidence or argument regarding subjective similarity of the comparators, such as experience, education, previous salary, or salary demand. Rather, Lafiette

16

relies on <u>Miranda v. B&B Cash Grocery Store, Inc</u>., 975 F.2d 1518, 1529 (11th Cir. 1992) (finding that the plaintiff established a prima facie case of sex discrimination under Title VII by demonstrating that she is female and that the job she occupied was similar to higher paying jobs occupied by males) and <u>Mulhall v. Advance Sec., Inc</u>., 19 F.3d 586 (11th Cir. 1994).  Based on these cases, Lafiette then contends that he has met his burden of producing evidence of a similarly situated comparator "through evidence that job titles are the same or that plaintiff performed the same types of tasks [and job duties] as his/her comparator." (Doc. 306 at 38).

However, as the Eleventh Circuit has counseled "[t]he methods of presenting a prima facie case are not fixed; they are flexible and depend to a large degree upon the employment situation."  <u>Wilson</u>, 376 F.3d at 1087.  In more recent Eleventh Circuit precedent, we have seen the application of this flexibility.  Specifically, the Court has pointed to the absence of relevant similarities amongst comparators, outside of job similarity, and held that plaintiff failed to meet his/her prima facie case.   For example, in <u>Cooper</u>, 390 F.3d 695,  the Court determined that the comparators for purpose of a disparate pay claim were not appropriate, *i.e.* similarly situated, when the plaintiff did not establish: 1) "that the proposed comparators had similar levels of experience or education" <u>id</u>. at 745; 2) "similar levels of seniority" <u>id</u>. at 743; and 3) similar disciplinary records, <u>id</u>. at 741.

When the Eleventh Circuit has reached beyond job similarities in its similarly situated analyses, unrebutted evidence was in the record to show that there existed a relevant factor (e.g., experience, education, starting pay demand) which rendered the comparators dissimilar.  For example, in <u>Mack v. ST Mobile Aerospace Eng., Inc</u>., 195 Fed. Appx. 829 (11th Cir. 2006) (unpublished), the court stated "[w]e affirm the court's entry of summary judgment as to this

claim because MAE produced uncontroverted evidence that Frye and Wicks were paid more than Mack because each had specialized experience and training in aeronautics and avionics, while Mack had only general electronic training. Consequently, Mack failed to show that they were 'similarly situated in all relevant respects.'" Id. at 843. Thus, although the burden of production at the prima facie stage does not shift to the defendant to produce any evidence, the failure of the defendant to point to other traits that are "relevant" to the particular employment situation dictates that the Court should look strictly to job similarities. Therefore, the Court will first examine the record to determine if Lafiette has submitted evidence of basic job similarities, and if so, whether there is evidence that the comparators are dissimilar in other relevant respects.

As detailed *supra*, Lafiette was hired on January 30, 2006 as a Fabrication Apprentice at $10/hour and did not become a Trades Assistant until March 2008. The record reveals that Chunn, Myers, Chambers and Floyd are not proper comparators, as they were not hired as Fabrication Apprentices. Chunn was hired as a Trades Assistant, Myers was hired as a Welder, Chambers was hired as a Storekeeper (in the Site Services Department) and Floyd was hired as a Trades Assistant (in the Engineering Department). (Doc. 331-4 at 3, 6 (Decltn. Dr. Steward)). There is no evidence that these jobs entail the same or similar duties. Austal has submitted uncontroverted evidence that the Trades Assistant position is "an entirely different position from Fabrication Apprentice and entails different responsibilities, training, skills, and experience." (Doc. 209-2 at 9 (Decltn. Lindley)).

Similarly, there is no evidence establishing that Mayo was hired as a Fabrication Apprentice. (Doc. 331-6 at 3-4 (Decltn. Combs)). The only position noted in connection with Mayo is that he is now a Trades Assistant, and he actually applied to be a Mig Welder. (Doc.

295 at 24 (Exhibit 105-Sealed); Doc. 331-6 at 29).  Additionally, as noted in the Declaration of

Harley Combs (Fabrication Department Manager), Austal takes into consideration skills,

education, experience and other qualifications of each applicant when determining pay and has

established different titles for its positions (such as Trades Assistant, Fitter, Welder) due to the

different skill sets, training, experience and qualifications needed to perform the job duties

unique to each job title.  (Doc. 331-6 at 4 (Decltn. Combs)).

Regarding Breland, the record reveals that as of October 9, 2007 he was an Apprentice

earning $14.90/hour, and because that position's length is for several years and Breland was

hired on October 9, 2006, the Court is satisfied that Breland was initially hired as an Apprentice.

(Doc. 295 at 5 (Exhibit 105-Sealed)).  However, the Department in connection with Breland's

position of Apprentice is that of Pipe & Machinery, _not_ Fabrication as applies to Lafiette.

Lafiette has presented no evidence that an apprenticeship in Fabrication is the same or similar to

that of one in a different department and/or specifically that of Pipe & Machinery.

Similarly, for Chounn, the record reveals that he is now an Apprentice earning

$21.22/hour, and because that position's length is for several years and Chounn was hired on

June 11, 2007, the Court is satisfied that he was initially hired as an Apprentice.  (Doc. 295 at  7

(Exhibit 105-Sealed)).  Additionally, the record reveals that he was hired at the rate of $20/hour.

(Id.)  However, the only Department in connection with Chounn's position of Apprentice is that

of Electrical, _not_ Fabrication as applies to Lafiette.  Lafiette has presented no evidence that an

apprenticeship in Fabrication is the same or similar to that of one in a different department and/or

specifically that of Electrical.

Concerning Goodwin, the record reveals that he was hired as a Fabrication Apprentice on

June 12, 2006 *at an unknown starting hourly rate*.  (Doc. 331-6 at 3 (Decltn. Combs); Doc. 295 at 14 (Exhibit 105-Sealed); Doc. 331-6 at 21).  Lafiette has submitted no admissible evidence as to Goodwin's starting rate (*i.e.*, that he was hired as a Fabrication Apprentice at $11/hour).  Additionally, Goodwin requested a starting pay of $10/hour (Doc. 331-6 at 4 (Decltn. Combs)), which (if applicable) would have been the very same starting hourly rate as Lafiette.

As for Justin Hatfield, the record reveals that he was hired on January 2, 2007 as a Fabrication Apprentice *at an unknown starting hourly rate*.  (Doc. 295 at 15 (Exhibit 105-Sealed); Doc. 331-6 at 3 (Decltn. Combs)).  Hatfield earned $12.50/hour as of February 26, 2007 (over seven (7) weeks later).  (Doc. 295 at 15 (Exhibit 105-Sealed)).  However, Lafiette has submitted no evidence as to Hatfield's starting rate (*i.e.*, that he was hired as a Fabrication Apprentice at $11/hour).  Additionally, Hatfield requested a starting pay of $15/hour (Doc. 331-6 at 3 (Decltn. Combs); Doc. 331-6 at 25 (Employment Application)), whereas Lafiette only requested "starting pay" (Doc. 331-6 at 5 (Employment Application)).

Thus, Austal's motion for summary judgment as to these proposed comparators, for Lafiette's pay claim, is **GRANTED**.

B.    **Promotion**

Lafiette alleges that he was denied promotions which were given to Caucasian co-workers Kenneth Parnell and Jeremy Donald.[10]  Specifically, Lafiette contends that Parnell was promoted to leadman within four (4) months of being hired in June 2007, when Lafiette had been

---

[10]    Lafiette also references Jeffrey Goodwin, Nicholas May and Justin Hatfield as receiving promotions, in his Opposition.  (Doc. 306 at 11).  However, in doing so, Lafiette does not contend that he was denied promotions which were given to these individuals, but rather he simply alleges that they received promotions at certain times (*i.e.*, sooner than Lafiette received his promotions).

working at Austal for 1½ years at that time.  (Doc. 209-1 (Dep. Lafiette at 81)).  Lafiette testified

that he thought Parnell's work experience was that he "came from a sawmill[]" and was a Trades

Assistant before being promoted.  (Doc. 331-2 (Dep. Lafiette at 93); Doc. 285-13 (Dep. Lafiette

at 94)).  Lafiette expressed his interest in becoming a leadman to Dane Tomberlin, his supervisor,

4-5 times.  (Doc. 285-13 (Dep. Lafiette at 95-96)).

     Parnell later took another position and Jeremy Donald was named lead man.  (Doc. 209-1

(Dep. Lafiette at 98-100)).  Lafiette acknowledges that Donald had been working at Austal longer

than he had.  (Id. (Dep. Lafiette at 100-101)).   Lafiette did not complain to management or

anyone else about Donald's selection for lead man because "they wouldn't let me come up

there…they [HR Manager] always would say you have to have your supervisor's permission."

(Id. (Dep. Lafiette at 103)).

     To establish a prima facie case of failure to promote, a plaintiff must show that: 1) he is a

member of a protected class; 2) who sought and was qualified for positions that the employer

was attempting to fill; 3) despite his qualifications he was rejected; and 4) the employer either

continued to attempt to fill the positions or in fact filled the positions with persons outside the

plaintiff's protected class. See, e.g., Harrington v. Disney Regional Ent., Inc., 276 Fed. Appx.

863, 872 (11th Cir. 2007) (citing Crawford v. Western Electric Co., Inc., 614 F.2d 1300, 1315

(5th Cir. 1980) (unpublished)).   A plaintiff claiming that he was discriminatorily denied a

promotion usually must show that he actually applied for the position as part of his prima facie

case.  Taylor v. Runyon, 175 F.3d 861, 866 (11th Cir. 1999); Combs v. Plantation Patterns, 106

F.3d 1519, 1539 at n. 11 (11th Cir. 1997).   Where an employer has an informal promotion

procedure (i.e., job openings are not posted or applications are not required), however, an

employee may establish this element by showing that the position was available and that the employer had some reason or duty to consider him for same. Jones v. Firestone Tire and Rubber Co., Inc., 977 F.2d 527, 533 (11th Cir. 1992); Carmichael v. Birmingham Saw Works, 738 F.2d 1126, 1133-1134 (11th Cir. 1984).

Austral contends that Lafiette is unable to establish a case of discrimination because he has failed to provide any evidence concerning his proposed comparators. Austal explains that Lafiette has failed to identify Caucasian employees who are "nearly identical" in all relevant respects including experience, background, and disciplinary history. (Doc. 181 at 18-19).

As to the prima facie case, Austal conflates the prima facie requirements of a discriminatory pay claim with those for a failure to promote claim. Similarly situated comparators are not necessary to establish a prima facie claim of failure to promote, rather plaintiff must only show that the position was filled with a person outside his protected class. See Harrington v. Disney Regional Ent., Inc., 276 Fed. Appx. 863, 872-873 (11th Cir. 2007) (providing that "[t]he elements are different for disparate pay and promotion claims…") (unpublished).

The Court finds that Lafiette has established a prima facie case. Thus, the Court considers Austal's reason for promoting Donald and Parnell to the lead man or step-up supervisor positions over Lafiette, that Lafiette was less qualified than either Donald or Parnell based on work experience. As support, Austal relies upon the Declaration of its Rule 30(b)(6) representative which provides that Parnell was more qualified than Lafiette because he was a Fitter and also an Accuracy Control Inspector. (Doc. 209-2 at 8 (Decltn. Lindley)). In contrast, Lafiette was working "in the less qualified position of Trades Assistant." (Id.) Thus, Austal has

articulated a non-discriminatory reason.  Lafiette has not submitted sufficient evidence to support that this reason is a pretext for unlawful discrimination.  As such, Austal's motion for summary judgment, as to this promotion claim concerning the position given to Parnell, is **GRANTED.**

When Austal promoted Donald, according to its Rule 30(b)(6) representative, Donald was more qualified than Lafiette because he was already serving as a step-up supervisor on another crew and thus had prior experience that Lafiette did not.  (Doc. 209-2 at 8 (Decltn. Lindley)).  Additionally, Donald's employment application reveals that in his prior job before Austal, he worked as a Foreman for almost five (5) years at a concrete company, he had graduated from high school, and he had attended Troy State for two (2) years of college.  (Doc. 331-6 at 34-35). Austal's stated reasons for promoting Donald over Lafiette, "are not implausible or inconsistent and might motivate a reasonable employer."  Sridej v. Brown, 361 Fed. Appx. 31, 35 (11th Cir. 2010) (unpublished) (citing Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000)).  See also Cofield v. Goldkist, Inc., 267 F.3d 1264, 1268-69 (11th Cir. 2001) (affirming summary judgment in favor of employer who promoted candidate it believed was more qualified); Clark v. Huntsville City Bd. of Educ., 717 F.2d 525, 527 (11th Cir. 1983) (stating that "[t]he defendants successfully rebutted the [prima facie] presumption through evidence that they selected [the successful applicant] due to his superior qualifications for the position[]").  Lafiette, then, must prove that Austal's proffered reason is pretextual by showing that the disparities between his qualifications and those of Donald are "of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff."  Drake-Sims v. Burlington Coat Factory Warehouse of Ala., Inc., 330 Fed. Appx. 795, 803 (11th Cir. 2009) (unpublished) (citing Brooks v. County Comm'n of

Jefferson County, Ala., 446 F.3d 1160, 1162 (11th Cir. 2006)).  See also e.g., Sridej, 361 Fed.

Appx. at 34 (citing Ash v. Tyson Foods, Inc., 546 U.S. 454 (2006)). Lafiette has not presented

any evidence showing that Austal's articulated reasons for promoting Donald over him were

pretextual.  Chapman, 229 F.3d at 1030 (stating that, to show pretext, plaintiff must rebut "head

on" employer's proffered non-discriminatory reasons).  As such, Austal's motion for summary

judgment, as to Lafiette's failure to promote claim for the position given to Donald is

**GRANTED.**

     **C.**      **Training**

     To establish a prima facie case of discriminatory denial of training, a plaintiff must show

that: 1) he is a member of a protected group; 2) the employer provided training to its employees;

3) he was eligible for training; and 4) he was not provided training under circumstances giving

rise to an inference of discrimination (i.e., that the plaintiff was denied training given to other

similarly situated employees who were not members of the protected group).  See, e.g., Newman

v. Career Consultants, Inc., 470 F. Supp. 2d 1333 (M.D. Ala. 2007).

     Lafiette alleges that he was denied welding and blueprint training at Austal.  Specifically,

Lafiette asked his supervisor Chris Robinson for welding and blueprint training which was

denied and given instead to Caucasian co-workers "Brad," Bodiford, Parnell and Myers.  (Doc.

37 at  81 at ¶¶392-394; Doc. 306 at 10; Doc. 209-1 (Dep. Lafiette at 80-81); Doc. 285-13 (Dep.

Lafiette at 83)).  Lafiette asked Robinson about 6-7 times when he would be allowed to go to

training.  (Doc. 209-1 (Dep. Lafiette at 81)). Robinson always told Lafiette "well, we'll get to

that later[]" or that "he'd check on it."  (Id. (Dep.  Lafiette at 81); Doc. 285-13 (Dep. Lafiette at

86)).  Lafiette wanted the welding training so that he could pass the welding test and be certified

as a B-Class welder.  (Doc. 285-13 (Dep. Lafiette at 86)).

At the outset, the record reveals no information concerning "Brad" and thus, Lafiette has failed to establish even that Brad is outside of his protected class.  The remaining alleged comparators were in different positions than Lafiette; Myers was a welder, Parnell was a fitter and Bodiford was a Trades Assistant.  As to Bodiford, Lafiette admitted to a difference in job position in his deposition testimony, but testified that he was a Trades Assistant at the time he requested training (suggesting that he and Bodiford were in the same position).  (Doc. 285-13 (Dep. Lafiette at 83-84)).  The record reveals, however, that Lafiette was not a Trades Assistant until March 2008.  (Doc. 209-2 at 8 (Delctn. Lindley)).  Moreover, Lafiette first asked his supervisor Robinson for welding training some time after November 13, 2006 (Doc. 285-13 (Dep. Lafiette at 80)), such that Bodiford would have been employed for approximately four (4) months' time as a Trades Assistant (at that time, Lafiette would have still been in the apprentice program). As such, Lafiette has not established that Bodiford was trained for duties and tasks which were even available to a Fabrication Apprentice.  See, e.g., Newman, 470 F. Supp. 2d at 1347.  See also e.g., McCann, 526 F.3d at 1373 (prima facie case of disparate treatment requires plaintiff to show that "employer treated similarly situated [white] employees more favorably") (citation omitted); Alansari v. Tropic Star Seafood Inc., 2010 WL 2853652, *1 (11th Cir. Jul. 22, 2010) ("A plaintiff fails to establish a prima facie disparate treatment case if he fails to show that he was treated less favorably than a similarly-situated person outside his protected class[]"); Holifield, 115 F.3d at 1564 (plaintiff's "opinion [that he was discriminated against], without more, is not enough to establish a prima facie case of race discrimination").  As such, Austal's motion for summary judgment, as to this denial of training claim, is **GRANTED.**

25

**VI.**     <u>**Conclusion**</u>

Accordingly, it is **ORDERED** that Austal's motion for summary judgment is **GRANTED** as to all claims.

**DONE** and **ORDERED** this the **13**[th] day of **October 2011.**

<u>/s/ Kristi K. DuBose</u>
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**
