## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **EARATON ADAMS, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **CIVIL ACTION NO.:** |
| **v.** | ) | **1:08-cv-155-KD-N** |
| | ) | |
| **AUSTAL, U.S.A., L.L.C.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT AUSTAL USA, LLC'S MOTION TO AWARD ATTORNEY FEES AND EXPENSES AGAINST CARLOS JOHNSON

Defendant, Austal USA, LLC ("Austal"),[1] pursuant to Fed. R. Civ. P. 11, Fed. R. Civ. P. 54(d)(2), SD ALA LR 54.3, 42 U.S.C. § 1988, 42 U.S.C. § 2000e-5, and 28 U.S.C. § 1927, respectfully moves the Court for an award of attorney fees and related nontaxable expenses in the approximate amount of $98,604.00 against Plaintiff Carlos Johnson and his counsel.[2]  In support of this motion, Austal shows the Court as follows:

---

[1] The pleadings and the caption incorrectly refer to Austal as "Austal, U.S.A., L.L.C."

[2] Because this lawsuit involves twenty-three (23) plaintiffs and has spanned four years, Austal respectfully requests that the Court decide the issue of its entitlement to a fee award before requiring Austal to submit evidence of the amount of the award.  *See* Rule 54(d)(2)(C) ("The court may decide issues of liability for fees before receiving submissions on the value of services.").

## I.    INTRODUCTION

Austal is an Alabama limited liability company located in Mobile, Alabama. Austal is dedicated to the design and construction of customized aluminum commercial and military vessels.   Johnson worked at Austal from May 2006 to until he abandoned his job in January 2012.  (Doc. 401 at 2).

On March 20, 2008, Johnson and his co-plaintiffs filed this lawsuit as a purported class action alleging race discrimination.[3]  (Doc. 1).  Johnson joined the lawsuit on June 24, 2008.   (Doc. 22; Doc. 27).   Specifically, Johnson asserted claims for hostile work environment, disparate treatment (pay, promotion, training, discipline, and evaluations), disparate impact (pay and promotion), and retaliation under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq. ("Title VII").[4]  (Doc. 37 at 74-79).

Austal moved the Court for summary judgment on Johnson's claims.[5]  (Doc. 171; Doc. 172).   Prior to a ruling on Austal's motion for summary judgment,

---

[3] As the Court noted in its order granting in part Austal's motion for summary judgment, "[w]hile initiated as a purported class action, this is no longer a class action case." (Doc. 401 at 1, n.2).

[4] Collectively, the plaintiffs asserted over 450 claims against Austal.  All claims have been abandoned by the Plaintiffs, summarily dismissed by the Court, or decided by a jury in Austal's favor.

[5] The Court found that Austal did not move for summary judgment on the merits of Johnson's disparate pay claims and/or failure to promote claim relating to Benjamin Hoffner. (Doc. 401 at 1, n.1).

Johnson voluntarily dismissed his disparate impact claims. (Doc. 366). The Court then granted Austal's motion for summary judgment, in part, dismissing Johnson's disparate treatment (training, discipline, and evaluations), and retaliation claims. (Doc. 401 at 1-2, n.3). The Court also granted the motion as to Johnson's disparate treatment (pay) claim relating to Benjamin Hoffner under Title VII. (Doc. 401 at 7-8). The Court denied the motion with regard to Johnson's hostile work environment and disparate treatment (remaining pay and promotion) claims. (Doc. 401).

Johnson presented his hostile work environment and disparate treatment (Everett Maylin promotion) claims to a jury.[6] After a 7-day trial, the jury returned a verdict in Austal's favor on Johnson's promotion claim but did not return a verdict on his hostile work environment claim. (Doc. 515). In January 2012, Johnson presented his hostile work environment claim to a second jury. This time, the jury returned a verdict in Austal's favor. (Doc. 719). On February 17, 2012, the Court entered final judgment. (Doc. 720).

Pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 2000e-5, Austal seeks an award of its attorney fees and related expenses as the prevailing party with respect to Johnson's class, disparate treatment (excluding the Everett Maylin promotion

---

[6] During Trial, Johnson abandoned his disparate treatment pay claims and his promotion claim relating to Benjamin Hoffner. (Doc. 515).

claim), disparate impact, and retaliation claims.   As documented below, these claims were completely frivolous, unreasonable, and wholly lacked any evidentiary foundation.   Additionally, because Johnson's counsel unreasonably and vexatiously multiplied the proceedings, Austal also seeks to recover attorney fees from counsel under 28 U.S.C. § 1927 and Fed. R. Civ. P. 11.[7]

## II.   ARGUMENT

### A.   AUSTAL IS ENTITLED TO AN AWARD OF ATTORNEY FEES AND EXPENSES AGAINST JOHNSON.

Pursuant to Fed. R. Civ. P. 54(d)(2), SD ALA LR 54.3, 42 U.S.C. § 1988, 42 U.S.C. § 2000e-5, and 28 U.S.C. § 1927, the prevailing party with respect to the types of claims brought by Johnson is entitled to recover its attorney fees, expert fees, and other non-taxable costs.   A prevailing party is "[a] party in whose favor a judgment is rendered . . . one who has been awarded some relief by the court . . . ." *Buckhannon Bd. and Care Home, Inc. v. West Virginia Dep't of Health and Human Resources,* 532 U.S. 598, 603 (2001) (internal quotation and citation omitted).   Here, Austal is the prevailing party because the Court granted its motion

---

[7]   Austal also seeks sanctions against Johnson's counsel under Fed. R. Civ. P. 11 for filing claims without substantial justification.   Rule 11 prohibits the filing of frivolous claims and conjoins with § 1927 in furtherance of the same objective of deterring unreasonable and vexatious litigation tactics. Fed. R. Civ. P. 11; *see also In re TCI, Ltd.,* 769 F.2d 441, 446 (7th Cir.) (Rule 11, Section 1927, and the bad faith exception to American rule against attorney's fees work together to deter unreasonable and vexatious litigation).

4

for summary judgment against Johnson, in part, and the remaining claims were either judged by a jury in Austal's favor or abandoned by Johnson.  (Doc. 366; Doc. 401; Doc. 515; Doc. 719; Doc. 720).

Although attorney fees are normally excluded because the "American Rule" prohibits the shifting of a prevailing party's attorney fees to the losing party in most cases, attorney fees are allowed where fee shifting is provided for by statute or rule, or where the Court invokes its inherent power to sanction bad-faith conduct. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991). *See also* 42 U.S.C. § 1988; 42 U.S.C. § 2000e-5.

Thus, when the prevailing party is the defendant in a § 1981 or Title VII action, as Austal is here, a court may, "in its discretion, . . . allow the prevailing party . . . a reasonable attorney's fee as part of the costs."  42 U.S.C. § 1988; 42 U.S.C. § 2000e-5(k).  These provisions also authorize the recovery of reasonable expenses, including expert fees. *See also Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421 (1978) ("[A] district court may in its discretion award attorney's fees to a prevailing defendant in a Title VII case upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith."); *Hughes v. Rowe*, 449 U.S. 5, 14 (1980) (applying *Christiansburg* to § 1983 claims). A district court may award reasonable attorney fees to a prevailing defendant under § 1988 if it finds that the plaintiff's claims

were frivolous, unreasonable, and without foundation, regardless of bad faith.[8] *See Christiansburg*, 434 U.S. at 421. Furthermore, a successful defendant may recover attorney fees for a frivolous claim even if the plaintiff had asserted non-frivolous claims. *See Quintana v. Jenne*, 414 F.3d 1306, 1312 (11th Cir. 2005) ("[I]t would also undermine the intent of Congress to allow plaintiffs to prosecute frivolous claims without consequences merely because those claims were joined with unsuccessful claims that were not frivolous.").

In *Quintana*, the Court of Appeals for the Eleventh Circuit emphasized that the "[f]actors that are 'important in determining whether a claim is frivolous' include '(1) whether the plaintiff established a prima facie case; (2) whether the defendant offered to settle; and (3) whether the trial court dismissed the case prior to trial or held a full-blown trial on the merits.' " 414 F.3d at 1309 (quoting *Sullivan v. School Board of Pinellas County*, 773 F.2d 1182, 1189 (11th Cir. 1985)). As set forth below, application of the factors (hereinafter occasionally the "*Sullivan* factors") weigh in favor of a finding that Johnson's claims discussed herein were frivolous, unreasonable and lacked evidentiary foundation. Austal, therefore, is entitled to an award of its attorney fees and related nontaxable expenses as the prevailing party.

---

[8] While *Christiansburg* involved a claim for attorney fees under Title VII, the Supreme Court has indicated that this reasoning also applies to claims for attorney fees under § 1988. *Hughes*, 449 U.S. at 14.

1.    **Austal is Entitled to Attorney Fees and Expenses Relating to Johnson's Disparate Pay Claims**

Johnson asserted disparate pay claims against Austal asserting that (1) he received a lower starting hourly wage than less qualified Caucasian employees, and (2) he received less pay than similarly situated Caucasian employees for performing the same or similar work. (Doc. 37 at 76 at ¶¶ at 370, 371).   Austal spent considerable time and money defending these claims.    As demonstrated below, these claims lacked merit.

First, Johnson abandoned the claims at trial without explanation or advance notice to Austal.  (Doc. 515-5).  In doing so, Johnson underscored the complete and total lack of merit regarding these claims. *See Rodriguez-Torres v. Gov't Dev. Bank of P.R.*, 708 F. Supp. 2d 195, 202 (D.P.R. 2010) ("Moreover, Plaintiffs failed to even oppose the arguments put forth by Defendants in their motion for summary judgment.  As such, the Court finds that Plaintiffs claims against individual Defendants were frivolous."); *Scelta v. Delicatessen Support Servs.*, 146 F. Supp. 2d 1255, 1262 (M.D. Fla. 2001) ("However, when the case was argued to the jury, the plaintiff virtually abandoned that claim.  The failure to argue meaningfully the hostile work environment contention underscores its total lack of merit.").

Moreover, the record does not support Johnson's disparate pay claims. Aside from Johnson's unsubstantiated and bald assertions, the record is devoid of any evidence establishing "job similarity" of Johnson's proposed comparators or

7

similarity as to the other relevant factors, such as experience, education, previous salary, or salary demand. Johnson started working at Austal on May 22, 2006 as a TA in the Fabrication Department earning $11/hour. (Doc. 401 at 2). Johnson thereafter changed departments three times. He went from Fabrication to Pipe to Fabrication to Quality Control. Johnson named Kenneth Allison, Benjamin Hoffner, Everett Maylin, Michael Scarborough, and Joseph Williams as his proposed comparators. (Doc. 304 at 8-9; Doc. 409 at 8). Johnson cited only "Exhibit 106" (Doc. 286-4) and "Exhibit 105" (Doc. 295-Sealed) to support his pay claims. (Doc. 304 at 8-9). [9] However, according to the admissible evidence, these individuals were not valid comparators. Johnson presented no evidence that the proposed comparators were hired at the same time for the same position in the same department yet received higher wages. Nor was there any evidence that the proposed comparators changed job titles and departments at the same time and frequency and were paid the same wages after they switched departments. Additionally, as for Allison and Scarborough, the only position indicated by the evidence in connection with their employment, is the position of Fitter A-Class in the Fabrication Department. (Doc. 295 at 1, 32 (Exhibit 105-Sealed)). As for

---

[9] As the Court stated in its Summary Judgment Order for E. Adams, "to the extent Exhibit 106 has no foundation in Exhibit 105, Austal's objection [to the admissibility of Exhibit 106] is **SUSTAINED**." (Doc. 364 at 19, n.14). Exhibit 106 lacked foundation in Exhibit 105 with regard to, *inter alia*, each proposed comparator's starting title, department, and salary.

Hoffner and Maylin, the evidence clearly revealed that they were Supervisors in the Pipe Department; Williams was a Pipe Tester in the Pipe Department. (Doc. 295 at 15, 23, 40 (Exhibit 105-Sealed)). Thus, the proposed comparators were not even within the same department and held different job titles that Johnson.

Furthermore, contrary to Johnson's assertions in his response to Austal's motion for summary judgment, Maylin was hired as a Pipe Fitter in the Pipe Department and not a TA and actually made $0.50/hour less at that time than Johnson. (Doc. 295 at 18, 23 (Exhibit 105-Sealed); Doc. 330-6 at 3 (Decltn. Dr. Steward)). Moreover, during his employment, Johnson's pay rate was greater than 73% of employees in the same job title and department and, at the end of 2009, Johnson was the highest paid employee in his job title and department. (Doc. 330-6 at 3 (Decltn. Dr. Steward)). The record also reveals that Williams made $18.54/hour as of March 2009, which was actually $0.03/hour less than Johnson said he made. (*Compare* Doc. 304 at 9 *with* Doc. 295 at 40 (Exhibit 105-Sealed)). In sum, the evidence, which Johnson submitted, plainly defeated rather than established a prima facie pay claim.

Johnson should have known from the inception of this lawsuit (or shortly thereafter) that his disparate pay claims were frivolous, unreasonable, without foundation, and based purely on speculation. *See*, *e.g.*, *Flowers v. Jefferson Hosp. Ass'n*, 49 F.3d 391, 392 (8th Cir. 1995) (attorney fees appropriate where a plaintiff

should have known her claims were "unreasonable, without foundation, and based purely on speculation"); *Ruszala v. Walt Disney World Co.*, 132 F. Supp. 2d 1347, 1355 (M.D. Fla. 2000) ("Sheriff Beary is also entitled to recover attorney's fees as a prevailing party under 42 U.S.C. § 1988. For the reasons stated above, as of Ruszala's February 26, 1999 deposition, the plaintiff should have known that the action against Sheriff Beary was frivolous, unreasonable, and without foundation.").

Turning to the second *Sullivan* factor, the Eleventh Circuit has held that courts should consider the amount of any offer to settle a plaintiff's claim to gauge its merits or lack thereof. *See Quintana*, 414 F.3d at 1310. The Eleventh Circuit instructed that unless the amount of the offer is a "substantial amount . . . [the second] factor [will] not support either party." *Id.* Austal did not make an offer to settle Johnson's claims. Accordingly, the second *Sullivan* factor is neutral.

The third *Sullivan* factor favors Austal in that Johnson completely abandoned his pay claims during trial thereby avoiding "a full-blown trial on the merits" of the baseless claims. Consequently, the *Sullivan* factors support an award of attorney fees to Austal.[10]

---

[10] Even if the perception is that Johnson's attorneys were primarily at fault, Johnson is responsible for maintaining frivolous claims. *See Beard v. Annis*, 730 F.2d 741, 745 (11th Cir. 1984) (" 'The perception that counsel was primarily at fault in filing or maintaining a frivolous, groundless, or unreasonable claim should play no role in the decision whether to assess attorneys' fees against the plaintiff in

2.    **Austal is Entitled to Attorney Fees and Expenses Relating to Johnson's Failure-to-Promote Claims**

Johnson alleged that Austal discriminated against him due to his race because it (1) promoted Benjamin Hoffner to Fitout Supervisor on June 1, 2007; (2) promoted Benjamin Hoffner to Engineering Supervisor on February 18, 2008; and (3) promoted Everett Maylin to Pipe Supervisor.  (Doc. 286-8 at 3 (EEOC Charge); Doc. 401 at 6-8).  Though these claims survived summary judgment, that does not establish the merit of the claims or immunize Johnson from attorney fees. *See Scelta*, 146 F. Supp. 2d at 1269-70 ("Advancing beyond summary judgment does not establish that a case has merit or immunize a party from attorneys' fees."). *See also Flowers*, 49 F.3d at 393 ("We reject Flowers's argument that the District Court's denial of the Hospital's summary judgment motion precludes an award of attorney's fees because, although in some instances a frivolous case will be quickly revealed as such, it may sometimes be necessary for defendants to blow away the smoke screens the plaintiffs had thrown up before the defendants may prevail.") (internal quotations omitted); *Hutchinson v. Staton*, 994 F.2d 1076, 1081 (4th Cir. 1993 (allowing a claim to go to trial "d[oes] not negate plaintiffs' responsibility to litigate a factually grounded claim").  Here, Johnson's attempt to camouflage the frivolity of his claim behind "smoke screens" failed.  Although it survived

---

a Title VII case.' ") (quoting *Durrett v. Jenkins Brickyard Inc.,* 678 F.2d 911, 916 (11th Cir. 1982)).

summary judgment, the claims still lacked merit.  Indeed, Johnson conceded his claims concerning Hoffner.  As demonstrated below, the claims were unreasonable, frivolous, without any foundation, and based purely on speculation.

First, the Court found that Johnson's Title VII failure-to-promote claim concerning Hoffner's 2007 promotion was clearly time-barred.  (Doc. 401 at 7-8). As such, Johnson had no realistic chances of ultimate success on that claim and the claim was, therefore, frivolous.  *See Coggins v. Tallapoosa County Court*, 2008 U.S. Dist. LEXIS 48884, *6 (M.D. Ala. June 25, 2008) ("A lawsuit is frivolous if the 'plaintiff's realistic chances of ultimate success are slight.' ") (quoting *Moreland v. Wharton*, 899 F.2d 1168, 1170 (11th Cir. 1990)).  *See also De La Fuente v. DCI Telecomms., Inc.*, 259 F. Supp. 2d 250, 263 (S.D.N.Y. 2003) ("Bringing an obviously time-barred complaint can itself be frivolous.").  Johnson and his attorneys should have known that this claim was time-barred prior to filing the lawsuit.  *See Capuano v. Consol. Graphics, Inc.*, 2007 WL 2088682 *6 (N.D. Ill. July 20, 2007) ("A reasonable investigation by Capuano's counsel would have revealed that Counts IV and V are time-barred.  It was frivolous to file those untimely claims . . . .  Accordingly, Brian E. Devilling, Paul Bozych, and Clausen Miller PC shall pay defendants' reasonable attorneys' fees and costs in defending against Counts IV and V.").

Second, the record is devoid of any admissible evidence supporting Johnson's 2008 Hoffner promotion claim. Johnson referred to only "Exhibit 106" (Doc. 286-4) to establish this claim. (Doc. 304 at 10). The Court previously found that Exhibit 106 was inadmissible "to the extent [it] has no foundation in Exhibit 105 [Doc. 295-Sealed], Austal's objection [to the admissibility of Exhibit 106] is **SUSTAINED**." (Doc. 364 at 19, n.14). Johnson cited Exhibit 106 for the purpose of establishing the dates of Hoffner's promotions and the positions to which he was promoted. (Doc. 304 at 10). However, Exhibit 105 does not include that information. (Doc. 295 (Exhibit 105-Sealed)). As such, Exhibit 106 was inadmissible for the purpose of establishing Hoffner's promotions, and Johnson presented no admissible evidence concerning this claim.

Third, Johnson abandoned his promotion claims concerning Hoffner without explanation during trial and never argued them to the jury. (Doc. 515-5). In fact, Johnson never mentioned Hoffner's name. (Trial 1 Reporter Transcript (Johnson)). Once again, abandoning these promotion claims demonstrates their total lack of merit. *See, e.g., Rodriguez-Torres*, 708 F. Supp. 2d at 202; *Scelta*, 146 F. Supp. 2d at 1262.

Turning to the remaining *Sullivan* factors, the second factor is neutral for the reasons set forth in the previous section, and the last factor favors Austal because the claims were abandoned, thereby avoiding "a full-blown trial on the merits" of

the baseless claims.   Consequently, application of the *Sullivan* factors favor awarding attorney fees to Austal.

**3.   Austal is also Entitled to Attorney Fees and Expenses Relating to Johnson's Retaliation Claims**

Johnson alleged that Austal retaliated against him after he complained about alleged racially discriminatory conduct and epithets.  (Doc. 37 at 77-79 at ¶¶ 379-382, ).  Specifically, Johnson alleged that Austal retaliated against him by:  (1) removing him from his "acting set-up supervisor" status on May 2, 2008; (2) denying him earned wages; (3) paying a less-experienced Caucasian employee a higher salary; and (4) requiring him to clean out water using a vacuum cleaner instead of a pump.  (Doc. 37 at 78-79 ¶¶ 381, 382; Exhibit 1 at 28-29, 152 (Dep. Johnson)).  As demonstrated below, Austal is entitled to attorney fees and expenses relating to Johnson's retaliation claims.

First, Austal moved for summary judgment on each claim.  (Doc. 171; Doc. 172).  Johnson responded (Doc. 245) but the Court struck the response.  (Doc. 293).  In its order doing so, the Court warned the plaintiffs, including Johnson, that the struck responses had not addressed some of Austal's arguments.  (Doc. 293). However, despite the Court's warning, Johnson never addressed the retaliation claims; Johnson also failed to address several other claims.  (Doc. 304; Doc. 401 at 1, n.3).  By abandoning his retaliation claims, Johnson demonstrated the complete

and total lack of merit for each of these claims. *See, e.g.*, *Rodriguez-Torres*, 708 F. Supp. 2d at 202; *Scelta*, 146 F. Supp. 2d at 1262.

Second, Johnson asserted that Austal retaliated against him by removing him from a step-up supervisor position on "Friday, May 2, 2008, while sitting in on a department meeting discussing the events from the previous day." (Doc. 37 at 78 at ¶ 381). However, Johnson testified that the only reason he was not given the step-up supervisor position was because of his race - not for complaining about racial discrimination. (Exhibit 1 at 69-70 (Dep. Johnson)). Thus, Johnson did not even allege a causal connection between any protected activity and the alleged loss of his step-up position. *See Nichols v. CSG Sys.*, 245 Fed. Appx. 937, 940 (11th Cir. 2007) ("a plaintiff must show that (1) she engaged in statutorily protected conduct; (2) she suffered an adverse employment action; and (3) there is a causal connection between the two events" to establish a prima facie case of discriminatory retaliation). In any event, Johnson acknowledged his failure to establish a prima facie claim for retaliation by conceding this claim in his opposition to summary judgment. Thus, the first *Sullivan* factor favors Austal.

For the reasons discussed above, the second factor is neutral, and the last factor favors Austal. Accordingly, Austal is entitled to an award of attorney fees and expenses in connection with Johnson's retaliation claims.

**4.     Austal is also Entitled to Attorney Fees and Expenses Relating to Johnson's Denial of Training, Discipline, Evaluations, and Class Claims**

### a. Training

Johnson alleged that Austal discriminated against him due to his race because it denied him training.  (Doc. 37 at 75 at ¶ 364).  This claim lacked merit, was unreasonably prosecuted, and summarily dismissed on summary judgment. (Doc. 401 at 28).  First, there is no evidence in the record indicating that Austal denied Johnson training.  Second, Johnson failed to address the claim in his 46-page response brief.  (Doc. 304; Doc. 401 at 1, n.3).  Thus, once again, he underscored the complete and total lack of merit regarding these claims.  *See, e.g., Rodriguez-Torres*, 708 F. Supp. 2d at 202; *Scelta*, 146 F. Supp. 2d at 1262.  Thus, the first *Sullivan* factor weighs in Austal's favor.

For the reasons discussed above, the second factor is neutral and the last factor favors Austal.  Accordingly, Austal is entitled to an award of attorney fees and expenses in connection with Johnson's training claims.

### b. Discipline

Johnson alleged that Austal discriminated against him due to his race because it gave him "unwarranted counseling based on his race." (Doc. 37 at 75 at ¶ 364).  However, Johnson failed to offer any evidence regarding this claim and the record is, therefore, devoid of any supporting evidence.  Furthermore, Johnson

failed to address this claim in his 46-page response brief (Doc. 304; Doc. 401 at 1, n.3), which underscored the complete and total lack of merit regarding this claim. *See, e.g., Rodriguez-Torres*, 708 F. Supp. 2d at 202; *Scelta*, 146 F. Supp. 2d at 1262. Thus, the first *Sullivan* factor weighs in Austal's favor.

For the reasons discussed above, the second factor is neutral, and the last factor favors Austal. Accordingly, Austal is entitled to an award of attorney fees and expenses in connection with Johnson's discipline claims.

### c. Denial of Proper Evaluations

Johnson alleged that Austal discriminated against him due to his race because it gave him lower evaluations than similarly situated Caucasian employees. (Doc. 37 at 75 at ¶ 368). This claim lacked merit.

First, the record does not support this claim. In fact, during his deposition, Johnson testified: "And, you know -- and another thing, too, looking at all my assessment and I'm getting good comments from my supervisor . . . ." (Exhibit 1 at 214 (Dep. Johnson)). Additionally, at trial, Johnson described his evaluations as "good," "pretty good," and testified that he consistently received good evaluations. (Trial 1 Reporter Transcript Day 4 at 12, 89, 119 (Johnson)).

Second, Johnson failed to address the claim in opposing Austal's motion for summary judgment. (Doc. 304; Doc. 401 at 1, n.3). Johnson, thus, underscored the complete and total lack of merit regarding this claim. *See, e.g., Rodriguez-*

17

*Torres*, 708 F. Supp. 2d at 202; *Scelta*, 146 F. Supp. 2d at 1262.  Thus, the first *Sullivan* factor weighs in Austal's favor.

For the reasons discussed above, the second factor is neutral, and the last factor favors Austal.  Accordingly, Austal is entitled to an award of attorney fees and expenses in connection with Johnson's denial of proper evaluations claim.

d. Class Claims

Johnson and the other plaintiffs initiated this action as a purported class action. (Doc. 37 at 8-15).  As the Court is well aware, however, none of Johnson's or the other plaintiffs' claims were based on an across-the-board policy of race discrimination that would have affected a class of African American employees.  Rather, all of the individual plaintiffs' claims were based on isolated and discrete acts of alleged discrimination involving (1) different decision makers in (2) different departments (3) over different periods of time.  (Doc. 37 at 8-15).  Johnson and the other individual plaintiffs unreasonably burdened discovery with class certification issues.

After prosecuting this case as a class action for more than two and one-half years, and after several amended scheduling orders, Johnson and the other plaintiffs did not even move the Court for class certification but rather let the December 16, 2010 deadline to file their motion for class certification pass without bothering to advise the Court or Austal that Plaintiffs were not pursuing their class

claims. (Doc. 293 at 3, n.6).   Plaintiffs' failure to pursue class certification underscores the total lack of merit of the class claims. *See, e.g., Scelta, supra.* The Court *sua sponte* struck all of the plaintiffs' class claims prior to trial. (Doc. 293 at 3, n.6). The class claims complicated and burdened discovery and significantly increased the costs of litigation for Austal. Johnson and his co-plaintiffs failed to present any evidence that a class ever even existed, and these claims were frivolous. Thus, the *Sullivan* factors favor Austal. Accordingly, Austal is entitled to attorney fees and expenses on Johnson's class claims.

## 5.   Austal is Entitled to Attorney Fees and Expenses Relating to Johnson's Disparate Impact Claims

Johnson supported his disparate impact (pay and promotion) claims with expert reports prepared by Edwin L. Bradley, Ph.D. (Doc. 304 at 41; *see also* Doc. 303 (Slay) at 42; Doc. 316 (Pettibone) at 42). Austal questioned the relevance and validity of Bradley's opinions and timely moved the Court to exclude the reports pursuant to the Federal Rules of Evidence, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Daubert's* progeny. (Doc. 345). Austal demonstrated in its motion that other courts had questioned the propriety of Bradley's methodology as well. Austal further demonstrated that Bradley had no experience or education in the field of employment discrimination and that his methodologies were biased and riddled with inaccuracies, errors, and

inconsistencies. (Doc. 345). The Court set a hearing on Austal's motion to strike for May 2, 2011. (Doc. 361).

On April 25, 2011, the Court entered its first summary judgment order in this case. (E. Adams, Doc. 364). In this order, the Court analyzed Bradley's reports and found them "irrelevant." (Doc. 364 at 15). Importantly, the Court found that "[a]t the very least, this improper aggregation of data ignores the most basic criteria of job similarity, as well as the specific differences in the jobs themselves, the requirements for employees to obtain such jobs, the differences in pay rates associated with each of the different jobs, etc." (Doc. 364 at 15). Because Johnson's disparate impact claims were based in their entirety on this "irrelevant" evidence, Johnson presented no relevant evidence in support of his claims. As a result, Johnson did not establish a prima facie disparate impact. Thus, the first *Sullivan* factor supports Austal.

Moreover, within a few days of the Court's order and just a few days before the scheduled hearing on Austal's motion to strike, Johnson *withdrew* Bradley's "expert" reports (the only evidence upon which he supported his disparate impact claims), and voluntarily dismissed such claims without explanation. (Doc. 365 at 1-2). On April 29, 2011, the Court dismissed the disparate impact claims for all plaintiffs with prejudice. (Doc. 366). Although Johnson eventually abandoned his disparate impact claim, his prolonged prosecution of the claim without any

20

supporting evidence forced Austal to incur significant attorney and expert fees.  In

light of the foregoing, application of the remaining *Sullivan* factors supports

awarding attorney fees and expenses to Austal.

**B.    AUSTAL IS ENTITLED TO AN AWARD OF ATTORNEY FEES AND EXPENSES UNDER 28 U.S.C. § 1927 AND FED. R. CIV. P. 11 AGAINST JOHNSON'S COUNSEL BECAUSE THEY UNREASONABLY AND VEXATIOUSLY MULTIPLIED THE PROCEEDINGS.**

Fee shifting is not limited to the parties, as an attorney may be personally

liable for "excess costs, expenses, and attorneys' fees reasonably incurred" when

an attorney "multiplies proceedings in any case unreasonably and vexatiously."  28

U.S.C. § 1927.  An award of attorney fees under 28 U.S.C. § 1927 applies a

different standard than the standard applied under 42 U.S.C. § 1988.  The United

States Court of Appeals for the Eleventh Circuit explained:

> Section 1927 provides, in pertinent part, that "[a]ny attorney . . . who so multiplies  the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." Under the plain language of the statute, then, in order for a court to justify sanctions, it must find that three conditions apply:

> First, the attorney must engage in "unreasonable and vexatious" conduct.  Second, that "unreasonable and vexatious" conduct must be conduct that "multiplies the proceedings."  Finally, the dollar amount of the sanction must bear a financial nexus to the excess proceedings, i.e., the sanction may not exceed the "costs, expenses, and attorneys' fees reasonably incurred because of such conduct."

*Santhuff v. Seitz*, 385 Fed. Appx. 939, 946-47 (11th Cir. 2010) (quoting *Hudson v. Int'l Computer Negotiations, Inc.*, 499 F.3d 1252, 1261-62 (11th Cir. 2007)).  The Eleventh Circuit has "consistently held that an attorney multiplies proceedings unreasonably and vexatiously within the meaning of the statute only when the attorney's conduct is so egregious that it is tantamount to bad faith."  *Santhuff*, 385 Fed. Appx. at 947 (internal quotations omitted).

"[B]ad faith turns not on the attorney's subjective intent, but on the attorney's objective conduct."  *Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1239 (11th Cir. 2006).  "A bad faith determination is warranted where an attorney knowingly or recklessly pursues a frivolous claim."  *Alford v. Consol. Gov't of Columbus*, 438 Fed. Appx. 837, 841 (11th Cir. 2011).  Additionally, "when it becomes apparent that discoverable evidence will not bear out the claim, the litigant and his attorney have a duty to discontinue their quest."  *Avirgan v. Hull*, 932 F.2d 1572, 1582 (11th Cir. 1991).  The Eleventh Circuit has previously held that "[i]f an attorney has failed to conduct a reasonable inquiry into the matter, then the court is obligated to impose sanctions even if the attorney had a good faith belief that the claim was sound."  *Glatter v. Mroz (In re Mroz)*, 65 F.3d 1567, 1573 (11th Cir. 1995).  It will not do to rest upon a "gut feeling" that one's client is a victim.  *See Blue v. United States Dep't of Army*, 914 F.2d 525, 541 (4th Cir. 1990).

In this case, Johnson's counsel asserted the claims discussed herein even though they were clearly unreasonable and based purely on Johnson's own self-serving unsubstantiated claims of discrimination.    Had Johnson's counsel conducted a reasonable investigation, they would have discovered the frivolity of his claims.

As in *Blue*, *supra*, "the only 'evidence' ever advanced by [Johnson] on [these] claims [were his] own 'unsubstantiated, self-serving, contradictory, and inconsistent claims of discrimination.' "    914 F.2d at 543 (internal citations omitted).  In the face of such unsubstantiated claims:

> [C]ounsel cannot simply rely on a client's patently incredible testimony when any reasonable investigation of the factual bases for the client's claims or examination of materials obtained in discovery would reveal the paucity and implausibility of the evidence.

*Id.* at 543.  The Fourth Circuit quoted at length from the district court's opinion on this point:

> Defendant had produced an enormous amount of discovery - much of it clearly unrebutted by any credible evidence in plaintiffs' possession. . . .  Counsel, certainly by this time . . . had no reasonable basis upon which to rely on either plaintiff.    Significant gaps and inconsistencies existed in plaintiffs' respective versions of events mandating that counsel question their perception of discrimination. . . .    Here, access to investigate plaintiffs' stories was virtually unchecked.  Yet, [plaintiffs'] claims were filed, and . . . continued, apparently without any objective thought as to their merit.

914 F.2d at 543 (alterations in original).

Similarly, in *Byrd v. Hopson*, 108 Fed. Appx. 749 (4th Cir. 2004), the Fourth

Circuit affirmed an award of sanctions where:

> [B]ased on a reasonable investigation of the facts and law, [counsel] should have quickly recognized that [the plaintiff's] claims were groundless. The court noted that [the plaintiff's] version of events underlying this lawsuit contained numerous inconsistencies and that the witnesses with whom [counsel] spoke in investigating the case lacked credibility [and] almost all of the information allegedly known by these individuals was hearsay, rumor, or speculation.

*Id.* at 755. " 'If particularly egregious, the pursuit of a claim without reasonable

inquiry into the underlying facts can be the basis for a finding of bad faith.' "

*Ocon v. Equinomics, Corp. (In re Ocon)*, No. 08-11226, 2009 WL 405370, *1

(11th Cir. Feb. 19, 2009) (quoting parenthetically *Barnes v. Dalton*, 158 F.3d 1212,

1214 (11th Cir. 1998)).

Here, as set forth above, pursuit of the foregoing claims by Johnson's

counsel was particularly egregious.  For example, Johnson's counsel knew (or

should have known) that there was no foundation for Johnston's retaliation,

training, or evaluation claims.  These claims were plainly contradicted by

Johnson's own testimony and personnel documents (i.e., evaluations).

Nevertheless, Johnson's counsel continued to pursue these claims for more than

three years.  Johnson's counsel also continued prosecuting Johnson's Title VII

claim relating to Hoffner's 2007 promotion even though the claim was clearly time-barred. A reasonable investigation by Johnson's counsel would have revealed that Johnson's Title VII promotion claim relating to Hoffner's 2007 promotion was untimely. Had Johnson's counsel performed even a minimal investigation, they would have discovered that Johnson's claims were frivolous.

Furthermore, Johnson's counsel's multiple requests for extensions of their deadline to submit expert information and their continued pursuit of the disparate impact (pay and promotion) claims multiplied the proceedings in this case unreasonably and vexatiously. Initially, Johnson's expert report was due August 14, 2009. (Doc. 43). After several extensions Johnson finally submitted the report of his expert, Dr. Bradley, on August 16, 2010; Johnson submitted Bradley's rebuttal report on February 7, 2011. (Doc. 149; Doc. 281-1; Doc. 286-2). On April 29, 2011, Johnson's counsel dismissed the disparate impact claims and withdrew the "expert" reports. (Doc. 365; Doc. 366). Counsel never possessed a single shred of relevant evidence to support Johnson's disparate impact claims, yet forced Austal to incur significant expert and attorney's fees to defend these claims.

Moreover, as highlighted above, significant gaps and inconsistencies existed in Johnson's version of Austal's employment practices and his "expert" reports, mandating that counsel question Johnson's perception of discrimination. Certainly by the time they reviewed the employment records, Johnson's counsel had no

reasonable basis upon which to blindly rely on Johnson's unsubstantiated claims or to permit Johnson's disparate impact (pay and promotion) or disparate treatment (pay) claims to proceed. Access to investigate Johnson's stories and Bradley's reports was virtually unchecked. Yet, Johnson's counsel filed the claims and prosecuted them for more than three years without any apparent objective thought as to their merit.

Additionally, Johnson's counsel unreasonably and vexatiously multiplied the proceedings in prosecuting this case as a class action. Johnson and the other plaintiffs prosecuted (and Austal defended) this case as a class action for more than two and one-half years. "After many amended scheduling orders, the plaintiffs were given until December 16, 2010 within which to file a motion seeking certification of a plaintiff class." (Doc. 293 at 3, n.6). The plaintiffs, however, never petitioned the Court for class certification. Instead, they abandoned the class claims without explanation. These baseless claims and expert reports dominated discovery and motion practice for more than three years (two and one-half years for class claims) before Johnson's counsel casually abandoned the allegations and withdrew the expert reports. This is precisely the type of behavior that § 1927 and Rule 11 were intended to punish and deter. *See Lee v. First Lenders Ins. Serv., Inc.*, 236 F.3d 443, 445 (8th Cir. 2000) (law firm's filing of class action complaint and pursuit of action through discovery for one and one-half years before

abandoning the class claims without explanation warranted attorney fees under §
1927). *See also Durr v. Intercounty Title Co. of Illinois*, 14 F.3d 1183, 1188 (7th
Cir.) (upholding Rule 11 sanctions against attorney who "sued on behalf of a class
of plaintiffs that did not exist"), cert. denied, 513 U.S. 811 (1994).

Finally, Johnson's counsel unreasonably and vexatiously multiplied the
proceedings by forcing Austal to defend and prepare to try claims that counsel
clearly never intended to pursue at trial only to abandon them at (or on the eve of)
trial without explanation. Indeed, this was a tactic that counsel employed in all
three trials. Johnson and his co-plaintiffs in the first trial (E. Adams, Barnes,
Carter, and Hedgeman) had 29 combined claims that survived summary judgment
(more if punitive damages, Title VII, and § 1981 claims are counted separately).
However, Johnson's counsel abandoned 18 of the 29 claims at or on the eve of
trial. Thus, Austal prepared to defend 29 claims while Johnson's counsel prepared
to prosecute only 11 claims.[11] Johnson's counsel certainly knew that they were
going to abandon the claims yet continued to pursue (or lead Austal to believe they
would pursue) them in bad faith. Counsel's gamesmanship and dilatory tactics

---

[11] These plaintiffs abandoned seven (7) claims at the time they filed the Joint Pre-
Trial Document (Doc. 409) for their September 2011 trial (E. Adams abandoned –
2 promotion; Barnes – 3 promotion; Hedgeman – 1 promotion; Johnson – 1
promotion, 1 pay). They abandoned 11 more without explanation during the trial
(Barnes – 8 promotion, 1 pay; Johnson – 1 promotion, 1 pay). (Doc. 515).

multiplied the proceedings and unnecessarily complicated the litigation.[12] Accordingly, Austal is entitled to attorney fees and expenses under 28 U.S.C. § 1927 and Fed. R. Civ. P. 11.

## III.   CONCLUSION

Johnson's claims were based on conclusory allegations and speculation with no basis in fact or law.  It is apparent that he joined this lawsuit solely on the notion that there is strength in numbers without any reasonable inquiry regarding the total lack of merit in his claims.  It is also clear that Johnson's counsel unreasonably and vexatiously multiplied the proceedings and engaged in dilatory litigation practices to increase the difficulty and expense of litigation for Austal. For the reasons stated above, Austal respectfully requests that the Court award it attorney fees and related nontaxable expenses against Johnson and his counsel.

---

[12] Johnson's counsel also abandoned six (6) gender claims asserted by plaintiff Beverly Thomas at voir dire, less than one week before her trial.  Similarly, counsel abandoned Roberson's pay claim, Bumper's promotion claims (10), Cunningham's promotion claims (2), Reed's pay claim, and Slay's promotion claim approximately one month before their respective trials. (Doc. 559; Doc. 560; Doc. 717; Doc. 718).   Thus, during these proceedings, Johnson's counsel abandoned approximately 40 claims on the eve of or during trial without explanation.

Respectfully submitted,

*/s/ Thomas M. O'Hara*
Thomas M. O'Hara (OHART4140)
tohara@mcdowellknoght.com
Brian P. McCarthy (MCCAB7434)
bmccarthy@mcdowellknight.com
Anne Laurie McClurkin (SMITA2262)
amcclurkin@mcdowellknight.com
*Attorneys for Defendant, Austal USA, LLC*

**OF COUNSEL:**

**McDOWELL KNIGHT ROEDDER
   & SLEDGE, L.L.C.**
Post Office Box 350
Mobile, Alabama 36601
Ph. 251-432-5300
Fax 251-432-5303
www.mcdowellknight.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of March, 2012, I electronically filed the foregoing pleading with the Clerk of the Court using CM/ECF system which will send notification of such to all counsel of record.

Ann C. Robertson
Rocco Calamusa
Candis A. McGowan
Jacob Andrew Kiser
Attorneys for Plaintiffs
WIGGINS, CHILDS, QUINN & PANTAZIS,
L.L.C.
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
(205) 314-0500

*/s/ Thomas M. O'Hara*

29

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF ALABAMA
2                  SOUTHERN DIVISION

3
         EARATON ADAMS, et al.,
4
              Plaintiffs,
5
              vs.          CASE NO. 1:08-CV-155
6
         AUSTAL, U.S.A., LLC,
7
              Defendant.
8

9              * * * * * * * * * *

10        DEPOSITION OF CARLOS JOHNSON, taken

11   pursuant to stipulation and agreement

12   before Audra Kirkland, Court Reporter

13   and Commissioner for the State of

14   Alabama at Large, in the Law Offices of

15   McDowell, Knight, Roedder & Sledge,

16   11 North Water Street, Suite 13290,

17   Mobile, Alabama, on Wednesday,

18   October 7, 2009, commencing at

19   approximately 9:18 p.m.

20             * * * * * * * * * *

21

22                 **EXHIBIT "1"**

23

```
 1    Q.   Okay.  And I guess it's your position
 2         that there hadn't been any change since
 3         the time that you filed your EEOC
 4         charge back in, I believe, '08?
 5    A.   Yes.  I've been promoted to step-up
 6         supervisor on paper this time.  And
 7         when we had the layoff, I was demoted
 8         back to my blue hat.
 9    Q.   Okay.  And you filed your charge on
10         May 21st, 2008?
11    A.   Yes, sir, that's correct.  Yes, sir.
12    Q.   Okay.  And so, as I understand it, it's
13         your testimony that noth -- nothing's
14         really changed in terms of your belief
15         that there's been -- you've been the
16         victim of discrimination and -- and
17         ral -- retaliation?
18    A.   Yes, sir; 'cause we got a guy that just
19         hired in in March, Joseph Williams.
20         He's currently making nineteen dollars
21         and ten cent an hour, and I'm only
22         making eighteen dollars and fifty-seven
23         cent an hour.  And he's hired in to do
```

```
 1          the same job that I'm doing.  I'm

 2          actually training him, showing him how

 3          to do the job, and he making more than

 4          me.

 5     Q.   Okay.  Mr. Johnson, do you know of

 6          Stephanie Pate?

 7     A.   Yes, sir, I do.

 8     Q.   Who is she?

 9     A.   She was employed in the HR department,

10          human resources.

11     Q.   Okay.  Did you talk to her in

12          December 2008 about this lawsuit?

13     A.   2008?  Yes, sir, I did.

14     Q.   And did you tell her that you were

15          going to con -- contact your attorney

16          and withdraw from the lawsuit?

17     A.   No, sir, I didn't.

18     Q.   Did you tell Ms. Pate that you did not

19          feel right holding Austal responsible

20          for something that Joe Johnson had

21          done?

22     A.   No, sir, I didn't.

23     Q.   Did you also tell Ms. Pate that you
```

Case 1:08-cv-00155-KD-N Document 723 Filed 03/02/12 Page 33 of 36

1      what's going on; how come Everett done

2      got my job when Everett ain't been here

3      six months and I've been doing all the

4      work?  Albert told me to go talk to

5      C.J.  And when I went to C.J., you

6      know, he was, like, Well, you going to

7      have to go talk to Joe Johnson.  And

8      that's when we was in the meeting.  And

9      Joe Johnson, Yeah, I never told you you

10     was a supervisor; you can take that

11     white -- you can your white hat off.

12     You know.

13              And when I went to HR and talked

14     to Jeff O'Dell.  And Jeff and me, after

15     that, talked to Joe.  He said he was

16     going to look into it later on.  And

17     Joe Johnson and Paul came and asked me

18     why I was trying to leave they [sic]

19     department.

20  Q.  All right.  Well, let me step back just

21     a little bit.  When you went to Albert

22     Kittrell, did you tell him that you

23     felt like the only reason -- well, the

```
 1        reason you weren't given the step-up
 2        supervisor position was because of your
 3        race?
 4   A.   Yes, sir.
 5   Q.   You did tell him that?
 6   A.   I -- I told him that.
 7   Q.   All right.  Well, if -- if you would,
 8        Mr. Johnson, when -- when I ask a
 9        question -- because I asked you what
10        you told Mr. Kittrell and Mr. Noletto
11        earlier and you didn't mention that,
12        so --
13   A.   Yes, sir.
14   Q.   -- you know, I had to kind of follow up
15        and -- and bring that out -- out --
16        out.
17   A.   Yes, sir.
18   Q.   So, if you would, be more complete in
19        terms of what you did discuss with him,
20        I'd appreciate it.
21        Now, going back to that question, tell
22        me exactly what you told, to the best of
23        your memory, Albert Kittrell and C.J.
```

```
 1                      and Mr. Kiser are present.)

 2            THE VIDEOGRAPHER:  Okay.  We're back

 3        on the record.  The time is 1:37.

 4   Q.   (By Mr. O'Hara)  Okay.  Mr. Johnson, we

 5        have been talking about an incident

 6        that you described where you said you

 7        had complained to Robert Sheppard --

 8   A.   Uh-huh.

 9   Q.   -- about Justin Murphy.

10   A.   Uh-huh.

11   Q.   And then after that, Mr. Murphy made

12        you clear water out of a hole using a

13        vacuum cleaner instead of a pump?

14   A.   Yes, sir.

15   Q.   Do you recall that?

16   A.   (Witness nods head.)

17   Q.   How long after you complained were you

18        assigned that task?

19   A.   One week, if I'm not mistaken.

20   Q.   All right.  And you believe -- is it

21        your contention that that was done in

22        retaliation for having complained about

23        Justin Murphy?
```

1      that, you know, might refresh your

2      memory in some way?

3   A.  There's a picture floating around that

4      me and Joe Johnson took on this same

5      day right here.  The day that we

6      launched this ship, me and him took one

7      by ourself in front of the ship.  It's

8      a girl used to be employed at Austal

9      that is no longer working there, she

10     has those pictures.  I've been trying

11     to get up with her to get those

12     pictures with me and Joe standing like

13     this taking a picture together.

14     And, you know -- and another thing, too,

15     looking at all my assessment and I'm

16     getting good comments from my

17     supervisor, you know, that I just -- you

18     know, that's the only thing I can't

19     understand.  But other than that,

20     everything went good.

21   Q.  Well -- all right.  You mentioned

22     picture.  Who's the -- who's the girl

23     that might have the pictures?