IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| JEROME PETTIBONE, *et al.*, | ) | |
|     Plaintiffs, | ) | |
| v. | ) | CIVIL ACTION 08-00155-KD-N |
| | ) | |
| AUSTAL, U.S.A., L.L.C., | ) | |
|     Defendant. | ) | |

**SUMMARY JUDGMENT ORDER ON REMAND**

This matter is before the Court on Defendant's motion for summary judgment (Docs. 175, 176), Plaintiff's Opposition (Doc. 316), Defendants' Reply (Doc. 342), and the Eleventh Circuit's remand (Doc. 821).

**I.    Factual Background**[1]

On March 20, 2008, multiple Plaintiffs initiated this action against Austal for legal and equitable relief to redress unlawful discrimination and harassment on the basis of race. (Doc. 1). Jerome Pettibone ("Pettibone") asserts claims for hostile work environment based on race in violation of Title VII and 42 U.S.C. § 1981. (Doc. 37 at 93-98).[2]

On May 31, 2011, this Court issued summary judgment in favor of Austal as to Pettibone's claims for hostile work environment and retaliation. (Docs. 378, 720). Pettibone's summary judgment ruling was appealed (USCA#12-11507-EE) (Doc. 753), and on June 17,

---

[1] At the summary judgment stage, the facts are taken in the light most favorable to the non-movant. Tipton v. Bergrohr GMBH–Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992). The "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." Priester v. City of Riviera Beach, 208 F.3d 919, 925 n. 3 (11th Cir. 2000).

[2] All other claims have been previously dismissed, abandoned, or judgment granted for the defendant.

2014, the Eleventh Circuit vacated the summary judgment order as to the claim of a racially hostile work environment. (Doc. 821 at 31). The Eleventh Circuit found that a reasonable jury could find that Pettibone's work environment was objectively hostile, and remanded his claims of a racially hostile work environment with instructions for this Court "to determine whether Austal is entitled to summary judgment on the ground that it was not directly or vicariously liable for the harassment or whether the employees' claims should proceed to trial." (Id. at 3, 31, 38). The mandate issued August 8, 2014. (Doc. 826).

### A. Austal

Defendant Austal USA ("Austal") is an Australian shipbuilding company dedicated to the design and construction of customized aluminum commercial and military vessels, located in Mobile, Alabama. (Doc. 176 at 2; Doc. 283-48 at 2-3 (Austal's 3/7/07 EEOC Position Statement)). The Operations Division has four (4) major Departments (Aluminum (divided into Fabrication and Components), Electrical, Engineering, and Fit Out (divided into HVAC, Insulation and Fit Out)). (Doc. 283-48 at 3-4).

### B. Pettibone's Employment

Jerome Pettibone was hired on December 13, 2005 and began working for Austal on January 9, 2006 as a welder in the Aluminum Fabrication Department at the rate of $12/hour. (Doc. 202-1 (Dep. Pettibone at 35, 37); Doc. 202-1 at 82; Doc. 202-2 at 10 (Decltn. Lindley)). On April 10, 2009, Pettibone was laid off due to company wide downsizing. (Doc. 202-1 (Dep. Pettibone at 49); Doc. 202-2 at 10 (Decltn. Lindley)).

C. **Austal's Anti-Harassment & Non-Discrimination Policy**

Austal submitted evidence of two (2) anti-harassment and non-discrimination policies: an "April 2006 Issue F" policy, and a "November 2007" policy. (Doc. 202-2 at 2-3 and note 1 (Decltn. Lindley); Doc. 202-2 at 36-37, 49-51 (the April 2006 Issue F policy and the November 2007 Issue A policy)). However, there were three (3) policies in effect during Pettibone's employment: the "November 2005 Issue E", April 2006, and the November 2007 policies.

The November 2005/April 2006 and November 2007 policies reveal different complaint procedures for different periods of time. The November 2005 and April 2006 policies "urge" employees to report complaints to his/her supervisor or, if not comfortable doing so, to the Departmental Manager:[3]

> Any employee suspecting a violation of this policy, or who in any way feels uncomfortable with the actions of Company Supervisors, employees or outsiders is urged to inform his or her Supervisor. If for any reasons the employee does not feel comfortable discussing the situation with his or her immediate Supervisor, he or she should report the matter to the Departmental Manager… Supervisors are **required** to report suspected harassment and any allegations of harassment to the Departmental Manager.

(Doc. 202-2 at 37 and Doc. 283-56 at 25 (emphasis in original)). (Doc. 284-3 (Dep. Lindley[4] I at 238-240, 245-246) (testifying that such was the procedure as to the 2005 and 2006 policies, and confirming that nothing in the policies identifies HR as an avenue for complaints). From November 2007 forward, employees "should report" to <u>both</u> to the supervisor <u>and</u> the Department Manager/Coordinator <u>before</u> even being allowed to report to HR:

1.3 Reporting an Incident of Harassment or Workplace Violence

---

[3] Based on the record and as indicated by Austal, the Departmental Managers (or Coordinators) manage specific departments, such as Aluminum Fabrication, and within those departments, there are Supervisors who supervise the employees working with said department. (Doc. 283-48 (Austal's 3/7/07 EEOC Position Statement)).

[4] Austal's Rule 30(b)(6) representative and HR Benefits Coordinator.

> It is the employee's responsibility to report any incident of harassment or workplace violence. The employee should report any incident of this nature to his/her supervisor. If the employee is not comfortable reporting the incident to his/her supervisor you may talk to the department coordinator or manager. If you need to talk with someone *after you have completed both steps,* you may contact the Human Resources Department. Any reported allegations of harassment or workplace violence will be Investigated confidentially and promptly.

(Doc. 202-2 at 50 (emphasis added)). No evidence has been submitted to the Court of Pettibone having signed the November 2005, April 2006 or November 2007 policies. The evidence submitted indicates only that Pettibone *reviewed a* policy following his 2006 orientation. (Doc. 202-1 (Dep. Pettibone at 62, 68)).

Regarding racially and hostile discriminatory comments, Pettibone alleges that he once was told that his supervisor Mike Waters said "you can get a lot of free slavery….a lot of hard work with cheap slave labor done." (Doc. 202-1 (Dep. Pettibone at 173)). Pettibone did not hear the statement and does not know if anyone reported it to Austal. (Id. (Dep. Pettibone at 173-174)). Pettibone was offended by the comment which he perceived to be discriminatory. (Id.)

Pettibone was told that supervisor Tim Clements walked up and kicked African American co-worker Jermaine Roberson when he was working, and also kicked African American co-worker Earaton Adams when he was working. (Doc. 285-16 (Dep. Pettibone at 270-273)).

Pettibone was subjected to displays of the Confederate flag on three (3) Caucasian co-workers' t-shirts, hard hats and lunch/tool/welding boxes, which he finds offensive and suggestive of violence directed to African Americans. (Doc. 202-1 (Dep. Pettibone at 161-163, 165, 194-195, 289); Doc. 285-16 (Dep. Pettibone at 196-197, 288-290)). Pettibone and other African American co-workers complained on multiple occasions about the flag imagery, to supervisors. (Doc. 202-1 (Dep. Pettibone at 161-163, 165); Doc. 285-16 (Dep. Pettibone at 164,

4

196)). When Pettibone complained to "[a]ny supervisor I saw[]" the response he received was "[t]hat's his shirt, he bought it." (Doc. 202-1 (Dep. Pettibone at 162-163)). Pettibone also complained directly to a co-worker about his shirt, when he wore it on one occasion, and in response, "he cracked jokes." (Id. (Dep. Pettibone at 163, 165)). Pettibone (and others) photographed the co-worker wearing the shirt. (Id.) Austal did nothing in response to the complaints about the Confederate flag imagery.

Pettibone saw racial epithets in graffiti on bathroom walls and stalls. (Doc. 202-1 (Dep. Pettibone at 175, 184-187, 189, 234); Doc. 285-16 (Dep. Pettibone at 129, 177, 183, 185-188, 234, 295-300)). The racial graffiti included: "how many niggers do you see around here wearing white hats," "White Power" with a picture of a hooded Klansman, "see, niggers travel in packs just like rats," "why don't niggers use aspirin, because they don't want to pick the cotton off the top," "KKK," "how do you keep a nigger out of your back yard, hang one in the front," "how do you keep 10 niggers from raping your wife, give them a basketball," "the only people wearing union shirts are the lazy-ass niggers," "KKK is getting bigger," "watch your ass. Oh, you better be glad you're not a nigger," "niggers," "white is right," "Jerome [Pettibone] is a snitch, blast his ass if he's a rat-a-tat-at," "hey, nigger," a drawing of a hangman stick figure, the letters "KKK" drawn next to a Nazi sign, the words "White Power" drawn next to a Nazi sign, and a drawing of African American co-worker Tesha Hollis with the words "I'm not a full-fledged white man until I split the raw, black oak" written underneath the drawing. (Id.) Pettibone reported the graffiti to supervisor Jeremy Gainous: "I told him they need to do something about the graffiti on the bathroom wall[]" and in response, Gainous told him "[t]here's nothing he can do about it." (Doc. 202-1 (Dep. Pettibone at 175)). Pettibone also complained to supervisor Yancy Allen,

5

who told him nothing could be done about the graffiti. (Doc. 285-16 (Dep. Pettibone at 176-177)). "I complained about all of it. I didn't like what I saw." (Doc. 202-1 (Dep. Pettibone at 187, 189)). Pettibone took photographs of all of the graffiti he saw. (Id. (Dep. Pettibone at 190)). Pettibone testified that when the graffiti of the picture of Tesha Hollis was reported, Austal removed it the same day. (Id. (Dep. Pettibone at 179-180)).

Austal has presented one example of evidence of its response to *Pettibone's* complaints about the graffiti, citing Pettibone's deposition testimony that once, when he was with others who reported graffiti, Austal removed it the same day. (Doc. 176 at 13 (citing Doc. 202-1 (Dep. Pettibone at 179-180)). Apart from that, Austal alleges that initially they counseled their supervisors regarding the graffiti. (See, e.g., Doc. 202-3 (Dep. Combs at 111, 126) (Austal "discussed it with our teams and told them graffiti of any kind, racial, sexual, or any kind is not tolerated[,]" adding it was discussed "with all the supervisors" and that the supervisors "have been told to discuss it with all of their people[]"). However, Combs does not really know if that ever occurred, noting that he saw graffiti in mid-2009. Thereafter, in August 2007, Austal responded to complaints by painting everything black. (Doc. 202-1 (Dep. Pettibone at 184, 187, 190, 193, 235); Doc. 285-2 (Dep. Browning at 16, 110). Yet the graffiti continued as the paint transformed the bathrooms into a chalkboard making the graffiti show up better. (Doc. 284-4 (Dep. Lindley II at 95-96, 166-168, 188-190, 195-196, 202-203); Doc. 284-5 (Dep. Lindley III at 254); Doc. 284-11 (Dep. O'Dell at 74-75); Doc. 284-7 (Dep. Friedlieb I at 84)).

There were no investigations, and no policy was implemented as to precisely how to document the graffiti and/or how to prevent it. (Doc. 285-2 (Dep. Browning at 16, 110); (Doc. 284-3 (Dep. Lindley I at 196); (Doc. 284-7 (Dep. Friedlieb I at 49, 52, 82, 84, 86)). Austal's

CEO testified that there were no discussions with HR about prevention of the graffiti apart from painting everything black. (Doc. 285-2 (Dep. Browning at 110, 113-114, 117)). Austal's HR Coordinator testified that there has been a constant problem with racially offensive and threatening graffiti since 2005, and while senior management and HR are aware of it, it was still ongoing as of 2009. (Doc. 284-4 (Dep. Lindley II at 86-89, 96, 101-102, 112-114, 123-124, 188-190, 195-196, 202-203); Doc. 284-5 (Dep. Lindley III at 254). HR Manager Carver testified that he does not recall any investigation into the graffiti or Austal issuing any memo or statement about it to employees. (Doc. 284-10 (Dep. Carver II at 62-63, 65-66, 70)). Carver also does not recall whether between 2004-2007 the issue of racial graffiti was ever formally addressed by Austal or whether Austal took any action to determine who was responsible for the graffiti. (Id.) According to Carver, "there's really no excuse….that I didn't send out a document to everybody and say, look this is not tolerated, I don't care what you say, there's really no excuse for it. I'll admit that." (Id. (Dep. Carver II at 81-82)).

Pettibone discovered a one noose hanging in the Austal breakroom in May 2008 ("I just stopped. (Doc. 202-1 (Dep. Pettibone at 135-136, 235, 282); Doc. 285-16 (Dep. Pettibone at 239-240, 252-253)). Pettibone photographed the noose and reported the noose to his supervisors, after which, Austal then photographed him. (Doc. 285-16 (Dep. Pettibone at 129-135, 243, 252-253)). Pettibone alleges that African American co-workers accused him of hanging the noose. Pettibone talked with Jeff O'Dell in HR and O'Dell accused him of being responsible for the noose to "bolster the lawsuit." (Id. (Dep. Pettibone at 282-283); Doc. 285-16 (Dep. Pettibone at 96, 282)).[5]

---

[5] Pettibone wrote a May 5, 2008 letter to Austal notifying Austal that a co-worker approached him and
(Continued)

Concerning the May 2008 noose, (Docs. 283-24, 283-25, 284-2), the City of Mobile was alerted to its presence through an article in the Press Register, and while Austal did not issue a memo, statement or email to its employees about the noose, Austal investigated and offered a reward for information. (Doc. 202-3 (Dep. Pate at 152); Doc. 283-26; Doc. 283-27; Doc. 283-28; Doc. 285-2 (Dep. Browning at 7-14, 118-120, 124-125); Doc. 284-3 (Dep. Lindley I at 255-256); Doc. 284-5 at 59 (Dep. O'Dell at 79)). The noose was also reported to Security, Supervisors, HR and Senior Management; Security and O'Dell in HR conducted an investigation but were unable to determine who was responsible. (Doc. 284-2; Doc. 284-4 (Dep. Lindley II at 157); Doc. 284-5 at 59 (Dep. O'Dell at 79); Doc. 284-8 (Dep. Friedlieb II at 145)). However, Austal's investigation consisted primarily of investigating the African American employees who found (and reported) the noose as suspects, with a focus on co-worker (and co-plaintiff) Beverly Thomas as having staged the incident. (Doc. 284-2; Doc. 284-8 (Dep. Friedlieb II at 163, 168, 170, 183-185, 191-192)).

Pettibone saw a second noose hanging on "block fifteen" on Austal property; it was taken down but not taken to "the front office" at Austal. (Doc. 285-16 (Dep. Pettibone at 245)). Pettibone testified that African American co-worker Earaton Adams told him that he saw Caucasian employee David Hebert showing "Dickey," a Caucasian supervisor, how to make a noose and that when Earaton Adams returned, the noose was hanging from the ceiling in that area of the workplace. (Id. (Dep. Pettibone at 245-246)).

Pettibone also saw a stick figurine of a hangman with a noose around its neck and the

---

asked him to lie for the company for a reward – to say he hung the noose. (Doc. 283-30). HR Director Jeff O'Dell responded to Pettibone's letter saying he had investigated Pettibone's claims. (Doc. 283-31).

word "niggers" written on its chest; he took a photograph of it and took the figurine and photograph to HR. (Doc. 202-1 (Dep. Pettibone at 286-288)). Pettibone never received a response from HR about any investigation. (Id. (Dep. Pettibone at 288)).

## II. Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (Dec. 2010). Amended Rule 56(c) governs Procedures, and provides as follows:

> *(1) Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> *(2) Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
>
> *(3) Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record.
>
> *(4) Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

FED.R.CIV.P. Rule 56(c) (Dec. 2010).

Defendant, as the party seeking summary judgment, bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). If the nonmoving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment. Celotex, 477 U.S. at 323. "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992), cert. den., 507 U.S. 911 (1993) (internal citations and quotations omitted).

### III. Section 1981/Title VII – Hostile Work Environment (Race)

Racial harassment is actionable under Section 1981 or Title VII where the conduct is sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment. See, e.g., Freeman v. City of Riverdale, 330 Fed. Appx. 863, 865 (11th Cir. 2009).[6] To establish a prima facie case of hostile work environment and/or racial harassment under Section 1981 or Title VII, the plaintiff must prove that: 1) he belongs to a protected group; 2) he has been subject to unwelcome harassment; 3) the harassment was based on a protected characteristic of the employee (such as race); 4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily

---

[6] This is an unpublished decision and is persuasive, but not binding, authority pursuant to Eleventh Circuit Rule 36-2. The Court notes this same rule applies to other Fed. Appx. cases cited herein.

abusive working environment; and 5) the employer is responsible for such environment under a theory of vicarious or direct liability. See, e.g., Reeves v. DSI Sec. Servs., Inc., 395 Fed. Appx. 544, 545-546 (11th Cir. 2010); McCann v. Tillman, 526 F.3d 1370, 1378 (11th Cir. 2008); Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002). See also e.g., Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999).

The first three (3) prima facie elements of a hostile work environment are satisfied and not disputed by the parties. However, as to the remaining elements, Austal contends that: 1) Pettibone's evidence of sporadic and isolated incidents of racially hostile comments, conduct and graffiti during the time she was employed do not meet the severe or pervasive threshold; 2) Pettibone makes no allegations and presents no evidence that the allegedly hostile environment unreasonably interfered with his ability to work on a day-to-day basis; 3) Austal maintained a policy establishing how an employee should report discriminatory conduct, but Pettibone failed to report certain conduct; and 4) Austal took reasonable preventative and corrective/remedial measures to prevent a hostile work environment.

### A. Severe or Pervasive

To be actionable as severe or pervasive, the harassment "must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceive[s]…to be abusive." Miller, 277 F.3d at 1276 (internal citation and quotation marks omitted). In other words, the severe or pervasive element has an objective and subjective component. McCann, 526 F.3d at 1378. To determine the objective severity of the harassment, courts look at the totality of the circumstances and consider: 1) the frequency of the discriminatory conduct; 2) the severity of the conduct; 3) whether the conduct is physically

11

threatening or humiliating, or a mere offensive utterance; and 4) whether the conduct unreasonably interferes with an employee's job performance. Reeves, 395 Fed. Appx. at 546. See also Faragher v. City of Boca Raton, 524 U.S. 775, 787-788 (1998); Allen v. Tyson Foods, 121 F.3d 642, 647 (11th Cir. 1997) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)). "The conduct is considered cumulatively instead of in isolation." Reeves, 395 Fed. Appx. at 546. There is sufficient evidence, if believed by a jury, that Pettibone subjectively perceived his work environment to be racially hostile.

As to the fourth element, the objective severity of the harassment, as established by the Eleventh Circuit in its remand:

> The record also presents a genuine dispute of material facts that Pettibone's work environment was objectively hostile. Pettibone worked for Austal for over three years, during which he saw racist graffiti in the bathroom on multiple occasions, saw Confederate flags displayed by multiple coworkers "all through the building," and saw a drawing of a hangman with the caption "niggers." Pettibone was one of the employees who discovered the noose in the breakroom, and his coworkers accused him of hanging it. He also heard secondhand about other nooses and racial slurs. One of the slurs was made by his supervisor, who had said, "[Y]ou can get a lot of free slavery.... A lot of hard work with cheap slave labor done." And he heard about another white supervisor kicking two black employees.
>
> Pettibone raises a disputed issue that the harassment he experienced was frequent and severe. Although Austal regularly removed the racist graffiti, he saw it frequently. He also frequently saw coworkers wearing the Confederate flag. The noose that he discovered and the stick figure with the noose and the caption "niggers" was severe, especially because he saw them both firsthand. And the slur by his supervisor, although not directed toward Pettibone, related directly to work at Austal by black employees. A reasonable jury could find that his workplace was objectively hostile.

(Doc. 821 at 19-20).

### B. <u>Employer Liability- Faragher/Ellerth Affirmative Defense</u>

With the fourth element satisfied, this Court turns to the fifth element: "…the employer[]…[Austal] is responsible for the hostile work environment under…a theory of

vicarious or direct liability[]"[7] unless Austal can avail itself of the Faragher/Ellerth affirmative defense.

In Faragher v. City of Boca Raton, 524 U.S. 775 (1998) and Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998), the Supreme Court held that employer liability is automatic when the supervisor's harassment culminates in a "tangible employment action, such as discharge, demotion, or undesirable reassignment." Faragher, 524 U.S. at 807, 808; Ellerth, 524 U.S. at 762, 763. Where no such action has occurred, "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." Faragher, 524 U.S. at 807; Ellerth, 524 U.S. at 745. But an employer may avoid vicarious liability by raising as an affirmative defense that it: 1) exercised reasonable care to prevent and correct promptly any harassing behavior, and 2) the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. Faragher, 524 U.S. at 807, 809; Miller, 277 F.3d at 1278. This is known as the Faragher/Ellerth affirmative defense. For an employer to avail itself of this defense and be found not liable, "[*b*]*oth elements must be satisfied*…the *defendant bears the burden of proof on both elements*." Frederick v. Sprint/United Mgmt. Co., 246 F.3d 1305, 1313 (11th Cir. 2001) (citations omitted) (emphasis added) (holding that factual issues existed regarding employer's complaint procedure and employee's use of it, precluding summary judgment on Faragher/Ellerth). If, however, neither element is satisfied, the employer is liable for the harassment. See *supra*. See also Joens v. John Morrell & Co., 243 F.Supp.2d 920, 933 (N.D. Iowa 2003) (providing a helpful flow chart).

---

[7] Miller, 277 F.3d at 1278.

Austal's liability is automatic if a supervisor's harassment culminated in a tangible employment action as to Pettibone (*e.g.*, discharge, demotion, undesirable reassignment). There is no dispute that Pettibone was laid off in April 2009. (Doc. 202-1 (Dep. Pettibone at 49)). In the operative complaint, Pettibone alleged that he was retaliated against after complaining of racially discriminatory conduct as he was demoted to lower job assignments. (Doc. 37 at 93-98). Nevertheless, while there is evidence of supervisor harassment, on summary judgment Pettibone submitted no evidence of any harassment *by a supervisor connected to and/or culminating in a tangible employment action* (including his lay off). Additionally, Pettibone does not allege as such on summary judgment. Moreover, this Court previously concluded that Pettibone waived his retaliation claim, and that ruling was not vacated by the Eleventh Circuit. Thus, there is no evidence before the Court showing a *causal* relationship between Pettibone's lay off (or other event) and any alleged racial harassment by a supervisor, and as such, no evidence of a tangible employment action on summary judgment. See, e.g., Otu v. Papa John's USA, Inc., 400 F. Supp. 2d 1315, 1328 (N.D. Ga. 2005) (discussing a similar situation where a plaintiff failed to show the causal relationship on summary judgment).

When there is no evidence that a harassing supervisor took a tangible employment action against an employee, courts assess whether the harassment is nevertheless severe or pervasive enough to constitute a hostile work environment. Joens, 243 F.Supp.2d at 933. If yes, *as is the case here (*see *supra)*, the employer is vicariously liable for a supervisor's harassment unless the employer can prove both elements of the Faragher/Ellerth affirmative defense. Id.

First, for "prevention," there is no uniform test for determining whether an employer's policy demonstrates that it exercised reasonable care, and the mere existence of a formal anti-

harassment policy does not satisfy this first prong. See, e.g. Frederick, 246 F.3d at 1313 (noting that the employer failed to establish that its policy contained reasonable complaint procedures); Dinkins v. Charoen Pokphand USA, Inc., 133 F. Supp. 2d 1237, 1251 (M.D. Ala. 2001) (concluding that the employer failed to establish the affirmative defense that it was diligent in preventing and correcting harassment, and that complaining employees had not taken advantage of opportunities for redress provided by employer). An employer's policy fulfills its "prevent harassment" obligation if the employer promulgates a policy that is "comprehensive, well-known to employees, vigorously enforced, and provides alternate avenues of redress[;] and the policy must not be administered "in bad faith" or be otherwise "defective or dysfunctional." Dinkins, 133 F. Supp. 2d at 1251 (citing Farley v. American Cast Iron Pipe Co., 115 F.3d 1548, 1554 (11th Cir. 1997) and Madray v. Publix Supermarkets, Inc., 208 F.3d 1290, 1298 (11th Cir. 2000)). "A policy is 'defective' if those responsible for its enforcement lack training and knowledge sufficient to recognize, prevent and correct workplace discrimination." Id. Essentially then, an employer can establish that it exercised reasonable care to prevent harassment by showing that it promulgated and effectively disseminated a clear anti-harassment policy with complaint procedures to its employees, see Faragher, 524 U.S. at 807-808 and Ellerth, 524 U.S. at 765, *so long as* the complaint procedures "meet the minimum requirements for the *Faragher* affirmative defense…[and do] not require…the employee to complain to the offending supervisor or through the supervisor's chain of command and…provide[] multiple avenues of lodging a complaint to assessable, designated representatives." Madray, 208 F.3d at 1299 (determining the policy was sufficient "because the procedures did not require that the employee complain to the offending supervisor or through the supervisor's chain of command and the procedures provided multiple

avenues of lodging a complaint to assessable, designated representatives[]"). See also e.g., Olson v. Lowe's Home Ctrs. Inc., 130 Fed. Appx. 380, 389 (11th Cir. 2005) (finding satisfaction of the first prong as the policies enabled employees to bypass harassing supervisors and provided several different avenues for employees to report harassment); Reyna v. ConAgra Foods, Inc., 506 F. Supp. 2d 1363, 1375 (M.D. Ga. 2007) (holding that material issues of fact, as to whether employer took reasonable care to prevent and properly correct harassment, precluded summary judgment for employer, based on existence of procedures for addressing discrimination issues not utilized by claimants). This "requires…a clear and known policy against workplace harassment…[including] permit[ting] employees to bypass supervisors and retain some vestige of anonymity." Bury v. Sky Chefs, 2011 WL 197383, *6 (S.D. Fla. Jan. 20, 2011) (defining the first prong of Faragher/Ellerth). Inherent defects exist when a policy's complaint procedures do not "meet the minimum requirements" for the Faragher affirmative defense: provide employees "*multiple* avenues of lodging a complaint *to assessable, designated representatives*" *outside* of the supervisory chain of command (do not require an employee complain to the offending supervisor or through the supervisor's chain of command). Madray, 208 F.3d at 1299 (emphasis added). Moreover, "a policy is [considered] 'defective' if those responsible for its enforcement lack training and knowledge sufficient to recognize, prevent, and correct workplace discrimination." Dinkins, 133 F. Supp. 2d at 1251.

Concerning the second prong of "prevention" -- whether the employer took reasonable care to "correct promptly" any harassment -- "the employer's notice of the harassment is of paramount importance [because] if the employer had notice of the harassment...then it is liable unless it took prompt corrective action." Madray, 208 F.3d at 1299 (citing Dees v. Johnson

Controls World Services, 168 F.3d 417, 422 (11th Cir. 1999)). An employer is directly liable for co-worker harassment if the employer knew or should have known of the conduct but failed to take prompt remedial action. See, e.g., Miller, 277 F.3d at 1278; Breda v. Wolf Camera & Video, 222 F.3d 886, 889 (11th Cir. 2000). "Actual notice is established by proof that management knew….constructive notice will be found where the harassment was so severe and pervasive that management should have known of it."[8] Miller, 277 F.3d at 1278. "This inquiry is facilitated by the identification of the 'appropriate Company representative' to whom employees should register their complaints" in the employer's policy. Madray, 208 F.3d at 1299-1300. Once it is determined that the employer had adequate notice, whether the employer took timely corrective action depends upon whether it responded in a reasonably prompt manner to the employee's harassment complaint. See, e.g., Frederick, 246 F.3d at 1316. Thus, when the employer had notice is key "to determine the alacrity of its response[;]" the employer is liable unless it took "prompt corrective action." Madray, 208 F.3d at 1299; Dees, 168 F.3d at 422. See also e.g., Coates v, Sundor Brands, Inc., 164 F.3d 1361, 1364 (11th Cir. 1999) (noting that the appropriate inquiry at this stage is to ask is what measures an employer (in that case via an HR Manager) reasonably believed had been taken to address the problem).

Second, courts assess whether the employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer to avoid harm.[9] Joens, 243

---

[8] For constructive notice, courts also consider: 1) the remoteness of the location of the harassment as compared to the location of management; 2) whether the harassment occurs intermittently over a long period of time; 3) whether the victims were employed on a part-time or full-time basis; and 4) whether there were only a few, discrete instances of harassment. See, e.g., Miller, 277 F.3d at 1278; Allen, 121 F.3d at 647.

[9] Austal references Pettibone's failure to report *each and every* single instance of harassment as a failure to fulfill this policy reporting procedure. (Doc. 176 at 13-14). Austal then cites Faragher as follows: "Pettibone's failure to utilize a preventive or corrective opportunity provided by Austal precludes Austal from being held

(Continued)

F.Supp.2d at 933. "[W]hile proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the [affirmative] defense." Madray, 208 F.3d at 1301 (citing Faragher, 524 at 807-808 and Ellerth, 524 U.S. at 765). However, "employees of such companies who believe they are victims of harassment need not be concerned with whether they pursued their complaints far enough up the company ladder." Breda, 222 F.3d at 890 (explaining that the question of whether an employee followed the procedures established in the company's policy in a reasonable manner is an issue of fact to be determined by a jury). "In defining the contours of what it means to reasonably use the complaint procedures and, thereby, properly report…harassment," the Eleventh Circuit has identified criteria that "must be satisfied[:]" 1) the employee must have complained to the appropriate person; and 2) if yes, the employee's conversations with such person must be sufficient to place the employer on notice. Olson, 130 Fed. Appx. at 389-390 (citing Madray, 208 F.3d at 1300, Breda, 222 F.3d at 889 and Coates, 164 F.3d at 1364).

Concerning co-workers, an employer is liable for co-worker harassment if the employer knew (actual notice) or should have known (constructive notice) of the harassing conduct but failed to take prompt remedial action. See, e.g., Miller, 277 F.3d at 1278; Breda, 222 F.3d at 889. Once notice is established, a plaintiff must show that the employer "failed to take

vicariously liable of the alleged actions of its employees." (Id.) However, Faragher does not state as such. Faragher provides: "[i]f the plaintiff *unreasonably* failed to avail herself of the employer's preventive or remedial apparatus, she *should* not recover damages that *could have been avoided if she had done so*. Faragher, 524 U.S. at 807 (emphasis added).

immediate and appropriate action." Watson v. Blue Circle, Inc., 324 F.3d 1252, 1259 (11th Cir. 2003). See also Frederick, 246 F.3d at 1314; Minix v. Jeld-Wen, Inc., 237 Fed. Appx. 578, 583 (11th Cir. 2007). The action must be "reasonably likely to prevent the misconduct from recurring." See, e.g., Kilgore v. Thompson & Brock Mgt., Inc., 93 F.3d 752, 754 (11th Cir. 1996). The employer's action must be "effective action in order to exempt an employer from liability[]" Saville v. Houston Cty. Healthcare Auth., 852 F. Supp. 1512, 1528 (M.D. Ala. 1994), and "must be 'reasonably calculated to end the harassment,' and the promptness and adequacy of the employer's response must be evaluated on a case-by-case basis. Of special importance is whether the…harassment ended after the remedial action was taken[]" Munn v. Mayor and Aldermen of City of Savannah, Ga., 906 F. Supp. 1577, 1583 (S.D. Ga. 1995).

Even though it bears the burden of proof, Austal's motion minimally addresses the fifth element of employer liability and the related Faragher/Ellerth affirmative defense. Austal submitted evidence (some of which appears irrelevant) that it characterizes as examples of "responses" taken, *in general*, to racial/harassment incidents during its history. (Doc. 176 at 14-15). Regardless, factual issues exist for element five, including whether Austal's response to complaints was adequate. In sum, the Court finds that Pettibone has submitted sufficient evidence to establish that genuine issues of material fact exist questioning Austal's ability to shield itself with Faragher/Ellerth. Accordingly, Austal's motion as to Pettibone's hostile work environment claim is **DENIED**.

## IV. Conclusion

Accordingly, it is **ORDERED** that Austal's motion for summary judgment is **DENIED** as to Pettibone's hostile work environment claim.[10]

**DONE** and **ORDERED** this the **3rd** day of **September 2014.**

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE
UNITED STATES DISTRICT JUDGE**

---

[10] Pettibone seeks an award of punitive damages against Austal. It is **ORDERED** that Austal's motion for summary judgment regarding Pettibone's punitive damages claim is **DENIED** at this time.

20