# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| LARRY LAFFIETTE, *et al.*,   Plaintiffs, | )  )  ) |
| v. | )  CIVIL ACTION 08-00155-KD-N |
| AUSTAL, U.S.A., L.L.C.,   Defendant. | )  )  )  ) |

## ORDER

This matter is before the Court on Defendant's motion for summary judgment (Docs. 180, 181), Plaintiff's Opposition (Doc. 306), Defendant's Reply (Doc. 331), and the Eleventh Circuit's remand (Doc. 821).

## I.  Factual Background[1]

On March 20, 2008, multiple Plaintiffs initiated this action against Austal for legal and equitable relief to redress unlawful discrimination and harassment on the basis of race. (Doc. 1). Larry Laffiette ("Laffiette") asserts claims for hostile work environment based on race in violation of Title VII and 42 U.S.C. § 1981. (Doc. 37 at 79-83).[2]

On September 21, 2011, this Court issued summary judgment in favor of Austal as to Laffiette's claims for hostile work environment, discriminatory pay, promotion and training, and mooted his punitive damages request. (Docs. 513, 720). Laffiette's summary judgment ruling was appealed (USCA#12-11507-EE) (Doc. 753), and on June 17, 2014, the Eleventh Circuit

---

[1] At the summary judgment stage, the facts are taken in the light most favorable to the non-movant. Tipton v. Bergrohr GMBH–Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992). The "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." Priester v. City of Riviera Beach, 208 F.3d 919, 925 n. 3 (11th Cir. 2000).

[2] All other claims have been previously dismissed, abandoned, or judgment granted for the defendant.

vacated the summary judgment order as to the claim of a racially hostile work environment. (Doc. 821 at 31). The Eleventh Circuit found that a reasonable jury could find that Laffiette's work environment was objectively hostile, and remanded his claims of a racially hostile work environment with instructions for this Court "to determine whether Austal is entitled to summary judgment on the ground that it was not directly or vicariously liable for the harassment or whether the employees' claims should proceed to trial." (Id. at 3, 31, 38). The mandate issued August 8, 2014. (Doc. 826).

### A. Austal

Defendant Austal USA ("Austal") is an Australian shipbuilding company dedicated to the design and construction of customized aluminum commercial and military vessels, located in Mobile, Alabama. (Doc. 181 at 2; Doc. 283-48 at 2-3 (Austal's 3/7/07 EEOC Position Statement)). The Operations Division has four (4) major Departments (Aluminum (divided into Fabrication and Components), Electrical, Engineering, and Fit Out (divided into HVAC, Insulation and Fit Out)). (Doc. 283-48 at 3-4).

### B. Laffiette's Employment

Laffiette began working for Austal on January 30, 2006 as a Fabrication Apprentice at the rate of $10/hour. (Doc. 209-1 (Dep. Laffiette at 36, 51); Doc. 285-13 (Dep. Laffiette at 36-37, 52); Doc. 295 at 21 (Exhibit 105-Sealed); Doc. 209-2 at 8 (Decltn. Lindley)). On May 6, 2009, Laffiette was laid off (downsizing). (Doc. 209-1 (Dep. Laffiette at 46-47, 49)).

### C. Austal's Anti-Harassment & Non-Discrimination Policy

Austal submitted evidence of two (2) anti-harassment and non-discrimination policies: an "April 2006 Issue F" policy, and a "November 2007" policy. (Doc. 209-2 at 2-3 and note 1

2

(Decltn. Lindley); Doc. 209-2 at 36-37, 49-51 (the April 2006 Issue F policy and the November 2007 Issue A policy)).

The April 2006 and November 2007 policies reveal different complaint procedures for different periods of time. The April 2006 policy "urges" employees to report complaints to his/her supervisor or, if not comfortable doing so, to the Departmental Manager:[3]

> Any employee suspecting a violation of this policy, or who in any way feels uncomfortable with the actions of Company Supervisors, employees or outsiders is urged to inform his or her Supervisor. If for any reasons the employee does not feel comfortable discussing the situation with his or her immediate Supervisor, he or she should report the matter to the Departmental Manager… Supervisors are **required** to report suspected harassment and any allegations of harassment to the Departmental Manager.

(Doc. 209-2 at 36-37 (emphasis in original)). (Doc. 284-3 (Dep. Lindley[4] I at 238-240, 245-246) (testifying that such was the procedure as to the 2006 policy, and confirming that nothing in that policy identifies HR as an avenue for complaints). From November 2007 forward, employees "should report" to <u>both</u> to his supervisor <u>and</u> his Department Manager/Coordinator <u>before</u> even being allowed to report to HR:

> 1.3 Reporting an Incident of Harassment or Workplace Violence
> It is the employee's responsibility to report any incident of harassment or workplace violence. The employee should report any incident of this nature to his/her supervisor. If the employee is not comfortable reporting the incident to his/her supervisor you may talk to the department coordinator or manager. If you need to talk with someone *after you have completed both steps,* you may contact the Human Resources Department. Any reported allegations of harassment or workplace violence will be Investigated confidentially and promptly.

(Doc. 209-2 at 50 (emphasis added)). No evidence has been submitted to the Court of Laffiette

---

[3] Based on the record and as indicated by Austal, the Departmental Managers (or Coordinators) manage specific departments, such as Aluminum Fabrication, and within those departments, there are Supervisors who supervise the employees working with said department. (Doc. 283-48 (Austal's 3/7/07 EEOC Position Statement)).

[4] Austal's Rule 30(b)(6) representative and HR Benefits Coordinator.

having signed either the April 2006 or November 2007 policy. The evidence submitted indicates only Laffiette signed *a* policy around January 30, 2006. (Doc. 285-13 (Dep. Laffiette at 37)).

Laffiette testified that he understood the complaint procedure at Austal was to report up the chain of command -- to report harassment/discrimination first to his supervisor and that he was not even allowed to speak to HR without his supervisor's permission. (Doc. 285-13 (Dep. Laffiette at 103)). On the one occasion when Laffiette asked for such permission, however, his supervisor responded that he had to "finish doing what I was doing" and "we'll get to that later." (Id. (Dep. Lafiette at 105-106)).

Regarding racially and hostile discriminatory comments, Laffiette alleges that he was possibly called "nigger" once by leadman "Gorham" on another crew, but is not sure ("where you been, nigger"). (Doc. 209-1 (Dep. Laffiette at 151-153, 155)). A few weeks later, Laffiette told Gorham that he found the word "nigger" offensive and Gorham responded "[d]on't worry about it. That ain't me[]" and "[i[f I really say something to you like that, I don't mean it." (Id. (Dep. Laffiette at 154-155)). Laffiette did not report the comment because he was not really sure what Gorham had said. (Id.) Laffiette alleges that his supervisor Dane Tomberlin called him "'[b]oy,' and stuff like that all the time[]" – over 10 times. (Id. (Dep. Laffiette at 156-158)). Laffiette told Tomberlin "don't be calling me that[]" as he did not like it; in response, Tomberlin said "I'm just playing with you." (Id. (Dep. Laffiette at 157)). Laffiette did not report Tomberlin's comment to HR, and Tomberlin "would [still] say it from time to time." (Id. Dep. Laffiette at 157-158)). Laffiette adds that Wesley Fiveash (leadman on Laffiette's crew) and Curt Hunt (co-worker who then became leadman after Fiveash was promoted to supervisor) also called him "boy" sometimes (Fiveash over 10 times and Hunt over 50 times). (Doc. 209-1 (Dep.

4

Laffiette at 156, 158, 161)). Laffiette testified that "they were saying it [boy] like in a playing gesture, but I didn't take that too kindly[;]" he complained, after which it stopped. (Id. (Dep. Laffiette at 156)). Laffiette did not report the comments because "I mean if he [his supervisor] called me Boy…that really ain't going to solve anything[,]" but told all of them that he did not like the term. (Id. (Dep. Laffiette at 160-162)). Hunt responded by telling him "[s]hut up, you need to go back to work" or something like that. (Id.)

Laffiette was subjected to Confederate flag imagery as displayed on several Caucasian co-workers' t-shirts who worked in another department. (Doc. 209-1 (Dep. Laffiette at 192); Doc. 285-13 (Dep. Laffiette at 166)). Laffiette is aware that another African American co-worker told the Caucasian co-workers that she found the flag imagery offensive. (Doc. 285-13 (Dep. Laffiette at 193)). Laffiette reported to his supervisor Chris Robinson at morning safety meetings that he found the flag imagery offensive. (Id. (Dep. Laffiette at 194)). Robinson's response was that there was no dress code so there "ain't nothing he can do about it." (Id.)

Laffiette was constantly subjected to racial epithets in graffiti on bathroom walls and stalls. (Doc. 209-1 (Dep. Laffiette at 182); Doc. 285-13 (Dep. Laffiette at 163-164, 166, 175, 235-236)). Laffiette "always" reported the racial graffiti. (Doc. 209-1 (Dep. Laffiette at 182, 186, 189, 191); Doc. 285-13 (Dep. Laffiette at 177-178, 181-182, 186, 229)). In response he would be told "we can't do nothing about it[]" or "[i]t's not like we can just watch the bathrooms all day." (Id.) The graffiti included the following: "white power" with a drawing of a hooded Klansman (a photograph of this on the bathroom wall on someone's phone); "why don't niggers use aspirin-because they don't want to pick the cotton out of the top;" "why do you think a white man loves to F a black girl;" and "see niggers travel in packs just like monkeys." (Doc. 209-1

(Dep. Laffiette at 182, 186, 189); Doc. 285-13 (Dep. Laffiette at 163-164, 166, 175-179, 182-183, 188-189, 191)). According to Laffiette, Austal "started trying to paint the walls probably about every three to four weeks." (Doc. 209-1 (Dep. Laffiette at 182, 189)).

Austal alleges that initially they counseled their supervisors regarding the graffiti. (See, e.g., Doc. 209-3 (Dep. Combs at 111, 126) (Austal "discussed it with our teams and told them graffiti of any kind, racial, sexual, or any kind is not tolerated[,]" adding it was discussed "with all the supervisors" and that the supervisors "have been told to discuss it with all of their people[]"). However, Combs does not really know if that ever occurred, noting that he saw graffiti in mid-2009. Thereafter, in August 2007, Austal responded to complaints by painting everything black. (Doc. 285-20 (Dep. Browning at 16, 110); Doc. 331-2 (Dep. Laffiette at 180)). Yet the graffiti continued as the paint transformed the bathrooms into a chalkboard making the graffiti show up better. (Doc. 285-20 (Dep. Roberson at 313); Doc. 284-4 (Dep. Lindley II at 95-96, 166-168, 188-190, 195-196, 202-203); Doc. 284-5 (Dep. Lindley III at 254); Doc. 284-11 (Dep. O'Dell at 74-75); Doc. 284-7 (Dep. Friedlieb I at 84)). There were no investigations, and no policy was implemented as to precisely how to document the graffiti and/or how to prevent it. (Doc. 285-2 (Dep. Browning at 16, 110); (Doc. 284-3 (Dep. Lindley I at 196); (Doc. 284-7 (Dep. Friedlieb I at 49, 52, 82, 84, 86)). Austal's CEO testified that there were no discussions with HR about prevention of the graffiti apart from painting everything black. (Doc. 285-2 (Dep. Browning at 110, 113-114, 117)). Austal's HR Coordinator testified that there has been a constant problem with racially offensive and threatening graffiti since 2005, and while senior management and HR are aware of it, it was still ongoing as of 2009. (Doc. 284-4 (Dep. Lindley II at 86-89, 96, 101-102, 112-114, 123-124, 188-190, 195-196, 202-203); Doc. 284-5 (Dep.

6

Lindley III at 254). HR Manager Carver testified that he does not recall any investigation into the graffiti or Austal issuing any memo or statement about it to employees. (Doc. 284-10 (Dep. Carver II at 62-63, 65-66, 70)). Carver also does not recall whether between 2004-2007 the issue of racial graffiti was ever formally addressed by Austal or whether Austal took any action to determine who was responsible for the graffiti. (Id.) According to Carver, "there's really no excuse….that I didn't send out a document to everybody and say, look this is not tolerated, I don't care what you say, there's really no excuse for it. I'll admit that." (Id. (Dep. Carver II at 81-82)).

Approximately 3½ years after being hired, Laffiette was shown a photograph of one noose, found by others in the break room at work. (Doc. 209-1 (Dep. Laffiette at 170-171)). Concerning the May 2008 noose, (Docs. 283-24, 283-25, 284-2), the City of Mobile was alerted to its presence through an article in the Press Register, and while Austal did not issue a memo, statement or email to its employees about the noose, Austal investigated and offered a reward for information (Doc. 209-3 (Dep. Pate at 152); Doc. 283-26; Doc. 283-27; Doc. 283-28; Doc. 285-2 (Dep. Browning at 7-14, 118-120, 124-125); (Doc. 284-3 (Dep. Lindley I at 255-256); Doc. 284-5 at 59 (Dep. O'Dell at 79)). The noose was also reported to Security, Supervisors, HR and Senior Management; Security and O'Dell in HR conducted an investigation but were unable to determine who was responsible. (Doc. 284-2; Doc. 284-4 (Dep. Lindley II at 157); Doc. 284-5 at 59 (Dep. O'Dell at 79); Doc. 284-8 (Dep. Friedlieb II at 145)). However, Austal's investigation consisted primarily of investigating the African American employees who found (and reported) the noose as suspects, with a focus on co-worker (and co-plaintiff) Beverly Thomas as having staged the incident. (Doc. 284-2; Doc. 284-8 (Dep. Friedlieb II at 163, 168,

7

170, 183-185, 191-192)).

## II. Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (Dec. 2010). Amended Rule 56(c) governs Procedures, and provides as follows:

> *(1) Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> *(2) Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
>
> *(3) Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record.
>
> *(4) Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

FED.R.CIV.P. Rule 56(c) (Dec. 2010).

Defendant, as the party seeking summary judgment, bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."

Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). If the nonmoving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment. Celotex, 477 U.S. at 323. "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992), cert. den., 507 U.S. 911 (1993) (internal citations and quotations omitted).

### III. Section 1981/Title VII – Hostile Work Environment (Race)

Racial harassment is actionable under Section 1981 or Title VII where the conduct is sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment. See, e.g., Freeman v. City of Riverdale, 330 Fed. Appx. 863, 865 (11th Cir. 2009) (unpublished).[5] To establish a prima facie case of hostile work environment and/or racial harassment under Section 1981 or Title VII, the plaintiff must prove that: 1) he belongs to a protected group; 2) he has been subject to unwelcome harassment; 3) the harassment was based on a protected characteristic of the employee (such as race); 4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and 5) the employer is responsible for such environment under a theory of vicarious or direct liability. See, e.g., Reeves v. DSI Sec. Servs., Inc., 395 Fed. Appx.

---

[5] This is an unpublished decision and is persuasive, but not binding, authority pursuant to Eleventh Circuit Rule 36-2. The Court notes this same rule applies to other Fed. Appx. cases cited herein.

544, 545-546 (11th Cir. 2010) (unpublished); McCann v. Tillman, 526 F.3d 1370, 1378 (11th Cir. 2008); Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002). See also e.g., Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999).

The first three (3) prima facie elements of a hostile work environment are satisfied and not disputed by the parties. However, as to remaining elements, Austal contends that: 1) Laffiette's evidence of sporadic and isolated incidents of racially hostile comments, conduct and graffiti during the time he was employed do not meet the severe or pervasive threshold; 2) Laffiette makes no allegations and presents no evidence that the allegedly hostile environment unreasonably interfered with his ability to work on a day-to-day basis; 3) Austal maintained a policy establishing how an employee should report discriminatory conduct, but Laffiette failed to report certain conduct; and 4) Austal took reasonable preventative and corrective/remedial measures to prevent a hostile work environment.

### A. Severe or Pervasive

To be actionable as severe or pervasive, the harassment "must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceive[s]…to be abusive." Miller, 277 F.3d at 1276 (internal citation and quotation marks omitted). In other words, the severe or pervasive element has an objective and subjective component. McCann, 526 F.3d at 1378. To determine the objective severity of the harassment, courts look at the totality of the circumstances and consider: 1) the frequency of the discriminatory conduct; 2) the severity of the conduct; 3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and 4) whether the conduct unreasonably interferes with an employee's job performance. Reeves, 395 Fed. Appx. at 546.

See also Faragher v. City of Boca Raton, 524 U.S. 775, 787-788 (1998); Allen v. Tyson Foods, 121 F.3d 642, 647 (11th Cir. 1997) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)). "The conduct is considered cumulatively instead of in isolation." Reeves, 395 Fed. Appx. at 546. There is sufficient evidence, if believed by a jury, that Laffiette subjectively perceived his work environment to be racially hostile.

As to the fourth element, the objective severity of the harassment, as established by the Eleventh Circuit in its remand:

> The record presents a genuine dispute of material facts that Laffiette's workplace was objectively hostile. He worked for Austal for roughly three years, during which he thought he heard a coworker once say to him, "Where you been at, nigger?" but he "couldn't really make out" what was said and he "wasn't sure" if the coworker said the slur "nigger." His supervisor called him "boy" "all the time," which he clarified was "over ten times." Two other coworkers called him "boy," "over ten times" and "over 50 times," respectively. He saw racist graffiti "all the time" in "pretty much all of" the restrooms that he used at work. He also saw several employees wear apparel with the Confederate flag, although "none of them worked on [his] crew." And his coworker showed him a photograph of a noose in the breakroom.
>
> Laffiette raises a disputed issue that the harassment he experienced was frequent and severe. Laffiette frequently experienced racial harassment by his supervisor's and coworkers' references to "boy," and he also frequently saw racist graffiti in the men's restrooms. And the photograph of the noose was severe, but less severe than if he had discovered the noose firsthand. Because of the frequency with which he was called "boy" and saw the racist graffiti, combined with the other harassment of which he learned secondhand, a reasonable jury could find that his workplace was objectively hostile.

(Doc. 821 at 23-24).

### B. Employer Liability- Faragher/Ellerth Affirmative Defense

With the fourth element satisfied, this Court turns to the fifth element: "…the employer[]…[Austal] is responsible for the hostile work environment under…a theory of

vicarious or direct liability[]"[6] unless Austal can avail itself of the Faragher/Ellerth affirmative defense.

In Faragher v. City of Boca Raton, 524 U.S. 775 (1998) and Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998), the Supreme Court held that employer liability is automatic when the supervisor's harassment culminates in a "tangible employment action, such as discharge, demotion, or undesirable reassignment." Faragher, 524 U.S. at 807, 808; Ellerth, 524 U.S. at 762, 763. Where no such action has occurred, "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." Faragher, 524 U.S. at 807; Ellerth, 524 U.S. at 745. But an employer may avoid vicarious liability by raising as an affirmative defense that it: 1) exercised reasonable care to prevent and correct promptly any harassing behavior, and 2) the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. Faragher, 524 U.S. at 807, 809; Miller, 277 F.3d at 1278. This is known as the Faragher/Ellerth affirmative defense. For an employer to avail itself of this defense and be found not liable, "[*b]oth elements must be satisfied…*the *defendant bears the burden of proof on both elements*." Frederick v. Sprint/United Mgmt. Co., 246 F.3d 1305, 1313 (11th Cir. 2001) (citations omitted) (emphasis added) (holding that factual issues existed regarding employer's complaint procedure and employee's use of it, precluding summary judgment on Faragher/Ellerth). If, however, neither element is satisfied, the employer is liable for the harassment. See *supra*. See also Joens v. John Morrell & Co., 243 F.Supp.2d 920, 933 (N.D. Iowa 2003) (providing a helpful flow chart).

---

[6] Miller, 277 F.3d at 1278.

Austal's liability is automatic if a supervisor's harassment culminated in a tangible employment action as to Laffiette (*e.g.*, discharge, demotion, undesirable reassignment). There is no dispute that Laffiette was "laid off" in May 2009. In the operative complaint, Laffiette alleged that he was retaliated against after complaining of the racially hostile environment as he was treated differently from white co-workers with regard to training and pay. (Doc. 37 at 80-82). Laffiette also testified that "[i]n a way[]" he feels he was laid off because of his race due to "all the other stuff that was going on, that was happening[;]" and that he thinks he was laid off in retaliation for suing Austal as his supervisor Tomberlin "was giving me the impression that they wanted to try to get rid of me anyway." (Doc. 209-1 (Dep. Laffiette at 55-56)). Nevertheless, while there is evidence of supervisor harassment, on summary judgment Laffiette submitted no evidence of any harassment *by a supervisor connected to and/or culminating in a tangible employment action* (including being laid off). Additionally, Laffiette does not allege as such on summary judgment. Moreover, this Court previously concluded that Laffiette waived his retaliation claim, and that ruling was not vacated by the Eleventh Circuit. Thus, there is no evidence before the Court showing a *causal* relationship between Laffiette's termination (or other event) and any alleged racial harassment by a supervisor, and as such, no evidence of a tangible employment action on summary judgment. See, e.g., Otu v. Papa John's USA, Inc., 400 F. Supp. 2d 1315, 1328 (N.D. Ga. 2005) (discussing a similar situation where a plaintiff failed to show the causal relationship on summary judgment).

When there is no evidence that a harassing supervisor took a tangible employment action against an employee, courts assess whether the harassment is nevertheless severe or pervasive enough to constitute a hostile work environment. Joens, 243 F.Supp.2d at 933. If yes, *as is the*

*case here (*see *supra)*, the employer is vicariously liable for a supervisor's harassment unless the employer can prove both elements of the Faragher/Ellerth affirmative defense. Id.

First, for "prevention," there is no uniform test for determining whether an employer's policy demonstrates that it exercised reasonable care, and the mere existence of a formal anti-harassment policy does not satisfy this first prong. See, e.g. Frederick, 246 F.3d at 1313 (noting that the employer failed to establish that its policy contained reasonable complaint procedures); Dinkins v. Charoen Pokphand USA, Inc., 133 F. Supp. 2d 1237, 1251 (M.D. Ala. 2001) (concluding that the employer failed to establish the affirmative defense that it was diligent in preventing and correcting harassment, and that complaining employees had not taken advantage of opportunities for redress provided by employer). An employer's policy fulfills its "prevent harassment" obligation if the employer promulgates a policy that is "comprehensive, well-known to employees, vigorously enforced, and provides alternate avenues of redress[;] and the policy must not be administered "in bad faith" or be otherwise "defective or dysfunctional." Dinkins, 133 F. Supp. 2d at 1251 (citing Farley v. American Cast Iron Pipe Co., 115 F.3d 1548, 1554 (11th Cir. 1997) and Madray v. Publix Supermarkets, Inc., 208 F.3d 1290, 1298 (11th Cir. 2000)). "A policy is 'defective' if those responsible for its enforcement lack training and knowledge sufficient to recognize, prevent and correct workplace discrimination." Id. Essentially then, an employer can establish that it exercised reasonable care to prevent harassment by showing that it promulgated and effectively disseminated a clear anti-harassment policy with complaint procedures to its employees, see Faragher, 524 U.S. at 807-808 and Ellerth, 524 U.S. at 765, *so long as* the complaint procedures "meet the minimum requirements for the *Faragher* affirmative defense…[and do] not require…the employee to complain to the offending supervisor or through

the supervisor's chain of command and…provide[] multiple avenues of lodging a complaint to assessable, designated representatives." Madray, 208 F.3d at 1299 (determining the policy was sufficient "because the procedures did not require that the employee complain to the offending supervisor or through the supervisor's chain of command and the procedures provided multiple avenues of lodging a complaint to assessable, designated representatives[]"). See also e.g., Olson v. Lowe's Home Ctrs. Inc., 130 Fed. Appx. 380, 389 (11th Cir. 2005) (finding satisfaction of the first prong as the policies enabled employees to bypass harassing supervisors and provided several different avenues for employees to report harassment); Reyna v. ConAgra Foods, Inc., 506 F. Supp. 2d 1363, 1375 (M.D. Ga. 2007) (holding that material issues of fact, as to whether employer took reasonable care to prevent and properly correct harassment, precluded summary judgment for employer, based on existence of procedures for addressing discrimination issues not utilized by claimants). This "requires…a clear and known policy against workplace harassment…[including] permit[ting] employees to bypass supervisors and retain some vestige of anonymity." Bury v. Sky Chefs, 2011 WL 197383, *6 (S.D. Fla. Jan. 20, 2011) (defining the first prong of Faragher/Ellerth). Inherent defects exist when a policy's complaint procedures do not "meet the minimum requirements" for the Faragher affirmative defense: provide employees "*multiple* avenues of lodging a complaint *to assessable, designated representatives*" *outside* of the supervisory chain of command (do not require an employee complain to the offending supervisor or through the supervisor's chain of command). Madray, 208 F.3d at 1299 (emphasis added). Moreover, "a policy is [considered] 'defective' if those responsible for its enforcement lack training and knowledge sufficient to recognize, prevent, and correct workplace discrimination." Dinkins, 133 F. Supp. 2d at 1251.

Concerning the second prong of "prevention" -- whether the employer took reasonable care to "correct promptly" any harassment -- "the employer's notice of the harassment is of paramount importance [because] if the employer had notice of the harassment...then it is liable unless it took prompt corrective action." Madray, 208 F.3d at 1299 (citing Dees v. Johnson Controls World Services, 168 F.3d 417, 422 (11th Cir. 1999)). An employer is directly liable for co-worker harassment if the employer knew or should have known of the conduct but failed to take prompt remedial action. See, e.g., Miller, 277 F.3d at 1278; Breda v. Wolf Camera & Video, 222 F.3d 886, 889 (11th Cir. 2000). "Actual notice is established by proof that management knew….constructive notice will be found where the harassment was so severe and pervasive that management should have known of it."[7] Miller, 277 F.3d at 1278. "This inquiry is facilitated by the identification of the 'appropriate Company representative' to whom employees should register their complaints" in the employer's policy. Madray, 208 F.3d at 1299-1300. Once it is determined that the employer had adequate notice, whether the employer took timely corrective action depends upon whether it responded in a reasonably prompt manner to the employee's harassment complaint. See, e.g., Frederick, 246 F.3d at 1316. Thus, when the employer had notice is key "to determine the alacrity of its response[;]" the employer is liable unless it took "prompt corrective action." Madray, 208 F.3d at 1299; Dees, 168 F.3d at 422. See also e.g., Coates v, Sundor Brands, Inc., 164 F.3d 1361, 1364 (11th Cir. 1999) (noting that the appropriate inquiry at this stage is to ask is what measures an employer (in that case via an HR

---

[7] For constructive notice, courts also consider: 1) the remoteness of the location of the harassment as compared to the location of management; 2) whether the harassment occurs intermittently over a long period of time; 3) whether the victims were employed on a part-time or full-time basis; and 4) whether there were only a few, discrete instances of harassment. See, e.g., Miller, 277 F.3d at 1278; Allen, 121 F.3d at 647.

16

Manager) reasonably believed had been taken to address the problem).

Second, courts assess whether the employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer to avoid harm.[8] Joens, 243 F.Supp.2d at 933. "[W]hile proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the [affirmative] defense." Madray, 208 F.3d at 1301 (citing Faragher, 524 at 807-808 and Ellerth, 524 U.S. at 765). However, "employees of such companies who believe they are victims of harassment need not be concerned with whether they pursued their complaints far enough up the company ladder." Breda, 222 F.3d at 890 (explaining that the question of whether an employee followed the procedures established in the company's policy in a reasonable manner is an issue of fact to be determined by a jury). "In defining the contours of what it means to reasonably use the complaint procedures and, thereby, properly report…harassment," the Eleventh Circuit has identified criteria that "must be satisfied[:]" 1) the employee must have complained to the appropriate person; and 2) if yes, the employee's conversations with such person must be sufficient to place the employer on notice. Olson, 130 Fed. Appx. at 389-390 (citing Madray, 208 F.3d at 1300, Breda, 222 F.3d at 889 and Coates, 164 F.3d at 1364).

---

[8] Austal references Laffiette's failure to report *each and every* single instance of harassment as a failure to fulfill this policy reporting procedure. (Doc. 181 at 13). Austal then cites Faragher as follows: "[o]n every occasion that Laffiette failed to utilize a preventive or corrective opportunity provided by Austal precludes Austal from being held vicariously liable of the alleged actions of its employees." (Id.) However, Faragher does not state as such. Faragher provides: "[i]f the plaintiff *unreasonably* failed to avail herself of the employer's preventive or remedial apparatus, she *should* not recover damages that *could have been avoided if she had done so*." Faragher, 524 U.S. at 807 (emphasis added).

Concerning co-workers, an employer is liable for co-worker harassment if the employer knew (actual notice) or should have known (constructive notice) of the harassing conduct but failed to take prompt remedial action. See, e.g., Miller, 277 F.3d at 1278; Breda, 222 F.3d at 889. Once notice is established, a plaintiff must show that the employer "failed to take immediate and appropriate action." Watson v. Blue Circle, Inc., 324 F.3d 1252, 1259 (11th Cir. 2003). See also Frederick, 246 F.3d at 1314; Minix v. Jeld-Wen, Inc., 237 Fed. Appx. 578, 583 (11th Cir. 2007). The action must be "reasonably likely to prevent the misconduct from recurring." See, e.g., Kilgore v. Thompson & Brock Mgt., Inc., 93 F.3d 752, 754 (11th Cir. 1996). The employer's action must be "effective action in order to exempt an employer from liability[]" Saville v. Houston Cty. Healthcare Auth., 852 F. Supp. 1512, 1528 (M.D. Ala. 1994), and "must be 'reasonably calculated to end the harassment,' and the promptness and adequacy of the employer's response must be evaluated on a case-by-case basis. Of special importance is whether the…harassment ended after the remedial action was taken[]" Munn v. Mayor and Aldermen of City of Savannah, Ga., 906 F. Supp. 1577, 1583 (S.D. Ga. 1995).

Even though it bears the burden of proof, Austal's motion minimally addresses the fifth element of employer liability and the related Faragher/Ellerth affirmative defense. Austal submitted evidence (some of which appears irrelevant) that it characterizes as examples of "responses" taken, *in general*, to racial/harassment incidents during its history. (Doc. 181 at 14-15). Regardless, factual issues exist for element five, including whether Austal's response to complaints was adequate. The Court finds that Laffiette has submitted sufficient evidence to establish that genuine issues of material fact exist questioning Austal's ability to shield itself with Faragher/Ellerth. Accordingly, Austal's motion as to Laffiette's hostile work environment

claim is **DENIED**.

IV. <u>Conclusion</u>

Accordingly, it is **ORDERED** that Austal's motion for summary judgment is **DENIED** as to Laffiette's hostile work environment claim.[9]

**DONE** and **ORDERED** this the **3rd** day of **September 2014.**

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**

---

[9] Laffiette seeks an award of punitive damages against Austal. It is **ORDERED** that Austal's motion for summary judgment regarding Laffiette's punitive damages claim is **DENIED** at this time.